Aaron M. Kaufman (Texas Bar No. 24060067)
Amber M. Carson (Texas Bar No. 24075610)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone:   (214) 954-4135
Facsimile:   (214) 953-1332
Email:   akaufman@grayreed.com
         acarson@grayreed.com

Keith J. Larson (admitted *pro hac vice*)
**MORGAN POTTINGER MCGARVEY**
401 South Forth Street, Suite 1200
Louisville, KY 40202
Telephone:   (502) 560-6758
Facsimile:   (502) 585-3498
Email:    kjl@mpmfirm.com

*Counsel to Community Financial Services Bank*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| In re: | Chapter 7 |
| MCCLAIN FEED YARD, INC., *et al.*,[1] | Case No. 23-20084-SWE |
| Debtors. | (Jointly Administered) |
| KENT REIS, *Chapter 7 Trustee for the Bankruptcy Estates of McClain Feed Yard, Inc., McClain Farms, Inc., and 7M Cattle Feeders, Inc.,* | |
| Plaintiff, | Adv. Proc. No. 25-02005-SWE |
| v. | |
| COMMUNITY FINANCIAL SERVICES BANK, *et al.*, | |
| Defendants. | |

## COMMUNITY FINANCIAL SERVICES BANK'S BRIEF IN SUPPORT
## OF ITS MOTION TO DISMISS PLAINTIFF'S ORIGINAL COMPLAINT
## UNDER RULE 7012 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

---

[1] The Debtors in these jointly administered chapter 7 cases, along with their case numbers, are: McClain Feed Yards, Inc. (Case No. 23-20084-SWE); McClain Farms, Inc. (Case No. 23-20085-SWE); and 7M Cattle Feeders, Inc. (Case No. 23-20086-SWE).

## <u>TABLE OF CONTENTS</u>

I.     Preliminary Statement ................................................................................ 1

II.    Jurisdiction and Venue ............................................................................. 2

III.   Background ............................................................................................... 2

     A.   The Complaint ................................................................................. 2

     B.   The Parties ....................................................................................... 3

     C.   The Legitimate Businesses ............................................................. 4

     D.   The Alleged Ponzi Scheme ............................................................ 4

     E.   The Alleged Check Kiting Scheme ............................................... 10

     F.   CFSB's Alleged Involvement in the Schemes ............................. 12

IV.   Argument and Authorities ....................................................................... 17

     A.   Rule 12(b)(6) Standard ................................................................. 17

     B.   Counts I–V Should Be Dismissed with Prejudice Under Kentucky Law ............. 18

         i)    Choice of Law – Kentucky Law Governs ................................. 18

         ii)   All Texas Law Claims Should be Dismissed with Prejudice. .................. 22

         iii)  The UCC Preempts the Common Law Claims Asserted in Counts I–V. . 23

              (1)   Count I: Kentucky Law Does Not Recognize a Claim for Knowing Participation in a Breach of Fiduciary Duty. ............................... 25

              (2)   Count II:  Kentucky Law Does Not Recognize a Claim for Breach of Fiduciary Duty Against a Bank Under the Facts Alleged in the Complaint ................................................................... 26

              (3)   Count III:  Without A Cognizable Claim for Breach of Fiduciary Duty, the Civil Conspiracy Claim Also Fails as a Matter of Law. 27

              (4)   Count IV:  The Complaint Fails to Plead a Claim for Negligence against CFSB Under Applicable Kentucky law ........................... 28

              (5)   Count V:  The Negligence Claim is Barred by the Kentucky Statute of Limitations ................................................................. 29

     C.   The Doctrine of *In Pari Delicto* Under Texas and Kentucky Law Requires Dismissal. ................................................................... 30

D.    The Trustee Has Failed to Plead Sufficient Facts to Proceed on His Common Law Claims (Counts I–V) Under Texas Law. ............................................................. 36

      i)      Count I – Knowing Participation in Breaches of Fiduciary Duties .......... 37

      ii)     Count II – Breach of CFSB's Fiduciary Duties to the Debtors ............... 38

      iii)    Count III – Common Law Conspiracy by CFSB ...................................... 40

      iv)     Count IV – CFSB's Alleged Professional Negligence ............................ 42

      v)      Count V – Punitive Damages ................................................................... 43

      vi)     Count XV:   The Fraudulent Transfers Are Not Well-Pled and Must Be Dismissed. .............................................................................................. 44

E.    The Trustee Has Failed to Allege a Transfer of the Debtors' Property or an Obligation Incurred by the Debtors. ....................................................................... 45

F.    The Trustee Has Failed to Allege Any Badges of Fraud or That Any Transfer Was Made or an Obligation Was Incurred for Less Than Reasonably Equivalent Value in Exchange. ........................................................................................................ 46

G.    Nearly Half of the Alleged Fraudulent Transfers/Obligations are Not Recoverable Because They Fall Outside the Two- or Four-Year Time Period. ........................ 48

H.    CFSB is Entitled to the Good Faith Defense. ....................................................... 48

I.    The Trustee Cannot Recover Attorney's Fees as Part of His Fraudulent Transfer Claim ...................................................................................................................... 50

J.    The Court Should Deny Leave to Amend ............................................................. 51

4915-0559-1351

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Able Body Temp. Servs., Inc.*,
626 B.R. 643 (Bankr. M.D. Fla. 2020) ............................................................15, 47

*In re Appalachian Fuels, LLC*,
No. 09–10343, 2012 WL 4059973 (Bankr. E.D. Ky. Sep. 14, 2012).....................32

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................2, 12, 17, 25

*Baker v. Match Grp., Inc.*,
2024 WL 4626079, 2024 U.S. Dist. LEXIS 196990 (N.D. Tex. Oct. 30, 2024)....................22

*Balistreri v. Pacifica Police Dep't*,
901 F.2d 696 (9th Cir. 1988) .............................................................................22

*Bank of Am., N.A. v. Corporex Realty & Inv., LLC*,
875 F. Supp. 2d 689 (E.D. Ky. 2012) .................................................................26

*Bank One, Tex., N.A. v. Stewart*,
967 S.W.2d 419 (Tex.App.—Houston [14th Dist.] 1998, pet. denied) ..................38

*Bass v. Stryker Corp.*,
669 F.3d 501 (5th Cir. 2012) .............................................................................36

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985)........................................31

*Baylor Scott & White v. Project MSO, LLC*,
633 S.W.3d 263 (Tex. App.—Tyler 2021, pet. denied)........................................37

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................17, 25, 36

*Brown v. Phillips (In re Phillips)*,
379 B.R. 765 (Bankr. N.D. Ill. 2007) .................................................................50

*Bullock v. Almon*,
No. 4:21-CV-57-JHM, 2021 U.S. Dist. LEXIS 147797 (W.D. Ky. Aug. 5,
2021) ...............................................................................................................49

*Bustamante v. Johnson (In re McConnell)*,
934 F.2d 662 (5th Cir. 1991) .............................................................................46

*Clancy Sys. Int'l, Inc. v. Salazar*,
177 P.3d 1235 (Colo. 2008)...............................................................................29

*Davenport's Adm'x v. Crummies Creek Coal Co.*,
184 S.W.2d 887 (1945) .................................................................................................27, 28

*Dean v. Commonwealth Bank & Tr. Co.*,
434 S.W.3d 489 (Ky. 2014) ..................................................................................... *passim*

*Deutsche Bank Trust Co. Americas v. U.S. Energy Dev. Corp. (In re First River
Energy, LLC)*,
896 F.3d 914 (5th Cir. 2021) ....................................................................................20

*In re Dublin Securities, Inc.*,
133 F.3d 377 (6th Cir. 1997) ...............................................................................30, 32

*In re Elcoteq, Inc.*,
521 B.R. 189 (Bankr. N.D. Tex. 2014) ......................................................36, 41, 45, 46

*Elephant Ins. Co. v. Kenyon*,
644 S.W.3d 137 (Tex. 2022) ......................................................................................42

*Ellington v. Fed. Home Loan Mortg. Corp.*,
13 F. Supp. 3d 723 (W.D. Ky. 2014) ..........................................................................27

*In re Enron Corp. Sec.*,
623 F. Supp. 2d 798 (S.D. Tex. 2009) ........................................................................19

*EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*,
467 F.3d 466 (2006) ...................................................................................................33

*In re Fair Finance Company*,
834 F.3d 651 (6th Cir. 2016) .....................................................................................31

*Farah v. Mafrige & Kormanik, P .C.*,
927 S.W.2d 663 (Tex.App.-Houston [1st Dist.] 1996, no writ) ......................................38, 39

*Faris v. Stone*,
103 S.W.3d 1 (Ky. 2003) ............................................................................................30

*Faulkner v. Ford Motor Credit Co. LLC (In re Reagor-Dykers Motors, LP)*,
2022 WL2046144 (Bankr. N.D. Tex. June 3, 2022) .......................................................9

*First Nat'l Bank v. Elsa State Bank & Tr. Co.*,
2007 WL 9747503 (S.D. Tex. Mar. 29, 2007) ............................................................11

*Flint v. Coach House, Inc.*,
No. 2012-CA-000580-MR, 2013 Ky. App. Unpub. LEXIS 211 (Ct. App. Mar.
8, 2013) ....................................................................................................................28

*Floyd v. CIBC World Markets Inc.*,
426 B.R. 622 (S.D. Tex. Aug. 25, 2009) .....................................................................33

*Gooch v. City of Stanford*,
  No. 2012-CA-001464-MR, 2013 Ky. App. Unpub. LEXIS 752 (Ct. App. Sep.
  13, 2013) ....................................................................................................25

*Grassmueck v. Am. Shorthorn Ass'n*,
  402 F.3d 833 (8th Cir. 2005) ....................................................................30, 31

*Greater S.W. Office Park, Ltd. v. Tex. Commerce Nat'l Bank*,
  786 S.W.2d 386 (Tex.App.—Houston [1st Dist.] 1990, writ denied) ....................................39

*Gutierrez v. Collins*,
  583 S.W.2d 312 (Tex. 1979)....................................................................20

*Hahn v. Love*,
  321 S.W.3d 517 (Tex. App.-Houston [1st Dist.] 2009, pet. denied) ....................................49

*Henkin, Inc. v. Berea Bank & Tr. Co.*,
  566 S.W.2d 420 (Ky. Ct. App. 1978) ....................................................................27

*In re J. Silver Clothing*,
  453 B.R. 518 (Bankr.D.Del.2011) ....................................................................13

*Janvey v. Golf Channel, Inc.*,
  487 S.W.3d 560 (Tex. 2016)....................................................................49

*Jelec USA, Inc. v. Safety Controls, Inc.*,
  498 F. Supp. 2d 945 (S.D. Tex. 2007) ....................................................................20

*Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*,
  310 F.3d 796 (5th Cir. 2002) ....................................................................49

*Johnson v. Bank of America, N.A.*,
  2014 WL 5490935 (Tex. App.—Beaumont October 30, 2014, no pet.) ....................................40

*Jones v. Thompson*,
  338 S.W.3d 573 (Tex. App.—El Paso 2010, pet. denied) ....................................................38

*Juhl v. Airington*,
  936 S.W.2d 640 (Tex. 1990)....................................................................19

*Kelly v. BMO Harris Bank Nat'l Ass'n*,
  115 F.4th 901 (8th Cir. 2024) ....................................................................30, 31

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*,
  160 S.W.2d 509 (Tex. 1942)....................................................................19

*Lewis v. Davis*,
  145 Tex. 468, 199 S.W.2d 146 (1947)....................................................................32, 33, 34

*Life Partners Creditors' Tr. v. Cowley (In re Life Partners Holding, Inc.),*
   926 F.3d 103 (5th Cir. 2019) ................................................................................46

*LMP Austin English Aire, LLC v. Lafayette Eng. Apartments, LP,*
   654 S.W.3d 265 (Tex. App. 2022) .........................................................................37

*Massey v. Armco Steel Co.,*
   652 S.W.2d 932 (Tex. 1983) .................................................................................40

*MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.),*
   675 F.3d 530 (5th Cir. 2012) ...........................................................................20, 21

*McGinnis v. Univ. of Ky.,*
   No. 2022-CA-1494-MR, 2023 Ky. App. Unpub. LEXIS 567 (Ct. App. Sep.
   29, 2023) ..............................................................................................................26

*In re Mongelluzzi,*
   591 B.R. 480 (Bankr. M.D. Fla. 2018) ...........................................................11, 43

*In re National Century Financial Enterprises, Inc.,*
   783 F.Supp.2d 1003 (S.D. Oh. 2011) ...................................................................35

*Neblett v. Brothers,*
   325 F.Supp.3d 797 (E.D. Ky. 2018) ......................................................................32

*Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers &*
   *Lybrand, LLP,*
   322 F.3d 147 (2d Cir. 2003) ..................................................................................35

*Osherow v. Charles (In re Wolf),*
   No. 15-31477-HCM, 2016 WL 4940198 (Bankr. W.D. Tex. Sept. 15, 2016),
   *subsequently aff'd,* 697 F. App'x 317 (5th Cir. 2017) ...........................................49

*In re Parmalat Securities Litig.,*
   659 F.Supp.2d 504 (S.D.N.Y. 2009), *aff'd in part, vacated in part on other*
   *grounds,* 412 F. App'x 325 (2d Cir. 2011) ...........................................................35

*Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC,*
   277 S.W.3d 255 (Ky. Ct. App. 2008) ....................................................................28

*Pinter v. Dahl,*
   486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)..................................31, 34

*Reagor-Dykes Motors, LP v. Firstcapital Bank of Texas, N.A.,*
   2020 WL 4939180 (Bankr. N.D. Tex. Aug. 24, 2020)..............................32, 33, 34

*Reed v. Pinnacle Props., LLC,*
   Civil Action No. 5: 25-020-KKC, 2025 U.S. Dist. LEXIS 17410 (E.D. Ky.
   Jan. 31, 2025)........................................................................................................25

4915-0559-1351

*Ritchie Cap. Mgmt., L.L.C. v. BMO Harris Bank, N.A.*,
    No. 14-cv-1936, 2015 WL 1433320 (S.D.N.Y. Mar. 30, 2015)..............................................13

*Robbins v. Payne*,
    55 S.W.3d 740 (Tex. App.—Amarillo 2001, pet. denied).......................................................43

*Rogers v. McDorman*,
    521 F.3d 381 (5th Cir. 2008) .........................................................................................30, 33

*Safeshred, Inc. v. Martinez*,
    365 S.W.3d 655 (Tex. 2012)....................................................................................................19

*Sallee v. Fort Knox Nat'l Bank, N.A.*,
    286 F.3D 878 (6th Cir. 2002) .............................................................................................26, 27

*Sandoz v. F.D.I.C.*,
    993 F.2d 67 (5th Cir. 1993) .....................................................................................................31

*In re Segerstrom*,
    247 F.3d 218 (5th Cir. 2001) ...................................................................................................31

*Snow Pallet, Inc. v. Monticello Banking Co.*,
    367 S.W.3d 1 (Ky. Ct. App. 2012) .........................................................................................27

*Steelvest, Inc. v. Scansteel Serv. Ctr.*,
    807 S.W.2d 476 (Ky. 1991)................................................................................................26, 27

*Stonestreet Farm, LLC v. Buckram Oak Holdings, NV*,
    Nos. 2008-CA-002389-MR, 2009-CA-000026-MR, 2010 Ky. App. Unpub.
    LEXIS 555 (Ct. App. July 9, 2010) .........................................................................................27

