UNDERWOOD LAW FIRM, P.C.
Thomas C. Riney, SBN: 16935100
W. Heath Hendricks, SBN: 240556451
500 South Taylor, Suite 1200, LB 233
Amarillo, Texas 79101
Telephone: (806) 376-5613
Facsimile: (806) 379-0316
Email: tom.riney@uwlaw.com
Email: heath.hendricks@uwlaw.com

   *and*

Michael R. Johnson (*Pro Hac Vice*)
Matthew M. Cannon (*Pro Hac Vice*)
Austin C. Nate (*Pro Hac Vice*)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
Email:  mjohnson@rqn.com
Email:  mcannon@rqn.com
Email:  anate@rqn.com

*Attorneys for Rabo AgriFinance LLC*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| In re:<br><br>MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.<br><br>    Debtors. | CASE NO. 23-20084-rlj7<br>Chapter No. 7<br><br>(Jointly Administered Cases) |
| KENT RIES, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATES OF MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.<br><br>    *Plaintiff,*<br><br>v. | ADV. PROC. NO. 25-02005<br><br>Honorable Scott W. Everett |

| COMMUNITY FINANCIAL SERVICES BANK; HTLF BANK; MECHANICS BANK; and RABO AGRIFINANCE LLC, *Defendants.* | |
|---|---|

**RABO AGRIFINANCE LLC'S BRIEF IN SUPPORT OF
MOTION TO DISMISS TRUSTEE'S ORIGINAL ADVERSARY COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 8, 9(b), 12(b)(1), and 12(b)(6), made applicable to this Adversary Proceeding by Rules 7008, 7009, and 7012 of the Federal Rules of Bankruptcy Procedure, and pursuant to 28 U.S.C. § 1404(a) and/or the doctrine of *forum non conveniens*, Defendant Rabo AgriFinance LLC ("**Rabo**"), through counsel, hereby submits this brief in support of its motion to dismiss *Trustee's Original Adversary Complaint* (the "**Complaint**") filed by Kent Ries, Chapter 7 Trustee ("**Plaintiff**" or "**Trustee**").

## TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT ........................................................ 9

STANDARDS OF REVIEW AND CHOICE OF LAW ......................... 12

ARGUMENT ........................................................................................ 15

I.  PLAINTIFF'S CLAIMS BASED ON RABO'S PURPORTED
KNOWING PARTICIPATION IN THE PONZI SCHEME MUST BE
DISMISSED FOR LACK OF ALLEGATIONS SUPPORTING ANY
SUCH KNOWLEDGE BY RABO. .................................................. 15

II.  RABO HAD NO DUTY AS A MATTER OF LAW IN
CONNECTION WITH ITS ALLEGED FAILURES AS A LENDER,
DICTATING THE DISMISSAL OF NUMEROUS CLAIMS. ..................... 17

III.  THE STATE LAW CLAIMS SHOULD BE DISMISSED
PURSUANT TO THE *IN PARI DELICTO* DOCTRINE. ............................ 20

IV.  THE SIX "STATE LAW" CLAIMS FAIL FOR ADDITIONAL
REASONS UNDER RULES 12(B)(6) AND/OR 9(B) OF THE
FEDERAL RULES OF CIVIL PROCEDURE. .................................. 21

A.  Plaintiff's Aiding and Abetting Breach of Fiduciary Duty
Claim Fails and Should be Dismissed. .................................... 22

1.  The Trustee's attempted linguistic gymnastics to
manufacture this claim are unavailing. .................................. 22

2.  The claim fails for absence of facts demonstrating
Rabo's knowing participation. .................................................. 25

3.  The claim fails for no underlying breach of fiduciary
duty. ........................................................................................ 26

B.  Plaintiff's Claim for Breach of Fiduciary Duty Fails for
Numerous Reasons. .............................................................. 26

1.  No breach of duty. ............................................................... 26

2.  Rabo was not the proximate cause of the alleged
damages. ................................................................................ 27

C.  Plaintiff's Claim for Civil Conspiracy Is Without Merit and Is
Not Asserted in Good Faith. ..................................................... 28

1.  The object of the conspiracy makes no sense and is not
plausible. ................................................................................ 28

2.      No facts supporting a "meeting of the minds" or "unlawful acts." ........................................................... 29

3.      No facts supporting damages. .................................................... 29

D.      The Claim for Professional Negligence Fails as a Matter of Law. ................................................................................. 30

E.      The Claim for Money Had and Received Is Without Merit. ............. 31

F.      Plaintiff's "Claim" for Punitive Damages Fails. ................................. 32

V.      ALL NON-CORE CLAIMS SHOULD BE DISMISSED PURSUANT TO THE WRITTEN AGREEMENTS BETWEEN RABO AND DEBTORS. ........................................................................................ 32

A.      The State-Law Claims Should Be Dismissed or Transferred Pursuant to the Forum-Selection Clauses in the Controlling Loan Agreements. ...................................................................... 32

B.      The Debtors Expressly Waived and Released the State-Law Claims Plaintiff Attempts to Assert on Their Behalf Here. ............... 37

VI.     THE COURT SHOULD DISMISS PLAINTIFF'S SIX "BANKRUPTCY" CLAIMS. ........................................................... 39

A.      Determination of Extent, Validity, and Priority of Lien. .................... 39

B.      Plaintiff's Preference Claim Related to Rabo Loan Payments Fails to State a Claim Upon Which Relief May Be Granted............... 41

C.      Plaintiff's Claim for Fraudulent Transfer Should Be Dismissed. ............................................................................... 43

D.      Plaintiff's Disallowance Claim Should Be Dismissed. ......................... 46

E.      Plaintiff's Equitable Subordination Claim Must Be Dismissed. ........ 46

CONCLUSION ............................................................................................ 48

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233 (5th Cir. 2009) ................................................ 14, 34

*Arias-Benn v. State Farm Fire & Cas. Ins. Co.*, 495 F.3d 228 (5th Cir. 2007) ........................... 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................................. 13, 16, 46

*Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49 (2013) .................................................................................................. 14, 33, 36, 37

*Bank of Am., N.A. v. Corporex Realty & Inv., LLC*, 875 F. Supp. 2d 689 (E.D. Ky. 2012) ......... 19

*Bertrand v. White*, No. 1:09-CV-358, 2009 WL 10682257 (E.D. Tex. July 7, 2009) ................. 28

*Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.),* 437 F.3d 457 (5th Cir. 2006) ................................. 42

*CapRock Milling & Crushing, LLC v. Perdue Agribusiness LLC*, No. 2:24-CV-G38-Z, 2024 WL 4582903 (N.D. Tex. Oct. 25, 2024) ............................................................... 33

*Chu v. Hong,* 249 S.W.3d 441 (Tex. 2008) ................................................................. 29

*Elson v. Black*, 56 F.4th 1002 (5th Cir. 2023) .............................................................. 13

*Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17–CV–444–RP, 2018 WL 315753 (W.D. Tex. Jan. 5, 2018) ........................................................................ 22

*Finn v. Alliance Bank*, 860 N.W.2d 638 (Minn. 2015) ..................................................... 45

*Gann v. Anheuser-Busch, Inc.*, 394 S.W.3d 83 (Tex. App. 2012) .......................................... 30

*General Car & Truck Leasing Sys., Inc. v. Lane & Waterman,* 557 N.W.2d 274 (Iowa 1996) ..................................................................................................... 20

*Highland Cap. Mgmt., L.P. v. UBS Secs LLC (In re Lyondell Chem. Co.)*, 491 B.R. 41 (Bankr. S.D.N.Y. 2013) .............................................................................. 14, 34

*Holt v. FDIC (In re CTS Truss, Inc.)*, 868 F2s 146 (5th Cir. 1989) ...................................... 47

*Houle v. Casillas*, 594 S.W.3d 524 (Tex. Ct. App. 2019) ................................................... 18

*Hunt v. Baldwin*, 68 S.W.3d 117 (Tex. App. 2001) ......................................................... 28

*In re Clark Pipe & Supply Co.*, 893 F.2d 693 (5th Cir. 1990) ............................................. 48

*In re Fabricators, Inc.*, 962 F.2d 1458 (5th Cir. 1991) .................................................... 47

*In re Hutcheson Med. Ctr., Inc.*, No. 14-42863-PWB, 2017 WL 4536076 (Bankr. N.D. Ga. Oct. 6, 2017) .................................................................................................................. 33

*In re LMI Legacy Holdings, Inc.*, 553 BR. 235 (Bankr. D. Del. 2016) ........................................ 33

*In re Manchester, Inc.*, 417 B.R. 377 (Bankr. N.D. Tex. 2009) .................................................... 33

*In re PA Co-Man, Inc.*, 644 B.R. 553 (Bankr. W.D. Pa. 2022) ....................................... 14, 34, 37

*In re Reagor-Dykes Motors, LP*, 2022 WL 1046144 (Bankr. N.D. Tex. June 3, 2022) .............. 45

*In re Today's Destiny, Inc.*, 388 B.R. 737 (S.D. Tex. 2008) ........................................................ 21

*In re U.S. Abatement Corp.*, 39 F.3d 556 (5th Cir. 1994)...................................................... 20, 47

*Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797 (5th Cir. 2017)............................................ 22

*Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560 (Tex. 2016) ........................................................ 45

*Jones v. Thompson*, 338 S.W.3d 573 (Tex. Ct. App. 2010) ........................................................ 18

*Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571 (Tex. App. 2007) ............................ 22, 26

*Kraetsch v. Stull*, 29 N.W.2d 341 (Iowa 1947).......................................................................... 20

*Kurth v. Van Horn*, 380 N.W.2d 693 (Iowa 1986) ..................................................................... 18

*Lane ex rel. Lane v. Halliburton*, 529 F.3d 548 (5th Cir. 2008)............................................ 14, 20

*Martinez v. Capital One*, Case No. H-22—2767, 2022 WL 17085938 (S.D. Tex. Hous. Div. Nov. 18. 2022) .................................................................................................................. 27

*MC Asset Recovery LLC v. Commerzbank A.G.*, 675 F.3d 530 (5th Cir. 2012).......................... 15

*McNally & Nimergood v. Neumann-Kiewit Constructors, Inc.*, 648 N.W.2d 564 (Iowa 2002) ......................................................................................................................................... 38

*Pappas v. Clark*, 494 N.W.2d 245 (Iowa Ct. App. 1992)........................................................... 21

*Perkins v. Haines (In re International Mgmt. Assocs., LLC)*, 661 F.3d 623 (11th Cir. 2011) .......................................................................................................................................... 45

*Phillips v. Super Servs. Holdings, LLC*, 189 F. Supp. 3d 640 (S.D. Tex. 2016) ......................... 30

*Robbins v. Payne*, 55 S.W.3d 740 (Tex. App. Ct. 2001) ............................................................ 32

*Rodriquez v. Love*, 860 S.W.2d 541 (Tex. Ct. App. 1993)......................................................... 21

*Safeshred, Inc. v. Martinez*, 365 S.W.3d 655 (Tex. 2012)......................................................... 32

*Sallee v. Fort Knox Nat'l Bank, N.A.*, 286 F.3d 878 (6th Cir. 2002) ............................ 18

*Sharpe v. Turley*, 191 S.W.3d 362 ..................................................................... 21

*Steelvest, Inc. v. Scansteel Serv. Ctr.*, 807 S.W.2d 476 (Ky. 1991) .............................. 18

*Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856 (Tex. App.—El Paso 2021, no pet.) ............................................................................................................... 30

*Super Starr Int'l, LLC v. Fresh Tex Produce, LLC*, 531 S.W.3d 829 (Tex. App. 2017) ........ 22, 26

*Thompson v. Kaczinki*, 744 N.W.2d 829 (Iowa 2009) .................................................. 30

*Thurman v. Med. Transportation Mgmt., Inc.*, 982 F.3d 953 (5th Cir. 2020) ..................... 13

*UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia,* 581 F.3d 210 (5th Cir. 2009) ............... 36

*United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365 (5th Cir. 2017) ................... 13