*Sulzer Carbomedics v. Or. Cardio-Devices, Inc.*,
    257 F.3d 449 (5th Cir. 2001) ...................................................................................................44

*Sunshine Kids Found. v. Sunshine Kids Juvenile Prod., Inc.*,
    2009 WL 5170215 (S.D. Tex. Dec. 18, 2009).........................................................................44

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..................................................................................................................17

*Templeton v. O'Cheskey (In re Am. Hous. Found.)*,
    785 F.3d 143 (5th Cir. 2015) ...................................................................................................49

*Test Masters Educ. Servs., Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005) ...................................................................................................51

*In re Today's Destiny, Inc.*,
    388 B.R. 737 (Bankr. S.D. Tex. 2008) ....................................................................................33

*Torch Liquidating Tr. v. Stockstill,*
    561 F.3d 377 (5th Cir. 2009) ............................................................17

*Travelers Indem. Co. v. Fuller,*
    892 S.W.2d 848 (Tex. 1995)....................................................43, 44

*Tri v. J.T.T.,*
    162 S.W. 3d 552 (Tex. 2005)............................................................19

*Tuchman v. DSC Commc'ns Corp.,*
    14 F.3d 1061 (5th Cir. 1994) ...........................................................46

*U.S. v. Frydenlund,*
    990 F.2d 822 (5th Cir. 1993) ...........................................................11

*United States v. Asher,*
    59 F.3d 622 (7th Cir. 1995) ......................................................11, 43

*United States v. Rackley,*
    986 F.2d 1357 (10th Cir. 1993) ................................................11, 43

*Vines v. City of Dallas,*
    851 F.Supp. 254 (N.D. Tex. 1994) ..................................................22

*Walch v. Adjutant Gen.*
    *'s Dep't of Tex.,* 533 F.3d 289, 293 (5th Cir. 2008) ......................17

*Walker v. Vanwinkle,*
    562 B.R. 671 (Bankr. E.D. Ky. 2016) .............................................25

*Wil-Roye Inv. Co. II v. Wash. Mut. Bank, F.A.,*
    142 S.W.3d 393 (Tex. App. 2004)...................................................19

*Wolfe v. Kimmel,*
    681 S.W.3d 7 (Ky. 2023)..................................................................30

**Statutes**

7 U.S.C. § 217b...........................................................................................10

11 U.S.C. § 541(a) ......................................................................................31

11 U.S.C. § 541(a)(1)..................................................................................31

11 U.S.C. § 548(1)(B)(i) .............................................................................47

11 U.S.C. §548(a)(1)...................................................................................45

11 U.S.C. § 548(a)(1)(A) ............................................................................44

4915-0559-1351

11 U.S.C. § 548(a)(1)(B) ........................................................................................44

11 U.S.C. § 548(c) .................................................................................................48

11 U.S.C. § 550 .........................................................................................44, 45, 50

11 U.S.C. § 550(a) ............................................................................................45, 50

11 U.S.C. § 1408 ......................................................................................................2

11 U.S.C. § 1409 ......................................................................................................2

28 U.S.C. § 157(b)(2) ..............................................................................................2

28 U.S.C. § 1334 .....................................................................................................2

Ky. Rev. Stat. § 355.4-102(2) ...............................................................................18

Ky. Rev. Stat. § 355.4-302 .............................................................................15, 47

Ky. Rev. Stat. § 355.4-401(1) ........................................................................13, 15

Ky. Rev. Stat. § 355.4-402 .......................................................................13, 15, 29

Ky. Rev. Stat. § 378A.040(1)(a) ...........................................................................45

Ky. Rev. Stat. § 378A.050 .............................................................................45, 47

Ky. Rev. Stat. § 378A.080 .....................................................................................49

Ky. Rev. Stat. § 378A.080(1) ................................................................................49

Ky. Rev. Stat. § 378A.090 .....................................................................................48

Ky. Rev. Stat. § 413.245 ........................................................................................30

Restatement (Second) of Conflict of Laws § 145 (Am. Law Inst. 1971) ...................20

Tex. Bus. & Com. Code § 4.102(b) .........................................................18, 42, 43

Tex. Bus. & Com. Code § 4.302 .....................................................................15, 47

Tex. Bus. & Com. Code § 24.005 ..........................................................................44

Tex. Bus. & Com. Code § 24.005(a) .....................................................................45

Tex. Bus. & Com. Code § 24.005(a)(2) .................................................................47

Tex. Bus. & Com. Code § 24.006 ..........................................................................44

Tex. Bus. & Com. Code § 24.006(a) .....................................................................45

4915-0559-1351

Tex. Bus. & Com. Code § 24.009(a) ......................................................................48, 49

Tex. Bus. & Com. Code § 24.010 ................................................................................48

Tex. Bus. & Com. Code § 24.013 ................................................................................50

Tex. Civ. Prac. & Rem. Code § 41.002(a)....................................................................44

UCC § 4-102(b) ...............................................................18, 23, 24, 25, 29, 39

**Other Authorities**

Fed. R. Bankr. P. 7008...................................................................................................3

Fed. R. Bankr. P. 7012.................................................................................................36

Fed. R. Bankr. P. 7012(b) .............................................................................................1

Fed. R. Civ. P. 8(a)(2)...................................................................................................17

Fed. R. Civ. P. 9(b) ................................................................................................46, 47

Fed. R. Civ. P. 12(b)(6)................................................................................1, 17, 33, 34

Community Financial Services Bank (the "<u>Movant</u>" or "<u>CFSB</u>") files this brief
(this "<u>Brief</u>") in support of its motion (the "<u>Motion</u>") to dismiss *Trustee's Original Adversary
Complaint* [Adv. Pro. Docket No. 1] (the "<u>Complaint</u>") filed by Kent Reis, chapter 7 trustee in the
underlying chapter 7 bankruptcy cases (the "<u>Plaintiff</u>" or "<u>Trustee</u>"), pursuant to rule 12(b)(6) of
the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by rule 7012(b)
of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and respectfully states as
follows:

## I.      <u>Preliminary Statement</u>

1.      The Complaint alleges that the Debtors maintained bank accounts with CFSB, as
one of their two depositary banks. *Compl.* ¶ 74. CFSB is a local community bank with its principal
branches in Benton, Kentucky, where the Debtors maintained the core of their "legitimate"
operations. *Compl.* ¶¶ 9, 14. This Complaint is the latest of several pre- and postpetition adversary
proceedings filed by the Trustee and other investors in connection with the Debtors' actions.

2.      Notably, however, this Complaint represents the *<u>first</u>* time any party has brought
legal action against CFSB for wrongdoing in connection with McClain and the Debtors.

3.      In the two years after the commencement of these chapter 7 cases, but before the
filing of this Complaint, CFSB actively cooperated with the Trustee and various investor third
parties by responding to formal and informal discovery requests. CFSB has worked in good faith
with the Trustee and other investors to help them understand the Debtors' banking activities with
and through CFSB.

4.      Despite these efforts, the Trustee has elected a "ready, fire, aim" approach through
the Complaint. Lacking any legal or factual predicates to do so, the Trustee has lumped CFSB in
with the Debtors' lender and other banking institutions, leading to the proverbial "square peg in a
round hole" throughout the Complaint—the claims against CFSB simply do not fit the facts or law.

5.      As discussed in this Brief, the allegations and claims asserted against CFSB suffer

materially critical flaws, both legally and factually.  Legally, the Trustee's claims are barred and

preempted under applicable Kentucky law.  Further, the Trustee stands in the Debtors' shoes and,

thus, is barred under the *in pari delicto* doctrine, as recognized in both Kentucky and Texas.

Factually, even if this Court applies Texas law, the Complaint offers little more than anecdote and

"unadorned, the-defendant-unlawfully-harmed-me accusations."  *See Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).  Nowhere in the Complaint does the Trustee allege specific facts against CFSB

on the claims asserted.  And where the Trustee does allege facts against CFSB, those facts are

immediately contradicted by the Trustee's own narrative—*e.g.,* that CFSB, a victim of the Debtors'

"check kiting" scheme actively engaged in fraudulent check kiting against itself.

6.      Accordingly, for the reasons detailed herein, the claims asserted against CFSB

(Counts I–V and XV) should be dismissed as a matter of law.

## II.      Jurisdiction and Venue

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This

matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

8.      Venue is proper pursuant to 11 U.S.C. §§ 1408 and 1409.

9.      CFSB consents to entry of final orders or judgment by the bankruptcy court.

## III.      Background

### A.      The Complaint

10.     On March 14, 2025, Trustee filed the Complaint, asserting fifteen (15) total counts.

This Motion relates to the following counts, which have been asserted against CFSB:

     a.      Count I:  Knowing participation in a breach of fiduciary duty;

     b.      Count II:  Breach of fiduciary duty;

     c.      Count III:  Common law conspiracy;

  d.  Count IV:  Professional Negligence;

  e.  Count V:  Punitive Damages;[1] and

  f.  Count XV:  Actual Fraudulent Transfers.

11. As discussed in this Brief, the Complaint fails to state a valid claim for relief under any of the above counts.  Thus, CFSB moves to dismiss all counts asserted against it.

12. For purposes of this Background section and this Brief, CFSB recites the Trustee's allegations, as set forth in the Complaint, without admitting or denying such statements.  In the event that the Motion is denied, in full or in part, CFSB reserves the right to admit or deny such allegations in its formal answer filed pursuant to Rule 7008 of the Bankruptcy Rules.

**B.** **The Parties**

13. The debtors in these related cases are McClain Feed Yard, Inc. ("Feed Yard"), McClain Farms, Inc. ("Farms"), and 7M Cattle Feeders, Inc. ("Feeders" and, together with Feed Yard and Farms, the "Debtors").  *Compl.* at 1, n.1.   The Debtors each filed a voluntary petition under chapter 7 of the Bankruptcy Code on April 28, 2023 (the "Petition Date").  *Compl.* ¶ 7.

14. At all relevant times prior to the Petition Date, the Debtors were managed by Brian McClain, an individual who was "well-known throughout the cattle and rodeo industries." *Compl.* ¶ 14.

15. Plaintiff Kent Reis is the chapter 7 trustee appointed in each of the Debtors' chapter 7 cases.  *Compl.* ¶ 8.

16. Defendant CFSB is a banking corporation chartered under the laws of the Commonwealth of Kentucky, with its principal office located in Benton, Kentucky.  *Compl.* ¶ 9.

---

[1] As discussed further herein, the Trustee does not allege an actual cause of action through Count V.  Instead, Count V seeks a legal remedy of punitive damages.

4915-0559-1351

17.    The co-defendants in this adversary proceeding are Rabo AgriFinance, LLC ("Rabo"), HTLF Bank ("HTLF"), and Mechanics Bank ("Mechanics").  *Compl.* ¶ 4.  All four defendants in this action are banking institutions.

## C.    The Legitimate Businesses

18.    Before the Petition Date, the Debtors were engaged in a "legitimate" cattle acquisition and aggregation business.  *Compl.* ¶ 15.  Specifically, according to the Trustee's Complaint, the Debtors acquired and aggregated cattle from sources throughout Kentucky, Texas, Oklahoma, and other parts in the Southeast to fulfill purchase orders from two primary purchasers—Cactus Feeders and Riley Livestock.  *Id.*  "[D]uring certain periods the Debtors operated as essentially a subcontractor for Riley Livestock, Inc. in acquiring cattle for its fulfillment of large purchase orders for Fiona Industries, Inc., and at other times the Debtors acquired cattle independently from various small sources in order to fulfill large purchase orders to Riley Livestock, Inc."  *Id.*  In summary, this aspect of the Debtors' prepetition business included obtaining, transporting, holding, and delivering cattle to buyers within one to three months of acquisition.  *Compl.* ¶ 16.

19.    In addition to the Debtors' acquisition and aggregation business, the Debtors also operated a second "legitimate" feedyard service business, albeit "in a much smaller capacity."  *Compl.* ¶ 17.  According to the Trustee's Complaint, the feedyard service business comprised the Debtors' taking possession of third-party cattle to feed and grow on behalf of the third party.  *Id.*

## D.    The Alleged Ponzi Scheme

20.    According to the Trustee, the Debtors' legitimate lines of business allowed them to maintain "a meaningful amount of cattle on hand" at any given time, which McClain used "to attract investors for a massive Ponzi scheme that McClain operated through Debtors."  *Compl.* ¶ 18.

21.    The Complaint does not specify when the Debtors operated their legitimate businesses, nor does the Trustee allege that they ever ceased.  *See Compl.* ¶ 18.  According to the Complaint, the Debtors started procuring "passive investments from hundreds of parties" in 2018.  *Compl.* ¶ 19.  The Trustee alleges that the Debtors entered into "partnership agreements" with private individuals and entities "that for one reason or another came to know McClain and decided to invest money with him to profit in the cattle industry."  *Id.*

22.    The Trustee alleges that the investor arrangements were all based upon various forms of a written "partnership" agreement.  *Compl.* ¶ 21.  The Complaint provides only one example of such arrangement.  According to this single example, an alleged investor entered into an agreement titled "Cattle Feeding agreement" with some combination of McClain, Feedyard, and Feeders.  *Id.*  The terms of the agreement provide as follows:

This agreement exists to identify the partnership of Brian McClain/McClain Feedyard/7M feeders [sic], 2548 CR 15 Friona Tx. 79035, and Thorlakson Diamond T feeders [sic] **who are involved in cattle feeding arrangement**. The arrangement allows for Thorlakson Diamond T Feeder LP to purchase the *calves* from Brian McClain/Mclain [sic] Feedyard/7M feeders [sic].  **At the time of purchase the cattle have also been contracted for sale at a pre-determined price**.  Brian McClain will grow the cattle to the desired weight and will cover the costs incurred to do so.  These costs will include the feed and supplements provided by McClain Feedyard or 7M feeders [sic], as well as all processing, medicine, trucking, and yardage expenses related to the cattle. Once the cattle have reached the desired weight, the profit will be determined as such:

*Sale price of the feeder cattle*

*Minus*

*Cost stated above that McClain incurs.*

*Minus*

*Original cost of the calves returned to Thorlakson Diamond T Feeders LP*

*Equals profit.*

*Profit divided 1/3 McClain and 2/3 Thorlakson Diamond T Feeders LP*

4915-0559-1351

*Compl.* ¶ 21 (bolded and underlined emphasis added, italics in original).

23.     The sample provided above is far from a model of clarity, and the Trustee does little to clarify it.  For example, the Complaint does not specify when or how much money, if any, customers (like Thorlakson in the above example) actually paid to or "invested" in the Debtors under these arrangements.  Moreover, it is not clear from the example above whether the Debtors actually held title to the cattle discussed in the agreement at the time of the agreement, or if the agreement merely contemplated that the Debtors may acquire some "calves" in the future to be fed and grown into "cattle" and then sold to the counterparty in the future.  As discussed above, the Complaint alleges that the Debtors previously conducted two legitimate lines of business—*i.e.*, acquisition/aggregation and feed services.  The example provided above arguably falls under both legitimate businesses and, regardless, is far from evidencing a "massive Ponzi scheme," without more.