*Walch v. Adjutant Gen.'s Dep't of Tex.*, 533 F.3d 289 (5th Cir. 2008) ............................ 14

*Weltzin v. Cobank, ACB*, 633 N.W.2d 290 (Iowa 2001) .............................................. 18

*Wil-Roye Investment Co. II and Renewable Investments Inc. v. Washington Mutual Bank, FA*, 142 S.W.3d 393 (Tex. Ct. App. 2004) ............................................................ 19, 27

*Zhu v. Lam*, 426 S.W.3d 333 (Tex. App. 2014) ....................................................... 26

**Statutes**

11 U.S.C. § 105(a) ....................................................................................... 39, 46

11 U.S.C. § 502(b)(1) ......................................................................................... 39

11 U.S.C. § 502(d) ............................................................................................ 39

11 U.S.C. § 502(h) ............................................................................................ 46

11 U.S.C. § 510(c)(1) ...................................................................................... 39, 46

11 U.S.C. § 541(a)(1) ........................................................................................ 39

11 U.S.C. § 547 ............................................................................................ 39, 41

11 U.S.C. § 547(b) ........................................................................................ 39, 42

11 U.S.C. § 548 (a) (1)(B) ............................................................................... 39, 44

11 U.S.C. § 548(a)(1)(A) .................................................................................... 39

11 U.S.C. § 548(d)(2)(A) ................................................................................................ 44

11 U.S.C. § 550 ............................................................................................................ 39, 41

11 U.S.C. § 551 ............................................................................................................ 39, 41

28 U.S.C. § 1404(a) .................................................................................................. 2, 13, 32

Tex. Bus. & Comm. Code § 24.004(a) ........................................................................ 44

**Rules**

Fed. R. Bankr. P. 7008 ................................................................................................. 2, 12

Fed. R. Bankr. P. 7009 ................................................................................................. 2, 12

Fed. R. Bankr. P. 7012 ................................................................................................. 2, 12

Fed. R. Bankr. P. 7012(b) .................................................................................................. 12

Fed. R. Civ. P. 12(b)(1) ........................................................................................... 2, 13, 14

Fed. R. Civ. P. 12(b)(6) ....................................................................... 2, 11, 12, 13, 14, 21

Fed. R. Civ. P. 8 ....................................................................................................... 2, 12, 42

Fed. R. Civ. P. 8(a)(2) ...................................................................................................... 13

Fed. R. Civ. P. 9 ................................................................................................................ 42

Fed. R. Civ. P. 9(b) ........................................................... 2, 11, 12, 13, 21, 28, 30, 48

Fed. R. Civ. P. Rule 11 ..................................................................................................... 30

Fed. R. Civ. P. Rule 56 ..................................................................................................... 15

## SUMMARY OF THE ARGUMENT

A massive Ponzi scheme involving the "purchase" and "sale" of non-existent cattle is at the foundation of this and every other case affiliated with Debtors' bankruptcy proceedings. In short, the fraudulent scheme involved an arrangement whereby investors provided funds to Debtors for the "purchase" of calves that would be housed, fed, and grown by Debtors for three to five months and then sold, with the profits to be split between Debtors and the investors. However, the purported cattle at issue in these arrangements do not appear to have existed, and the "profits" paid out to investors were simply from funds provided by other investors or parties (such as Rabo's line of credit). Discovery in these bankruptcy proceedings suggests the fraudulent scheme started to expand in 2022 and ramped up substantially in late 2022 and early 2023. And as alleged by Plaintiff, the demise of the "scheme occurred when: (i) Rabo performed onsite inspections [of Debtors' operations] and confirmed that the reported head of cattle on hand grossly exceeded actual cattle on hand; (ii) Rabo then insisted that McClain hire an independent Chief Restructuring Officer ("CRO"), and (iii) McClain [died by suicide] on April 18, 2023, within days of the CRO beginning his financial investigation."

Rabo and Debtors had a commercial lending relationship that began in 2018, and that was memorialized through various loan agreements and documents. The loans Rabo provided to Debtors for their businesses were collateralized and otherwise secured by blanket liens on all of Debtors' real and personal property assets, including all cattle and cattle proceeds. Debtors' defaults resulted in an over $50 million loss to Rabo, which loss forms the basis of Rabo's Proofs of Claim in these bankruptcy proceedings. Through this current action, Plaintiff seeks to reduce and/or eliminate Rabo's Claim and seeks "affirmative" claims/damages based on Rabo's purported

role(s) in the fraudulent Ponzi scheme (or alternatively its failure to discover the fraud and put an end to it in a timely fashion).

Specifically, Plaintiff purports to assert twelve claims against Rabo—six "state law" or "non-core" claims and six "bankruptcy" claims. The state law claims include: (I) Knowing Participation in Breach of Fiduciary Duties; (II) Breach of Fiduciary Duty; (III) Common-Law Civil Conspiracy; (IV) Professional Negligence; (V) Punitive Damages; and (XI) Money Had and Received. Plaintiff's bankruptcy claims include: (VI) Determination of Extent, Validity, and Priority of Lien; (VII) Avoidance of Deposit Account Control Agreement; (VIII) Preferential Payments; (IX) Fraudulent Transfer; (X) Disallowance of Claim; and (XII) Equitable Subordination. Most of the claims are grounded in one of two general theories of liability: (1) Rabo knowingly and intentionally operated and facilitated the Ponzi scheme; or alternatively (2) Rabo failed to abide by its internal controls and otherwise ignored many red flags in originating, extending, and increasing Debtors' line of credit that partially funded or otherwise facilitated the Ponzi scheme. These theories and claims are not supported by Plaintiff's allegations or the law and all of Plaintiff's claims should be dismissed for numerous, independent reasons.

First, Plaintiff's claims based on Rabo's purported intentional and knowing participation in the Ponzi scheme fail for the simple reason that Plaintiff alleges no fact supporting such intent or knowledge on the part of Rabo. The absence of any such fact is wholly unsurprising given the illogical contention that Rabo would willfully conspire with Debtors/Mr. McClain to loan millions of dollars to Debtors *not* for their legitimate cattle operations, but instead for the operation of a fraudulent Ponzi scheme whereby Debtors/Mr. McClain would solicit investments for non-existent

cattle.[1] Essentially, Plaintiff makes the absurd allegation that Rabo conspired with the Debtors/Mr. McClain to engage in a money losing Ponzi scheme with no hope of repaying the loan. Furthermore, the vast majority of Plaintiff's allegations address Rabo's alleged failure to timely *identify* the Ponzi scheme—allegations that directly contradict the claim that Rabo knowingly operated/facilitated the fraudulent scheme. There are no allegations that Rabo knew about Debtors' Ponzi scheme; this alone is fatal to Plaintiff's fiduciary duty claims, claims for civil conspiracy, and request for punitive damages.

Second, Plaintiff's claims based on Rabo's alleged irresponsible lending are barred because Rabo owed no duty with respect to the complained-of actions as a matter of law. This lack of duty is fatal to Plaintiff's claims for negligence, money had and received, and equitable subordination, and provides additional grounds for dismissal of the fiduciary duty claims and claims for conspiracy and punitive damages.

Third, the Trustee has repeatedly and consistently alleged and acknowledged that the Debtors/Mr. McClain operated the fraudulent Ponzi scheme. Because the Trustee is standing in the shoes of the Debtors here, these allegations and admissions dictate dismissal of Plaintiff's claims under the doctrine of *in pari delicto.*

Fourth, each of the state-law claims should be dismissed for additional reasons under 12(b)(6) and/or 9(b) given Plaintiff's failure to allege facts supporting the necessary elements for each of those claims.

---

[1] Although the absence of facts supporting these claims is unsurprising, it *is* surprising that Plaintiff would choose to assert such salacious claims here, especially considering that Plaintiff has had nearly two years to prepare the pleading and has had the benefit of substantial discovery, including tens of thousands of pages of documents produced by Rabo.

Fifth, Plaintiff's non-core claims should be dismissed pursuant to the written agreements between Rabo and Debtors. The controlling loan agreements contain express forum selection provisions providing that claims related to or arising directly or indirectly from the agreements must be litigated in Iowa. Furthermore, Debtors expressly *waived and released* Plaintiff's claims in the Forbearance Agreement executed by the Debtors in April 2023, and those waivers and releases are binding upon the Trustee.

Sixth, all of Plaintiff's "bankruptcy" claims are defective for additional reasons, including Plaintiff's failure to allege facts supporting the essential elements for each of those claims. One of the fatal flaws plaguing many of these claims is the Trustee's unsupported and otherwise unjustified treatment of Rabo as an "investor" as opposed to the Debtors' lender.

Rabo appreciates and respects the Trustee's desire to obtain a maximum recovery of funds for the creditors in this case—especially considering Rabo is by far the largest creditor in these cases. However, even if well intentioned, the Trustee has crossed the line in this Complaint by claiming that Rabo was a co-conspirator, deliberately engaged in the Ponzi scheme, is subject to punitive damages, and should have its entire bankruptcy claim disallowed.

For the reasons outlined herein and in the motions to dismiss filed by Rabo's co-defendants (which arguments Rabo incorporates herein), the Complaint fails and should be dismissed.

## STANDARDS OF REVIEW AND CHOICE OF LAW

### *Fed. R. Civ. P. 8, 9(b), and 12(b)(6)*

Most of the Motion seeks dismissal of Plaintiff's claims pursuant to Rules 8, 9, and/or 12(b)(6) of the Federal Rules of Civil Procedure, which rules apply to adversary proceedings pursuant to Rules 7008, 7009, and 7012 of the Federal Rules of Bankruptcy Procedure. *See* Fed. Bank. R. 7008, 7009, & 7012(b). To state a claim for relief, Rule 8 requires that a pleading contain

"a short and plain statement of the claim showing that the pleader is entitled relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) governs dismissals for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Furthermore, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief." *Id.* (cleaned up). Although courts accept "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff" in analyzing a Rule 12(b)(6) motion, "a complaint may be dismissed if it clearly lacks merit—for example, where there is 'an absence of law to support a claim of the sort made.'" *Thurman v. Med. Transp. Mgmt., Inc.*, 982 F.3d 953, 955–56 (5th Cir. 2020) (cleaned up). Moreover, courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Arias-Benn v. State Farm Fire & Cas. Ins. Co.*, 495 F.3d 228, 230 (5th Cir. 2007) (cleaned up).

There are certain claims, such as those based on fraud, that require factual allegations that satisfy the heightened pleading requirement under Rule 9(b) of stating with particularity the circumstances constituting the claim. Fed. R. Civ. P. 9(b). "This requires, at a minimum, that a plaintiff plead the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 371 (5th Cir. 2017) (cleaned up). And if a plaintiff fails to satisfy this pleading standard, "[t]he application of Rule 9(b) is . . . fatal" to the claims, and they must be dismissed. *Elson v. Black*, 56 F.4th 1002, 1008 (5th Cir. 2023).