24.     Perhaps recognizing this logistical gap, the Trustee alleges (without support) that some investors entered into "verbal terms similar to the above written agreement."  *Compl.* ¶ 22.  According to the Trustee:

> Those investors sent the Debtors money for cattle already purportedly owned by, and in the possession of, the Debtors under an arrangement whereby the Debtors would retain the cattle, grow them, and split the profit with the investor.  In many cases, McClain suggested to the investor they had a futures contract for the sale of cattle at a certain price per pound, when, in reality, McClain did not have such [a] guaranteed future price.

*Compl.* ¶ 22.  But, here again, the Trustee offers only anecdotal allegations of verbal agreements, without specifics.  Nowhere in the Complaint does the Trustee provide even a single specific example of any verbal agreement with an actual customer or investor, with the specific terms of such an anecdotal arrangement.  In short, the Trustee's entire Complaint relies on anecdotal data points, all of which fall short of evidencing a Ponzi or check kiting scheme.

6

25.     Adding to the lack of clarity is the Trustee's additional vague allegation that McClain offered "side-benefit[s]" to investors by using investors' cattle at rodeo events. *Compl.* ¶ 23.  According to the Complaint, "this ability to use cattle provided by McClain at rodeo was an attractive benefit to certain investors in investing in McClain's cattle operation." *Id.*  The Complaint does not elaborate further, nor does it provide specific examples of the benefits an investor received from having its cattle used at rodeos or why this would make the Debtors an attractive investment.

26.     The Trustee then alleges that the Debtors' arrangements with alleged "investors" could not have been purchase contracts, because "the parties clearly invested money with McClain, through Debtors, in a common enterprise that expected profits to be derived solely from Debtors' efforts." *Compl.* ¶ 24.  The Trustee adds that "the investors did not obtain sufficient information about, or take possession of, their specific cattle to arguably establish transfer of title and ownership." *Compl.* ¶ 25.  But, like the Trustee's non-specific allegations about verbal investor or partnership agreements referenced above, the Trustee's general and anecdotal allegations about the characterization of these agreements lacks specificity.  Nowhere in the Complaint does the Trustee list any investors, what they paid to the Debtors, or what they received from the Debtors. Considering the large scale of the fraud alleged in the Complaint, and further considering the Trustee's claims of "knowing participation" and "civil conspiracy" against CFSB, CFSB should

be afforded a full and fair opportunity to consider and respond to these specific allegations, including precisely how CFSB participated in, or conspired with, this alleged misconduct.[2]

27.      The Complaint then alleges that investors, in several instances, "had possession of blank checks from the Debtors that the investor filled in on their own to more quickly facilitate the flow of funds from McClain and the Debtors." *Compl.* ¶ 26.  But this allegation establishes the exact opposite of what the Trustee tried to allege in the preceding paragraphs.  According to the Complaint, the investors allegedly transferred unspecified amounts of money to the Debtors. *Compl.* ¶¶ 21–25.  The Trustee alleges that the same then-investors used blank checks drawn on the Debtors' accounts to "more quickly facilitate the flow of funds." *Compl.* ¶ 26.  Even if these allegations are accepted as true, the Complaint still fails to explain how and why the investors came to be in possession of blank checks to draw on the Debtors' accounts, and how that would fit into the alleged "massive Ponzi scheme" that the Trustee attempts to allege.

28.      According to the Complaint, "investor[s] expected an annualized profit of approximately 30% on each transaction based on specific stated growth rates and future sale weight and price per pound." *Compl.* ¶ 27.  The Trustee adds that "the Debtors consistently provided each investor with a return on their investments." *Id.*  But these statements, if accepted as true, still fall short of alleging that the Debtors or McClain made specific representations to investors regarding

---

[2] The Complaint speciously lumps the Debtors together as a single entity without alleging facts to support this factual error.  CFSB has responded to pre-litigation discovery and provided the Trustee with, among other things, a detailed list of the Debtor bank accounts maintained with CFSB.  So, the Trustee is well aware that Debtor Feeders, for example, never maintained any bank accounts or relationships with CFSB.  This is one of many fatal flaws in the Complaint, especially with respect to the allegations against CFSB, given the Trustee's knowledge of the absence of a banking relationship between CFSB and one of the three Debtors (Feeders).  Yet, the Complaint does not allege with specificity which Debtors banked with CFSB, *see Compl.* ¶ 74, nor does it allege what role each of the three Debtor played in the alleged Ponzi scheme and how that implicates CFSB.  This dearth of allegations further underscores how the Complaint does not provide CFSB with a full and fair opportunity to consider and respond to allegations concerning which of the three Debtors participated in the fraud, which of the three Debtors allegedly conspired with CFSB, which of the three Debtors were harmed by CFSB, and which of the three Debtors were owed a duty by CFSB. For example, without this level of specificity in the Complaint, CFSB cannot be expected to defend allegations that CFSB breached duties of care owed to entities with which CFSB never had a relationship.

their annualized returns—*i.e.*, no *pro forma* or prospectus, no marketing materials, no e-mails or text messages, not even verbal promises by McClain or the Debtors. Without alleging such representations or misstatements, the Trustee utterly fails to articulate a factual basis that would give rise to a legal claim of misrepresentation or fraud, much less a "massive Ponzi scheme." The Complaint is wholly devoid of allegations of any specific representations made to customers regarding their investments. In sum, the Complaint falls well short of alleging a factual basis for this Court to find the existence of a "massive Ponzi scheme." And, without a Ponzi presumption, the Trustee's entire case collapses, because the Trustee has failed to allege specific badges of fraud.[3]

29.     The Complaint goes on to broadly allege that any investor profits were fictitious. *Compl.* ¶ 29. As a basis for this statement, the Trustee alleges that "[t]he volume of funds in and out of the Debtors' bank accounts for investors exceeded the volume of funds of cattle actually acquired and sold by the Debtors by a 10x multiple." *Compl.* ¶ 31. But having acknowledged that the Debtors were operating two legitimate lines of business during this time, the Trustee fails to allege how the Debtors' revenues changed when it began this alleged Ponzi scheme in 2018. *See Compl.* ¶ 19.

30.     According to the Trustee, over 100 claimants filed claims with the United States Department of Agriculture ("USDA") under the Dealer Trust Statute, but of the $122.3 million in claims asserted, the USDA determined that only $2.9 million were "qualified" USDA claims, while

---

[3] In *Reagor-Dykes*, Judge Jones discussed the evolution of the "Ponzi-Scheme Presumption" as well as the Fifth Circuit's reluctance to extend the presumption to cases involving general fraud or mismanagement, such as the case in this Complaint. *Faulkner v. Ford Motor Credit Co. LLC (In re Reagor-Dykers Motors, LP)*, 2022 WL2046144 at *4–8 (Bankr. N.D. Tex. June 3, 2022) (collecting cases).

4915-0559-1351

the other $119.3 million were not "qualified." *Compl.* ¶¶ 35, 36.[4]  The Trustee speculates with

bare conclusory allegations that any claim that is not qualified under the USDA Dealer Trust Act

must be an investor claim arising from fraud. *Id.*

**E.      The Alleged Check Kiting Scheme**

31.      The Trustee contends that all investor receipts came into one of three bank accounts,

but that all investor repayments came from a different account. *Compl.* ¶ 32.  The Trustee does

not specify whether the Debtors' legitimate operating revenues came into the same or different

accounts.    The Trustee further alleges that "the Debtors' bank statements are replete with

intercompany transfers." *Id.*  Without explanation, the Trustee concludes that these intercompany

transfers amount to a "check kiting scheme."

32.      The Trustee defines check kiting as follows:

> In a kiting scheme, multiple bank accounts are opened, often at different
> bank institutions.  Money is transferred between accounts by the writing of
> a check out of one account for deposit into another.  The period between
> when credit is given to an account holder by the depositing bank versus
> when a payment clears from the disbursing bank is referred to as the "float"
> period.  This float period allows the check kiting perpetrator to use credit
> for money which did not exist at the time.  In essence, check kiting results
> in the creation of fictitious funds.

*Compl.* ¶ 37.

33.      The Trustee's description of a check kiting scheme is generally accurate, but it

omits two key features of a check kiting scheme.  First, the true harm caused by a check kiting

scheme is not the cumulative amount of withdrawals drawn on the Debtors' bank accounts; it is

---

[4] Without any context or explanation, the Complaint references the Dealer Trust Statute of 7 U.S.C. § 217b. *Compl.*
¶¶ 35–36, 95, 107.  That statute establishes a trust for the benefit of sellers who sell livestock to dealers for cash.  The
statute expressly does not apply to sellers who sell their cattle on credit or alternative payment methods, such as profit
sharing.  Further, the statute provides that sellers lose their status as trust beneficiaries if they fail to give notice to the
Secretary of Agriculture within the prescribed time, or if they receive a payment instrument that is dishonored.
Because these references to the Dealer Trust Statute are provided without context or explanation, CFSB is left to
speculate the relevance of the statute to the claims asserted against CFSB, which means that the Trustee has deprived
CFSB of the opportunity to meaningfully respond and defend against these allegations.

the amount of any provisional credit, or "float," that does not get paid once the scheme is discovered. *See U.S. v. Frydenlund*, 990 F.2d 822, 826 (5th Cir. 1993) (explaining that the "loss" caused to a victim bank by the kiting scheme is measured, for purposes of criminal sentencing, by the unsatisfied credit extended by the victim bank before the kite is discovered, even though the bank may subsequently mitigate its losses); *see also First Nat'l Bank v. Elsa State Bank & Tr. Co.*, 2007 WL 9747503 at *9–10 (S.D. Tex. Mar. 29, 2007) (emphasis added, citations omitted).  The Complaint presents charts that purport to show $2 billion in cumulative withdrawals over a five-year period. *Compl*. at 12–18.  This data point is largely irrelevant as to CFSB.  The Trustee alleges that CFSB received an aggregate $33.3 million in alleged fraudulent transfers over the relevant period of time.  *Compl.* ¶ 170.  However, as discussed below, the Trustee does not explain how this damage model or legal theory has any basis in fact or law.

34.     Second, and more importantly, the Trustee fails to acknowledge that CFSB would have been the victim of any alleged check kiting scheme.  "***The bank left holding dishonored checks is the victim of the scheme as it is the bank who suffers the loss – not the creditors of the check-kiter***."  *In re Mongelluzzi*, 591 B.R. 480, 491 (Bankr. M.D. Fla. 2018) (emphasis added) (citing *United States v. Asher*, 59 F.3d 622 (7th Cir. 1995); *United States v. Rackley*, 986 F.2d 1357, 1361 (10th Cir. 1993)).  The Trustee does not allege who, if anyone, was left holding dishonored checks.  Without such an allegation, there is simply no evidence of an actual check kiting scheme or any harm to the Debtors.

35.     As discussed further herein, the Trustee's check kiting theories and analysis are both flawed and meritless.  It appears that the Trustee has added it to his Complaint for no reason other than to attempt to bolster his fraud claims.  The Court should discount these allegations accordingly.  There is simply nothing in these allegations that supports the Trustee's allegations of fraud or the existence of a Ponzi scheme.

11

F.    **CFSB's Alleged Involvement in the Schemes**

36.    The Trustee presents pages of data, including charts and graphs, in an effort to detail the Defendants' combined roles in the alleged Ponzi and check kiting schemes. But a careful reading of these allegations reveals the paucity of CFSB's actual knowledge or involvement in the alleged schemes.

37.    The Trustee lumps all Defendants together in many instances, in what the Supreme Court would call "unadorned, the-defendant-unlawfully-harmed-me accusations." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Due process requires more specificity. Even accepting all of the Trustee's data points as true, the Court should recognize that the Trustee's claims (knowing participation, breach of fiduciary duty, civil conspiracy, professional negligence, and receipt of actual fraudulent transfers) lack legal and factual merits.

38.    The Trustee alleges that "CFSB, Mechanics Bank, and HTLF were necessary components of McClain's Ponzi and check kiting schemes." *Compl.* ¶ 45. As an example, the Trustee alleges that Defendant HTLF held blank, pre-signed checks and filled them in for investors to "perpetuate McClain's runaway shell game." *Id.* Notably, the Trustee makes no similar allegations against CFSB, generally or specifically, anywhere in the Complaint.

39.    The Trustee alleges that Defendant Rabo loaned the Debtors $70 million with insufficient due diligence. *Compl.* ¶¶ 50–63. But none of these allegations indicate how CFSB aided or even knew about Rabo's alleged failures of due diligence. Nowhere in the Complaint does the Trustee allege that CFSB made improvident loans to the Debtors or that Rabo relied upon any statements made by CFSB. In fact, the Complaint does not even allege that CFSB was a lender

4915-0559-1351

or creditor of the Debtors,[5] because as the Trustee knows, but refuses to acknowledge, that CFSB was merely an innocent depositary bank at all relevant times.

40.    While the Trustee alleges throughout the Complaint that CFSB somehow exerted control over the Debtors' bank accounts through a Deposit Account Control Agreement, or DACA,[6] *see Compl.* ¶¶ 70, 91, 93, 103, 109, 126, 145, the Trustee does not allege that a DACA actually existed among Rabo (as lender), the Debtors (as borrowers), and CFSB (depositary bank). As the Trustee knows or should know, Rabo never entered into a DACA with the Debtors and CFSB.  Even if there had been such an agreement, the DACA would not have given CFSB control over the Debtors' bank accounts; it would have given Rabo such control.  In the absence of such an agreement, the Debtors maintain control over their own accounts, and CFSB as the depositary bank had legal obligations to the Debtors to honor properly presented checks.  Ky. Rev. Stat. § 355.4-401(1) ("A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft. An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank."); *Dean v. Commonwealth Bank & Tr. Co.*, 434 S.W.3d 489, 510 (Ky. 2014) (even in case involving check kiting scheme, depositary bank was required to honor checks that were properly payable; "[i]ndeed, if the bank had dishonored the checks, it could face liability for wrongful dishonor.") (citing Ky. Rev. Stat. § 355.4-402).

---

[5] While not alleged in the Complaint, in the interest of transparency, CFSB did loan money to the Debtors on a secured basis in the past, albeit on a significantly smaller scale than Rabo.  Those loans were secured by property other than livestock, and they were paid off nearly two full years before the Trustee alleges that the alleged fraud could have been discovered.

[6] "In a deposit account control agreement, a debtor, a secured party, and a bank maintaining a deposit account agree that the bank will comply with instructions from the secured party regarding disposition of the account's funds without further consent of the debtor.  Such an agreement enables the secured party to obtain control over the deposit account, and its security interest in the account to be perfected." *Ritchie Cap. Mgmt., L.L.C. v. BMO Harris Bank, N.A.*, No. 14-cv-1936, 2015 WL 1433320, at *2 n.2 (S.D.N.Y. Mar. 30, 2015) (citing *In re J. Silver Clothing,* 453 B.R. 518, 532 n.6 (Bankr.D.Del.2011)).

41.     Undeterred, the Trustee persists with allegations of CFSB's alleged entanglement in the purported Ponzi and check kiting schemes. *Compl.* ¶ 64. The Trustee alleges that HTLF (*not* CFSB) acted as a "shadow or pseudo-lender" by using kited checks as a means of loaning the Debtors funds before the underlying funds arrived from CFSB and Mechanics Bank. *Compl.* ¶ 66. Not only is this allegation nonsensical, but it also fails to allege any wrongdoing by CFSB. The Trustee alleges that HTLF knew or should have known that these checks were improper, *Compl.* ¶ 67, but, even if the Court accepts this allegation as true, the Trustee does not articulate a factual or legal basis for CFSB to be imputed with such knowledge. From CFSB's perspective, seemingly legitimate checks were being presented to CFSB for payment, putting CFSB at legal risk had it attempted to return otherwise valid requests for payment.