### *28 U.S.C. § 1404(a) & Fed. R. Civ. P. 12(b)(1)*

With respect to Rabo's arguments based on the forum-selection clause, the United States Supreme Court has explained that "the appropriate way to enforce a forum-selection clause

pointing to a state or foreign forum is through the doctrine of *forum non conveniens*" and that "Section 1404(a) is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional remedy of outright dismissal with transfer." *Atl. Marine Const. Co., Inc. v. U.S. Dist. C. for W. Dist. of Tex.*, 571 U.S. 49, 60 (2013). As to the question of whether this portion of the Motion falls under 12(b)(1) and/or 12(b)(6), it does not appear that there is a settled answer. *See id.* at 61; *see also Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 237 n.1 (5th Cir. 2009) ("This court on at least three previous occasions has declined to address the enigmatic question of whether motions to dismiss on the basis of forum selection clauses are properly brought as motions under [F.R.C.P.] 12(b)(1) [or] 12(b)(3).") (cleaned up). Under Rule 12(b)(1), "the court is permitted to look at evidence in the record beyond simply those facts alleged in the complaint and its proper attachments." *Id.* at 238 (cleaned up); *see also Lane ex rel. Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008); *Walch v. Adjutant Gen.'s Dep't of Tex.*, 533 F.3d 289, 293 (5th Cir. 2008).[2]

---

[2] As further outlined in Argument V below, there are provisions in the parties' agreements other than the forum-selection clause that dictate dismissal of Plaintiff's claims. Given the dispositive nature of these provisions, the fact that Rabo's lending relationship to Debtors is integral to Plaintiff's claims, and Plaintiff's knowledge of these agreements and citation to the Proof of Claim containing some of these agreements, there is authority suggesting the Court could consider these agreements within the context of Rule 12(b)(6). *See Brand Coupon Network, LLC v. Catalina Mktg. Corp.,* 748 F.3d 631, 635 (5th Cir. 2014); *In re PA Co-Man, Inc.*, 644 B.R. 553, 617-618 (Bankr. W.D. Pa. 2022) (holding that court could consider Consent and Release document wherein debtor released non-bankruptcy claims on a motion to dismiss, even though not specifically referenced in the complaint or attached as a document to the complaint, because the contractual relationship of the parties was "integral to the plaintiff's claim" and "plaintiff has had notice of the documents' contents"); *Highland Cap. Mgmt., L.P. v. UBS Secs LLC (In re Lyondell Chem. Co.)*, 491 B.R. 41, 50 n.48 (Bankr. S.D.N.Y. 2013), *aff'd*, 505 B.R. 409 (S.D.N.Y. 2014) ("But if the plaintiff . . . knows about [the extrinsic documents] and intentionally chooses to disregard [them], a moving defendant still may rely on that extrinsic matter in moving to dismiss, and the Court need not subject that defendant, and the Court system, to the additional expenses and burden considering the same matter later on a motion for summary judgment."). In the alternative, the Court could

*Choice of Law – Texas, Kentucky, and Iowa*

The state-law claims asserted against Rabo implicate the laws of potentially three states: Iowa, Texas, and Kentucky. (*See generally* Compl.; *see, e.g., id.* ¶¶ 14, 52 (addressing operations in Benton, Kentucky); *see, e.g., id.* ¶¶ 16, 52 (allegations concerning Debtors' facilities and operations in Texas); *see also* Debtors' facilities in Texas); *see, e.g.,* ¶¶ 50-51, 56 (addressing Rabo's commercial lending relationship with Debtors and citing Rabo's Proof of Claim, which claim includes the loan agreements implicating Iowa law). However, identifying which state's law applies to each claim is only necessary if the laws actually conflict. *See, e.g., MC Asset Recovery LLC v. Commerzbank A.G.*, 675 F.3d 530, 536-37 (5th Cir. 2012). With limited exceptions (which will be addressed below), the potentially applicable laws for Plaintiff's state-law claims do not appear to conflict. But regardless of what state's law applies, the Plaintiff's claims all fail as outlined herein.

## ARGUMENT

I.    **PLAINTIFF'S CLAIMS BASED ON RABO'S PURPORTED KNOWING PARTICIPATION IN THE PONZI SCHEME MUST BE DISMISSED FOR LACK OF ALLEGATIONS SUPPORTING ANY SUCH KNOWLEDGE BY RABO.**

Plaintiff appears to assert at least four claims based (at least in part) on the theory that Rabo actively and knowingly facilitated the Ponzi scheme. (*See, e.g.,* Compl. Counts I, II, III & V.) In purported support of Plaintiff's claim for knowing participation in breach of fiduciary duties, Plaintiff alleges that "McClain breached his fiduciary duties to Debtors and their stakeholders by using Debtors to operate a billion-dollar Ponzi scheme" and that "Defendants knew they were

---

consider that portion of the Motion to be made pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See, e.g., Robinson v. Dist. of Columbia,* 736 F. Supp. 2d 254, 263 (D.D.C. 2010) ("When a motion to dismiss is combined with a motion for summary judgment and outside matters are considered by the court with respect only to the latter motion, the district judge may dispose of the motion either under Rule 56 or may limit its disposition to the motion to dismiss.").

participating in McClain's breach of his fiduciary duties to Debtors" and "Defendants took an active role in McClain's Ponzi scheme through cash and check kiting activity." (Compl ¶¶ 106-108.) In his claim for breach of fiduciary duty, Plaintiff alleges that "[a]t all times, Defendants knew—or should have known—about McClain's Ponzi scheme." (*Id.* ¶ 117.) With respect to Plaintiff's conspiracy claim, the alleged "object" of the conspiracy was "the unlawful operation of a billion-dollar Ponzi scheme" and that Defendants and McClain/Debtors had a "meeting of the minds on the object of operating a fraudulent Ponzi scheme." (*Id.* ¶¶ 129-30.). Finally, though not a recognized cause of action, as outlined below, Plaintiff's "claim" for punitive damages appears to be based on Rabo's alleged knowing participation in the Ponzi scheme. (*Id.* ¶¶ 142-44.)

Tellingly, the conclusory and unsupported allegations above constitute most of Plaintiff's allegations concerning Rabo's alleged deliberate and knowing participation in the Ponzi scheme. (*See generally id.*) And the few other attempts to directly address Rabo's purported knowledge of the scheme are likewise comprised of similar conclusory and unsupported statements. (*See, e.g., id.* ¶ 61 (alleging that Rabo had a "desire to perpetuate McClain's Ponzi scheme for years").) Such conclusory allegations are a far cry from any "fact" supporting Rabo's purported knowledge of the Ponzi scheme and cannot support those claims as a matter of law. *See Iqbal*, 556 U.S. at 662.

Furthermore, Plaintiff provides numerous allegations in the Complaint demonstrating that Rabo was *not* intentionally operating or facilitating the Ponzi scheme. Indeed, the bulk of Plaintiff's allegations concerning Rabo address Rabo's purported failures to recognize and address red flags and otherwise timely discover that it and others were being defrauded by Debtors. (*See* Compl. ¶¶ 44-63; *see also id.* ¶ 34 (Plaintiff alleging that the demise of the Ponzi scheme came after "Rabo performed onsite inspections and confirmed that the reported head of cattle on hand grossly exceeded actual cattle on hand" and when Rabo "insisted that McClain hire an independent

Chief Restructuring Officer"); *id.* ¶ 62 (alleging that Rabo's investigation "revealed that the Debtors had been giving Rabo false reports about the number of cattle allegedly held by them"); *id.* ¶ 63 ("After years of turning a blind eye to the Debtors' operations and financial situation . . . ."); *id.* ¶ 87 ("When Rabo actually inspected the Debtors' operation on or around February 28, 2023, Rabo learned that the Debtors had 72,000 _**less**_ cattle on hand **than what was being represented to Rabo**.") (emphasis added.); *id.* ¶ 92 (alleging that Lawson testified that Rabo could and should have caught McClain's fraud before he ran up $70 million in loans).[3]

There are simply no factual allegations supporting any intentional tort or knowing participation on the part of Rabo, and all claims relying on such knowledge must be dismissed.

## II.    RABO HAD NO DUTY AS A MATTER OF LAW IN CONNECTION WITH ITS ALLEGED FAILURES AS A LENDER, DICTATING THE DISMISSAL OF NUMEROUS CLAIMS.

Plaintiff's second general theory of liability is that Rabo's irresponsible lending to Debtors, such as Rabo failing to recognize and heed red flags and providing funds "when it was uncertain whether Debtors were in a financial position to pay back the loans," purportedly gives rise to liability. (*See, e.g.,* Counts I, II, IV, V, XI & XII.) This theory forms the foundation of Plaintiff's negligence claim, and may also form a part of the foundation for Plaintiff's fiduciary duty claims and certain bankruptcy claims. However, given the undisputed lender-borrower relationship

---

[3] On the one hand, the Plaintiff alleges that these actions were "belated" and "too little too late," yet then immediately turns around and chastises Rabo for taking immediate actions to secure the property. (*See* Compl. ¶ 62.) This is a common theme throughout the Plaintiff's pleading, as the Plaintiff makes every disparaging argument possible against Rabo, regardless of whether the argument is directly contradicted by the Trustee's other allegations. (*See, e.g., id.* ¶¶ 88-89) (complaining that Rabo took over five weeks after allegedly discovering the potential fraud to stop the movement of funds through the Debtors' depository accounts, yet also complaining that Rabo immediately took steps to further investigate the fraud and protect the assets of the estate).)

between Rabo and Debtors, the allegations concerning Rabo's irresponsible lending actions, Rabo had no duty to Debtors that could support these claims as a matter law.

The laws of Iowa, Texas, and Kentucky appear to be generally consistent with respect to the issue of a lender's potential duty to its borrower. All three states have repeatedly concluded that a fiduciary (or special) relationship does not exist in an ordinary lender-borrower relationship. *See Weltzin v. Cobank, ACB*, 633 N.W.2d 290, 293 (Iowa 2001) (stating that "this court has made clear that fiduciary duties are not automatically implicated in a banker-borrower relationship"); *Kurth v. Van Horn*, 380 N.W.2d 693, 696 (Iowa 1986) (same); *Sallee v. Fort Knox Nat'l Bank, N.A. (In re Sallee)*, 286 F.3d 878, 891 (6th Cir. 2002) (stating that no fiduciary duty arises in an arm-length transaction and that such a duty is the "highest order of duty imposed by law"); *Steelvest, Inc. v. Scansteel Serv. Ctr.*, 807 S.W.2d 476, 485 (Ky. 1991) (recognizing that banks do not owe fiduciary duties to their customers or debtors); *Houle v. Casillas*, 594 S.W.3d 524 (Tex. Ct. App. 2019) (stating that a fiduciary relationship does not exist in an ordinary lender-borrower relationship); *Jones v. Thompson*, 338 S.W.3d 573, 583 (Tex. Ct. App. 2010) (recognizing that "no fiduciary relationship exists between a lender and a borrower").

In *Weltzin*, the Iowa Supreme Court addressed a borrower's claims of negligence and breach of fiduciary duty against a lender based on the lender's alleged failure to analyze the records received, note discrepancies in quarterly reports, seek additional financial information that was required to evaluate the borrower's financial condition, and notify officers and directors of borrower of its true financial situation. 633 N.W.2d at 294-95. The Court cited the general rule that lenders do not generally owe duties to their borrowers, and dismissed all claims based on a lack of duty. *See id.* The court explained that imposing a duty on a lender to manage, supervise, and control its borrowers' business affairs would be unreasonable and untenable. *Id.* at 293. Iowa

appellate court cases likewise "reflect a rather narrow scope" of the existence of a duty in the commercial lender/borrower relationship, *see Greatbatch v. Metro. Fed. Bank*, 534 N.W.2d 115, 117 (Iowa Ct. App. 1995), and Texas and Kentucky courts have reached similar conclusions, *see Wil-Roye Inv. Co. II v. Wash. Mut. Bank, FA*, 142 S.W.3d 393, 410 (Tex. Ct. App. 2004) ("Likewise, the relationship between a borrower and a lender is usually neither a fiduciary relationship nor a special relationship."); *Bank of Am., N.A. v. Corporex Realty & Inv., LLC*, 875 F. Supp. 2d 689, 704 (E.D. Ky. 2012) ("As a general rule, banks do not owe a fiduciary duty to their customers or debtors.").

The limited exception to this rule, where a lender exerts excessive control over the borrower, is not even remotely implicated in this case. *See Wil-Roye Inv. Co. II*, 142 S.W.3d at 411 (stating that when a "special relationship between a borrower and lender has been found, it has rested on extraneous facts and conduct, such as excessive lender control over, or influence in, the borrower's business activities"). As addressed above, the vast majority of Plaintiff's allegations against Rabo uniformly address Rabo's purported failures to address red flags and otherwise timely discover that it was being defrauded by Debtors. (*See* Compl. ¶¶ 44-63.) Plaintiff asserts numerous allegations concerning "Rabo turning a blind eye" and that it was not "until February 2023" that Rabo "delve[d] into the Debtors' operations in detail." (*Id.* ¶¶ 59-62.) These allegations demonstrate the *exact opposite* of "excessive control." (*See id.* ¶¶ 44-63.)