42.     Next, the Trustee alleges that CFSB exerted "excessive" control over the Debtors using DACAs, alleging as follows:

> Defendants paid those investors regardless of how much money was in Debtors' bank accounts. CFSB and Mechanics Bank overcame any shortfalls due to overdrafts on Debtors' accounts by working directly with Rabo via the DACA—and HTLF—to secure additional funds even when it was uncertain whether Debtors were in a financial position to pay back the loans.

*Compl.* ¶ 70. These statements simply make no sense and cannot be considered plausible under any interpretation. *First*, the Trustee does not allege that CFSB was a lender; it was merely a depositary bank holding accounts subject to deposit account agreements with the Debtors. *Second*, the Trustee does not allege the existence of any sort of DACA with CFSB, nor can he—no such agreement existed. *Third*, the Trustee does not allege that any overdrafts with CFSB were paid

14

outside the time required under applicable law; as discussed below, all or substantially all of such "overdrafts" were covered in a fashion consistent with applicable law.[7]

43.    The Trustee further contends that "[a] cursory examination of Debtors' financial records in Defendants' possession would have revealed McClain's Ponzi scheme fraud." *Compl.* ¶ 71.  This allegation is implausible for several reasons as well.  *First*, the Trustee does not allege *which* financial records CFSB possessed and *how* a "cursory examination" of such records would have revealed the alleged fraud.  *Second*, such conclusory statements that CFSB and the other co-Defendants could have readily discovered the Ponzi scheme fraud is entirely inconsistent with the Trustee's own description of a Ponzi scheme—*i.e.*, a scheme that gives all outward appearances of profitability while hiding losses from its own creditors and investors.  *Compl.* ¶ 1. The Trustee even acknowledges that "[b]ecause the Debtors constantly moved hundreds of millions of dollars between the Debtors' bank accounts at CFSB and Mechanics Bank—which Rabo controlled through its DACA—Rabo could not ascertain whether the Debtors were making or losing money."  *Compl.* ¶ 91; *see also Compl.* ¶ 93.  It is simply not plausible on its face to plead that Rabo (a secured lender that regularly prepared and submitted collateral inspection reports, *Compl.* ¶ 57) was fleeced by McClain's alleged fraud, *Compl.* ¶ 91, while CFSB (whose only role was to accept and pay checks) should have unearthed all the Debtors' alleged schemes, *Compl.* ¶ 109.

---

[7] As a matter of law, the supposed "overdrafts" referenced in the Complaint were not *true* overdrafts. Ky. Rev. Stat. § 355.4-302; Tex. Bus. & Com. Code § 4.302. Rather, they were provisional ledger balance overdrafts, which do not become true overdrafts if – prior to the midnight deadline on the second day following presentment – the bank either (i) returns checks NSF or (ii) the customer covers the provisional ledger balance with guaranteed funds. Thus, under the facts pled in the Complaint, the Debtors did not "overdraft" the CFSB account as a matter of law. *Id*; *see also In re Able Body Temp. Servs., Inc.*, 626 B.R. 643, 677 (Bankr. M.D. Fla. 2020) (holding provisional ledger balance overdrafts before bank's day two midnight deadline were not true overdrafts). As such, it is not plausible to allege CFSB breached a particular duty by "allow[ing] Debtors to thwart acceptable banking practices" simply by permitting overdrafts, *Compl.* ¶ 45, because the Complaint does not allege a true overdraft ever occurred. And even if it did, as detailed below, "[a] bank may charge against the account of a customer an item that is properly payable from that account *even though the charge creates an overdraft*." Ky. Rev. Stat. § 355.4-401(1) (emphasis added); *Dean v. Commonwealth Bank & Tr. Co.*, 434 S.W.3d 489, 510 (Ky. 2014) (citing Ky. Rev. Stat. § 355.4-402).

44.     The bulk of the Trustee's allegations focus on Rabo's mismanagement of its loans to the Debtors and its lack of oversight of the Debtors' operations.  *Compl*. ¶¶ 72–87.  Nowhere in these allegations does the Trustee contend that CFSB had knowledge of the Debtors' operations.  The Trustee alleges that Rabo took too long to "stop the movement of funds through the Debtors' depository accounts at CFSB and Mechanics Bank."  *Compl.* ¶ 88.  Nothing in these allegations suggests wrongdoing by CFSB.

45.     Despite alleging no acts or omissions by CFSB, the Trustee boldly states that "if ***Rabo and Mechanics Bank*** had done their jobs and caught McClain's fraud, his Ponzi scheme would have been far less damaging to creditors that lost huge sums of money ***because of CFSB***, HTLF, Mechanics Bank, and Rabo's lawless conduct."  *Compl.* ¶ 92 (emphasis added).  Such loose language is not only inaccurate, but it fails to state a plausible basis of any actual wrongdoing by CFSB.

46.     The Complaint does not allege any specific acts or omissions by CFSB, does not specifically allege what CFSB knew or should have known about third-parties' misconduct, does not even allege whether an actual Deposit Account Control Agreements existed with CFSB, and does not articulate what specific duties CFSB owed to the Debtors beyond contractual obligations set forth in a standard deposit account agreements signed by the Debtors.  Yet, despite these many failings, the Trustee brazenly asserts five claims against CFSB for:  (a) knowing participation in McClain's breaches of fiduciary duties; (b) breaches of fiduciary duties; (c) common-law conspiracy; (d) professional negligence; and (e) fraudulent transfers.[8]  As discussed below, all claims against CFSB must be dismissed as a matter of law for failure to state legal and factual bases for relief against CFSB.

---

[8] As noted above, Count V seeks punitive damages for Counts I–V.

## IV.    **Argument and Authorities**

### A.    **Rule 12(b)(6) Standard**

47.    Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." To do so, and to thus survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a party must plead factual allegations sufficient, when accepted as true, "to state a claim for relief that is plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A claim is plausible on its face when the complaining party pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545. "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief." *Torch Liquidating Tr. v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) (citation omitted).

48.    Although when deciding a motion to dismiss under Rule 12(b)(6) the Court must accept as true all the well-pleaded facts, bare conclusory allegations are not entitled to the assumption of truth. See *Iqbal*, 556 U.S. at 679–81. Similarly, a complaint must contain more than mere "labels and conclusions or a formulaic recitation of the elements of a cause of action." *Id.* (quoting *Twombly*, 550 U.S. at 557).

49.    When deciding a motion to dismiss under Rule 12(b)(6), a court may consider the complaint and any undisputed facts incorporated into the complaint by reference. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *Walch v. Adjutant Gen.'s Dep't of Tex.*, 533 F.3d 289, 293 (5th Cir. 2008) ("[U]nder Rule 12(b)(1), the court may consider any of the following:

17

'(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'").

**B.    Counts I–V Should Be Dismissed with Prejudice Under Kentucky Law.**

    **i)    Choice of Law – Kentucky Law Governs.**

50.    Uniform Commercial Code ("UCC") § 4-102(b) – which has been codified by *both* the Commonwealth of Kentucky and the State of Texas – provides, in relevant part:

> The liability of a bank for action or non-action with respect to an item handled by it for purposes of presentment, payment, or collection is governed by the law of the place where the bank is located. ***In the case of action or non-action by or at a branch or separate office of a bank, its liability is governed by the law of the place where the branch or separate office is located.***

Tex. Bus. & Com. Code § 4.102(b); Ky. Rev. Stat. (also referred to as "KRS") § 355.4-102(2) (emphasis added).

51.    Here, the Complaint correctly alleges (i) CFSB is a "corporation formed and existing under the laws of the State of Kentucky"[9] and (ii) CFSB's principal office is hosted in Benton, Kentucky.[10]  Further, the Trustee's allegations center around the broad and inaccurate statement that "the Debtors had housed their depository accounts at CFSB and Mechanics Bank."[11]  All of CFSB's alleged action (or inaction) arise from CFSB's handling of checks for presentment, payment, or collection.  Thus, pursuant to both Tex. Bus. & Com. Code § 4.102(b) and Ky. Rev. Stat. § 355.4-102(2), CFSB's alleged liability under the Complaint is governed by Kentucky law.

---

[9] *Compl.* ¶ 9.

[10] *Id.*

[11] *Id.* ¶ 74.  As discussed *infra* note 4, the Trustee fails to specify which of the three Debtors actually maintained depository banks with CFSB.  The Trustee has actual knowledge that Debtor Feeders—*i.e.*, the only Debtor entity organized in Texas with any meaningful Texas connections—did <u>not</u> maintain depository banks at Kentucky-based CFSB.

52.     The Trustee presumes the application of Texas law to all common law claims against CFSB, foregoing any sort of choice of law analysis.  Thus, the Trustee brings all five common law Counts I–V against CFSB pursuant to Texas law:

i.      Count I alleges CFSB knowingly participated in Debtors' breach of fiduciary duty.  In support, Count I states that "[u]nder Texas law, 'where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such.'"[12]

ii.     Count II claims CFSB breached an alleged fiduciary duty it owed the Debtors.  Count II lists the elements of a breach of fiduciary duty claim under Texas law.[13]  Count II further alleges a fiduciary duty can arise under Texas law where a bank exerts excessive control over a borrower.  The legal theory for Count II also relies entirely on the decision rendered by the Court of Appeals of Texas in *Wil-Roye Inv. Co. II v. Wash. Mut. Bank, F.A.*, 142 S.W.3d 393 (Tex. App. 2004).[14]

iii.    Count III alleges common-law civil conspiracy against CFSB, citing language pulled from *In re Enron Corp. Sec.*, 623 F. Supp. 2d 798, 809 (S.D. Tex. 2009).[15]  In listing the elements for this cause of action, the District Court for the Southern District of Texas (Judge Harmon) relied upon two cases from the Supreme Court of Texas: *Juhl v. Airington*, 936 S.W.2d 640 (Tex. 1990) and *Tri v. J.T.T.*, 162 S.W. 3d 552 (Tex. 2005).

iv.     Count IV advances a professional negligence claim against CFSB under Texas negligence law.[16]

v.      Count V asserts a cause of action against CFSB pursuant to the Texas Supreme Court's explanation of when punitive damages may be available.[17]

---

[12] *Id*. ¶ 98 (quoting *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942)).

[13] *Id*. ¶ 112.

[14] *Id*. ¶ 114. Tellingly, the Complaint uses *Wil-Roye* as its hallmark case for asserting a claim for breach of a fiduciary duty against a bank, but the *Wil-Roye* court made clear that "[t]he relationship between a bank and its customers does not usually create a special or fiduciary relationship" and it held that a fiduciary duty did not exist in that case. *Wil-Roye Inv. Co. II*, 142 S.W.3d at 410.

[15] *Compl*. ¶¶ 121-23.

[16] *Id*. ¶ 134.

[17] *Id*. ¶ 143 (citing *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 660 (Tex. 2012)).

53.    The Bankruptcy Code provides no method for resolving potential conflicts of law.

*See Deutsche Bank Trust Co. Americas v. U.S. Energy Dev. Corp. (In re First River Energy, LLC)*,

896 F.3d 914, 923-24 (5th Cir. 2021).  While circuits are divided on whether to apply state or

federal choice-of-law rules, the Fifth Circuit has not had to weigh in on this split, because Texas

state law and federal rules both adopt the Restatement (Second) of Conflicts of Law.  *Id.* (citations

omitted).  Because Counts I–V are tort theories, state and federal choice of law rules would both

apply a "most significant relationship" test, but only if the laws of the possible jurisdictions

actually conflict.  *See MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.)*, 675

F.3d 530, 536-37 (5th Cir. 2012) (quoting *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979)).

Under this standard, the relevant contacts to consider are:

     *i.*     The place where the injury occurred;

     *ii.*     The place where the conduct causing the injury occurred;

     *iii.*     The domicile, residence, nationality, place of incorporation and place of business of the parties; and

     *iv.*     The place where the relationship, if any, between the parties is centered.

*Jelec USA, Inc. v. Safety Controls, Inc.*, 498 F. Supp. 2d 945, 951-52 (S.D. Tex. 2007) (citing

Restatement (Second) of Conflict of Laws § 145 (Am. Law Inst. 1971)).  Based on the specific

allegations in the Complaint, the balance tilts decidedly in favor of Kentucky law, particularly as

it relates to the claims against CFSB.

54.    It is unclear where the alleged injury occurred, if anywhere in particular.  The

Trustee alleges that the Debtors operated a legitimate cattle aggregation business for two Texas

customers.  *Compl.* ¶ 16.  The Trustee also alleges that the Debtors operated a legitimate feedyard

service business, but he does not allege whether this operation occurred anywhere outside of

Benton, Kentucky.  *See Compl.* ¶ 17.  The Trustee alleges that the Debtors procured passive

investments from hundreds of parties starting in 2018, but he does not allege where this activity

occurred, if anywhere outside of the Debtors' principal operations in Benton, Kentucky. *Compl.*

¶¶ 14, 19. Similarly, the Trustee does not specify where the alleged check-kiting scheme took

place, if anywhere outside of the Debtors' principal location in Benton, Kentucky. Because the

injuries alleged by the Trustee are "intangible," at best, this contact does not favor one jurisdiction

over the other, but potentially suggests that Kentucky has more contacts with the potential injury.

*See In re Mirant*, 675 F.3d at 537 ("[T]he commentary to the Restatement suggests that when the

injury is intangible the importance of this factor is severely diminished.").

55.     The next two factors weigh heavily in favor of Kentucky law. According to the

Complaint, CFSB is organized under the laws of Kentucky, with its principal place of business

located in Benton, Kentucky. *Compl.* ¶ 9. Indeed, CFSB has no branches of operations outside of

the Benton, Kentucky area. Similarly, the Trustee alleges that the Debtors' operations were

centered in Benton, Kentucky:

> Brian McClain was well-known throughout the cattle and rodeo industries and
> primarily based out of Benton, Kentucky. He formed, owned, and operated each
> of the Debtors—which he used for various functions in the cattle industry.

*Compl.* ¶ 14. The other three Defendants are less centralized. HTLF is organized and based in

Colorado. *Compl.* ¶ 10. Mechanics Bank is organized and based in California. *Compl.* ¶ 11. And

Rabo is organized in Delaware with a registered agent in Houston, Texas. *Compl.* ¶ 12. None of

the other Defendants have significant contacts with Texas to justify the application of Texas law

against them.

56.     The Trustee does not specify where the conduct causing the injury occurred other

than the place of the Debtors' principal operations in Benton, Kentucky. Thus, for purposes of this

factor of the "most significant relationship" test, this Court should find that the conduct occurred

where McClain's operations were "primarily based" in Benton, Kentucky. *Compl.* ¶ 14.