Plaintiff's single conclusory allegation that "Rabo was 'controlling' McClain and Debtors" fails to even remotely support the excessive control required to create a duty on the part of a lender—especially considering the legion of allegations supporting the exact opposite.[4] And

---

[4] Plaintiff's allegation is actually grossly misleading. At no time during Mr. Lawson's deposition did he say that Rabo was "controlling" Debtors or Mr. McClain. In fact, Mr. Lawson provided the *exact opposite* testimony, stating that the concern was that Mr. McClain and his companies *could*

Plaintiff's reliance on the Deposit Account Control Agreement ("DACA") is likewise misplaced (and again misleading) given it was not even put into place until March 23, 2023, or less than two weeks before the Mechanics Bank accounts were frozen and just more than one month before these cases were filed. (*See* Compl. ¶ 126.) Furthermore, having a lien on a bank account perfected by a DACA hardly means that a secured creditor is "in control" of its debtor, let alone exerting the excessive control necessary to create duties that are not generally recognized. *See, e.g., In re U.S. Abatement Corp.*, 39 F.3d 556, 562 (5th Cir. 1994) ("We know of no case (and USA cites none in its brief) in which the exercise by one party to a contract of a contractual right . . . occasioned by the breach by the other contracting party of that contract has been considered the type of inequitable 'control' which would justify equitable subordination."). Plaintiff provides no fact or law to support a duty, and the claims based on Rabo's purported duties fail as a matter of law.

## III.    THE STATE LAW CLAIMS SHOULD BE DISMISSED PURSUANT TO THE *IN PARI DELICTO* DOCTRINE.

The *in pari delicto* doctrine is intended "to deter future misconduct by denying relief to one whose losses were substantially caused by his own fraud or illegal conduct." *Gen. Car & Truck Leasing Sys., Inc. v. Lane & Waterman,* 557 N.W.2d 274, 279 (Iowa 1996). The public policy considerations underlying the doctrine "are not affected by the theory upon which the wrongdoer seeks recovery" and, therefore, "if the required elements are present, the doctrine is applicable, even in the context of a negligence action." *Lane & Waterman,* 557 N.W.2d at 279. Iowa courts apply the doctrine "where the plaintiff was equally or more culpable than the defendant or acted with the same or greater knowledge as to the illegality or wrongfulness of the transaction." *Id.* at 279; *see also Kraetsch v. Stull*, 29 N.W.2d 341, 349 (Iowa 1947); *Pappas v. Clark*, 494 N.W.2d

---

*not* be controlled. Plaintiff's unsupported and misleading allegation here which directly contradict the actual record is deeply troubling and borders on a Rule 11 violation.

245, 247 (Iowa Ct. App. 1992) (the doctrine is consistent with other stated Iowa public policy which "generally denies relief to those injured in whole or in part because of their own illegal acts"). Under Texas law, the doctrine, also known as the "unlawful act rule," provides that "no action may be predicated upon an admittedly unlawful act of the party asserting it." *Rodriquez v. Love*, 860 S.W.2d 541, 544 (Tex. Ct. App. 1993); *see also Sharpe v. Turley*, 191 S.W.3d 362, 366 (Tex. Ct. App. 2006) ("Courts have interpreted this defense to mean that if the illegal act is inextricably intertwined with the claim and the alleged damages would not have occurred but for the illegal act, the plaintiff is not entitled to recover as a matter of law."); *Hill v. Day (In re Today's Destiny, Inc.)*, 388 B.R. 737, 748 (S.D. Tex. 2008).

Here, the Trustee has repeatedly and consistently alleged and acknowledged that the Debtors/Mr. McClain operated the fraudulent Ponzi scheme. (*See generally* Compl.) Because the Trustee is standing in the shoes of the Debtors here, these allegations and admissions dictate dismissal of Plaintiff's claims under the doctrine of *in paro delicto*.

## IV. THE SIX "STATE LAW" CLAIMS FAIL FOR ADDITIONAL REASONS UNDER RULES 12(B)(6) AND/OR 9(B) OF THE FEDERAL RULES OF CIVIL PROCEDURE.

As outlined above, Plaintiff's six state law claims fail as a matter of law and should be dismissed based on the absence of facts supporting any duty, let alone any intentional/knowing actions by Rabo. (*See* Arg. I-II, *supra.*) Given the Debtors' operation of the Ponzi scheme, the *in pari delicto* doctrine provides a third, independent basis for dismissal of Plaintiff's state-law claims. (*See* Arg. III, *supra.*) As yet another basis for dismissal, Plaintiff has failed to allege facts supporting essential elements of each of the claims, as outlined below.

### A.    Plaintiff's Aiding and Abetting Breach of Fiduciary Duty Claim Fails and Should be Dismissed.

Under Texas law, "[w]hen a third party knowingly participates in the breach of a fiduciary duty, the third party becomes a joint tortfeasor and is liable as such. A cause of action premised on a contribution to a breach of fiduciary duty must involve the knowing participation in such a breach."[5] *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex. App. 2007) (citations omitted). Critically, a claim "for aiding and abetting a breach of fiduciary duty is derivative of [a] breach of fiduciary duty claim." *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17–CV–444–RP, 2018 WL 315753, at *4 (W.D. Tex. Jan. 5, 2018). "But Texas law does not recognize a fiduciary relationship lightly, especially in the commercial context." *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 809 (5th Cir. 2017) (cleaned up). And "when a breach of fiduciary duty claim fails, so should an aiding and abetting in the breach of fiduciary duty claim." *Super Starr Int'l, LLC v. Fresh Tex Produce, LLC*, 531 S.W.3d 829, 847 (Tex. Ct. App. 2017).

For the reasons outlined in Sections I-III above, the claim fails. Additionally, the claim fails based on Plaintiff's failure to allege facts or point to any law that would support the purported duty and breach described herein. The claim also fails for failure to allege facts demonstrating damages.

### 1.    The Trustee's attempted linguistic gymnastics to manufacture this claim are unavailing.

Although unclear, it appears that Plaintiff might be attempting to argue that for purposes of this claim, the Debtors are somehow "victims" and Rabo and the other Defendants conspired

---

[5] Plaintiff alleges this claim under Texas law. (*See* Compl. ¶ 98.) Rabo therefore addresses the adequacy of Plaintiff's allegations under Texas law but does not concede that Texas law applies. Plaintiff's allegations fail to identify allegations sufficient to identify where the alleged claims arose and/or which state law applies, *see generally* Compl., and Rabo reserves the right to challenge this and Plaintiff's other claims under the appropriate law.

and otherwise worked with Mr. McClain to defraud the Debtors. This, however, is belied by

Plaintiff's own allegations and documents. For example, the Plaintiff alleges here that:

- "In several instances, the 'investor' even had possession of blank checks from the **Debtors** that the investor filled in on their own to more facilitate the flow of funds from McClain and the **Debtors**." (*Id.* ¶ 26 (emphasis added).)

- "The **Debtors** consistently provided each investor with a return on their investments." (*Id.* ¶ 27 (emphasis added).)

- "In other cases, investors 'pressed' their money with the **Debtors** by allowing them to retain some or all of either the principal or profit component of their transaction for future deals." (*Id.* ¶ 28 (emphasis added).)

- "[T]he **Debtors** did not repay with actual profits from **Debtors'** cattle operations because the unique cattle backing up every agreement did not exist." (*Id.* ¶ 29 (emphasis added).)

- "Further, based upon the **Debtors'** bank statements and source of funds, it is clear the **Debtors** repaid investors with other investors' funds. Accordingly, the investors' profits were fictitious and exclusively reliant upon a stream of new investor funds." (*Id.* ¶ 30 (emphasis added).)

- "Moreover, the **Debtors** resorted to check kiting between at least two banks to keep his Ponzi scheme afloat and over investor checks when available funds were insufficient to cover investment returns." (*Id.* ¶ 32 (emphasis added).)

These allegations are consistent with the bank records attached to the Complaint, which

are the bank accounts of the *Debtors—not Mr. McClain*. (*See id.* at Ex. A.) They are also consistent

with the single "Cattle Feeding agreement" included in the Complaint, which agreement

"identif[ies] the partnership of Brian McClain/McClain Feedyard/7M feeders." (*Id.* ¶ 21.)[6]

Such allegations are also consistent with the Trustee's allegations in every other filing in

this bankruptcy case. For example, in the Trustee's *sister* adversary proceeding against the

---

[6] In fact, the overwhelming majority of the "Feeding Agreements" at issue in this case provide that the investors were partnering with Debtor "McClain Feedyard," as evidence by the dealer trust claims filed with the USDA and as contained in the motion for partial summary judgment supported by the Trustee. (*See* Adv. Proc. No. 23-02005-rlj (Dkt. No. 192), App. 90, 94, 279, 296, 297, 308, 309, 332, 333, 342, 343, 344, 351, 352, 353, 358, 359, 360, 365, 366, 367, 368, 384, 385, 387, 388, and 418.)

investors, vendors, and McClain family members, Plaintiff naturally points to the Debtors (not Mr.

McClain personally) as operating the Ponzi scheme, alleging as follows:

- "The **Debtors** operated a massive Ponzi scheme involving purported investments in cattle." (Adv. Proc. No. 25-02003, Compl. ¶ 2 (emphasis added).)

- "The **Debtors** were running a Ponzi scheme and, to keep the scheme going, paid investors and other parties with funds from other investors." (*Id.* ¶ 4 (emphasis added).)

- "Starting by at least 2018,[7] the **Debtors** procured passive investments from hundreds of parties pursuant to 'partnership agreements' where the investor intended to invest money with the **Debtors** in return for a purported split of profits from the **Debtors'** grown cattle." (*Id.* ¶ 30 (emphasis added).)

- "[T]he investors' participation in these 'cattle' was limited to sending the **Debtors** money and waiting for a return on their invested funds." (*Id.* ¶ 31 (emphasis added).)

- "Those investors sent the **Debtors** money for cattle already purportedly owned by, and in possession of, the **Debtors** under an arrangement that the **Debtors** would retain the cattle, grow them, and split the profit with the investor. In many cases, the **Debtors** suggested to the investor that they had a futures contract for the sale of cattle at a certain price per pound, when in reality, the **Debtors** did not actually have such guaranteed future price." (*Id.* ¶ 33 (emphasis added).)

- "In several instances, 'investors' even had possession of blank checks from the **Debtors** that the investors filled in on their own to more quickly facilitate the flow of funds." (*Id.* ¶ 37 (emphasis added).)

- "The **Debtors** consistently provided each investor with a return on their investments." (*Id.* ¶ 38 (emphasis added).)

- "In other cases, investors 'pressed' their money with the **Debtors** by allowing the **Debtors** to retain some or all of either the principal or profit component of their transaction for future deals." (*Id.* ¶ 39 (emphasis added).)

- "Further based upon the **Debtors'** bank statements and the sources of funds, it is apparent that when the **Debtors** repaid investors, they used other investor funds." (*Id.* ¶ 41 (emphasis added).)

---

[7] Discovery in this case has revealed that the vast majority of the investors in the Ponzi scheme did not get involved with the Debtors until 2022, with the "original" Cattle Feeding Agreement apparently being dated June 30, 2022. (*See* Adv. Proc. No. 23-02005-rlj (Dkt. No. 192), App. 279 (Cattle Feeding Agreement prepared by an agent of investor Robert J. Spring and providing that "[t]his agreement exists to identify the partnership of McClain Feedyard and Robert J. Spring . . . whom are involved in a cattle feeding arrangement.").)

- "Moreover, the **Debtors** resorted to check kiting between 2 different financial institutions to keep the scheme afloat and to cover investor checks when funds on hand were insufficient to cover the investment returns. As further irregular business practices, the **Debtors** generally accepted all investor money into 1 of the 3 **Debtor** bank accounts, paid out all investor money out of a different **Debtor** bank account, and the **Debtors'** bank statements are mired with intercompany transfers." (*Id.* ¶ 43 (emphasis added).)