21

57.    Based on a balancing of these contacts, as alleged by the Trustee, it is clear that Kentucky has the most significant relationship with the parties and the alleged conduct.  As such, Kentucky law should apply to the tort theories asserted against CFSB in Counts I–V, as well as Count XV.

ii)    **All Texas Law Claims Should be Dismissed with Prejudice.**

58.    Having demonstrated why Kentucky law applies to Counts I–V, the Court should dismiss all Texas law claims as a matter of law, as Judge Godbey did in *Baker v. Match Grp., Inc.*, 2024 WL 4626079 at *1, 2024 U.S. Dist. LEXIS 196990, at *3-4 (N.D. Tex. Oct. 30, 2024). "Dismissal is proper where there is either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Vines v. City of Dallas*, 851 F.Supp. 254, 259 (N.D. Tex. 1994) (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).  Here, the Trustee has only asserted claims under Texas law, which are not legally cognizable given that Kentucky law applies.

59.    In *Baker v. Match Grp., Inc.*, the plaintiffs pleaded only claims arising under Illinois law. The defendant filed a motion to dismiss, arguing Texas law applied and thus the plaintiffs had failed to state a claim. Judge Godbey determined, after conducting a "significant relationship" analysis, that Texas law applied and that alone was sufficient ground for dismissal of the Illinois claims with prejudice.  *Baker v. Match Grp., Inc.*, 2024 WL 4626079 at *5, 2024 U.S. Dist. LEXIS 196990, at *15 ("Because all the asserted claims arise under Illinois law, they must be dismissed with prejudice as a matter of law").

60.    The case at hand is indistinguishable from *Baker v. Match Grp., Inc*. Any potential liability for CFSB's alleged action or inaction would be governed by Kentucky law for the reasons described above.  Because Trustee's only asserts Counts I–V under Texas law, Counts I–V must all be dismissed with prejudice.

### iii)    The UCC Preempts the Common Law Claims Asserted in Counts I–V.

61.    Moving onto the merits under Kentucky law, in a unanimous 2014 ruling, the

Supreme Court of Kentucky observed that UCC Articles 3 and 4 preempt and bar these types of

common law claims against banks. *Dean v. Commonwealth Bank & Tr. Co.*, 434 S.W.3d 489 (Ky.

2014).

62.    In *Dean*, the plaintiff was a real estate closing law firm that held accounts with

multiple banks. *Id.* at 492. The law firm's bookkeeper, using her authority as an authorized signer

on the real estate escrow account, embezzled more than $800,000 from the law firm. The

bookkeeper used "check kiting" to aid her fraud, "which involved her writing and depositing

checks between the [defendant b]ank account and [the plaintiff]'s account at [another bank]." *Id.*

at 492-93. The bookkeeper used preprinted checks and blank counter checks to further her check

kiting scheme in a way that "artificially inflated and maintained illusory balances in the

[defendants' bank accounts]." *Id.* at 493-94.

63.    Like the Trustee does in this action, rather than suing the actual perpetrator of the

fraud, the plaintiff law firm sued the bank through which the bookkeeper ran the check kite.

The law firm's complaint alleged common law causes of action, including (i) aiding and abetting

fraud, (ii) common law negligence, (iii) breach of duty of good faith and fair dealing, and (iv) a

claim for punitive damages. *Id.* at 494. There, the defendant bank argued that the law firm's

common law claims had been displaced by the UCC, and the Supreme Court of Kentucky

unanimously agreed. *Id.* at 505-10. The Supreme Court of Kentucky reasoned:

> A majority of jurisdictions decide UCC-displacement questions with the
> "comprehensive rights and remedies test." [citation omitted] ***Under that
> rule, "where the Code provides a comprehensive remedy for the parties to
> a transaction, a common law action will be barred."*** *Sebastian v. D & S
> Exp., Inc.*, 61 F. Supp. 2d 386, 391 (D.N.J. 1999).
>
> This Court concludes that with respect to the transactions at issue, the UCC
> provides a comprehensive remedy, or scheme of remedies[ . . . ***T]he Articles***

*3 and 4 system of remedies itself is intended to be "a comprehensive allocation scheme for check fraud losses*." A. Brooke Overby, *Check Fraud in the Courts After the Revisions to U.C.C. Articles 3 and 4*, 57 Ala. L. Rev. 351, 398 (2005).

\*\*\*

At best, the [plaintiff law firm]'s remedy lies in "the law relating to the presentment and payment of a depositor's checks," . . . [b]ut again, the firm cannot assert a claim under that law because the checks were "properly payable." *KRS 355.[4]-401(1) ("A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft.").*

A check "is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank." *Id*. There is no question that the checks were paid in accordance with the agreement with the bank. And [the bookkeeper]'s status as an apparent agent means that the checks were "authorized." Under KRS 355.3-401, a person can be liable on a negotiable instrument, including a check, if the person signs it or "[t]he person is represented by an agent or representative who signed the instrument and the signature is binding on the represented person under KRS 355.3-402." KRS 355.3-401(1)(b). A signature is binding under KRS 355.3-402(1) if it would be binding on a simple contract. An agent's apparent authority is sufficient to bind the principal with respect to third parties, like the bank. *See Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 594 (Ky. 2012) ("The principal will then be bound by such a transaction [by an apparent agent] even if the agent was not actually authorized to enter it."). Because [the bookkeeper] had apparent authority to sign the checks, her action was binding on the firm with respect to the bank, *making the checks properly payable*.

*How can the bank be held liable for having paid a properly payable item? The simple answer is that it cannot.*

*Id*. at 506-08 (emphasis added).

64.     Like the plaintiff law firm that sued the defendant bank in *Dean*, the Trustee's only potential remedy against CFSB lies in UCC law. But the Trustee cannot assert such a claim if the transactions at issue were properly payable under the UCC. The Complaint is therefore fatally deficient because it fails to allege the transactions referred to in the Complaint were not properly payable under the UCC and fails to assert any claim under UCC Articles 3 or 4.

4915-0559-1351

65.     Because the Complaint fails to state a legally cognizable claim under Kentucky law, it is axiomatic that it fails to state a claim upon which relief can be granted. The Trustee's common law claims (Counts I–V) are preempted by Kentucky's codified UCC.

### (1)     Count I: Kentucky Law Does Not Recognize a Claim for Knowing Participation in a Breach of Fiduciary Duty.

66.     "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions[.]" *Twombly*, 550 U.S. at 555. "Simply labeling the defendants' actions" under the label of an alleged cause of action "deprives the defendants of notice of the conduct complained of, a notice to which they are entitled." *Reed v. Pinnacle Props., LLC*, Civil Action No. 5: 25-020-KKC, 2025 U.S. Dist. LEXIS 17410, at *3 (E.D. Ky. Jan. 31, 2025). For this reason, "[t]he first step in a dismissal proceeding is identification of the elements and scope of a plaintiff's cause of action." *Walker v. Vanwinkle*, 562 B.R. 671, 676 (Bankr. E.D. Ky. 2016) (citing *Iqbal*, 556 U.S. at 675).

67.     Even if this Court concludes that Counts I–V are not preempted by the UCC under applicable Kentucky law, these Counts must be dismissed on the merits, for failure to plead sufficient facts to demonstrate grounds for relief under Kentucky law.  Count I pleads nothing more than labels and conclusions. It does not state a claim recognized by Kentucky law. Indeed, the undersigned is unable to find a single Kentucky court decision or statute that permits a cause of action for "knowing participating in a breach of fiduciary duty."  The "absence of other legal remedies does not [alone] create a cause of action . . . or alter the fact that the elements of a[]claim were not met." *Gooch v. City of Stanford*, No. 2012-CA-001464-MR, 2013 Ky. App. Unpub. LEXIS 752, at *8-9 (Ct. App. Sep. 13, 2013). Because Kentucky law does not recognize a claim for knowing participation in a breach of fiduciary duty, Count I should be dismissed.

> **(2)    Count II:  Kentucky Law Does Not Recognize a Claim for Breach of Fiduciary Duty Against a Bank Under the Facts Alleged in the Complaint.**

68.    Similarly, Kentucky law does not recognize the existence of a fiduciary duty owed by a bank to its bank customer.  A fiduciary duty is "the highest order of duty imposed by law."  *Sallee v. Fort Knox Nat'l Bank, N.A.*, 286 F.3D 878, 891 (6th Cir. 2002).  No such duty arises in an arms-length commercial transaction where each party is assumed to be protecting its own interest. *Id*. at 894. "As a general rule, banks do not owe a fiduciary duty to their customers or debtors." *Bank of Am., N.A. v. Corporex Realty & Inv., LLC*, 875 F. Supp. 2d 689, 704 (E.D. Ky. 2012) (citing *Steelvest, Inc. v. Scansteel Serv. Ctr.*, 807 S.W.2d 476, 485 (Ky. 1991)); *see also McGinnis v. Univ. of Ky.*, No. 2022-CA-1494-MR, 2023 Ky. App. Unpub. LEXIS 567, at *9 (Ct. App. Sep. 29, 2023) ("We are aware of no case law imposing a fiduciary duty based solely upon a debtor-creditor relationship or a provider-customer relationship").

69.    The Sixth Circuit Court of Appeals has explained why banks do not owe their customers a fiduciary duty:

> This flows from the nature of the creditor-debtor relationship. As a matter of business, banks seek to maximize their earnings by charging interest rates or fees as high as the market will allow. Banks seek as much security for their loans as they can obtain. In contrast, debtors hope to pay the lowest possible interest rate and fee charges and give as little security as possible. Without a great deal more, a mere confidence that a bank will act fairly does not create a fiduciary relationship obligating the bank to act in the borrower's interest ahead of its own interest.

*Sallee*, 286 F.3d at 893.

70.    Indeed, both the Sixth Circuit Court of Appeals and the U.S. District Court for the Eastern District of Kentucky note there are "only two published cases in Kentucky where courts [] found a fiduciary relationship [could have] exist[ed] between a bank and a borrower[.]" *Corporex Realty & Inv., LLC*, 875 F. Supp. 2d at 705 (citing *Sallee*, 286 F.3d at 893). In both instances, the defendant bank profited at the borrower's expense by using confidential information

the bank received from the borrower. *Sallee*, 286 F.3d at 893. In the first case, the bank used its borrower's confidential business plans to assist one of the borrower's competitors generate new business for the bank. *Id.* (citing *Steelvest, Inc.*, 807 S.W.2d at 485-86). In the second case, the borrower disclosed confidential information to the bank solely to obtain a loan to refinance a preexisting promissory note. The bank then deceived its customer by immediately using that confidential information to the bank's advantage to purchase the preexisting note at a discount, accelerate the note, and then institute a foreclosure action against its customer. *Henkin, Inc. v. Berea Bank & Tr. Co.*, 566 S.W.2d 420, 422 (Ky. Ct. App. 1978).

71.    In the present case, the Complaint does not allege a lender-borrower relationship existed between the Debtors and CFSB with respect to the transactions at issue. That alone distinguishes this case from the two published Kentucky cases where the court found a fiduciary relationship could exist between a bank and its customer.  Moreover, there is no allegation in the Complaint that CFSB profited at the Debtors' expense by using confidential information the bank received from the Debtors.  Absent these types of allegations, the Complaint fails to state a cognizable claim against CFSB for breach of fiduciary duty under Kentucky law.  *Snow Pallet, Inc. v. Monticello Banking Co*., 367 S.W.3d 1, 5 (Ky. Ct. App. 2012) (affirming dismissal of breach of fiduciary duty claim against bank where plaintiff did not allege bank profited from confidence gained through the borrower).

### (3)    *Count III:  Without A Cognizable Claim for Breach of Fiduciary Duty, the Civil Conspiracy Claim Also Fails as a Matter of Law.*

72.    "[C]ivil conspiracy is not a free-standing claim; rather, it merely provides a theory under which a plaintiff may recover from multiple defendants for an underlying tort." *Stonestreet Farm, LLC v. Buckram Oak Holdings, NV*, Nos. 2008-CA-002389-MR, 2009-CA-000026-MR, 2010 Ky. App. Unpub. LEXIS 555, at *38 (Ct. App. July 9, 2010) (citing *Davenport's Adm'x v. Crummies Creek Coal Co*., 184 S.W.2d 887, 888 (1945)); *see also Ellington v. Fed. Home Loan*

*Mortg. Corp.*, 13 F. Supp. 3d 723, 730 (W.D. Ky. 2014) (where claim for alleged statutory violation fails, the civil conspiracy claim based on those statutory claims also fails).

73.    "[M]ere negligence is not sufficient to support a claim for civil conspiracy." *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008).  There must be some other legally viable underlying claim that would allow a plaintiff to recover from multiple defendants.  *Crummies Creek Coal Co.*, 184 S.W.2d at 888.

74.    In *Flint v. Coach House, Inc.*, No. 2012-CA-000580-MR, 2013 Ky. App. Unpub. LEXIS 211, at *10 (Ct. App. Mar. 8, 2013), the Kentucky Court of Appeals upheld the trial court's dismissal of a claim for conspiracy to breach a fiduciary duty where the plaintiff had not properly pled the underlying claim of breach of fiduciary duty.  2013 Ky. App. Unpub. LEXIS 211, at *10. Similarly, as discussed in the precedent section, the Complaint does not state a claim, which if true, would sustain an action for breach of a fiduciary duty.  As such, the cause of action for civil conspiracy alleged against CFSB necessarily fails to state a plausible claim under Kentucky law.

### (4)    *Count IV:  The Complaint Fails to Plead a Claim for Negligence against CFSB Under Applicable Kentucky law.*

75.    The Trustee's negligence claim (Count IV) centers on conclusory speculation that CFSB breached its duty of care to the Debtors because CFSB engaged in cash and check kiting.[18] This analysis turns Kentucky law on its head.  In truth, "[b]anks are usually regarded as the victims of check-kiting schemes, as they tend to suffer the losses, not the account holders." *Dean*, 434 S.W.3d at 509 (citation omitted). Importantly, it is the business entity that authorized the transaction in question that is to be held liable to the injured bank, rather than the bank owing a duty to the customer business. *Id*. (citations omitted).

---

[18] *Compl.* ¶ 137.

76.     Just as in the Trustee's Complaint, the plaintiff in *Dean* asserted that the bank was "negligent . . . and generically that the bank's actions allowed diversion of the funds." *Id*. at 509. The *Dean* court unanimously rejected the "cleverly pleaded" fiction that there could be a legally plausible claim against a bank for being used by its customer as a pawn in a check kite.  *Id*. The *Dean* Court held that "the UCC implicitly allocates the loss [associated with check fraud] to the account-hold[er . . . ] by binding an account holder by the acts of an apparent agent and by allowing the bank to pay properly payable items." *Id*. at 509.  "Indeed, if the bank had dishonored the checks, it could face liability for wrongful dishonor." *Id*. at 510 (citing Ky. Rev. Stat. § 355.4-402).  The Complaint fails to allege how the victim of a check kite (the bank) could somehow be liable to the Debtors for the conduct of the account holder's agent.  And as discussed previously, the UCC preempts and bars common law claims where the UCC has a "comprehensive remedy for the parties to a transaction[.]"  *Dean*, 434 S.W.3d at 506-07 (internal quotation marks and citation omitted).  The UCC "should also be understood to intend the displacement of the common law whenever both the code and the common law would provide a means of recovery for the same loss." *Id*. at 507 (quoting *Clancy Sys. Int'l, Inc. v. Salazar*, 177 P.3d 1235, 1237 (Colo. 2008)).

77.     Allowing a bank to be sued under a professional negligence theory because a customer "kited" checks would breach long-standing Kentucky Supreme Court precedent. *Id*.  Not only did the bank not owe the Debtors a duty beyond what is required by the UCC, a bank customarily does not owe a duty to a debtor or customer. *Compl*. ¶ 19.  For these reasons, the Complaint does not state a professional negligence claim for which relief can be granted under applicable Kentucky law.