Accordingly, it is jarring and confusing when the Plaintiff then attempts to allege that *Mr. McClain* purportedly operated the Ponzi scheme and that Defendants "conspired" with Mr. McClain to breach fiduciary duties to Debtors. The purpose of Plaintiff's strained attempt is unclear, but it is perhaps an attempt to avoid the obvious *in pari delicto* problems associated with these claims, or to manufacture creative claims for aiding and abetting breaches of duties. In any event, such allegations are not supported by facts, are directly contradicted by the Trustee's position and statements in every other pleading and case, and require the suspension of reality. They also create additional problems for Plaintiff, including that if Plaintiff truly intends to take this position, then Mr. McClain's estate would obviously be a necessary party to this case—which it is not. Furthermore, Plaintiff's position here undermines his request for the application of the Ponzi presumption by adding a complicating layer of participation that would require a different analysis than what the Trustee is alleging in its sister adversary proceedings against the investors. Simply put, if Mr. McClain was the fraudster and the Debtors were merely some of his victims, then the Ponzi presumption *would not apply* to transfers made by the Debtors to third parties. Rather, it would only apply to transfers made from Mr. McClain's personal accounts (and he is not even a bankruptcy debtor).

### 2.    The claim fails for absence of facts demonstrating Rabo's knowing participation.

The breach of fiduciary duty is premised on the assertion that Rabo purportedly helped facilitate Mr. McClain's operation of the Ponzi scheme through the Debtors. However, there are

no allegations demonstrating that Rabo had knowledge of the Ponzi scheme at any point in extending loans to the Debtors. Accordingly, this claim fails and must be dismissed. *See Kastner*, 231 S.W.3d at 580 ("A cause of action premised on a contribution to a breach of fiduciary duty must involve the knowing participation in such a breach.")

### 3.    The claim fails for no underlying breach of fiduciary duty.

A plaintiff must demonstrate an underlying breach of fiduciary duty in connection with any claim for aiding and abetting such a breach. *Super Starr Int'l, LLC*, 531 S.W.3d at 847. "To prevail in a breach-of-fiduciary-duty claim, a plaintiff must prove that (1) there is a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached his fiduciary duty to the plaintiff, and (3) the breach resulted in an injury to the plaintiff or benefit to the defendant." *Zhu v. Lam*, 426 S.W.3d 333, 339. Here, the facts alleged fail to demonstrate the injuries required for a potential claim of breach of fiduciary duty because the alleged "injuries" were that Debtors received funding from Rabo, which is no injury at all.[8]

### B.    Plaintiff's Claim for Breach of Fiduciary Duty Fails for Numerous Reasons.

As outlined above, a claim for breach of fiduciary duty requires a plaintiff to demonstrate that "(1) there is a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached his fiduciary duty to the plaintiff, and (3) the breach resulted in an injury to the plaintiff or benefit to the defendant." *Zhu,* 426 S.W.3d at 339 (Tex. App. 2014). The claim fails for numerous reasons.

### 1.    No breach of duty.

As outlined above, the facts alleged by Plaintiff do not support a fiduciary duty as a matter of law. (*See* Argument III, *supra*.) Because there was not duty, there could obviously be no breach

---

[8] Furthermore, if Plaintiff really intends to assert theories based on Mr. McClain's personal actions, Mr. McClain's estate would be a necessary and indispensable party to this action.

of that duty. Even if there were a duty, however, Plaintiff's allegations do not support a breach of that duty. Plaintiff's allegations in purported support of Rabo's breach of fiduciary duties to Debtors are simply that Rabo loaned Debtors' money. (Compl. ¶¶ 115-17.) Loaning money to your borrower or increasing the limit pursuant to the Loan Agreements is not a breach of fiduciary duty, and Plaintiff points to no fact or law to support such a conclusion. Indeed, the cases cited and relied on by Plaintiff actually support dismissal of the claim. *See Martinez v. Cap. One*, Case No. H-22—2767, 2022 WL 17085938, at * 4 (S.D. Tex. Hous. Div. Nov. 18. 2022) (recognizing that the "relationship between a bank and its customer does not usually create a fiduciary relationship"); *see also Wil-Roye Inv. Co. II,* 142 S.W.3d at 411 (same).

## 2.    Rabo was not the proximate cause of the alleged damages.

The claim also fails to allege facts supporting that Rabo was the proximate cause of the "damages" at issue here. Plaintiff baldly contends that "Defendants' breaches of their fiduciary duties inflicted hundreds of millions of dollars in financial losses on Debtors." (Compl, ¶ 118.) But how? Rabo loaning money to Debtors—who then improperly used those funds in connection with a Ponzi scheme—does not make Rabo the proximate cause of those damages. Indeed, the whole concept is backwards. A lender loans money to a borrower—the borrower uses some of those funds for illegal purposes—and the *lender* is somehow responsible for any "damages" suffered by the borrower as a result of its fraud? Furthermore, insofar as Debtors were using Rabo's funds to pay "profits" to an investor who invested funds, that investor was not injured and did not have a loss as a result of the investment. In fact, the injured party is Rabo, whose funds were not being used for the acquisition and operations of the legitimate cattle acquisitions and operations, which legitimate operations and cattle collateralized the loans provided by Rabo. Accordingly, not only was Rabo at a much higher risk of not getting paid back, but Rabo had the additional loss of

not having the security it otherwise would have had if the Debtors had used the funds as required under the Loan Agreements. Plaintiff's entire theory of damages is confusing and misplaced, and is a fatal flaw running through all Plaintiff's claims.

### C.    Plaintiff's Claim for Civil Conspiracy Is Without Merit and Is Not Asserted in Good Faith.

"A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose by unlawful means." *Hunt v. Baldwin*, 68 S.W.3d 117, 133 (Tex. Ct. App. 2001). A civil conspiracy claim has five elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages." *Id.* In pleading the foregoing elements, a plaintiff must satisfy Rule 9(b)'s heightened pleading standard. *Bertrand v. White*, No. 1:09-CV-358, 2009 WL 10682257, at *3 (E.D. Tex. July 7, 2009).

### 1.    The object of the conspiracy makes no sense and is not plausible.

As briefly outlined above, the purported "facts" supporting the claim that Rabo somehow conspired to operate a fraudulent Ponzi scheme are confusing, illogical, and unsupported. The Trustee is asking this Court to ignore logic and common sense by suggesting Rabo "conspired" to loan over $50 million for an unsupportable fraudulent Ponzi scheme in order to suffer a complete financial loss. Unsurprisingly, the Trustee provides *no* fact supporting the preposterous and implausible claim. Instead, the majority of the Trustee's allegations go to purported "irresponsible" lending such as Rabo "deviating from its policies, procedures, and internal controls to bend over backwards to approve, extend, and increase its lending facilities to Debtors despite clear red flags and alarm bells sounding due to Debtors' precarious financial situation" and "failure to conduct due diligence" and "disregarding applicable bank policies, procedures, and controls." Such allegations obviously fall far short of supporting a conspiracy. Plaintiff fails to identify the

"policies and procedures" violated and ignored; fails to identify what "laws" were ignored; and otherwise fails to allege with any particularity the facts purportedly supporting this claim. There are simply no facts supporting the illogical "object of the conspiracy between McClain and Defendants [as] the unlawful operation of a billion-dollar Ponzi scheme." (Compl. ¶ 129.)

### 2.    No facts supporting a "meeting of the minds" or "unlawful acts."

Plaintiff's allegation that "McClain housed all of Debtors' bank accounts at CFSB and Mechanics Bank and utilized Rabo as a lending facility for Debtors' operations" is wholly insufficient to support a meeting of the minds. (Compl. ¶ 131; *See, e.g., Chu v. Hong,* 249 S.W.3d 441, 447 (Tex. 2008).) Furthermore, there are no allegations supporting Rabo's knowledge of the Ponzi scheme, and the allegations concerning Rabo's lending of funds to Debtors fails to support any unlawful acts. (*See* Compl. ¶¶ 125-31.)

### 3.    No facts supporting damages.

"When Defendants conspired to commit the Ponzi scheme, they should have foreseen the fraud would collapse, leaving Debtors and their creditors with massive financial losses." (Compl. ¶ 132.) Granted, if Rabo had actually "conspired to commit the Ponzi scheme" of accepting and paying out funds for fictitious cattle, then, yes, Rabo certainly should have foreseen the fraud would collapse. But this statement is yet just another example of the fact that Rabo obviously did not conspire to commit the Ponzi scheme, and the Plaintiff's entire theory on damages makes no sense, as outlined above. Furthermore, Rabo would have nothing to gain but *everything to lose* through conspiring to operate the Ponzi scheme. Blind allegations that lack even the barest of

internal logic or consistency cannot survive a motion to dismiss. Plaintiff's allegations are without factual support and fall woefully short of satisfying the requirements of Rule 9(b).[9]

### D.   The Claim for Professional Negligence Fails as a Matter of Law.

To state a claim for negligence generally, "a plaintiff must be able to prove three elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damage proximately caused by the breach." *Gann v. Anheuser-Busch, Inc.*, 394 S.W.3d 83, 88 (Tex. Ct. App. 2012). "The threshold inquiry in a negligence case is duty. . . . If there is no duty, liability for negligence cannot exist." *Id.*; *see also Thompson v. Kaczinki*, 774 N.W.2d 829, 834 (Iowa 2009) (stating that "[a]n actionable claim of negligence requires the existence of a duty to conform to a standard of conduct to protect other, a failure to conform to that standard, proximate cause, and damages." (cleaned up)). As to proximate cause, a plaintiff must demonstrate foreseeability—*i.e.*, "that a person of ordinary intelligence should have anticipated the danger created by the negligent act or omission." *Phillips v. Super Servs. Holdings, LLC*, 189 F. Supp. 3d 640, 648 (S.D. Tex. 2016).

In this case, Plaintiff's negligence claim fails for several reasons. First, as outlined in Section II above, there was no duty as a matter of law that could support this claim. (*See* Argument II, *supra*.) Plaintiff's reliance on *Strobach v. WesTex Cmty. Credit Union*, and the Texas UCC as a basis for a duty on Rabo is misplaced. 621 S.W.3d 856, 873 n.5 (Tex. Ct. App. 2021). The Texas UCC does not apply to Rabo and its lending relationship with Debtors except as it relates to Rabo's security interests in the Debtors' assets and the perfection of those interest. Furthermore, as explained in *Apache Corp. v. Dynegy Midstream Services, Ltd. Partnership*:

---

[9] The lack of facts supporting this claim raise serious questions under Rule 11 of the Federal Rules of Civil Procedure and Rabo expressly reserves its right to pursue actions under that Rule at a future date.

> The failure to act in good faith under the UCC . . . [is not] an independent cause of
> action because the duty of good faith and fair dealing is aimed at making effective
> the agreement's promises. The UCC defined duties that grow out of specific
> contract terms and obligations. In the absence of a specific duty or obligation in the
> contract to which the good-faith standard can be tied, the obligation of good faith
> under the UCC will not support a claim for damages.

214 SW3d 554, 563 (Tex. Ct. App. 2006), *rev'd in part on other grounds sub nom. Dynegy
Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164 (Tex. 2009) (citations omitted).
Plaintiff points to no provision in the Loan Agreements in support of the UCC duty it relies on its
Complaint.[10]

Furthermore, as with the rest of Plaintiff's claims, this claim fails to allege facts
demonstrating that Rabo proximately caused the alleged damages, as outlined in this Motion.
Furthermore, Plaintiff's suggestion that it was "foreseeable" that Debtors would have used the
loaned funds to operate a Ponzi scheme is unsupported and without merit.