> ***(5)      Count V:  The Negligence Claim is Barred by the Kentucky Statute of Limitations.***

78.     Even if the Court finds that the Complaint pleads sufficient allegations to survive dismissal under Kentucky law, the claim must still be dismissed as barred by applicable statutes

of limitation.  Under Kentucky law, professional negligence claims "shall be brought within one (1) year from the date of the occurrence or from the date when the cause of action was, or reasonably should have been, discovered by the party injured." Ky. Rev. Stat. § 413.245; *see also Faris v. Stone*, 103 S.W.3d 1, 1 (Ky. 2003); *Wolfe v. Kimmel*, 681 S.W.3d 7, 26 (Ky. 2023).

79.    The Complaint asserts a professional negligence claim against CFSB, which claim purportedly belonged to the Debtors prior to the filing of the bankruptcy case. However, because the Debtors authored, commenced, and implemented the alleged Ponzi scheme, the Debtors would have been alerted to the occurrence of CFSB's claimed professional negligence as early as 2018.[19] As such, the negligence claim against CFSB needed to be brought by the Debtors in 2019 to comply with Kentucky's one-year statute of limitations.

**C.    The Doctrine of *In Pari Delicto* Under Texas and Kentucky Law Requires Dismissal.**

80.    Even if the Court does not dismiss Counts I–V under Kentucky law as set forth above, each of the Trustee's common law claims (Counts I–V) are barred by the equitable doctrine of *in pari delicto*.

81.    "The equitable defense of *in pari delicto* embodies the principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *Kelly v. BMO Harris Bank Nat'l Ass'n*, 115 F.4th 901, 904 (8th Cir. 2024) (citing *Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833, 837 (8th Cir. 2005)); *Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008) (discussing same legal standard); *In re Dublin Securities, Inc.*, 133 F.3d 377, 380 (6th Cir. 1997) (same).  The *Kelly* decision is the most recent example of a Circuit Court vacating a jury verdict rendered in favor of a bankruptcy trustee for a bank's alleged aiding and abetting a debtor's Ponzi scheme.  *Kelly*, 402 F.4th at 904.  In that case, the Court of Appeals explained that

---

[19] *Compl.* ¶ 19.

4915-0559-1351

the company's causes of action enter the bankruptcy estate subject to the same defenses that could have been asserted against the debtor in state court. *Id.* at 906 (citing *Grassmueck*, 402 F.3d at 836) ("If [the debtor] had sued BMO in a Minnesota court, the defense of *in pari delicto* would have been available. BMO thus should have been able to raise the defense against Kelley as the bankruptcy trustee.").

82.    Section 541(a) of the Bankruptcy Code provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). This provision ensures that a bankruptcy trustee holds no greater rights than the debtor held at the commencement of the case. *Id.* As a consequence, as the chapter 7 trustee appointed in the Debtors' bankruptcy cases, the Plaintiff in this action "stands in the shoes of the debtor" and is "subject to all defenses available against the debtor[.]" *See In re Segerstrom*, 247 F.3d 218, 224 (5th Cir. 2001); *see also Sandoz v. F.D.I.C.*, 993 F.2d 67, 70 (5th Cir. 1993) (denying bankruptcy trustee's argument that Bank had taken fatally inconsistent positions regarding its security interest based in part on the fact that "the trustee himself stands *in pari delicto*."); *In re Fair Finance Company*, 834 F.3d 651, 676 (6th Cir. 2016) ("The *in pari delicto* defense has repeatedly been used to bar the actions of 'bankruptcy trustee[s] against third parties who participated in or facilitated wrongful conduct of the debtor[s].'").

83.    The *in pari delicto* defense is controlled by state law. *See Pinter v. Dahl*, 486 U.S. 622, 632, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The doctrine is based on the common law notion that a plaintiff's recovery should be barred by his own wrongful conduct. *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). As discussed above, this Court must first decide whether Kentucky or Texas law applies to the Plaintiff's common law claims under Counts I–V. Both states recognize the *in pari delicto* defense. There are at least two published decisions from Kentucky courts granting a motion to dismiss

under the *in pari delicto* defense.  While the undersigned has found no published opinions by a Texas court granting a motion to dismiss under the *in pari delicto* defense, the case law in Texas suggests that the standard for such dismissal is the same as expressed by Kentucky courts.

84.    Courts in Kentucky will grant a motion to dismiss under the *in pari delicto* doctrine "where the complaint 'establishes conclusively' that the defense applies." *In re Appalachian Fuels, LLC*, No. 09–10343, 2012 WL 4059973 at *2 (Bankr. E.D. Ky. Sep. 14, 2012).  In *Neblett v. Brothers*, 325 F.Supp.3d 797, 810–13 (E.D. Ky. 2018), a bankruptcy trustee commenced an action against third party suppliers for their part in an illegal scheme to export chips through the debtor technology company to China.  But the owner of the technology company pled guilty to various federal criminal charges associated with the scheme and, as such, was at least as culpable as the defendant suppliers.  *Id.* at 811.  The Court held that, as a matter of Kentucky law, the bankruptcy trustee was barred by the doctrine of *in pari delicto* and could not succeed on his causes of action against those suppliers.  *Id.*  Thus, the Court in *Neblett* granted a motion to dismiss based in part on its application of the *in pari delicto* doctrine.

85.    Similarly, and perhaps even more directly on point, in *In re Dublin Securities, Inc.*, 133 F.3d 377, 380 (6th Cir. 1997), a bankruptcy trustee admitted in his complaint that the debtors' own actions were instrumental in perpetrating a fraud on their investors in a securities scheme. The *Dublin Securities* court stated that "[s]uch purposeful conduct thus establishes conclusively that the debtors were *at least* as culpable as the defendants in this matter." *Id.*  The Sixth Circuit thus concluded, based on the trustee's own allegations, and as a matter of Kentucky law, that the *in pari delicto* doctrine barred the trustee from maintaining an action against the debtors' former law firms and lawyers for their part in the scheme.  *Id.*

86.    As noted above, Texas law also recognizes the defense of *in pari delicto*.  *See Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146, 151 (1947).  Judge Robert Jones, in *Reagor-Dykes* treated

the *in pari delicto* doctrine as an affirmative defense, akin to the "mere-conduit defense." *Reagor-Dykes Motors, LP v. Firstcapital Bank of Texas, N.A.*, 2020 WL 4939180 at * 13 (Bankr. N.D. Tex. Aug. 24, 2020) (citing *Rogers v. McDorman*, 521 F.3d 381, 386 (5th Cir. 2008). While recognizing that dismissal of a complaint based on an affirmative defense is rare, bankruptcy courts in Texas have continuously explained that "dismissal under rule 12(b)(6) may be appropriate based on a successful affirmative defense" in cases where, as the Kentucky courts have found, the defense was so apparent from the face of the complaint. *Id.* (citing *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (2006)); *see also Floyd v. CIBC World Markets Inc.*, 426 B.R. 622, 642-43 & n.40 (S.D. Tex. Aug. 25, 2009) (denying a motion to dismiss because the *in pari delicto* defense was not clearly apparent on the face of the complaint and required discovery to assess the applicability of three potential public policy exceptions: the adverse interest exception, the corporate insider exception, and the innocent insider exception.); *see also In re Today's Destiny, Inc.*, 388 B.R. 737, 749 (Bankr. S.D. Tex. 2008) (similarly denying a motion to dismiss pending a review of evidence).

87.    In *Today's Destiny*, the Bankruptcy Court for the Southern District of Texas found that the four corners of a bankruptcy trustee's complaint affirmatively stated that the chapter 11 debtor entity was engaged in illegal conduct and thus, the trustee stood *in pari delicto* with the defendants who had been pre-petition lenders to the debtor. *In re Today's Destiny, Inc.*, 388 B.R. at 749. However, the court cited to *Lewis* for the proposition that *in pari delicto* is not an automatic bar to recovery under Texas law, stating that "the Court must consider how the facts and equities of the individual case interact with the policy *in pari delicto* was designed to serve." *Id.* (citing *Lewis*, 199 S.W.2d at 151). As such, the *Today's Destiny* court stated in dicta that the necessary policy analysis could not be undertaken prior to discovery and an evidentiary hearing. *Id.* Notably, however, the court in *Today's Destiny* cited to no authority for the proposition that discovery and

33

4915-0559-1351

evidentiary hearings are required to balance public policy factors under *Lewis*, nor does the *Lewis* opinion itself reveal such an explicit requirement. *See Lewis*, 199 S.W.2d at 151.

88.     In another example, before Judge Robert Jones in *Reagor-Dykes*, the chapter 11 debtors asserted a number of chapter 5 causes of action against their "Rogue CFO" and FirstCapital Bank for collaborating to, in effect, defraud the debtors and their creditors. *In re Reagor-Dykes*, 2020 WL 4939180 at *1. The trustee alleged wrongdoings such as a Ponzi-like electronic check kiting scheme, which allegedly allowed the debtors to maintain large overdrafts in their accounts at the bank and accommodating their desire to create immediate credit and allow their scheme to persist beyond their means. *Id.* Interestingly, the Court in *Reagor-Dykes* found that "although dismissal under rule 12(b)(6) ***may be appropriate*** based on a successful affirmative defense … [h]ere, *in pari delicto* does not arise from the face of the complaint[.]" *Id.* at *13 (emphasis added). Notably, the Court went on to explain that it was only asked to apply the *in pari delicto* defense to the Debtors' equitable subordination claim, on which "bankruptcy courts disagree [] whether an *in pari delicto* defense would even apply[.]" *Id.*

89.     This case is distinguishable from *Reagor-Dykes* for two reasons: (1) the Trustee has asserted state common law claims against CFSB, not equitable subordination or other chapter 5 causes of action, and (2) the Trustee alleges the existence of a "massive Ponzi scheme" to which the *in pari delicto* defense clearly arises. Here, the *in pari delicto* defense is apparent from the face of the Complaint because, according to the Trustee's Complaint, the Debtors were "active, voluntary participant[s] in the unlawful activity that is the subject of the suit." *Pinter*, 486 U.S. at 636, 108 S.Ct. 2063. The Trustee alleges that the Debtors created a Ponzi scheme that was "staggering" in size "relative to the Debtors' actual cattle operations[.]" *Compl.* ¶ 31. He alleges that "it is clear the Debtors repaid investors with other investors' funds. Accordingly, the investors' profits were fictitious and exclusively reliant upon a stream of new investor funds." *Compl.* ¶ 30.

34

90.    Further, even if the Trustee could allege that CFSB committed some sort of wrongdoing, any alleged wrongdoing by CFSB derived only from the Debtors' own misconduct in the first instance, which the Trustee readily admits.  That is, but for the Debtors' own fraud, there would have been no wrongdoing by CFSB or harm caused to any creditors or investors.  The Trustee further admits that it was the Debtors who perpetuated an illegal check kiting scheme by defrauding CFSB and other Defendants.  Thus, according to the Trustee's own Complaint, the Debtors and McClain bear at least as much responsibility as CFSB—if not complete responsibility—for the alleged harm the Trustee seeks to redress in the Complaint.  Per the Trustee's Complaint, CFSB merely "perpetuated" the Debtors' own wrongdoing by failing to recognize and stop the fraud sooner.  *Compl.* ¶ 94.  However, the Trustee has failed to plead any plausible basis for how knowledge of the Debtors' wrongdoing could have been imputed to CFSB or, had CFSB truly known the extent of the alleged fraud, how CFSB could have done anything to stop it.[20]

91.    In this case, the face of the Complaint alleges a "massive Ponzi scheme" perpetuated by the Debtors and their owner.  The Trustee does not allege how public policy would be served by allowing the Trustee (standing in the Debtors' shoes) to hold third parties like CFSB liable for the Debtors' own fraud.  CFSB is, itself, a victim of the Debtors' misconduct.  The Trustee alleges that CFSB was "entangled" in the purported Ponzi and check kiting schemes.  All five Counts I–V asserted against CFSB are premised on the argument that CFSB did not affirmatively

---

[20] Similar arguments have been widely rejected by courts in the past. *See, e.g., Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 165 (2d Cir. 2003) (rejecting as "flawed" the plaintiff's argument that an underwriter was to blame for not rescuing the primary wrongdoers from their own knowing misconduct); *In re Parmalat Securities Litig.*, 659 F.Supp.2d 504, 530–31 (S.D.N.Y. 2009) (applying *in pari delicto* even though defendant auditors and bank allegedly worked with corporate insiders to facilitate and conceal the wrongdoing), *aff'd in part, vacated in part on other grounds*, 412 F. App'x 325 (2d Cir. 2011); *In re National Century Financial Enterprises, Inc.*, 783 F.Supp.2d 1003, 1022 (S.D. Oh. 2011) (applying *in pari delicto* to bar recovery against defendant bank because it was the debtors' principals who bore primary responsibility for the overall wrongdoing; notably, the chief means through which the controls were circumvented all occurred at the principals' command and orchestration).

4915-0559-1351

stop the Debtors' misconduct sooner.  In light of the foregoing, under either Texas or Kentucky common law, the Court should dismiss the Trustee's common law claims (Counts I–V) on the basis that the Trustee, standing in the Debtors' shoes, is barred by the *in pari delicto* doctrine from pursuing a claim against CFSB for the Debtors' own alleged wrongdoing.

**D.      The Trustee Has Failed to Plead Sufficient Facts to Proceed on His Common Law Claims (Counts I–V) Under Texas Law.**

92.      Even if the Court determines that Texas law applies (rather than Kentucky law), and further determines that the Trustee's claims are not barred under the doctrine of *in pari delicto*, the claims against CFSB still must be dismissed for the Trustee's failure to allege sufficient facts to establish plausible claims under Texas law.

93.      In the Fifth Circuit, "[d]ismissal is appropriate when the plaintiff has not alleged enough facts to state a claim to relief that is plausible on its face or has failed to raise his right to relief above the speculative level." *In re Elcoteq, Inc.*, 521 B.R. 189, 201 (Bankr. N.D. Tex. 2014) (quoting *Bass v. Stryker Corp.*, 669 F.3d 501, 506 (5th Cir. 2012)).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (internal quotation marks and alterations in original omitted).

94.      The Trustee has failed to articulate grounds for relief against CFSB.  While the Trustee paints the Defendants as culpable in broad strokes, the Complaint offers only conclusory statements about CFSB's alleged entanglement in an alleged Ponzi and check kiting scheme.  Due process and Bankruptcy Rule 7012 requires more.  For the reasons discussed below, the Trustee has failed to plead sufficient facts to state a plausible basis for relief against CFSB under Counts I–V, and such claims should be dismissed under Texas law.

i)       **Count I – Knowing Participation in Breaches of Fiduciary Duties**

95.     To survive a motion to dismiss under Count I (knowing participation in a breach of fiduciary duty), the Trustee must allege:  (1) there was a fiduciary relationship; (2) the third party knew of the fiduciary relationship; and (3) the third party was aware of his or her participation in the breach of the fiduciary's duty. *LMP Austin English Aire, LLC v. Lafayette Eng. Apartments, LP*, 654 S.W.3d 265, 287 (Tex. App. 2022); *Baylor Scott & White v. Project MSO, LLC*, 633 S.W.3d 263, 284 (Tex. App.—Tyler 2021, pet. denied).