### E.      The Claim for Money Had and Received Is Without Merit.

Plaintiff also asserts a claim for Money Had and Money Received. "In the alternative, given
the circumstances of this case it would be inequitable to allow Rabo to retain the interest, fees, and
profit that it made off of the loans to the Debtors." First of all, Rabo had no "profit" in this
transaction, and Plaintiff has failed to allege facts demonstrating any such profit; indeed, Rabo's
Proofs of Claims demonstrate that it took a multi-million loss on its loans. In any event, this
"claim" for unjust enrichment is essentially a catch-all. However, it is barred by the economic loss
doctrine. Furthermore, the claim fails based on the failure of all of the other claims asserted against
Rabo in this case. As outlined herein, Rabo owed no duty as a matter of law, did not breach any

---

[10] Had Plaintiff attempted to point to provisions in the Loan Agreements, Plaintiff would most
certainly have expected Rabo to point to the numerous applicable waiver and indemnification
provisions which further preclude Plaintiff's claim as a matter of law.

duties, did not proximately cause the damages, and did not actively conspire to defraud itself and others. Accordingly, there is no "equitable" ground to add more injury and insult to Rabo's injury by disgorging any payments to Rabo under the Loan Agreements or otherwise reducing Rabo's secured claim. The Plaintiff has provided no facts or argument to support this claim.

### F.    Plaintiff's "Claim" for Punitive Damages Fails.

Plaintiff purports to assert a "claim" against Rabo for punitive damages. As an initial matter, "punitive damages" is not a recognized cause of action but is merely a remedy. *See, e.g., Robbins v. Payne*, 55 S.W.3d 740, 747 (Tex. Ct. App. 2001) (recognizing that "there is no independent cause of action for exemplary damages" and that such damages are "simply an element of damages recoverable under a cause of action") (cleaned up). In any event, as outlined herein, Plaintiff has provided no fact or law to remotely support an award of punitive or exemplary damages against Rabo under the controlling legal standards. (*See generally* Compl.) Plaintiff's reliance on *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 660 (Tex. 2012) is misplaced. The "claim" for punitive damages is without merit and there is no basis for an award of damages against Rabo, let alone punitive/exemplary damages.

## V.    ALL NON-CORE CLAIMS SHOULD BE DISMISSED PURSUANT TO THE WRITTEN AGREEMENTS BETWEEN RABO AND DEBTORS.

The Plaintiff's state law claims against Rabo should be dismissed and/or transferred pursuant to 28 U.S.C. § 1404(a) and/or the doctrine of *forum non conveniens* because the claims are subject to forum-selection clauses in the controlling agreements between Rabo and Debtors.

### A.    The State-Law Claims Should Be Dismissed or Transferred Pursuant to the Forum-Selection Clauses in the Controlling Loan Agreements.

The United States Supreme Court, in a unanimous decision, has instructed that "[w]hen the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause" and "[o]nly under extraordinary circumstances unrelated

to the convenience of the parties should a § 1404(a) motion be denied." *Atl. Marine Const. Co., Inc. v. U.S. Dist. C. for W. Dist. of Tex.*, 571 U.S. 49, 62 (2013). The Court continued, stating:

> When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations. A forum-selection clause, after all, may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; it may, in fact, have been a critical factor in their agreement to do business together in the first place. In all but the most unusual cases, therefore, 'the interest of justice' is served by holding parties to their bargain.

*Id.* at 64. These same standards apply to bankruptcy cases. *See In re Manchester, Inc.*, 417 B.R. 377, 385 (Bankr. N.D. Tex. 2009) ("With respect to 'non-core' matters, forum selection clauses are enforceable to the same extent that they are enforceable outside of bankruptcy."). Accordingly, a forum selection clause is "presumptively enforceable" to non-core claims brought in bankruptcy court unless the resisting party meets the "'heavy burden' of demonstrating that enforcement of the forum selection clause would be unreasonable." *CapRock Milling & Crushing, LLC v. Perdue Agribusiness LLC*, No. 2:24-CV-G38-Z, 2024 WL 4582903, at *5 (N.D. Tex. Oct. 25, 2024) (quoting *In re Manchester*, 417 B.R. at 387). The same goes for claims asserted by a trustee on the debtor's behalf; i.e., if the debtor agreed to litigate in a forum, the trustee is equally bound. *See In re Manchester*, 417 B.R. at 386–88 (enforcing forum selection clause against trustee); *In re LMI Legacy Holdings, Inc.*, 553 BR. 235, 246 (Bankr. D. Del. 2016) (same); *In re Hutcheson Med. Ctr., Inc.*, No. 14-42863-PWB, 2017 WL 4536076, at *10 (Bankr. N.D. Ga. Oct. 6, 2017) (explaining that for purposes of forum selection clause, "the Trustee stands in the shoes of [the Debtor]").

Unlike a court's "typical" analysis under a 1404(a) or *forum non conveniens* motion, courts addressing a forum-selection clause *do not* give any weight to the plaintiff's choice of forum and *do not* consider arguments about the parties' private interests. *See Atl. Marine*, 517 U.S. at 63-64.

Instead, the courts "may consider arguments about public-interest factors only." *Id.* at 64. The "[p]ublic-interest factors may include the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having a trial of a diversity case in a forum that is at home with the law." *Id.* at 62 n.6 (cleaned up). Given those factors, the *Atlantic Marine* Court stated:

> Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases. Although it is conceivable in a particular case that the district court would refuse to transfer a case notwithstanding the counterweight of a forum selection clause, such cases will not be common.

*Id.* at 62 (cleaned up). The party acting in violation of the forum-selection clause "must bear the burden of showing that public-interest factors *overwhelmingly* disfavor a transfer." *Id.* (emphasis added.)

Many of the key agreements between Rabo and Debtors are attached to Rabo's three Proofs of Claim, including the Proof of Claim cited by the Trustee in the Complaint. (*See* Proof of Claim, App. 1-204, cited by Plaintiff at Compl. ¶ 146.) These agreements contain express forum selection provisions that the Court can and should consider with this Motion.[11] As to the specific agreements, Rabo and Debtors entered into various Master Credit Agreements ("**MCA**"), with Rabo as "Lender" and Debtors as the borrower or "Party." (App. 11-39.) The MCA provides that the "Governing Law State" is Iowa and contains, in part, the following forum-selection provision:

> **12.10   Jurisdiction and Venue** PARTY HEREBY AGREES THAT ALL ACTIONS OR PROCEEDINGS INITIATED BY PARTY AND ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT SHALL BE LITIGATED IN ANY CIRCUIT COURT OR UNITED STATES DISTRICT COURT OF THE GOVERNING LAW STATE, OR, IF LENDER INITIATES

---

[11] *See Ambraco, Inc.*, 570 F.3d at 237 (court can consider outside materials in connection with a 12(b)(1) argument); *see also In re PA Co-Man, Inc.*, 644 B.R. at 617-618; *Highland Cap. Mgmt., L.P.*, 491 B.R. at 50 n.48. The identical agreements are also contained in Proof of Claim No. 52, Case No. 23-20086, and Proof of Claim No. 56, Case No. 23-20084.

SUCH ACTION, ANY COURT IN WHICH LENDER SHALL HAVE
JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY
LENDER IN ANY SUCH COURTS, AND HEREBY WAIVES PERSONAL
SERVICE OF THE SUMMONS AN COMPLAINT, OR OTHER PROCESS OR
PAPERS ISSUED THEREIN, AND AGREES THAT SERVICE OF SUCH
SUMMONS AND COMPLAINT OR OTHER PROCESS OR PAPERS MAY BE
MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO PARTY
AT THE ADDRESS TO WHICH NOTICES ARE TO BE SENT PURSUANT TO
THIS AGREEMENT[.] PARTY WAIVES ANY CLAIM THAT THAT
GOVERNING LAW STATE IS AN INCONVENIENT FORUM OR AN
IMPROPER FORUM BASED ON LACK OF VENUE . . . . THE EXCLUSIVE
CHOICE OF FORUM FOR PARTY SET FORTH IN THIS SECTION SHALL
NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT BY LENDER OF
ANY JUDGMENT OBTAINED IN ANY OTHER FORUM OR THE TAKING
BY LENDER OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER
APPROPRIATE JURISDICTION, AND PARTY HEREBY WAIVES THE
RIGHT, IF ANY, TO COLLATERALLY ATTACK ANY SUCH JUDGMENT
OR ACTION.

(App. 17; *see also* Joinders at App. 23 & 25.)

The Debtors, as "Grantors," and Rabo, as "Beneficiary," also executed various Deeds of

Trust. (App. 41-143.) The Deeds of Trust each contain the following provision:

     **41.**    **JURISDICTION AND VENUE**  GRANTOR IRREVOCABLY
AGREES THAT, AT THE OPTION OF THE BENEFICIARY, ALL ACTIONS,
PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING
TO THIS DEED OF TRUST OR ANY OTHER TRANSACTION DOCUMENT
WILL BE LITIGATED IN THE IOWA DISTRICT COURT FOR BLACK HAWK
COUNTY, IOWA, OR THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF IOWA. GRANTOR IRREVOCABLY CONSENSTS
TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL
SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES
ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF
DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

(App. 53, 100-01 & 127.) This same forum-selection clause is also contained in the Master Security

Agreements ("**MSA**") executed by Debtors and Rabo. (*See* App. 153. The MSA, Deeds of Trust,

and MCA shall collectively be referred to herein as the "**Loan Agreements**").

The forum-selection provisions in the Loan Agreements are clearly mandatory in nature as

they require claims filed by the Debtors, or by Trustee standing in their shoes, to be asserted only

in the Governing Law State of Iowa. (App. 17, 53, 100-01, 127, 153; *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia,* 581 F.3d 210, 219 (5th Cir. 2009) (a mandatory forum selection clause requires that all litigation be conducted in a specified forum).) The provisions are also extremely broad, encompassing all claims that indirectly arise from or otherwise relate to the Loan Agreements. (App. 17, 53, 100-01, 127 & 153.) Plaintiff's state-law claims fall squarely under these provisions, with Plaintiff relying exclusively on Rabo's role and actions as the lender to Debtors as the basis for his claims. (*See generally* Compl.) Accordingly, the only question before the Court is whether Debtors can demonstrate that this case is one of those "extraordinary" and "most unusual" circumstances where the forum selection provisions should be disregarded. *See Atlantic Marine*, 517 U.S. at 62-64.

Based on the agreements and facts at issue, the Debtors cannot meet their heavy burden of demonstrating that "the public-interest factors overwhelmingly disfavor a transfer." *Id.* at 64. The three examples cited by the *Atl. Marine* Court provide Plaintiff with no help here. *See id.* at 62 n.6 (citing administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having a trial of a diversity case in a forum that is at home with the law). The forum selection clauses at issue are clear, unambiguous, and part of commercial transactions involving sophisticated parties. (App. 11-204.) Furthermore, with the negotiation and execution of each of the documents comprising the Loan Agreements, Debtors confirmed their intentions to be bound by this provision. (*See generally id.*) This case is not limited to "local"—i.e., Texas—interests. The Debtors operated in *both* Texas and Kentucky, and their investors were all over the country. Rabo is a Delaware corporation with its principal place of business in St. Louis, and with its legal offices located in both Missouri and Iowa. To

36

refue to enforce those provisions here would be in direct violation of the clear standard and

directions provided by the United States Supreme Court. *See Atlantic Marine*, 517 U.S. at 61-64.

Accordingly, the Court should dismiss the state-law claims (for potential re-filing in Iowa

state court) or transfer the state law claims to Iowa federal court.