96.     The Trustee attempts to cobble together facts to survive dismissal, but the allegations ultimately fall short.  The Trustee pleads the first two elements—*i.e.,* that McClain owed his companies fiduciary duties, and that CFSB would have known about McClain's role with his companies.  However, the Trustee alleges nothing to support the third element of this claim: whether CFSB was aware of McClain's fraudulent activities that would constitute breaches of McClain's fiduciary duties.  Moreover, the Trustee alleges nothing that could be considered a plausible basis to find that CFSB was aware of how it was "participating" in McClain's fraudulent activities.  The only facts alleged by the Trustee regarding CFSB's knowledge or participation in McClain's schemes are the following conclusory statements:

> Defendants knew they were participating in McClain's breach of his fiduciary duties to Debtors. Even worse, Defendants took an active role in McClain's Ponzi scheme through cash and check kiting activity.

*Compl.* ¶ 108.

97.     These conclusory statements are insufficient to overcome a motion to dismiss.  The Trustee fails to allege anything more specific about what CFSB knew or how CFSB took an active role in these schemes.  The Trustee further does not allege or assert that CFSB had a duty to investigate the circumstances of the Debtors' business.  The Trustee simply alleges that CFSB made "on-the-spot payments to investors who presented claims for payment on Partnership

4915-0559-1351

Agreements with McClain." *Compl.* ¶ 109.[21]  But honoring checks is what banks are legally obligated to do, and, while the Trustee contends that the Partnership Agreements were fraudulent, it does not follow that CFSB knew or had a duty to investigate every check or wire transfer drawn on the Debtors' bank accounts with CFSB.  In short, the Trustee does not state a sufficient factual basis to meet the elements of this cause of action.  It should be dismissed as a matter of law.

### ii)    Count II – Breach of CFSB's Fiduciary Duties to the Debtors

98.    Count II must also be dismissed under Texas law.  In general, Texas law does not recognize fiduciary duties owed by banks to their customers.  *See Farah v. Mafrige & Kormanik, P .C.*, 927 S.W.2d 663, 675 (Tex.App.-Houston [1st Dist.] 1996, no writ) (holding that the relationship between a bank and its customers does not create a special or fiduciary relationship); *Jones v. Thompson*, 338 S.W.3d 573, 583 (Tex. App.—El Paso 2010, pet. denied) (holding lenders owe no fiduciary duties to their borrowers and that mere subjective trust does not transform arms-length transactions into a fiduciary relationship); *Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 442 (Tex.App.—Houston [14th Dist.] 1998, pet. denied) ("A special relationship does not usually exist between a borrower and lender, and when Texas courts have found one, the findings have rested on extraneous facts and conduct, such as excessive lender control or influence in the borrower's business activities.").

99.    In limited circumstances, none of which are applicable here based on the Trustee's allegations, some Texas courts have found "special relationships" to exist based on "extraneous facts and conduct, such as excessive lender control over, or influence in, the borrower's business

---

[21] Notably, the Complaint fails to provide a single example of one such "on-the-spot" payment, fails to name an investor, and fails to name which investor or investors allegedly were paid by CFSB at the behest of McClain. This alone is grounds for dismissal under the *Twombly/Iqbal* standards.

activities." *See Farah*, 927 S.W.2d at 675 (citing *Greater S.W. Office Park, Ltd. v. Tex. Commerce Nat'l Bank*, 786 S.W.2d 386, 391 (Tex.App.—Houston [1st Dist.] 1990, writ denied)).

100.    Nowhere in the Complaint does the Trustee allege that CFSB exerted such excessive control over McClain or the Debtors.  The only fact alleged by the Trustee to support the existence of a fiduciary duty is the following conclusory statement:  "Defendants used their positions to control the outflow of funds from Debtors' bank accounts, and to increase and extend Debtors' line of credit with Rabo." *Compl.* ¶ 114.  Not only is this allegation vague and conclusory, but it is also not plausible when reviewed alongside the Trustee's more specific allegations.  Earlier in the Complaint, the Trustee alleges the following:

> The Trustee's position is that Defendants used their control over Debtors' accounts to pay investors who requested compensation in connection with the Debtors' Partnership Agreements.  Defendants paid those investors regardless of how much money was in Debtors' bank accounts. CFSB and Mechanics Bank overcame any shortfalls due to overdrafts on Debtors' accounts by working directly with Rabo via the DACA—and HTLF—to secure additional funds even when it was uncertain whether Debtors were in a financial position to pay back the loans.

*Compl.* ¶ 70; *see also Compl.* ¶ 93.

101.    Taken at face value, what the Trustee alleges here is that CFSB honored its legal obligations to Rabo under an alleged DACA[22] by honoring checks and wiring instructions when investors made valid payment requests presented on the Debtors' accounts at CFSB.  As discussed above in, CFSB's actions to fulfill its own legal obligations under the UCC are just ordinary banking activity—not the sort of "excessive control" that courts in Texas find to give rise to a fiduciary duty.

---

[22] For the sake of this Motion, CFSB will assume the existence of a DACA to be true, even though there was never any such DACA between Rabo and CFSB.  This factual inaccuracy is ultimately irrelevant, because the existence of a DACA would not have altered CFSB's obligations to honor properly presented checks.

102.     To illustrate the distinction, consider *Johnson v. Bank of America, N.A.*, 2014 WL 5490935, at *16 (Tex. App.—Beaumont October 30, 2014, no pet.), where a bank customer brought a breach of fiduciary duty claim against its lender after the lender failed to remit bank-escrowed funds to the customer's insurance company, allowing the customer's home insurance policy to lapse. *Id.* The Texas appellate court held that these facts were insufficient to create a special relationship, or a fiduciary duty. *Id.* ("[T]hese types of relationships are not, as a matter of law, fiduciary or special.").

103.     As in *Johnson*, the Trustee here has not pled sufficient facts to establish a special relationship between CFSB and the Debtors. While the Complaint is lengthy and broad in scope, a closer review of the actual facts alleged against CFSB demonstrates nothing special or extraneous. The Trustee has failed to allege a legal or factual basis under applicable Texas law to hold CFSB liable for breaches of fiduciary duty. Accordingly, this Count must be dismissed as a matter of Texas law.

### iii)    Count III – Common Law Conspiracy by CFSB

104.     Next, the Trustee seeks to hold CFSB liable for civil conspiracy with the Debtors and the other co-Defendants. But the Trustee fails to allege sufficient facts to assert a viable claim for civil conspiracy under Texas law. The essential elements of a civil common law conspiracy include: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983).

105.     While the Trustee alleges that multiple banks were "entangled" in the Debtors' finances, the Complaint fails to allege the remaining elements. Nowhere in the Complaint does the Trustee allege what CFSB sought to accomplish through an arrangement with the Debtors and other co-Defendants. The Trustee does not allege a specific "meeting of the minds" between CFSB

and any other Defendant.  Nor does the Trustee allege what object or course of action CFSB agreed

upon.  As it relates to CFSB, the following is the most specific statement articulated in the

Complaint regarding CFSB's alleged involvement in anything remotely resembling a conspiracy:

> CFSB, HTLF, and Mechanics Bank violated their own policies and procedures for fraud review and analysis (and their internal controls for verification of deposits received) and ignored federal and state laws regarding money laundering and other such fraudulent schemes to grease the wheels of McClain's Ponzi scheme, to the detriment of the Debtors. By the same token, Rabo deviated from its policies, procedures, and internal controls to bend over backwards to approve, extend, and increase its lending facilities to Debtors despite clear red flags and alarm bells sounding due to Debtors' precarious financial situation. Moreover, Mechanics Bank executed the DACA with Rabo that gave Rabo the ability to control Debtors' access to funds, and outflows from Debtors' bank accounts at CFSB and Mechanics Bank.

*Compl.* ¶ 126.

106.    The Trustee does not specify what "policies and procedures" CFSB violated.  Nor

does the Trustee specify which federal and state laws CFSB ignored.  Moreover, the Trustee does

not articulate *why* CFSB would have desired to "grease the wheels of McClain's Ponzi scheme"—

*i.e.,* a Ponzi or check kiting scheme would not have benefited CFSB.  On this point, the Trustee

simply glosses over how Ponzi and check kiting schemes generally harm the banks exploited by

the scheme.  As noted above, CFSB would have been the victim of a check kiting scheme, had it

existed.

107.    At bottom, the Complaint is nothing more than a salacious fabrication of vague and

conclusory statements that was clearly prepared for no purpose beyond survival of a motion to

dismiss.  A closer review of the actual allegations in the Complaint demonstrates the lack of

substance.  Because these statements are not facially plausible and do not allege the components

of a true "civil conspiracy," the claim for civil conspiracy must also be dismissed as a matter of

law.  *Cf. In re Elcoteq, Inc.*, 521 B.R. at 201 (dismissing a fraudulent transfer claim because the

trustee failed to allege the defendant's actual receipt of a transfer).

iv)    **Count IV – CFSB's Alleged Professional Negligence**

108.    The Trustee also fails to allege sufficient facts to state a facially plausible basis for

relief under his negligence Count IV.    Negligence under Texas law consists of three elements:

(1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages

proximately resulting from that breach. *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 144 (Tex.

2022).

109.    Here, the Trustee alleges that, because the Debtors were bank customers of CFSB,

CFSB owed an ordinary duty of care under the Texas Uniform Commercial Code. *Compl.* ¶ 136.

110.    But the only facts alleged to support a breach of that duty are the following:

> CFSB and Mechanics Bank breached their duty of ordinary care to Debtors by
> engaging in cash and check kiting activity where CFSB and Mechanics Bank
> used their control over Debtors' accounts to make on-the-spot payments to
> investors demanding payment under fraudulent Partnership Agreements.

*Compl.* ¶ 137.

111.    For this Count, the Trustee seems to be saying that CFSB breached its ordinary duty

of care by "engaging in cash and check kiting activity." *Id.*  It is unclear what this means, because,

by definition, banks are the victims of their customers' fraudulent check kiting schemes.  Thus, the

allegation above is nonsensical.  Moreover, the argument that CFSB engaged in check kiting

directly contradicts the Trustee's own allegations in other portions of the Complaint, where the

Trustee alleged that the Debtors and McClain propagated this fraudulent check-kiting scheme,

which requires an unsuspecting depository bank like CFSB. *See Compl.* ¶ 37 ("The Debtors' cash

activity was also a massive check kiting scheme."), ¶ 40 ("To remedy the overdrafts, the Debtors

resorted to, among other tactics, a pervasive check-kiting scheme."), ¶ 42 ("Despite the Debtors'

extensive check-kiting, the Debtors' accounts remained overdrawn and materially so . . ."), ¶ 43

("The Debtors' intercompany transactions totaled in the tens of millions per month and $2 billion

in 5 years, thus illustrating the fraudulent volume required to, among other things, fund the

Debtors' check kiting scheme and the Debtors' desperate attempts to cover the checks due to their

investors . . ."), ¶ 66 ("HTLF accomplished this shadow lending through check kiting undertaken

by Ragland and Fernandez on behalf of the Debtors").

112.    Notably, while the Trustee alleges that Rabo, HTLF, and Mechanics may have had

reasons to suspect the existence of a fraudulent check kiting scheme, the Trustee does not allege

that CFSB had the same information or reason to suspect what McClain was doing.  Indeed,

nothing in Complaint alleges (or even suggests) that CFSB knew or had reason to know about the

check kiting or Ponzi scheme.  And, as discussed above, even if CFSB had known about the check

kiting sheme, CFSB would have been the victim of the fraud, not the proponent of it.  *See In re*

*Mongelluzzi*, 591 B.R. 480, 491 (Bankr. M.D. Fla. 2018) ("The bank left holding dishonored

checks is the victim of the scheme as it is the bank who suffers the loss – not the creditors of the

check-kiter.") (citing *United States v. Asher*, 59 F.3d 622 (7th Cir. 1995); *United States v. Rackley*,

986 F.2d 1357, 1361 (10th Cir. 1993)).

113.    As with the prior Counts, the statement that CFSB somehow *engaged* in check

kiting activity is nothing short of salacious.  The Trustee does not allege what, if anything, CFSB

did to violate its duties under the Texas Uniform Commercial Code.  For these reasons, Count IV

should be dismissed as a matter of Texas law.

### v)    Count V – Punitive Damages

114.    Count V must also be dismissed, as it is merely a remedy, not an independent cause

of action recognized under Texas law.  *See Travelers Indem. Co. v. Fuller*, 892 S.W.2d 848, 853

(Tex. 1995) ("To the extent that punitive damages are a common law remedy, they are also

dependent at common law upon actual damages."); *see also Robbins v. Payne*, 55 S.W.3d 740, 747

(Tex. App.—Amarillo 2001, pet. denied) ("Similarly, there is no independent cause of action for

exemplary damages. They are simply an element of damages recoverable under a cause of action")

(citing Tex. Civ. Prac. & Rem. Code § 41.002(a)); *Sunshine Kids Found. v. Sunshine Kids Juvenile Prod., Inc.*, 2009 WL 5170215 at \*17 (S.D. Tex. Dec. 18, 2009) ("Exemplary damages are a remedy and not a cause of action.") (citing *Sulzer Carbomedics v. Or. Cardio-Devices, Inc.*, 257 F.3d 449, 461 (5th Cir. 2001); *Fuller*, 892 S.W.2d at 852).

115.    As such, the Trustee cannot maintain an independent cause of action under Count V, and it should be dismissed with the other counts asserted against CFSB.

### vi)    Count XV:    The Fraudulent Transfers Are Not Well-Pled and Must Be Dismissed.

116.    The final count asserted against CFSB is Count XV, which seeks to avoid and recover under 11 U.S.C. §§ 548(a)(1)(A), 548(a)(1)(B), and 550, Sections 24.005 and .006 of the Texas Fraudulent Transfer Act, and Sections 378A.040 and .050 of the Kentucky Uniform Voidable Transactions Act $33,277,959.91 (plus attorney's fees) in "overdrafts…repaid by the Debtors." *Compl*. ¶ 170.  The Trustee has apparently included this count as an afterthought and failed to include even the barest of allegations supporting an actual or constructive fraudulent transfer.

117.    Count XV fails to incorporate by reference any of the allegations made elsewhere in the Complaint.  The sole factual allegation in support of the Trustee's fraudulent transfer claim against CFSB is that "[t]he overdrafts to CFSB repaid by the Debtors totals [sic] $33,277,959.91 as detailed on the schedule attached as Exhibit E hereto."  This statement is facially insufficient to assert a claim for fraudulent transfer.  Furthermore, even if this Court considers allegations outside of Court XV, they are similarly insufficient to meet the *Twombly*/*Iqbal* standards.  Count XV should be dismissed with prejudice.

**E.      The Trustee Has Failed to Allege a Transfer of the Debtors' Property or an Obligation Incurred by the Debtors.**

118.    The Trustee's fraudulent transfer claims require the Trustee to show the transfer

"of an interest of the debtor in property…or any obligation…incurred by the debtor"

11 U.S.C. §548(a)(1), or a "transfer made or obligation incurred by a debtor," Tex. Bus. & Com.

Code §§ 24.005(a), 24.006(a); Ky. Rev. Stat. §§ 378A.040(1)(a), 378A.050.