**B.      The Debtors Expressly Waived and Released the State-Law Claims Plaintiff
Attempts to Assert on Their Behalf Here.**

The Trustee's state-law claims also fail because they were all released in April of 2023, or

*after* all of the conduct giving rise to Plaintiff's claims occurred. As noted above, the Trustee stands

in the Debtors' shoes in asserting his state-law claims. On April 12, 2023, just a few days before

these bankruptcy cases were filed, the Debtors and Rabo entered a *First Amendment to Amended
and Restated Forbearance Agreement* (the "**Forbearance Agreement**"). (App. 205-13.)[12]

Paragraph 7 of that agreement provides:

> 5.    <u>Release and Waiver of Claims.</u> THE LOAN PARTIES, JOINTLY AND
> SEVERALLY, BOTH FOR THEMSELVES AND FOR ALL PERSONS OR
> ENTITIES CLAIMING BY, THROUGH OR UNDER THEM, HEREBY WAIVE,
> RELEASE AND FULLY DISCHARGE RAF, AND RAF'S PARENTS,
> SUBSIDIARIES, AFFILIATES, PREDECESSORS, SUCCESSORS, ASSIGNS,
> PARTICIPANTS,      AGENTS,      ATTORNEYS,      EMPLOYEES      AND
> REPRESENTATIVES (COLLECTIVELY, THE "**RELEASED PARTIES**")
> FROM ANY AND ALL MANNER OF CLAIMS, ACTIONS, CAUSES OF
> ACTION IN LAW OR IN EQUITY, SUITS, DEBTS, LIENS, CONTRACTS,
> LIABILITIES, CLAIMS, DEMANDS, DAMAGES, LOSSES, FEES, COSTS,

---

[12] The control numbered Forbearance Agreement was produced to the Trustee and other parties in
these bankruptcy proceedings on September 27, 2024, and the Court can and should consider this
agreement as part of the motion to dismiss. *See In re PA Co-Man, Inc.*, 644 B.R. at 617-618
(holding that court could consider Consent and Release document wherein debtor released non-
bankruptcy claims on a motion to dismiss, even though not specifically referenced in the complaint
or attached as a document to the complaint, because the contractual relationship of the parties was
"integral to the plaintiff's claim" and "plaintiff has had notice of the documents' contents"); *In re
Lyondell Chem. Co.*, 491 B.R. at 50 n.48 ("But if the plaintiff . . . knows about [the extrinsic
documents] and intentionally chooses to disregard [them], a moving defendant may still rely on
that extrinsic matter in moving to dismiss, and the Court need not subject that defendant, and the
Court system, to the additional expenses and burden considering the same matter later on a motion
for summary judgment."). In the alternative, this portion of the motion could be converted to and
considered under Rule 56 of the Federal Rules of Civil Procedure.

EXPENSES, SET OFFS, OR CLAIMS FOR RECOUPMENT, OF ANY NATURE
WHATSOEVER, KNOWN OR UNKNOWN, FIXED OR CONTINGENT THAT
ANY OF THEM HAVE OR MAY HAVE OR CLAIM AGAINST THE
RELEASED PARTIES, FROM THE BEGINNING OF TIME TO THE CLOSING
DATE, BASED UPON ANY CONDUCT, CLAIMS, ACTIONS OR OMISSIONS
OF THE RELEASED PARTIES RELATING OR PERTAINING IN ANY WAY
TO THE LOANS, THE LOAN DOCUMENTS, THE RABO COLLATERAL,
THE RAF INDEBTEDNESS, OR THE NEGOTIATIONS RELATING TO THIS
AMENDMENT AND THE OTHER DOCUMENTS EXECUTED IN
CONNECTION WITH THIS AMENDMENT OR THE FORBEARANCE
AGREEMENT AND ANY OTHER INSTRUMENTS AND AGREEMENTS
EXECUTED BY ANY LOAN PARTY IN CONNECTION WITH EITHER THE
LOAN DOCUMENTS, THE FORBEARANCE AGREEMENT OR THIS
AMENDMENT, OR ANY OTHER ACT OR OMISSION THAT HAS
OCCURRED PRIOR TO THE CLOSING DATE, INCLUDING BUT NOT
LIMITED TO ANY AND ALL CLAIMS OR CAUSES OF ACTION FOR
USURY,        FRAUD,        DECEIT,        MISREPRESENTATION,
UNCONSCIONABILITY, DURESS, LENDER LIABILITY, ANY OTHER
CLAIM IN TORT OR CONTRACT OR AT EQUITY, OR FOR VIOLATION OF
ANY LAW, RULE OR REGULATION.

(App. 211.) Based upon the plain, clear and unambiguous language set forth above, the Trustee

cannot assert any claims against Rabo that would have belonged to the Debtors as of the Petition

Date as those claims were all released. (App. 211.)

But even before the Debtors released these claims through the Forbearance Agreement, the

Debtors had already repeatedly waived claims in the Loan Agreements, and also agreed to express

indemnification obligations that would operate to bar the claims had they not been released. (App.

6-7, 33, 47-60, 75-78, 95-107; *see also McNally & Nimergood v. Neumann-Kiewit Constructors,*

*Inc.*, 648 N.W.2d 564, 571-72 (Iowa 2002) (providing that "a contract for indemnification is

generally subject to the same rules of formation, validity and construction as other contracts" and

are enforceable to relieve indemnitee from liability for its own negligence where written indemnity

provides for such indemnification).

The only claims not released or waived would be claims that only the Debtors' bankruptcy estates would have, which claims would only arise under the Bankruptcy Code.[13]

## VI.   THE COURT SHOULD DISMISS PLAINTIFF'S SIX "BANKRUPTCY" CLAIMS.

Plaintiff purports to bring six claims arising under the Chapter 11 of the Bankruptcy Code: (a) Determination of Extent, Validity, and Priority of Lien; (b) Avoidance of Deposit Account Control Agreement – 11 U.S.C. § 547(b); (c) Preferential Payments – 11 U.S.C. § 547, 550, 551; (d) Fraudulent Transfer – 11 U.S.C. §§ 548(a)(1)(A) and (a) (1)(B) (as well as under state law Sections 24.005 and .0006 TUFTA, and Sections 378A.00 and .050 KUVTA0; (e) Disallowance of Claim 11 U.S.C. § 502(d), 11 U.S.C. § 502(b)(1); and (f) Equitable Subordination – 11 U.S.C. §§ 510(c)(1) and 105(a). The claims should all be dismissed.

### A.   Determination of Extent, Validity, and Priority of Lien.

Count VI of Plaintiff's Complaint asks the Court "to declare that the estate funds are not the proceeds of Rabo's asserted security interest pursuant to 11 U.S.C. § 506." (Compl. ¶ 145.) This claim fails for all the reasons outlined in this brief. The claim also fails because it does not even meet the basic pleading standards of Rule 8 and the *Twombly/Iqbal* plausibility standards. Specifically, Plaintiff does not identify the amount of the funds he holds, from whom they were obtained, when the funds were obtained, or what they are the proceeds of. The Trustee clearly has this information readily available. For example, the Trustee's Form 1 filed in the McClain Feed

---

[13] 11 U.S.C. § 541(a)(1) provides another potential "jurisdictional" defect of Trustee's claims insofar as this Court were to conclude that the investors/creditors, not the Trustee, have standing and/or the right to bring these state-law claims against Rabo. The Court is likely aware that in the Consolidated Adversary Proceeding, the investors have asserted claims against Rabo that appear to be identical or closely overlap the claims asserted here by the Trustee. Based on Rabo's reading of the relevant caselaw, it is Rabo's current position that the Trustee likely "owns" these claims, and not the creditors. However, insofar as the Court concludes that the creditors own these claims, Rabo would naturally request that the Court dismiss the Trustee's claims here, and Rabo expressly reserves the right to make such a request after the Court's ruling on that issue in the Consolidated Adversary Proceeding.

Yard case indicates that the Trustee is holding $835,560.05 as proceeds of cattle sales, and $1,414,714.60 from "Mechanics Bank Account." (Dkt. 341, Case 23-20084.) Similarly, the Trustee's Form 1 filed in the McClain Farms case indicates that the Trustee holds $1,638,772.29 as proceeds of cattle sales, and $80,010.70 from the Chase Bank account which is an account that Rabo specifically funded to the Debtors' Chief Restructuring Officer as a protective advance after the Mechanics Bank accounts were frozen. (Dkt. 83, Case No. 23-20085.) And the Trustee's Form 1 filed in the 7M Cattle case indicates that the Trustee is holding $22,224.85 which is proceeds from a creditor overpayment. Given the Plaintiff's own Form 1 filings, his assertion in paragraph 145 of the Complaint that all funds he holds are "proceeds of commingled investor funds" is a blatant misrepresentation.

Plaintiff should be required to identify all funds he holds which he contends "are not the proceeds of Rabo's asserted security interest pursuant to 11 U.S.C. § 506," identifying the specific amount of the funds and the sources from which the funds derived so that Rabo can properly respond to this claim. And if Plaintiff continues to assert that literally all funds he holds are not encumbered by Rabo's liens he should explain the basis for that position, as some of the funds held by Plaintiff clearly are not investor funds and were never held in the Debtors' Mechanics Bank accounts, which are the only two reasons given by Plaintiff to support this claim.

Finally, this claim fails on its face because, irrespective of whether Rabo's DACA is avoidable as a preference, Rabo has a perfected lien on *all of* the Debtor's personal property assets, including but not limited to accounts, contract rights, payment intangibles and all other forms of personal property recognized by the Uniform Commercial Code, as well as the proceeds of such property. Even if the Trustee's incorrect statement that "the Debtors' property is all proceeds of commingled investor funds" is true, those "commingled investor funds" are the proceeds of the

40

Debtors' property interests in such things as accounts, contract rights and payment intangibles, all of which Rabo has a perfected lien on.  In short, unless the "commingled investor funds" are not property of the Debtors at all, Rabo has a properly perfected, first-priority lien on the funds.

   **B.    Plaintiff's Preference Claim Related to Rabo Loan Payments Fails to State a Claim Upon Which Relief May Be Granted.**

   Plaintiff contends that "[d]uring the preference period, Rabo improved its position (reduced its debt) by approximately $4,000,000.00." (Compl. ¶ 154.) Thus, according to the Trustee, he "is entitled to avoid all payments made to Rabo during the 90-day period before bankruptcy, including the improvement in position, pursuant to 11 U.S.C. §§ 547 and 550, and to preserve such payments for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551, including but not limited to the payments attached as Exhibit A hereto, for the benefit of Debtors' innocent creditors, who suffered at Rabo's behest." (Compl. ¶ 155.)

   As currently drafted, this claim fails to state a claim against Rabo upon which relief may be granted.  First, while Plaintiff does attach Exhibit "A" to his Complaint showing certain alleged loan payments (and also advances on the Rabo credit line, which would constitute new value), that exhibit also shows that payments were made by all three Debtors. Yet Plaintiff lumps all Debtors together as if they are one and the same. While the Debtors' estates are being jointly administered, their separate estates have not been substantively consolidated. Thus, it is improper for the Plaintiff to file a single claim lumping all transfers together instead of asserting the elements of a preference claim as it relates to each of the three Debtors.

   Second, while Plaintiff cites to Section 547 of the Bankruptcy Code in his pleading, he does not even list the required elements of a preference claim. Plaintiff has the burden to both plead and prove the prima facie elements of a preference claim in this case. To prevail on a preference claim, a trustee must establish: (1) there was a transfer of an interest of the debtor in

property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt owed by the debtor before such transfer was made, (4) made while the debtor was insolvent, and (5) the transfer enabled the creditor to receive more than such creditor would receive (i) if the debtor filed under chapter 7, and (ii) the transfer had not been made. *See* 11 U.S.C. 547(b); *see also Cage v. Wyo–Ben, Inc. (In re Ramba, Inc.),* 437 F.3d 457, 459 (5th Cir. 2006).  Here, while Rabo admits that a preference claim is subject to Rule 8 pleading standards not Rule 9 pleading standards, even Rule 8 requires that Plaintiff list as part of this claim all elements of a prima facie preference claim, along with some detail showing that, if the allegations were proven, Plaintiff would be entitled to relief under this cause of action.