119.    The Trustee alleges that to the extent overdrafts existed, they were covered by

payments by *non-Debtor* entities.  "Each overdraft with CFSB and Mechanics Bank created a debt

of the Debtors that was subsequently repaid by covered funds, *usually from investors*."

*Compl.* ¶ 164 (emphasis added).  Similarly, the Trustee alleges that "[w]hen Debtors' accounts

would go into overdraft, CFSB and Mechanics Bank worked in tandem with Rabo, utilizing the

DACA and other processes to *bypass Debtors and seek additional funding*…*Rabo, CFSB, and*

*Mechanics Bank loaned Debtors any account shortfalls* resulting from cash and check kiting to

perpetuate McClain's Ponzi scheme."  *Compl.* ¶ 109 (emphasis added).

120.    If these allegations are taken as true, no transfers were made by the Debtors.

Instead, at best, the Debtors incurred debts through the overdrafts that were subsequently satisfied

from investors or one of the Defendants.

121.    This Court should dismiss Count XV, as the Trustee has utterly failed to allege what

transfers were made and which "transfers" might have been received by CFSB as the direct or

subsequent transferee.  *See In re Elcoteq, Inc.*, 521 B.R. at 201-02 ("From the Court's perspective,

Philips is correct that the Trustee has failed to plead how Philips is a party from whom the Trustee

can recover based upon the avoidance of some prepetition transfer that may have arisen from the

issuance of the Strike Summons.  As just explained, under § 550, the Trustee can only recover

from the initial transferee, a subsequent transferee of the initial transferee, or one for whom the

transfer was made. 11 U.S.C. § 550(a). Philips is not alleged to be any of those persons").

122.    Just as the trustee failed to allege key elements of a fraudulent transfer claim in *Elcoteq*, the Trustee here has failed to plead facts showing that a transfer of the Debtors' property has taken place or that CFSB was a recipient of such a transfer.  No amendment can correct this factual deficiency.  *See id.* at 205 (denying leave to amend as futile).

**F.      The Trustee Has Failed to Allege Any Badges of Fraud or That Any Transfer Was Made or an Obligation Was Incurred for Less Than Reasonably Equivalent Value in Exchange.**

123.    Furthermore, the Trustee has failed to allege (a) any badges of fraud to support an actually fraudulent transfer or (b) that any actions surrounding the overpayments resulted in less than reasonably equivalent value being received by the Debtors in exchange for purposes of a constructive fraudulent transfer theory.  Instead, he relies upon the "Ponzi scheme presumption," notwithstanding that there has been no finding that a Ponzi scheme existed here.

124.    To state a claim for actual fraudulent transfer, the Trustee bears the burden of showing the requisite fraudulent intent.  *Bustamante v. Johnson (In re McConnell)*, 934 F.2d 662, 665 n. 1 (5th Cir. 1991).  Since it involves actual fraud, the heightened pleading standard of Fed. R. Civ. P. 9(b) applies to such claim, and the Complaint must contain factual allegations stating "the who, what, when, where, and why as to the fraudulent conduct." *Life Partners Creditors' Tr. v. Cowley (In re Life Partners Holding, Inc.)*, 926 F.3d 103, 117 (5th Cir. 2019) (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)).

125.    The Complaint wholly fails to plead any of these factors and Exhibit E, titled "CFSB Negative Activity," does not provide the requisite support.  Exhibit E merely seems to list negative amounts in one CFSB account.  It is unclear whether the listed amounts are negative balances in a bank account, overdrafts, payments, or something else.

126.    Furthermore, a Debtor entity (McClain Farms Inc.) is listed in an "Entity" column, but it is unclear whether this is the entity that owns the listed bank account, making an alleged

4915-0559-1351

transfer, allegedly incurring an obligation, or something else. There is a "Date" column, but, again, the inclusion of this column in the Exhibit is wholly without context. CFSB cannot discern from the Exhibit whether the dates listed in the column represent: (i) the date of a payment made by the Debtors from their accounts at CFSB to some third party transferee (*i.e.*, not a transfer *to* CFSB, but rather a transfer *from* an account held with CFSB); (ii) the date CFSB extended provisional credit to cover a check presented to CFSB for payment (*i.e.*, not a transfer *to* CFSB, or even a "transfer" under applicable law), (iii) the date CFSB received cover from a third-party bank on its provisional credit (*i.e.*, not a transfer if received by the "midnight" deadline,[23] and not a transfer if simply received from the Debtors' accounts at a different banking institution), or (iv) something else.

127.    These allegations are entirely insufficient to meet the normal pleading standard, and do not even begin to address the "time, place and false representations" with sufficient specificity to meet the Fed. R. Civ. P. 9(b) pleading standard.

128.    To assert a claim for constructive fraudulent transfer, the Trustee must show that transfers were made for "less than a reasonably equivalent value" or "without receiving a reasonably equivalent value in exchange." *See* 11 U.S.C. § 548(1)(B)(i); Tex. Bus. & Com. Code § 24.005(a)(2); Ky. Rev. Stat. § 378A.050. The Trustee has failed to assert a lack of reasonably equivalent value in any manner. Accordingly, the Complaint fails to state a claim for constructive fraudulent transfer.

129.    Rather than allege badges of fraud or reasonably equivalent value, the Trustee appears to rely upon the "Ponzi presumption." *Compl.* ¶ 3. However, as detailed above, the

---

[23] When an overdraft is covered by midnight on the second day after presentment there is no "true" overdraft that constitutes a transfer. *See, e.g.*, *In re Able Body Temp. Servs., Inc.*, 626 B.R. 643, 677 (Bankr. M.D. Fla. 2020); Ky. Rev. Stat. § 355.4-302; Tex. Bus. & Com. Code § 4.302.

Complaint does not sufficiently allege a Ponzi scheme and there has been no finding that a Ponzi scheme existed. Accordingly, the Trustee cannot rely upon the Ponzi presumption to support his alleged fraudulent transfer claims and he has failed to assert a plausible claim for fraudulent transfer.

**G.    Nearly Half of the Alleged Fraudulent Transfers/Obligations are Not Recoverable Because They Fall Outside the Two- or Four-Year Time Period.**

130.    Under Texas and Kentucky state fraudulent transfer law, a fraudulent transfer claim is extinguished unless it is brought within four (4) years following the transfer at issue. Tex. Bus. & Com. Code § 24.010; Ky. Rev. Stat. § 378A.090. Here, a significant portion of the listed "Negative Activity" on Exhibit E occurred outside of the four-year lookback period. The four-year period is April 28, 2019, through April 28, 2023. Assuming the Trustee is asserting that the 87 "amounts" on Exhibit E constitute transfers, nearly half fall prior to that window. *See Compl.*, Exhibit E. Any attempt to avoid transfers that occurred prior to April 28, 2019, is barred and the underlying claim is extinguished. Accordingly, the Complaint fails to state a claim for fraudulent transfer in relation to such transfers.

**H.    CFSB is Entitled to the Good Faith Defense.**

131.    Pursuant to Section 548(c), a good-faith taker for value has a defense to an actual or constructive fraud claim:

> a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

132.    Texas and Kentucky law provide similar good faith taker defenses against actual fraud, providing that "[a] transfer or obligation is not voidable…against a person who took in good faith and for a reasonably equivalent value." *See also* Tex. Bus. & Com. Code § 24.009(a);

Ky. Rev. Stat. § 378A.080(1).  CFSB bears the burden of proving these affirmative defenses.  *See*

*Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 799 (5th Cir. 2002).

133.    "For purposes of the 'reasonably equivalent value' requirement in [TUFTA] section

24.009(a), proof that an exchange occurred for market-value rates in an arm's-length transaction

conclusively establishes that the value exchanged was 'reasonably equivalent.'"  *Janvey v. Golf*

*Channel, Inc.*, 487 S.W.3d 560, 582 (Tex. 2016).  To the extent the Trustee alleges that the

"transfers" he is seeking to avoid and recover are payments to cover true overdrafts, such payments

went to reduce, on a dollar-for-dollar basis, any "credit" extended by CFSB.

134.    The only issue remaining regarding this defense is CFSB's good faith in receiving

the transfers.  The issue of good faith is analyzed by evaluating:

> First, whether the transferee had information that that put the transferee on inquiry
> notice that the transferor-debtor was either insolvent or making the transfer with a
> fraudulent purpose. Second, once the transferee was on inquiry notice, the court
> addressed whether the transferee satisfied the requirement of a "diligent
> investigation" of the transfer.

*Osherow v. Charles (In re Wolf)*, No. 15-31477-HCM, 2016 WL 4940198, at *32 (Bankr. W.D.

Tex. Sept. 15, 2016), *subsequently aff'd*, 697 F. App'x 317 (5th Cir. 2017) (citing *Templeton v.*

*O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 164 (5th Cir. 2015)).  The analysis is

substantially the same under TUFTA: a transferee cannot have actual or inquiry notice of a

transfer's fraudulent nature if it wishes to assert the good faith taker defense.  *Hahn v. Love*, 321

S.W.3d 517, 527 (Tex. App.-Houston [1st Dist.] 2009, pet. denied)); *Bullock v. Almon*, No. 4:21-

CV-57-JHM, 2021 U.S. Dist. LEXIS 147797, at *13 n.2 (W.D. Ky. Aug. 5, 2021) (TUFTA actions

are subject to the limitations of KRS 378A.080).

135.    The Complaint makes the conclusory allegation that CFBS should have known of

the existence of the Debtors' scheme merely due to the existence of overdrafts in the Debtors' bank

accounts.  However, the Complaint fails to include any factual allegations about why CFSB should

have suspected wrongdoing simply due to normal banking activity.  The Trustee alleges in the Complaint that overdrafts were fairly common occurrences, ranging from as few as six days per year in 2020, to as many as 43 days per year in 2018.  *Compl.* ¶ 38.  In 2021 and 2022, the Debtors spent 32 and 18 days, respectively, in overdraft.  *Id.*  Nowhere in the Complaint does the Trustee allege why the number of days in overdraft, without more, would have given CFSB reason to suspect a check kiting scheme or any other issues with the Debtors' bank accounts, especially since overdrafts were regularly covered quickly.  *See Compl.* at 16 (chart showing "End of Day Balance").  The Court is not bound to accept the Trustee's conclusory allegations as true.  Here, the Complaint simply fails to allege any facts that would negate CFSB's good faith, which is otherwise apparent on the face of the Complaint.

## I.    The Trustee Cannot Recover Attorney's Fees as Part of His Fraudulent Transfer Claim

136.    The Trustee seeks attorney's fees under Tex. Bus. & Com. Code § 24.013.  He cannot do so—the Trustee's recovery on avoidance claims is set by Section 550, which has no similar provision for attorney's fees.  *See* 11 U.S.C. § 550.

137.    It is black letter law that avoidance and recovery are separate claims: "Even though an action to avoid a transfer may be, and often is, brought in conjunction with an action to recover the property transferred or its value, a court must evaluate the two bases of relief separately." *Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 780 (Bankr. N.D. Ill. 2007) (citing cases).

138.    Even if the Trustee could articulate a valid basis to *avoid* "transfers" under state law, the separate claim for *recovery* of the avoided transfer is not governed by section 24.013 of the Texas Business & Commerce Code or similar Kentucky law.  Once the transfer is avoided, the Trustee's recovery is controlled by section 550 of the Bankruptcy Code.  The Bankruptcy Code limits recovery to the actual "property transferred," or "the value of such property." 11 U.S.C.

§ 550(a).  Accordingly, the Trustee has failed to state a claim for attorneys' fees that is plausible and this portion of Count XV should be dismissed.

**J.      The Court Should Deny Leave to Amend**

139.    Although a denial of leave to amend a Complaint is rare, such relief if warranted if "there is undue delay, bad faith or dilatory motive, undue prejudice or futility of the amendment." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 576 n.8 (5th Cir. 2005).  These chapter 7 cases were filed nearly two years before the Trustee commenced the Complaint.  In that two-year period, CFSB engaged in extensive pre-suit discovery with the Trustee and other creditors in these cases.  Yet, despite having ample opportunity to investigate potential claims against CFSB, the Trustee has utterly failed to articulate any facts that come close to articulating any plausible bases for relief against CFSB.  The Trustee should not be allowed to force CFSB to incur the legal expense of continuing to respond to the Trustee's "ready, fire, aim" shotgun approach.  CFSB respectfully requests that the Court dismiss the claims asserted against CFSB with prejudice, and without leave to amend.

[*Remainder of page intentionally left blank*]

4915-0559-1351

WHEREFORE, CFSB respectfully requests that this Court enter the attached Order, dismissing the Complaint in its entirety with prejudice, and grant it such other and further relief to which it is justly entitled.

Respectfully submitted this 19th day of May 2025.

**GRAY REED**
By:  */s/ Aaron M. Kaufman*
    Aaron M. Kaufman
    Texas Bar No. 24033684
    Amber M. Carson
    Texas Bar No. 24075610
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone:    (214) 954-4135
Facsimile:    (214) 953-1332
Email:    akaufman@grayreed.com
        acarson@grayreed.com

-and-

**MORGAN POTTINGER MCGARVEY**
By:  *Keith J. Larson*
    Keith J. Larson (admitted *pro hac vice*)
401 South Fourth Street, Suite 1200
Louisville, KY 40202
Telephone:    (502) 560-6758
Facsimile:    (502) 585-3498
Email:    kjl@mpmfirm.com

*Counsel to Community Financial Services Bank*

4915-0559-1351

## Certificate of Service

   I certify that on May 19, 2025, I caused a copy of the foregoing document to be served via electronic mail on the counsel listed below, and via the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

**LYNN PINKER HURST & SCHWEGMANN LLP**
Alan Dabdoub (adabdoub@lynnllp.com)
Campbell Sode (csode@lynnllp.com)
Farsheed Fozouni (ffozouni@lynnllp.com)
Nathaniel Plemons (nplemons@lynnllp.com)
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: 214-981-3800
Facsimile: 214-981-3839

**JOBE LAW PLLC**
Hudson M. Jobe (hjobe@jobelawpllc.com)
6060 North Central Expressway, Suite 500
Dallas, Texas 75206
(214) 807-0563

*Counsel for the Plaintiff/Trustee*

**LOVELL LOVELL ISERN & FARABOUGH, LLP**
John H. Lovell (john@lovell-law.net)
112 Southwest 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314
Telephone: (806) 373-1515
Facsimile: (806) 379-7176

*Counsel for Defendant HTLF Bank*

**RAY QUINNEY & NEBEKER P.C.**
Michael R. Johnson (mjohnson@rqn.com)
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 532-1500
Facsimile: (801) 532-7543

**UNDERWOOD LAW FIRM, P.C.**
Thomas C. Riney
tom.riney@uwlaw.com
Heath Hendricks
heath.hendricks@uwlaw.com
500 South Taylor, Suite 1200, LB 233
Amarillo, Texas 79101
Telephone: (806) 376-5613
Facsimile: (806) 379-0316

*Counsel for Defendant Rabo Agrifinance, LLC*

**HUSCH BLACKWELL LLP**
Buffey Klein
Buffey.Klein@huschblackwell.com
Richard A. Illmer
rick.illmer@huschblackwell.com
1900 N. Pearl Street, Suite 1800
Dallas, Texas 75201
(214) 999-6100
(214) 999-6170 (fax)

*Counsel for Defendant Mechanics Bank*

*/s/ Aaron M. Kaufman*
Aaron M. Kaufman

4915-0559-1351