Third, the Trustee baldly states that Rabo was "paid with cash that was not Rabo's collateral because . . . the funds are the commingled proceeds of investor funds."  If the Trustee is saying that Rabo was paid with funds belonging to investors rather than the Debtors, then his preference claim fails on its face because he has not alleged and certainly cannot prove that the transfers made to the Debtor were of "an interest of the debtor in property." Conversely, if the Trustee is saying that Rabo was paid with Debtor funds originating from investor parties, he fails to explain or provide any details as to why that matters to the preference analysis. As an initial matter, the Trustee admits that the Debtors' operations did include legitimate cattle transactions and that the Debtors received legitimate funds both from the sale of cattle and from caring for and feeding cattle belonging to third parties. Thus, the Trustee's suggestion that every nickel that was paid to Rabo must have come from "investor funds" simply does not square with the other allegations of the complaint. Moreover, as noted above, the Debtors granted Rabo a lien on *all of* their presently existing or after acquired personal property assets, not just on their cattle, and on all proceeds thereof. Thus, the Trustee's bald assertion that Rabo was "paid with cash that was not Rabo's

collateral" is simply not plausible. Rabo was the only creditor with a lien on the Debtors' assets, and that lien was all-encompassing, excluding nothing. Thus, any monies paid by the Debtors to Rabo necessarily were paid from Rabo's collateral and, as such, the Trustee cannot, as a matter of law, establish the required elements of a preference claim.

Fourth, the Trustee has failed to provide any meat to his allegations that the other creditors in this case "suffered at Rabo's behest." To the contrary, the allegations of Plaintiff's Complaint clearly demonstrate that Rabo was the party that uncovered the Debtors' fraud and that Rabo was defrauded out of more money (about $50 million) than anybody else. If anything, Rabo *reduced* the losses of investors insofar as these investors were paid from Rabo's loan proceeds. The Trustee ignores this obvious reality in his pleading in his myopic attempt to create some leverage against the estates' largest creditor.

Fifth, there are no facts alleged demonstrating that Rabo "improved its position (reduced its debt)" by $4,000,000.00 during the preference period. (*See generally* Compl.) The absence of such factual allegations is unsurprising because the bank records and other relevant financial documents do not show such a benefit. Indeed, it is disappointing that the Trustee has asserted this claim against Rabo after having had the benefit of substantial pre-filing discovery, including extensive bank records and documentation showing payments on the Rabo Loan and the Debtors' bank statements.

### C.    Plaintiff's Claim for Fraudulent Transfer Should Be Dismissed.

The Trustee asserts that he is entitled to recover all payments Rabo received on its loan during the applicable reach-back periods under Section 548 of the Bankruptcy Code and state fraudulent transfer statutes because the Debtors were engaged in a Ponzi scheme and, as such, all transfers made by the Debtors are presumed to have been made with actual intent to hinder, delay

or defraud.  Alternatively, the Trustee also asserts that, even if the payments are not presumed to

have been made with actual intent to hinder, delay or defraud, the payments can be avoided as

constructively fraudulent transfers which, as the Court is aware, requires proof both that transfers

were made while a debtor was insolvent and that the debtor did not receive reasonably equivalent

value in return for the transfers.  *See generally* 11 U.S.C. § 548(a)(1)(B)

Addressing the Trustee's constructively fraudulent transfer claims first, the Trustee has no

constructive fraud claims against Rabo as a matter of law. As the Complaint makes clear, Rabo

made a multi-million-dollar loan to the Debtors secured by all of the Debtors' presently existing

and after-acquired personal property assets, and the transfers the Trustee seeks to avoid are

payments made on that loan.  But every time a payment was made on the loan, the Debtors partially

satisfied their contractual obligations to Rabo. Under both Section 548 of the Bankruptcy Code

and state fraudulent transfer laws, "value" includes (but is not limited to) the satisfaction of an

existing or antecedent debt.  *See* 11 U.S.C. § 548(d)(2)(A); Tex. Bus. & Comm. Code § 24.004(a).

Thus, there is no constructive fraud claim as a matter of law.

Further, as it relates to the actual fraud claim, the Trustee is not entitled to rely upon the

"Ponzi presumption" instead of pleading with specificity the badges of fraud here. First, the

Trustee has taken the position in his complaint that Brian McClain personally was the fraudster,

and the Debtors were just some of his victims. But if that is true, only transfers made from Brian

McClain's personal accounts would have the benefit of the Ponzi presumption. Subsequent

transfers made by the victims of Mr. McClain's fraud—i.e., the Debtors—would not enjoy that

same presumption.  Second, if the Debtors were the ones engaging in the Ponzi scheme (and they

were), the Ponzi presumption does not help the Trustee in his claims against Rabo because Rabo

was not an investor. Rather, Rabo was the Debtors' secured lender. As Judge Jones noted in the

*Reagor-Dykes* case, the Fifth Circuit has "not addressed the application of the Ponzi-Scheme Presumption in a case where the transfers are payments made under a traditional debtor-creditor relationship." *Faulkner v. Ford Motor Credit Co. (In re Reagor-Dykes Motors, LP)*, No. 18-50214-RLJ-11, 2022 WL 2046144, at *7 (Bankr. N.D. Tex. June 3, 2022). Applying the Ponzi presumption to payments made to a lender as part of a legitimate debtor-creditor relationship and bypassing pleading and proof of the actual badges of fraud "would be a radical departure from the statute." *Id.* In short, while transfers to an investor "in furtherance of" a Ponzi scheme may be presumed to have been made with actual intent to hinder delay or defraud, the transfers made to Rabo were not "in furtherance of" the Ponzi scheme because Rabo was not an investor. *See Perkins v. Haines,* 661 F.3d 623, 626 (11th Cir. 2011). Rabo was the Debtors' secured lender. *See, e.g., Finn v. Alliance Bank*, 860 N.W.2d 638, 644-53 (Minn. 2015) (Ponzi presumption could not be used to support fraudulent transfer claims against banks and financial institutions who were not investors in the scheme). If the Ponzi presumption applies to Rabo in this case, then it applies to *everyone* that the Debtors made payments to, including feed suppliers, cattle sellers, providers of veterinary services, and even employees. That is not the law.

Additionally, the Trustee's attempt to use the Ponzi presumption as a substitute for pleading and proving an actual fraud claim under the Texas Uniform Fraudulent Transfer Act, or TUFTA, appears to be completely foreclosed by the Texas Supreme Court as a matter of law. *See Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 581 (Tex. 2016) ("We therefore conduct the same 'value' and 'reasonably equivalent value' analysis inquiry under TUFTA regardless of whether the debtor was operating a Ponzi scheme or a legitimate enterprise.").

**D.      Plaintiff's Disallowance Claim Should Be Dismissed.**

Plaintiff's claim once again ignores the commercial lender-borrower relationship at issue and attempts to lump Rabo in with the investors in Debtors' Ponzi scheme. Plaintiff's continued failure to acknowledge the relationship at issue critically undermines this claim. Furthermore, Plaintiff's reliance on Section 502(d) for disallowing Rabo's claim is misplaced because this claim is dependent upon Plaintiff's preference and fraudulent transfer claims. As outlined herein, Plaintiff has failed to assert plausible preference and fraudulent transfer claims against Rabo so there is simply no basis for its proofs of claim to be disallowed.  This claim should be dismissed.

**E.      Plaintiff's Equitable Subordination Claim Must Be Dismissed.**

Plaintiff's unnumbered allegation under this claim is as follows: "Rabo's conduct with respect to its handling of the loan and its borrowers resulted in injury to creditors or the conferring of an unfair advantage on Rabo. This inequitable conduct has resulted in hardship to the Debtors' estates and the entire creditor body. Accordingly, pursuant to 11 U.S.C. §§ 510(c)(1) and 105(a), Rabo's claims against the Debtors' estates, including any that arise pursuant to 11 U.S.C. § 502(h), should be equitably subordinated to the allowed claims of legitimate general unsecured creditors for distribution purposes." (Compl. at Count XII.) The claim fails.

That the Trustee continues to contend Rabo was conferred an "unfair advantage" is confounding given that Rabo was defrauded out of over $50 million. The real "inequity" at issue in this case is that Rabo—the party that Plaintiff admits uncovered the fraud and brought the Ponzi scheme to a halt—was defrauded out of far more money than anybody else yet is being unfairly attacked by the Trustee through unsupported and legally barred claims. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Furthermore, "where the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but has not 'shown'—that the pleader is entitled to relief.'" *Id.* Here, the Trustee's equitable subordination claim is not plausible given that Rabo's relationship with the Debtors resulted in Rabo holding a $50 million loan that may not be collectable.

The claim fails for additional reasons as well. Although the Trustee alleges that Rabo's actions resulted in "hardship" to the Debtors' estates and the creditor body, the legal standard is whether the conduct resulted in a provable injury to creditors, or conferred an unfair advantage on the claimant. *See, e.g., In re Fabricators, Inc.*, 926 F.2d 1458, 1464-65 (5th Cir. 1991). "Hardship" is far different from actual injury or unfair advantage. In essence, the Trustee's argument in this case is that if Rabo had done a better job of monitoring its loan it would have discovered the Debtors' conduct and put an end to its scheme earlier. Even if true, that is hardly a basis to subordinate Rabo's claims.

Finally, the Trustee's equitable subordination claim against Rabo fails under controlling Fifth Circuit law. In *In re U.S. Abatement Corp.*, the court held that equitable subordination claims are confined "to three general paradigms: (1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors." 39 F.3d 556 , 561 (citing *Holt v. FDIC (In re CTS Truss, Inc.)*, 868 F.2d 146, 148-49 (5th Cir. 1989)). As shown herein, Rabo was not a fiduciary of the Debtors as a matter of law. Thus, the first paradigm fails. Also, there is no allegation that Rabo actually controlled the Debtors, so the second paradigm fails as well. Indeed, the only real allegation of any control relates to Rabo's DACA on the Mechanics Bank accounts. As the Trustee acknowledges, however, that DACA was not put into place until March 23, 2023, or less than two weeks before the Mechanics Bank accounts were frozen and just

more than one month before these cases were filed. Moreover, having a lien on a bank account perfected by a DACA hardly means that a secured creditor is "in control" of its debtor. *Id.*, at 562 ("We know of no case (and USA cites none in its brief) in which the exercise by one party to a contract of a contractual right . . . occasioned by the breach of the other contracting party of that contract has been considered the type of inequitable 'control' which would justify equitable subordination."); *see also In re Clark Pipe & Supply Co.*, 893 F.2d 693, 702 (5th Cir. 1990) ("Associates' control over Clark's finances, admittedly powerful and ultimately severe, was based solely on the exercise of powers found in the loan agreement. Associates' close watch over Clark's affairs does not, by itself, however, amount to such control as would justify equitable subordination. . . Although the terms of the agreement did give Associates potent leverage over Clark, that agreement did not give Associates total control over Clark's activities."). Finally, there are no allegations in the Trustee's Complaint, let alone allegations that would satisfy the heightened pleading standards of Rule 9(b), that Rabo defrauded creditors. While the Trustee baldly and without support alleges that Rabo and the other defendants engaged with McClain in a conspiracy, there are no allegations that Rabo personally defrauded anyone. In fact, the Complaint does not identify a single communication that Rabo had with any of McClain's investors, let alone explain how any such communications would be fraudulent or untrue. The third prong fails as well.

## CONCLUSION

WHEREFORE, Rabo prays that its Motion be granted in its entirety, and that all of the Trustees' claims against Rabo be dismissed.

DATED: May 27, 2025.

UNDERWOOD LAW FIRM, P.C.
Thomas C. Riney, SBN: 16935100
W. Heath Hendricks, SBN: 240556451
500 South Taylor, Suite 1200, LB 233
Amarillo, Texas 79101
Telephone: (806) 376-5613
Facsimile: (806) 379-0316
Email: tom.riney@uwlaw.com
Email: heath.hendricks@uwlaw.com

--and--

RAY QUINNEY & NEBEKER P.C.
Michael R. Johnson *(Pro Hac Vice)*
Matthew M. Cannon *(Pro Hac Vice)*
Austin C. Nate  *(Pro Hac Vice)*
36 South State, Suite 1400
Salt Lake City, UT 84111
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
Email:  mjohnson@rqn.com
Email: mcannon@rqn.com
Email: anate@rqn.com


*/s/ Michael R. Johnson*
Michael R. Johnson
*Attorneys for Rabo AgriFinance LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2025, the foregoing document was filed with the Clerk of the Court using the CM/ECF system, which sent notice of electronic filing to all electronic filing users in this case.

*/s/ Michael R. Johnson*
Michael R. Johnson

1710255