HUDSON M. JOBE
JOBE LAW PLLC
6060 NORTH CENTRAL EXPRESSWAY,
SUITE 500
DALLAS, TEXAS 75206

ALAN DABDOUB
LYNN PINKER HURST & SCHWEGMANN LLP
2100 ROSS AVENUE, SUITE 2700
DALLAS, TEXAS 75201

SPECIAL COUNSEL TO THE TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| IN RE: | Chapter 7 |
| MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC., | CASE NO. 23-20084-swe Jointly Administered |
| *Debtors*.[1] | |
| KENT RIES, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATES OF MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC., *Plaintiff,* v. COMMUNITY FINANCIAL SERVICES BANK; HTLF BANK; MECHANICS BANK; and RABO AGRIFINANCE, LLC, *Defendants.* | ADV. PROC. NO. 25-02005-swe Honorable Scott W. Everett |

## <u>TRUSTEE'S FIRST AMENDED ADVERSARY COMPLAINT</u>

---

[1] The Debtors in these chapter 7 cases are: McClain Feed Yard, Inc. (Case No. 23-20084-swe), McClain Farms, Inc. (Case No. 23-20085-swe), and 7M Cattle Feeders, Inc. (Case No. 23-20086-swe).

Kent Ries, the Chapter 7 Trustee of the bankruptcy estates of McClain Feed Yard, Inc.
("**MFY**") (Case No. 23-20084-swe), McClain Farms, Inc. ("**McClain Farms**") (Case No. 23-20085-swe), and 7M Cattle Feeders, Inc. ("**7M**") (Case No. 23-20086-swe) (the "**Trustee**"), files his First
Amended Adversary Complaint with knowledge as to his own acts and otherwise upon information
and belief as follows:

## I.   SUMMARY

1.      This case seeks justice and recompense for the victims of a massive Ponzi scheme
operated by the Debtors' former owner, Brian McClain ("**McClain**"), that would not have been
possible without the Defendants' lawless conduct. A Ponzi scheme is "[a] fraudulent investment
scheme in which money contributed by later investors generates artificially high dividends or returns
for the original investors, whose example attracts even larger investments." PONZI SCHEME, Black's
Law Dictionary (11th ed. 2019); *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011). In a Ponzi scheme, "a
corporation operates and continues to operate at a loss." *Alguire*, 647 F.3d at 597-98 (*quoting Hirsch v.
Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n. 3 (2d Cir. 1995)). It gives the appearance of being
profitable by obtaining new investors and using those investments to pay for the high premiums
promised to earlier investors. *Id.* "The effect of such a scheme is to put the corporation farther and
farther into debt by incurring more and more liability and to give the corporation the false appearance
of profitability in order to obtain new investors." *Id.*

2.      As a matter of law, a Ponzi scheme is insolvent from its inception. *Id.*; *Janvey v. Golf
Channel, Inc.*, 487 S.W.3d 560, 563 (Tex. 2016) (explaining "a Ponzi scheme … is driven further into
insolvency with each transaction"). "While Ponzi schemes have been defined in different ways, they
are, at bottom, investment scams. A Ponzi scheme is not a legitimate business, and investment deals
are different from debtor-creditor relations." *In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2022
WL 2046144 at *7 (Bankr. N.D. Tex. June 3, 2022).

3.      The Debtors' now-former owner, McClain, operated a massive Ponzi scheme through
Debtors involving purported investments in cattle. McClain used new money from investors and bank

loans to pay off old investors and so on until the scheme collapsed. In addition, McClain and the

Defendants perpetrated a massive check kite as additional means through which McClain obtained

new, albeit fictitious, cash to cover payments owed to investors, vendors or other creditors. The

ultimate purpose of this bankruptcy case will be to make the maximum distribution possible to

innocent parties that suffered net losses by properly adjusting allowed claims and maximizing the pool

of assets that will be available for distribution.

4.      The Trustee may avoid transfers made with the actual intent to hinder, delay, or

defraud creditors. "[T]ransfers made from a Ponzi scheme are presumptively made with intent to

defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v. Schonsky*,

247 F. App'x 583, 586 (5th Cir. 2007); *see also Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).

Because McClain operated a massive Ponzi scheme through Debtors, transfers from the Debtors to

Defendants on account of an antecedent debt are conclusively presumed to have been made with the

requisite fraudulent intent.   As the Fifth Circuit has held:

> TUFTA provides that "a transfer made or obligation incurred
> by a debtor is fraudulent as to a creditor . . . if the debtor made
> the transfer or incurred the obligation . . . with actual intent to
> hinder, delay, or defraud any creditor of the debtor." Thus,
> "TUFTA requires that the debtor *transferor* make the transfer
> 'with actual intent to . . . defraud any creditor of the debtor.'"
> "In this circuit, proving that [a transferor] operated as a Ponzi
> scheme establishes the fraudulent intent behind the transfers
> it made." . . . It is well-established that the Stanford principles
> operated the Stanford entities as a Ponzi scheme, and the
> existence of the Ponzi scheme establishes fraudulent intent. In
> other words, this is not the case of an innocent debtor
> preferring one creditor over another; instead, this was an
> insolvent Ponzi scheme perpetuated by paying old investors
> with new investors' investments. We agree with the district
> court that the Receiver established that the Stanford principles
> transferred monies to the investor-defendants with fraudulent
> intent.

*Janvey v. Brown*, 767 F.3d at 438-39 (quoting Tex. Bus. & Com. Code Ann. § 24.005(a)(1); *Alguire*,

647 F.3d at 598 (emphasis in original) (other citations omitted). Transactions or transfers in furtherance

of a check kiting scheme are similarly fraudulent and entitled to the same presumption of fraud as are transfers in a Ponzi scheme.

5.      This is an adversary proceeding asserting various tort and avoidance claims against Defendants Community Financial Services Bank ("**CFSB**"), HTLF Bank, as Successor to First Bank & Trust ("**HTLF**"), Mechanics Bank ("**Mechanics**"), and Rabo AgriFinance, LLC ("**Rabo**") (collectively, the "**Defendants**") to hold them accountable for their unlawful conduct in permitting, enabling, facilitating, and participating in McClain's check kiting scheme and Ponzi scheme, and to recover the transfers that Defendants received from the Debtors to provide meaningful returns to the Debtors' innocent investors and other creditors.

## II.      **JURISDICTION AND VENUE**

6.      On April 28, 2023, McClain Feed Yard, Inc. ("**MFY**"), McClain Farms, Inc. ("**MFI**"), and 7M Cattle Feeders, Inc. ("**7M**") (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code. Kent Ries, (the "**Trustee**") is the appointed and acting Chapter 7 Trustee in each of the Debtors' bankruptcy cases.

7.      This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(a)-(b) and 1334. This is a core proceeding as defined under 28 U.S.C. § 157(b). Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

## III.      **PARTIES**

8.      The Debtors filed for Chapter 7 bankruptcy on April 28, 2023 (the "**Petition Date**"). McClain Farms and MFY are incorporated in Kentucky, while 7M is incorporated in Texas. McClain Farms' primary place of business was Kentucky, while MFY's and 7M's principal places of business were in Texas, with their respective feed yards in Hereford, Deaf Smith County, Texas and in Friona, Texas, respectively. 7M was incorporated for the purpose of buying the Texas feed yard.

9.      Kent David Ries was appointed and qualified to serve as Chapter 7 Trustee for the Debtors' bankruptcy estate.

10.      Defendant CFSB is a corporation formed and existing under the laws of the State of Kentucky. Publicly available online records maintained by the Kentucky Secretary of State indicate that CFSB hosts its principal office at 221 West Fifth Street, P.O. Box 467, Benton, Kentucky, 42025. CFSB can be served with this lawsuit through its registered agent for service of process, Michael Radcliffe, at 221 West Fifth Street, P.O. Box 467, Benton, Kentucky 42025.

11.      Defendant HTLF is a corporation formed and existing under the laws of the State of Colorado. Publicly available online records maintained by the Colorado Secretary of State indicate that HTLF hosts its principal place of business at 1800 Larimer Street, Suite 100, Denver, Colorado 80202. HTLF can be served with this lawsuit through its registered agent for service of process in Colorado, Corporation Service Company, at 1900 West Littleton Boulevard, Littleton, Colorado 80120.[2]

12.      Defendant Mechanics Bank is a corporation formed and existing under the laws of the State of California. Publicly available online records maintained by the California Secretary of State indicate that Mechanics Bank hosts its principal place of business at 1111 Civic Drive, Walnut Creek, California, 94596 and hosted the Debtors' depository accounts in California. Mechanics Bank can be served with this lawsuit through its registered agent for service of process, Glenn Shrader, at 17785 Center Court Drive North, Suite 400, Cerritos, California 90703. On or around September 1, 2019, Mechanics Bank completed its acquisition of the "retail, business banking, commercial real estate, mortgage, and wealth management business" from Rabobank, N.A., a subsidiary of Rabobank Group, for $2.1 billion. The transaction was first announced in March 2019.

13.      Defendant Rabo is a limited liability company formed and existing under the laws of the State of Delaware. Rabo can be served with this lawsuit through its registered agent for service of process in Texas, Corporate Creations Network, Inc., at 5444 Westheimer #1000, Houston, Texas

---

[2]  HTLF is now First Bank & Trust, a division of UMB Bank n.a., successor by merger to HTLF Bank. Per HTLF, UMB is a national bank chartered and regulated by the Office of the Comptroller of the Currency and located in Kansas City, Missouri. On January 31, 2025, UMB Bank n.a. acquired HTLF, which was then operating as HTLF Bank, as successor to First Bank & Trust. Following the acquisition, HTLF Bank is now operating as UMB Bank, n.a., and First Bank & Trust is now operating as a division of UMB Bank, n.a.

77056. Rabo is part of the Rabobank Group. As part of the Mechanics Bank acquisition, Rabobank, N.A. transferred its approximately $5 billion food and agriculture loan portfolio to Rabo.[3] Through at least January 2022, at least some documentation pertaining to the Debtors' depository and credit accounts reflected Rabo and Mechanics were still jointly operating in some capacity:



14.     Nationwide service of process by first-class mail postage prepaid is available to the Trustee pursuant to Federal Rules of Bankruptcy Procedure 7004(b) and (d).

## HISTORY OF THE MCCLAIN DEBTORS

15.     McClain, who lived in and was primarily based out of Benton, Kentucky, was well-known throughout the cattle and rodeo industries. He formed, owned (at least in part), and operated each of the Debtors—which he used for various functions in the cattle industry. Until his divorce from his ex-wife, Crystal McClain ("**Crystal**"), McClain owned 51% of each of the Debtors, and Crystal owned 49%. Crystal was also a director of Debtor McClain Farms, if not a director of all the Debtors during this time. Her ownership interests and role as a director were extinguished in or around December 2020 or the first part of 2021. At that time, McClain became the sole owner and director of each Debtor.

---

[3]  *See* Chris Janiac, *Rabobank Sells Non-ag US Banking Unit for $2.1bn*, AgriInvestor (Mar. 22, 2019), *available at* https://www.agriinvestor.com/rabobank-sells-non-ag-us-banking-unit-for-2-1bn/.

16.     Prior to 2017, McClain Farms' and MFY's primary business was to acquire and aggregate cattle from many different sources across Texas, Kentucky, Oklahoma, and the Southeast United States to fulfill large purchase orders for two of their primary buyers, both of whom were located in Texas: Cactus Feeders and Riley/Friona. With respect to Riley/Friona, during certain periods, the Debtors operated as essentially a subcontractor for Riley Livestock, Inc. in acquiring cattle for its fulfillment of large purchase orders for Friona Industries, Inc., and at other times the Debtors acquired cattle independently from various small sources to fulfill large purchase orders to Riley Livestock, Inc.

17.     With respect to the livestock acquired in Kentucky and the Southeast, including Florida, the Debtors would transport the cattle to their locations in Kentucky for "straightening out," whereby the cattle would be evaluated for health, size, and other issues, then sorted and placed in the yard, where they were fed and cared for while they gained weight. The cattle would then be transported to the Debtors' Texas facilities or to one of the Debtors' Texas buyers. Similarly, with respect to the livestock acquired in Texas and Oklahoma, the Debtors would take possession of the cattle and transport that cattle to and between the Debtors' Texas locations—where the cattle would be "straightened out" and delivered to the Debtors' Texas buyers. In summary, the Debtors would obtain, transport, hold, and deliver cattle to buyers within one to three months of acquisition, with a substantial portion of that business occurring within Texas.

18.     In addition to the above model, the Debtors also provided feedyard services in a much smaller capacity to other cattle owners. In some instances, the Debtors would take possession of third-party cattle to feed and grow on behalf of the third party in exchange for compensation.

19.     In connection with these legitimate cattle activities, the Debtors had a meaningful amount of cattle on hand at any given time. McClain used this cattle to attract investors for a massive Ponzi scheme that McClain operated through Debtors.

## THE PONZI SCHEME

20.    Starting by at least 2018, McClain, through the Debtors, solicited and procured passive investments from hundreds of parties pursuant to "partnership agreements" or "cattle feeding agreements" under which an investor "invested" money with the Debtors in return for a purported split of profits from the Debtors' grown cattle. In many cases, the investors were not sophisticated banks, hedge funds, private equity firms, or large companies. Rather, they were private individuals and entities that for one reason or another came to know McClain and decided to invest money in his businesses to profit in the cattle industry.

21.    Those investors did not: (i) actually take possession of cattle; (ii) visually confirm the actual existence of "their" cattle; (iii) require or confirm that they were segregated and not the subject of other investor deals; (iv) obtain unique identifiers on "their" cattle that would enable a party to confirm any of the foregoing; or (v) actively participate in the management, growth, and sale of cattle. Instead, the investors' participation in these "cattle" was limited to sending the Debtors their investment payments and waiting for a return on their invested funds.

22.    In many cases, the investor arrangements were based upon a written "partnership" agreement that varied somewhat in form, but generally contained terms like the example on the following page, excerpted from a proof of claim filed in the bankruptcy case.[4]

---

[4]  Claim 64 Part 3, Case No. 23-20084-swe (Sept. 13, 2023), at 7.

### Cattle Feeding agreement

This agreement exists to identify the partnership of Brian McClain/McClain Feedyard/7M feeders, 2548 CR 15 Friona Tx. 79035, and Thorlakson Diamond T feeders who are involved in cattle feeding arrangement.  The arrangement allows for Thorlakson Diamond T Feeder LP to purchase the calves from Brian McClain/Mclain Feedyard/7M feeders. At the time of purchase the cattle have also been contracted for sale at a pre-determined price. Brian McClain will grow the cattle to the desired weight and will cover the costs incurred to do so. These costs will include the feed and supplements provided by McClain Feedyard or 7M feeders, as well as all processing, medicine, trucking, and yardage expenses related to the cattle. Once the cattle have reached the desired weight, the profit will be determined as such:

*Sale price of the feeder cattle*

*Minus*

*Cost stated above that McClain incurs.*

*Minus*

*Original cost of the calves returned to Thorlakson Diamond T Feeders LP*

*Equals profit.*

*Profit divided 1/3 McClain and 2/3 Thorlakson Diamond T Feeders LP*

This agreement is for _408_ head of heifer calves at a total weight of _237,292_ lbs. at a price of _163.14_ per pound. They are lots _946_ and located at 7M feeders or McClain feeders. Total cost for this group of calves is $ _390,380.00_ which Thorlakson Diamond T Feeders has paid to McClain Feedyard or 7M feeders.

These feeder cattle are forward contracted to sell at $ _160.00_ per lb. at an average weight of _775_ lbs.

Tom Thorlakson

_____

Thorlakson Diamond T Feeders LP

Date Signed _Dec 1, 2022_

Brian McClain

_____

McClain Feedyard's/7M Feeders

23.    In other instances, the investor did not have a written "partnership agreement" and instead invested money with the Debtors on verbal terms similar to the above written agreement. Those investors sent the Debtors money for cattle already purportedly owned by, and in the possession of, the Debtors under an arrangement whereby the Debtors would retain the cattle, grow them, and split the profit with the investor upon resale. In many cases, McClain suggested to investors at the time of the investment that there was already a binding futures contract for the sale of cattle at

a certain price per pound, which would suggest a certain percentage of "guaranteed" profit when, in reality, McClain did not have such guaranteed future price if the cattle even existed at all.

24.    In addition to promised profits, McClain attracted additional investors through his participation in the rodeo circuit. McClain offered a "side-benefit" to certain investors by transporting "their" cattle to and from rodeo events where they would use the cattle for roping and similar activities. The cattle McClain transported to rodeos, however, generally lacked any records or other indicia denoting whether the Debtors, investors, or other persons or entities owned any particular cattle. But this ability to use cattle provided by McClain at rodeo events was an attractive benefit to certain investors.

25.    Some parties may posit the investors did not "invest" but instead "purchased" cattle under these arrangements. The substance of the relationship, however, dictates otherwise. A financial arrangement constitutes an "investment contract" if the contract comprises: (1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party. *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Here, the parties clearly invested money in the Debtors, in a common enterprise that expected profits to be derived solely from Debtors' efforts.

26.    Moreover, in almost all cases, the investors did not obtain sufficient information about, or take possession of, their specific cattle to arguably establish transfer of title and ownership of the cattle. *See, e.g.*, UCC §§ 2-501, 2-401, 2-601, 2-105, 2-305, 2-308 (all applicable in both Kentucky and Texas); Tex. Ag. Code § 146.001.

27.    In several instances, certain investors (or their bank) were provided blank, pre-signed checks from the Debtors that the investors filled in on their own to more quickly facilitate the flow of funds to and from the Debtors, which arrangement McClain took advantage of to kite checks.

28.    Based on McClain's promises of locked-in futures contracts, investors generally expected an annualized profit of *approximately 30%* on each transaction based on specific, stated growth

rates, future sale weights, and predetermined price per pound. McClain would use new investment payments, among other sources of cash, to pay old investors their principal investment and this anticipated profit until the Debtors' fraudulent operation collapsed shortly before the Debtors' filed their bankruptcy petitions.

29.    While the scheme was ongoing, most investors would simply keep their money after the purported cattle were allegedly sold and they received their principal and profit. In other cases, however, investors "pressed" their money with the Debtors by allowing the Debtors to retain some or all of either the principal or profit component of their transaction for future deals. Rather than simply permit the Debtors to retain and reinvest the money, however, these investors would receive (or write themselves) a check from the Debtors, deposit it in their respective accounts, and immediately or very soon thereafter, wire the funds back to Debtors—often before the Debtors' bank(s) honored and paid on the check.

30.    But the investors' purported "profits" were fictitious. In addition to the unrealistic 30-percent returns, the volume of cattle that the Debtors purportedly acquired with investor money far exceeded: (i) the volume of cattle that the Debtors were legally permitted to and capable of handling; (ii) the actual head of cattle that the Debtors were selling to third parties (even assuming that all cattle on hand with the Debtors were acquired with investor funds, not the Debtors (vis-à-vis purchases funded by Rabo's loans to the Debtors) and not any other third-party's that had simply placed its cattle with the Debtors' for feeding purposes; and (iii) the head of cattle actually on hand, as ultimately determined by independent third parties. Accordingly, the Debtors did not repay investors with actual profits from Debtors' cattle operations because the unique cattle backing up every purported agreement did not exist and could not have been sold for profit.

31.    Rather, based upon the Debtors' bank statements and sources of funds, it is clear the Debtors repaid investors with other investors' funds, as well as from the proceeds of credit extensions granted by Rabo, in the traditional sense of a loan or line of credit, and Mechanics or CFSB, in the form of the payment of insufficient funds checks that left the Debtors' accounts in a near perpetual

state of negative overdraft balances. Accordingly, the investors' profits were fictitious and exclusively reliant upon a stream of new investor funds.

32.     The size of McClain's Ponzi scheme relative to the Debtors' actual cattle operations grew to staggering proportions. The volume of funds in and out of the Debtors' bank accounts for investors exceeded the volume of funds of cattle actually acquired and sold by the Debtors by a 10x multiple.

33.     To keep up with the exponentially increasing size of the scheme, McClain also resorted to check kiting to generate "new money" in the form of the "float" created by the check kite to keep old investors paid on time and the Ponzi scheme afloat when actual cash flows were insufficient to repay investors.

34.     As further irregular business practices, McClain generally deposited all investor money into one of the Debtors' depository bank accounts, paid out all investor money out of a different Debtor bank account, and from 2018 through the scheme's unraveling in March or April 2023, processed more than *$2 billion* in intercompany transactions across the Debtors' accounts at Mechanics and CFSB.[5]

35.     The expected "turn" for the acquisition and sale of cattle in the purported business operations of the Debtors was 60-90 days. In the months leading up to the downfall of McClain's Ponzi scheme, the "turns" between investment and repayment to many investors sped up to a completely unrealistic matter of weeks, and in some instances, days.

36.     The demise of McClain's Ponzi scheme ultimately occurred when: (i) Rabo's collateral inspection lead for the Debtors' file, Michelle Stockett, finally decided she would perform a comprehensive audit and inspection of the Debtors' reported cattle count and confirmed that the

---

[5] The Debtors' funds were so commingled that the Trustee is taking the position in this lawsuit that the funds should be treated as one single unit for purposes of avoidance claims. The Trustee reserves the right to amend to further delineate claims against parties based upon payments received or value given with respect to any one particular Debtor.

reported head of cattle on hand grossly exceeded actual cattle on hand; (ii) Rabo then insisted that McClain resign from managing the Debtors and hire an independent Chief Restructuring Officer ("CRO"), and (iii) McClain committed suicide on April 18, 2023, within days of the CRO beginning his financial investigation after being appointed.

## THE USDA CLAIMS

37.     The presence (and size) of McClain's Ponzi scheme is further illustrated by the parties that remained unpaid at the conclusion of the case. According to records provided by the United States Department of Agriculture ("**USDA**"), over 100 claimants filed claims with the USDA under the Dealer Trust Statute (7 U.S.C. § 217(b)) for allegedly unpaid amounts for cattle sales to the Debtors in the total amount of $122,295,867.46.

38.     Of that total amount, only $2,930,940.33 were considered by the USDA to be "qualified" USDA claims resulting from unpaid sales of cattle to the Debtors. The remaining $119,364,927.13 of claims all appear to be investor claims described above. Accordingly, when the Debtors' operations froze, the parties allegedly stiffed on actual cattle purchases comprised a miniscule percentage of the alleged claims of the passive investors.

## CHECK KITING SCHEME

39.     The Debtors' cash activity constituted a Ponzi scheme because McClain was repaying investors with fictitious profits, extensions of credit from Rabo, Mechanics, and CFSB, and "floats" from the check kiting scheme. Check kiting is the process of crediting the deposit of an interbank transfer before receiving the associated disbursement from the payor bank, thus briefly double counting the amount of cash. In a kiting scheme, multiple bank accounts are opened, often at different bank institutions. Money is transferred between accounts by the writing of a check out of one account for deposit into another. The period between when credit or provisional credit is given to an account holder by the depositing bank, which generally occurs first, versus when a payment clears from the disbursing bank, which can happen a day or two later, is referred to as the "float" period. This float

period allows the check kiting perpetrator to access cash which did not actually exist at the time except on the account's ledger. In essence, check kiting results in the creation of fictitious funds.

40.     When the perpetrator of a check kite uses those fictitious funds, the result is usually one or more of the involved accounts incurring negative overdraft balances—either because the payor bank refused to honor the check, in which case the recipient bank will remove the credit from the payee's account, potentially overdrawing the account if the payee had already transferred the clawed-back credit to another account or person. Or because the payor bank decides to honor the check, resulting in an overdraft of the payor account unless sufficient funds or float to cover the check(s) are transferred back into the account. Thus, a check kiting scheme inherently involves large numbers of intercompany transfers that have no apparent legitimate purpose, and often results in frequent overdrafts. Indeed, from 2018 through April 2023, the Debtors were in an overdraft or overdrawn position a staggering number of days—as summarized below:

| Number of Days in Overdraft Position | | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| CFSB | 43 | 13 | 6 | 32 | 18 | 1 |
| Mechanics Bank - all accounts | 62 | 54 | 51 | 193 | 87 | 44 |

41.     As shown above, in 2021, the Debtors' accounts with Mechanics Bank were overdrawn 193 days out of the year, often by hundreds of thousands if not millions of dollars. Normal business accounts are not managed in this fashion, and the combination of constant, six- and seven-figure overdrafts is a glaring red flag to an ordinary commercial bank (or lender).

42.     The Debtors were in a perpetual overdraft situation with its banks and continually insolvent because the Debtors were constantly needing to issue investor distributions, including profits from the purported resale of the cattle, but the Debtors generated little if any actual profit on

their legitimate business from which to pay these investors, among other operational shortfalls. Instead, the Debtors relied upon new investor contributions to cover its debts to investors, which required McClain to recruit new investors on a near daily basis to keep the Debtors afloat.

43.     To remedy the overdrafts and to buy time, the Debtors resorted to, among other tactics, a pervasive check-kiting scheme whereby the Debtors would float funds between intercompany bank accounts to try to cover outgoing checks (usually to investors) with the hope of future cash influxes (also usually from investors). These transactions all related to the hundreds-of-millions of dollars' worth of "partnership" or "investment" agreements, under which the Debtors were supposed to purchase and provide actual, living cattle, transfer ownership of the cattle to the investors, feed and raise the cattle, resell them for profit, and distribute the funds back to investors. Instead the Debtors retained possession and control of the few actual, living cattle that were on the Debtors' yards that should otherwise have been subject of the investment agreements.

44.     The Debtors consistently used massive intercompany transfers between the Debtors' bank accounts to artificially inflate the value of those accounts and create float. Those intercompany transfers comprise over 5,000 transactions in the hundreds of millions of dollars on an annual basis, as summarized below:

**<u>Intercompany Activity at Community Financial Services Bank – Receipts and Withdrawals</u>**



**Intercompany Activity at Mechanics Bank – Receipts and Withdrawals:**



45.     Despite the Debtors' extensive transfers, the Debtors could not keep up with their check kiting activities such that their accounts remained over-drawn and materially so. The following charts reflect the end of day balances for the Debtors' accounts:





46.    As reflected below, the Debtors' intercompany transfers totaled millions of dollars per month, and $2 billion over five years, thus illustrating the sheer volume of transfers and cash required to, among other things, fund the Debtors' check kiting scheme, and thereby, its Ponzi scheme.

**McClain Feed Yard Inc. et al - Intercompany Receipts & Withdrawals**

| Sum of Amount | Column Labels | |
|---|---|---|
| Row Labels | 1 - Receipt | 2 - Withdrawal |
| **2018** | **$ 28,799,906.85** | **$ (42,578,079.08)** |
| Mar | | $ (120,606.18) |
| Apr | | $ (1,102,234.18) |
| May | $ 146,573.79 | $ (1,048,273.03) |
| Jun | $ 1,275,971.53 | $ (3,188,532.73) |
| Jul | $ 2,562,453.77 | $ (5,464,406.33) |
| Aug | $ 1,675,873.37 | $ (3,245,090.82) |
| Sep | $ 2,753,048.17 | $ (4,083,191.72) |
| Oct | $ 5,830,610.41 | $ (8,956,661.89) |
| Nov | $ 6,016,724.16 | $ (6,023,534.01) |
| Dec | $ 8,538,651.65 | $ (9,345,548.19) |
| **2019** | **$ 448,755,804.77** | **$ (447,266,806.85)** |
| Jan | $ 11,406,551.72 | $ (10,214,012.52) |
| Feb | $ 9,035,585.37 | $ (9,958,011.42) |
| Mar | $ 13,507,255.16 | $ (13,366,797.87) |
| Apr | $ 9,528,393.61 | $ (9,245,315.75) |
| May | $ 14,190,456.11 | $ (14,884,104.41) |
| Jun | $ 12,067,530.22 | $ (10,475,451.61) |
| Jul | $ 32,560,973.94 | $ (32,020,103.42) |
| Aug | $ 31,788,005.91 | $ (32,253,124.89) |
| Sep | $ 33,039,934.10 | $ (32,664,003.90) |
| Oct | $ 69,584,908.77 | $ (67,146,406.24) |
| Nov | $ 95,485,372.06 | $ (92,906,363.95) |
| Dec | $ 116,560,837.80 | $ (122,133,110.87) |
| **2020** | **$ 173,132,814.32** | **$ (174,078,533.25)** |
| Jan | $ 14,398,853.35 | $ (15,904,950.35) |
| Feb | $ 14,288,131.35 | $ (14,118,523.03) |
| Mar | $ 4,766,643.68 | $ (4,655,972.80) |
| Apr | $ 8,193,392.90 | $ (8,473,672.10) |
| May | $ 11,028,095.69 | $ (9,295,385.58) |
| Jun | $ 7,249,828.82 | $ (8,358,770.56) |
| Jul | $ 13,849,616.14 | $ (13,872,438.72) |
| Aug | $ 18,141,555.45 | $ (17,826,752.34) |
| Sep | $ 8,486,514.39 | $ (9,197,216.08) |
| Oct | $ 18,138,808.75 | $ (18,163,254.64) |
| Nov | $ 18,320,750.78 | $ (18,501,352.10) |
| Dec | $ 36,270,623.02 | $ (35,710,244.95) |
| **2021** | **$ 416,025,913.53** | **$ (417,358,816.84)** |
| Jan | $ 26,537,170.61 | $ (26,348,992.02) |
| Feb | $ 26,685,832.35 | $ (26,754,845.44) |
| Mar | $ 41,131,031.22 | $ (40,472,278.10) |
| Apr | $ 38,548,390.25 | $ (37,372,100.97) |
| May | $ 33,596,805.59 | $ (36,028,391.68) |

**McClain Feed Yard Inc. et al - Intercompany Receipts & Withdrawals**

| Sum of Amount Row Labels | Column Labels 1 - Receipt | | 2 - Withdrawal |
|---|---|---|---|
| Jun | $ | 59,539,625.14 | $ (55,696,330.24) |
| Jul | $ | 54,110,182.17 | $ (53,445,359.37) |
| Aug | $ | 46,069,823.40 | $ (50,443,529.31) |
| Sep | $ | 23,296,228.75 | $ (24,511,755.05) |
| Oct | $ | 24,952,921.47 | $ (23,918,897.87) |
| Nov | $ | 17,222,070.58 | $ (17,079,197.03) |
| Dec | $ | 24,335,832.00 | $ (25,287,139.76) |
| **2022** | **$** | **435,475,256.98** | **$ (433,750,503.55)** |
| Jan | $ | 25,886,808.85 | $ (26,368,590.70) |
| Feb | $ | 25,274,613.19 | $ (24,020,306.10) |
| Mar | $ | 12,120,432.21 | $ (12,095,221.10) |
| Apr | $ | 17,466,813.62 | $ (17,492,023.67) |
| May | $ | 25,845,302.81 | $ (25,845,302.81) |
| Jun | $ | 29,948,402.76 | $ (29,948,402.76) |
| Jul | $ | 28,330,608.91 | $ (28,330,608.91) |
| Aug | $ | 17,636,490.02 | $ (17,636,490.02) |
| Sep | $ | 34,651,502.15 | $ (34,662,976.75) |
| Oct | $ | 30,052,862.40 | $ (30,052,862.40) |
| Nov | $ | 81,358,824.75 | $ (81,358,824.75) |
| Dec | $ | 106,902,595.31 | $ (105,938,892.52) |
| **2023** | **$** | **551,667,798.99** | **$ (552,631,501.74)** |
| Jan | $ | 106,266,784.61 | $ (107,230,487.40) |
| Feb | $ | 189,891,717.00 | $ (189,891,717.00) |
| Mar | $ | 228,932,748.79 | $ (228,932,748.79) |
| Apr | $ | 26,576,548.55 | $ (26,576,548.55) |
| Jun | $ | 0.04 | |
| **Grand Total** | **$** | **2,053,857,495.44** | **$ (2,067,664,241.31)** |

## DEFENDANTS' PARTICIPATION IN THE PONZI/KITING SCHEME

47.     Defendants were lynchpins of McClain's kiting and Ponzi scheme. McClain, through the Debtors, ultimately secured $70 million in loans or more from Rabo to facilitate the Debtors' too-good-to-be-true growth and purported profitability. Rabo's extension of $70 million in credit provided the Debtors with $70 million of extra cash that McClain appears to have predominantly used to massively expand his kiting and Ponzi scheme, to the detriment of the Debtors and their innocent investors and creditors.

48.     Rabo ignored countless red flags during its initial loan application reviews in 2017 and 2018, and it ignored many more red flags in each subsequent review and extension of additional credit

to the Debtors, continuing to extend and increase the Debtors' supersized line of credit—even sidelining a discerning credit officer who opposed Rabo's lending to the Debtors—to keep funding McClain's kiting and Ponzi scheme while at the same time receiving millions of dollars of interest, fees, and principal payments from the Debtors.[6]

49.     CFSB is a local Kentucky bank that originally financed McClain's initial businesses, including Debtor McClain Farms. In or around 2006, however, CFSB "could not get comfortable with the growth rate of his livestock business, the amount of money it took to do so and the collateral position of the real estate versus livestock." McClain then moved the business's accounts to Regions Banks for three years before moving the accounts back to CFSB when he became dissatisfied with Regions. CFSB ultimately approved its refinancing of McClain's business and remained the Debtors' long-term banking partner, and until 2021, one of its primary secured lenders. CFSB was thus closely connected to the Debtors' business operations for years, and it soon became a facilitator of and participant in the Debtors' fraudulent investment scheme.

50.     As the local, hometown bank, CFSB was more than just McClain's business banking partner. CFSB was also the McClain family's apparent bank of choice for their personal banking needs for over two decades. CFSB banked the Debtors and their affiliates for several decades, in addition to certain investors, and it has identified hundreds of accounts thus far for these parties, as reflected in the following table:

---

[6] This would not be the first time Rabo acted wrongly to conceal improper banking activities. In February 2018, Rabobank, N.A., which was still owned by Rabobank Group at the time, pleaded guilty to felony conspiracy for "impairing, impeding and obstructing" the OCC by "concealing deficiencies in its anti-money laundering program and for obstructing the OCC's examination of Rabobank." Rabobank, N.A. agreed to forfeit $368,71,259 for allowing illicit funds to be processed by the bank without sufficient review. *See* https://www.justice.gov/archives/opa/pr/rabobank-na-pleads-guilty-agrees-pay-over-360-million.

| Account Holder | Acct # | Type | Open Date | Close Date |
|---|---|---|---|---|
| 7M Cattle Feeders | N/A | | | |
| Angela Powell | 56 | Personal Checking | 9/17/1997 | Open |
| Angela Powell | 55 | Personal Checking | 2/28/1996 | Open |
| Angela Powell | 41 | Personal Checking | 2/24/2000 | Open |
| Angela Powell | 49 | Personal Checking | 2/13/2021 | Open |
| Angela Powell | 13 | Personal Checking | 2/15/2012 | 6/11/2018 |
| Angela Powell | 25 | Business Savings | 7/31/1992 | Open |
| Angela Powell | 20 | Personal Checking | 7/13/2015 | Open |
| Angela Powell | 630 | Angela Powell Rep Payee | 6/26/2020 | Open |
| Angela Powell | 760 | Personal Checking | 7/3/2020 | Open |
| Angela Powell | 228 | Personal Checking | 11/10/2020 | Open |
| Angela Powell | 956 | Business Checking | 7/1/1985 | Open |
| Angela Powell | 527 | Personal Checking | 5/17/1996 | Open |
| Angela Powell | 5343 | Loan - Real Estate | 1/14/2008 | 3/23/2020 |
| Angela Powell | 790 | Loan - Auto | 8/8/2013 | 7/2/2018 |
| Angela Powell | 435 | Safe Deposit Box | 7/17/2012 | Open |
| Angela Powell | 3903 | Loan - Line of Credit | 8/20/2010 | Open |
| Angela Powell | 2982 | Loan - Line of Credit | 8/17/2023 | Open |
| Brain McClain DBA USTPA Region 4 | 1382 | Business Checking | 7/22/2016 | 2/12/2018 |
| Brian McClain | 7743 | Loan - Real Estate | 10/22/2009 | 12/7/2020 |
| Brian McClain | 6762 | Loan -Real Estate | 12/8/2010 | 7/14/2023 |
| Brian McClain | 1339 | Loan - Ag Line of Credit | 1/25/2012 | 10/29/2019 |
| Brian McClain | 8598 | Loan - Real Estate | 10/1/2015 | 11/4/2020 |
| Brian McClain | 1572 | Loan - Vehicle Indirect | 7/20/2016 | 4/19/2021 |
| Brian McClain | 923 | Personal Checking | 1/31/1997 | 4/20/2023 |
| Brian McClain | 923 | Loan - Consumer Cash Reserve | 1/31/1997 | 4/20/2023 |
| Brian McClain | 137 | Savings | 1/5/2000 | 4/21/2023 |
| Brian McClain | 287 | Personal Checking | 1/31/2020 | 5/11/2023 |
| Brian McClain | 6181 | Savings | 6/5/2015 | 4/21/2023 |
| Brian McClain | 8310 | Loan - Vehicle | 5/10/2013 | 5/15/2018 |
| Brian McClain (Guarantor) | 9374 | Loan - Ag Line of Credit | 6/17/2013 | 11/18/2019 |
| Brian McClain (Guarantor) | 2667 | Loan - Vehicle | 2/24/2014 | 2/12/2019 |
| Brian McClain (Guarantor) | 2535 | Loan - Real Estate | 5/9/2016 | 5/22/2018 |
| Brian McClain (Guarantor) | 2482 | Loan - Real Estate | 12/3/2020 | 9/22/2021 |
| Chelsea McClain | 23 | Personal Checking | 1/31/1997 | 4/20/2023 |
| Chelsea McClain | 11 | Personal Checking | 8/27/2015 | Open |
| Chelsea McClain | 87 | Personal Checking | 1/31/2020 | 5/11/2023 |
| Chelsea McClain | 202 | KYUTMA - Cade Cook | 8/28/2020 | Open |
| Chelsea McClain | 4501 | Simplified Employee Pension (SEP) | 7/16/2018 | Open |
| Crystal McClain | 99 | Personal Checking | 4/20/2019 | Open |
| Crystal McClain | 918 | Personal Checking | 9/14/2020 | Open |
| Crystal McClain | 302 | Personal Checking | 12/30/2021 | Open |
| Crystal McClain | 854 | KYUTMA savings - Piper McClain | 12/28/2004 | 6/23/2022 |
| Crystal McClain | 292 | KYUTMA savings - Kristin McClain | 1/24/2007 | Open |
| Crystal McClain | 364 | Certificate of Deposit | 1/8/2024 | Open |
| Crystal McClain | 1521 | Safe Deposit Box | 6/29/2012 | Open |
| Crystal McClain | 7743 | Loan - Real Estate | 10/22/2009 | 12/7/2020 |
| Crystal McClain | 8598 | Loan - Real Estate | 10/1/2015 | 11/4/2020 |
| Crystal McClain | 1466 | Safe Deposit Box | 9/2/2016 | Open |
| Crystal McClain (Guarantor) | 9374 | Loan - Ag Line of Credit | 6/17/2013 | 11/18/2019 |
| Crystal McClain (Guarantor) | 2535 | Loan - Real Estate | 5/9/2016 | 5/22/2018 |
| Jed Goad | 0219 | Presonal Checking | 8/31/2021 | 4/24/2023 |
| Jed Goad | 6193 | Boat Loan | 5/28/2021 | 5/11/2023 |
| JLE Trucking | N/A | | | |
| JM Fiberoptics Inc | 157 | Business Checking | 11/12/2020 | 6/23/2023 |
| Joshua Moreland | 49 | Personal Checking | 11/17/2006 | Open |
| Joshua Moreland | 97 | Personal Checking | 6/4/2019 | Open |

| | | | | |
|---|---|---|---|---|
| Joshua Moreland | 816 | Savings | 11/8/2007 | 1/20/2022 |
| Joshua Moreland | 157 | Business Checking | 11/12/2020 | 6/23/2023 |
| Joshua Moreland | 6693 | Loan - UTV | 6/20/2016 | 5/10/2018 |
| Joshua Moreland | 3160 | Loan - Vehicle Indirect | 1/11/2018 | 6/10/2019 |
| Joshua Moreland | 9425 | Loan - Consumer | 8/7/2017 | 8/7/2019 |
| Joshua Moreland | 2287 | Loan - Real Estate | 6/4/2019 | 5/31/2023 |
| Kinsey Moreland | 49 | Personal Checking | 11/17/2006 | Open |
| Kinsey Moreland | 49 | Personal Checking | 5/27/2011 | 3/27/2018 |
| Kinsey Moreland | 97 | Construction Checking | 6/4/2019 | Open |
| Kinsey Moreland | 816 | Savings | 11/8/2007 | 1/20/2022 |
| Kinsey Moreland | 3160 | Loan - Vehicle Indirect | 1/11/2018 | 6/10/2019 |
| Kinsey Moreland | 2287 | Loan - Real Estate | 6/4/2019 | 5/31/2023 |
| Kinsey Moreland | 1269 | Loan - Freddie Mac | 3/4/2015 | 5/15/2019 |
| Leslie White | 95 | Personal Checking | 10/22/2007 | Open |
| Leslie White | 63 | Personal Checking | 11/19/2008 | Open |
| Leslie White | 49 | Personal Checking | 5/27/2011 | 3/27/2018 |
| Leslie White | 816 | Savings | 11/8/2007 | 1/20/2022 |
| Leslie White | 174 | Safe Deposit Box | 10/27/2021 | Open |
| Leslie White | 14 | Personal Checking | 3/24/2015 | Open |
| Leslie White | 76 | Personal Checking | 12/22/2016 | Open |
| Leslie White | 4681 | Health Savings Account | 11/19/2018 | Open |
| Leslie White | 0030 | Loan - Freddie Mac | 4/17/2020 | Open |
| Leslie White | 0416 | Loan - Consumer | 3/22/2022 | Open |
| Leslie White | 4706 | Loan - Auto Indirect | 11/13/2020 | Open |
| Leslie White | 192 | Loan - Consumer LOC | 6/25/2014 | Open |
| Leslie White | 582 | Loan - RLOC | 4/8/2015 | Open |
| Leslie White | 623 | Savings | 1/20/2009 | Open |
| Leslie White | 073 | Savings | 1/6/2021 | Open |
| Leslie White | 857 | Savings | 8/14/2008 | Open |
| Leslie White | 6496 | Savings - Christmas Club | 10/11/2017 | Open |
| Leslie White | 201 | Personal Checking | 6/28/1995 | 1/18/2024 |
| Leslie White | 0961 | Loan - Freddie Mac | 11/28/2014 | 4/22/2020 |
| Leslie White | 77 | Savings | 2/2/2017 | 12/5/2019 |
| Leslie White | 718 | Savings | 1/24/2014 | 12/5/2019 |
| Leslie White | 494 | Savings | 12/12/2015 | 12/6/2019 |
| Leslie White | 618 | Savings | 1/25/2019 | 12/6/2019 |
| Leslie White | 070 | KYUTMA - Leslie custodian | 6/23/2017 | 12/6/2019 |
| McClain Farms Inc | 786 | Business Checking | 6/25/2015 | 1/9/2023 |
| McClain Farms Inc | 8310 | Loan - Vehicle | 5/10/2013 | 5/15/2018 |
| McClain Farms Inc | 9374 | Loan - Ag Line of Credit | 6/17/2013 | 11/18/2019 |
| McClain Farms Inc | 2667 | Loan - Vehicle | 2/24/2014 | 2/12/2019 |
| McClain Farms Inc | 2482 | Loan - Real Estate | 12/3/2020 | 9/22/2021 |
| McClain Farms Inc | 2710 | Loan - Ag Line of Credit | 10/22/2009 | 9/22/2021 |
| McClain Farms Inc | 7726 | Loan - Ag Line of Credit | 6/25/2015 | 12/10/2020 |
| McClain Farms Inc | 2200 | Credit Card | | 5/3/2023 |
| McClain Farms Inc | 4400 | Credit Card | | 5/3/2023 |
| McClain Farms Inc  (Guarantor) | 2535 | Loan - Real Estate | 5/9/2016 | 5/22/2018 |
| McClain Feedyard | 2535 | Loan - Real Estate | 5/9/2016 | 5/22/2018 |
| McClain Feedyard | 2710 | Loan - Ag Line of Credit | 10/22/2009 | 9/22/2021 |
| Meagan Goad | 137 | Savings | 1/5/2000 | 4/21/2023 |
| Meagan Goad | 596 | Personal Checking | 7/7/2016 | Open |
| Meagan Goad | 219 | Personal Checking | 8/31/2021 | 4/24/2023 |
| Meagan Goad | 41 | Business Checking | 3/2/2020 | 9/1/2022 |
| Meagan Goad | 1339 | Loan - Ag Line of Credit | 1/25/2012 | 10/29/2019 |
| Meagan Goad | 5262 | Loan - Ag Line of Credit | 1/25/2012 | 10/29/2019 |
| Meagan Goad | 5731 | Loan - Auto | 12/1/2015 | 6/13/2018 |
| Meagan Goad | 5270 | Loan - RV | 2/13/2018 | 9/14/2018 |
| Meagan Goad | 4258 | Loan - RV | 9/11/2018 | 6/18/2020 |



**A.      Rabo lent the Debtors $70 million after next to no due diligence.**

51.      The Debtors shared, a major secured creditor, Rabo, whose alleged claim against them exceeds $53 million. Rabo is one of the largest lenders in the American agricultural industry and touts the expertise it developed over its 100 years of experience in the agricultural lending industry. Rabo advertises its in-depth understanding of all segments of the agricultural industry, including cattle feeding, with a nationwide team of agricultural lenders, financial analysts, and other leading professionals in the agricultural finance space. Rabo's own website explains that its "Relationship Managers are agricultural specialists with global networks and local knowledge, on-farm experience and financial expertise . . . ."[7]

52.      Rabo's $53 million under-secured claim in this proceeding is troubling given Rabo's outsized role in furthering McClain's Ponzi scheme. From the inception of its relationship with Debtors, Rabo ignored many red flags in originating, extending, and increasing the $70 million line of credit on which Rabo now seeks to recover. That funding allowed McClain to expand his network and Ponzi scheme to the detriment of innocent investors and other creditors, now left unpaid, and in some cases insolvent themselves, in the wake of the Ponzi scheme.

---

[7]   *See*   https://www.raboag.com/financing/overview-132#:~:text=Our%20Relationship%20Managers%20a re%20agricultural,term%20relationships%20with%20their%20clients. Indeed, in connection with its sale of Rabobank, N.A. to Mechanics Bank, Rabo claimed it would be the "only U.S. lender to offer a broad, nationwide biew of agriculture coupled with local expertise and global resources. See https://www.raboag.com/news/rabobank-announces-plan-to-strengthen-us-rural-banking-business-46.

53.     Rabo presented the Debtors the opportunity to expand his cattle feeding operations from Kentucky into the Texas Panhandle in 2017. Later that year, Rabo formally rejected the Debtors' line of credit application after an initial approval because, among other things, "[o]verall, documented information risk was much higher than anticipated at time of approval." Specifically, Rabo found that "systems were lacking to provide accurate trial balance, ability to generate adequate verification of accounts receivable and accounts payable, and could not document interrelated activity between" the three Debtors. Rabo ultimately concluded that "[r]isk is deemed too high as borrower does not meet minimum financial system and reporting standards to enter into relationship at this time." Rabo noted in its due diligence that the Debtors could have possession of cattle that would not be subject to Rabo's lien in connection with the Debtors' feedyard operations yet did nothing to require sorting or identification of cattle by the Debtors.[8]

54.     Rabo employees Chip Lawson ("**Lawson**") and Jason Dunn ("**Dunn**") worked feverishly to reverse that rejection of Debtors' application. And their internal campaign was relentless. Lawson and Dunn sidelined other Rabo employees to ensure the Debtors' line of credit was ultimately approved. For example, when a senior Rabo credit officer voiced concerns about the Debtors and pushed back against Lawson and Dunn, they complained that the resistant credit officer was "giving us sh*t on this deal." Worse, Dunn threatened to "explode and get myself fired" if the Debtors' line of credit application was not approved. Rabo employees (or former employees) have explained in sworn testimony that Lawson and Dunn badly wanted the loan to close because the Debtors' loan facility would be Rabo's largest loan within the region and allow Rabo to make millions in profit. In addition, Lawson and Dunn explained they would likely personally benefit as well from having this "profitable" loan on their personal books when their bonuses were determined.

---

[8]  Rabo's knowledge that at least some of the cattle on the Debtors' various feed lots were, at various times, potentially owned by, or subject to security agreements with, third-parties is further evidenced by its execution or attempted execution of intercreditor agreements with CFSB and AgTexas (a third-party cattle owner and investor) to specify which party had rights to what collateral in light of CFSB's first-priority security interest in McClain Farms' cattle (until its secured loan was refinanced with new financing from Rabo) and AgTexas' ownership of branded cattle that were deposited with McClain for feeding prior to resale.

55.     After Dunn's initial sentiments waned, he admitted that the Debtors' line of credit application "definitely has red flags." He said that "the big negative is [Debtors'] record keeping is not up to par." Dunn further concluded that not "having a good record keeping system is probably not wise" and could pose serious problems for the loan.

56.     However, Lawson (who oversaw the Debtors' loan application) did not go down without a fight. Despite acknowledging that the resistant credit officer found "[t]here was too much information risk and in 6 months [Rabo] would have a problem," Lawson derisively suggested the credit manager "make a $1,000 bet with" Lawson on the strength of the Debtors' application. Lawson even suggested that Rabo's internal underwriting policies should be subject to more flexibility "to bring a deal to an approvable status."

57.     Lawson, Dunn, and other Rabo bankers who championed the Debtors' risky application finally browbeat Rabo's underwriters into approving the Debtors' loan in mid-2018. From that point forward, Rabo relaxed its underwriting policies to repeatedly and routinely increase and extend Debtors' line of credit.

58.     A Rabo representative would periodically prepare and submit a collateral inspection report to the Rabo finance team. On multiple occasions, those internal Rabo reports raised questions and concerns regarding the Debtors' operations, including the actual ownership of the cattle in the Debtors' yards, the number of cattle present in the yards, and a concerning lack of operational safeguards and procedures.

59.     In May 2019, Rabo extended a $12 million line of credit to the Debtors. Later in 2019, Rabo increased the Debtors' line of credit to $16 million. In January 2020, Rabo again raised the Debtors' line of credit to $23 million. The expansion and extension of credit to the Debtors continued unabated, with Rabo making another $2 million in operating capital available to the Debtors in March 2021, bringing the Debtors' original lines of credit with Rabo to $25 million.

60.    Rabo approved extensions of Debtors' line of credit despite internal misgivings. In 2020, Rabo listed the Debtors as a "Client of Key Concern" because the Debtors' financial projections "seem[ed] too good to be true." Worse, Rabo sidelined the credit manager who had consistently voiced concerns about the Debtors, with Lawson (the Debtors' relationship manager) "making sure [the resistant credit manager] doesn't try to get on the credit committee and kill it there." Other evidence from Rabo's internal communications reflect Rabo turning a blind eye to the Debtors' ongoing Ponzi scheme:

   a)    Disbelief at the Debtors' ability to fund cattle feed ("I still can't grasp how he feeds all that cattle, and his feed costs are $5 [million] through 6 months")[9];

   b)    Concern over the Debtors' cash flow ("I think Brian [the Debtors] is in more cash trouble than we think ….");

   c)    Fear that the Debtors were not being forthright about who actually owned the cattle ("He is now changing his story on customer cattle.");

   d)    Worry that Rabo had not conducted a cattle headcount in years ("It has come to my attention that a full headcount/inspection has not been done for over 4 yrs.");

   e)    Uncertainty about the Debtors' accounting of the cattle in the Debtors' possession ("[I]f the cattle were sold, where is the money? If they bought new cattle, where are they?"); and finally

   f)    Downright alarm that the Debtors may not even own all the cattle they purport to and for Rabo to—*finally*—take immediate action ("Recommendation to

---

[9]  In the same email chain, Lawson, the Debtors' constant champion at Rabo, said: "if it ain't broke, don't fix it is what I say …."

downgrade immediately and take control of cattle as soon as possible, due to concerns related to cattle being owned by other parties.").

61.     Notwithstanding the growing body of glaring red flags above, in August 2021, Rabo gave the Debtors a $45 million operating line of credit and a $1.02 million real estate note. Rabo lent those funds despite its mounting internal concerns about the Debtors. And Rabo lent those funds despite the Debtors consistently being overdrawn on their bank accounts and needing "emergency" or exigent extensions of additional credit beyond the approved limit, which Rabo often granted anyway. Those new funds pushed the Debtors' borrowings from Rabo well beyond the $70 million mark by 2023 and allowed McClain to continue his Ponzi scheme unabated until then.

62.     In short, Rabo's failure to abide by its own internal controls, negligent underwriting policies, desire to perpetuate McClain's Ponzi scheme for years so it could profit at others' expense, and dereliction of its obligations to investigate suspicious transactions and report fraud, allowed the Debtors' loans with Rabo to turn into a $70 million runaway train that increased the Debtors' debt load by 500% in only two years. Had Rabo conducted even the most basic of inquiries at the outset, or at any time prior to the ultimate downfall of the Debtors, McClain's scheme would have been easily and readily revealed and could have been stopped in its tracks.[10]

**B.     Much too late, Rabo finally heeds the massive red flags in Debtors' finances.**

63.     Not until February 2023 did Rabo take its obligations seriously and delve into the Debtors' operations in detail. Only then did Rabo inspect the collateral for the Debtors' supersized line of credit. That inspection substantiated the pre-lending concerns raised internally by Rabo employees opposed to loaning the Debtors money. Rabo's belated investigation further revealed that the Debtors had been giving Rabo false reports about the number of cattle allegedly held by them. Despite the Debtors' claims that they possessed approximately 80,000 head of cattle, Rabo's too little, too late collateral inspection revealed that only *8,000* cattle were present at the Debtors' facilities in

---

[10] For example, Rabo's CRM for the Debtors' loans (Lawson) admitted in his deposition that Rabo should have caught on to the fact that Rabo's borrowing base certificates for the Debtors showed a huge cattle inventory that exceeded Debtors' feedyard capacity several times over.

Texas. Rabo's inspection also revealed the cattle in these facilities were subject to claims of third parties and not subject to Rabo's security interest.

64.     All of the Debtors' operations were shut down before their bankruptcy filings. Rabo worked quickly and quietly to salvage its $70 million mistake. After years of turning a blind eye to the Debtors' operations and financial situation, Rabo speedily took action to protect its own interests. First, within 90-days of the Petition Date, Rabo entered into a Deposit Account Control Agreement ("DACA") with Mechanics Bank and Debtors, giving Rabo ultimate control over the Debtors' Mechanics Bank depository accounts and purporting to give Rabo a perfected lien on those accounts, in apparent anticipation of a bankruptcy filing. Second, Rabo executed multiple forbearance agreements with the Debtors, including one just a few days before the Petition Date that (i) required Debtors to turn control of their business over to a "chief restructuring officer" of Rabo's choosing and (ii) purported to grant Rabo a waiver and release of all potential claims Debtors may have had against Rabo through the agreement date to keep the operation afloat. Rabo then seized Debtors' cattle and swept the funds from the Debtors' Mechanics Bank accounts, which funds were comprised of payments received from investors and not proceeds from any cattle sales or otherwise.

**C.     CFSB and others also afforded themselves self-help upon the Debtors' demise.**

65.     Further, in the days leading up to McClain's death, several parties took improper self-help action. Two of the Debtors' largest investors worked with CFSB to improperly reverse prior deposits into the Debtors' bank accounts. Exhibit G hereto details deposits that were made into the McClain Feed Yard bank account #0197 at Mechanics Bank by MAP Enterprises and Wildforest Cattle. The deposits (all made by check – 47 by MAP / 28 by Wildforest) were made by "Remote Deposit" on April 3-5, 2023 (Monday through Wednesday). All the checks that were written by MAP & Wildforest were on their individual accounts at CFSB.

66.     Late in the day on Wednesday April 5, 2023, Rabo froze the Debtors' bank accounts and informed McClain on Thursday afternoon, April 6, that the Debtors' Mechanics accounts had been frozen.

67.    On information and belief, McClain informed the principals of both MAP and Wildforest of the freezing of the Mechanics Bank accounts, and he also either informed CFSB directly, or CFSB was informed by the investors. This led to both MAP and Wildforest clawing back the deposits they made on April 3-5, 2023, with the assistance of CFSB. Exhibit H hereto shows that MAP clawed back approximately $20.4 million in deposits, and Wildforest clawed back approximately $10.6 million in deposits, for a total of approximately $31 million. The MAP & Wildforest clawbacks put the 3 accounts (combined) in a negative position of approximately $31 million.

### C.  HTLF actively participates in the kiting and Ponzi scheme.

68.    Though Rabo may have been the primary booster of the explosive growth of McClain's kiting and Ponzi schemes, CFSB, Mechanics, and HTLF were also necessary components to effectuate the schemes. CFSB and Mechanics allowed the Debtors to thwart acceptable banking practices by improperly floating hundreds of millions of dollars of checks and blithely ignoring numerous red flags, including the evident kiting activity, regular, substantial overdrafts, multiple checks or wires that were dishonored or refused by CFSB and Mechanics due to insufficient funds, hundreds-of-millions in intercompany transactions annually, blatant inconsistencies in the Debtors' financial statements, glaring inconsistencies in the Debtors' stated business model, and all of the automated, internal alerts, such as check kiting and suspicious activity reports, designed to detect and compel the investigation of the Debtors' and McClain's finances and operations.

69.    More egregiously, HTLF actively participated in the check kiting scheme by holding blank, pre-signed checks from the Debtors, filling in the information for investor payments at McClain's or his daughter's direction, directly depositing those fraudulent checks into the respective investor's account at HTLF, immediately crediting the full amount of the check, and transferring most or all of those funds right back to the Debtors on the very same day or the day after.

70.    More specifically, HTLF housed the bank accounts of prominent investors (Bo Robinson and 2B Farms) who entrusted the Debtors with many millions of dollars. To facilitate McClain's Ponzi scheme, HTLF banker Shawn Ragland ("**Ragland**") accepted delivery of pre-signed

blank checks from the Debtors that would be drawn on the Debtors' accounts at Mechanics. When the Debtors' investors who housed their accounts at HTLF presented claims for payment, Ragland or his assistant, Rebecca Fernandez ("**Fernandez**") would undertake the following steps for the Debtors:

a)     Accept delivery of a falsified cattle statement directly from the Debtors that purportedly reflected cattle sales and profits earned on behalf of the Debtors' investors who banked at HTLF.

b)     Fill out the Debtors' pre-signed blank Mechanics Bank checks for the amounts owed to the Debtors' investors who banked at HTLF.

c)     Deposit those kited checks into the investors' accounts at HTLF without the required endorsements by the investors.

d)     Grant the investors immediate credit for those payments before the associated funds arrived via wire transfer from the Debtors' accounts at Mechanics Bank.

e)     Wire funds out of the investors' HTLF accounts to the Debtors' Mechanics Bank account before incoming funds from Mechanics Bank had cleared.

71.     Based on those facts, HTLF was both (i) acting as an agent for and fiduciary of Debtors by possessing and completing blank checks at the Debtors' instruction and (ii) serving as a shadow or pseudo-lender to the Debtors in at least two ways. First, HTLF used kited checks as a means of loaning the Debtors the money necessary to pay investors before the underlying funds arrived from the Debtors' accounts at CFSB or Mechanics Bank—at the initial risk of not HTLF, but its investor-customers. HTLF did so by immediately crediting 2B Farms' and/or Robinson's accounts for the full amount of the Debtors' checks that it deposited before Mechanics or CFSB determined whether sufficient funds were available in Debtors' accounts or whether to honor such checks. Second, HTLF permitted the investors to then immediately resend some or all of the money it had received right back to the Debtors, still before the Debtors' bank(s) honored and paid on the checks. In other words, during this "float" period, HTLF was the party whose cash was at risk when used by

Debtors and was effectively loaning Debtors the float. Moreover, HTLF's agreement to engage, and engagement in, such an irregular arrangement whereby it held and completed blank checks for a non-customer, directly enabled McClain to continue to perpetuate the Ponzi scheme by enabling Debtors to both repay investors and temporarily recapitalize itself with the "float," which further enabled Debtors to continue to repay investors. HTLF accomplished this shadow lending through check kiting undertaken by Ragland and Fernandez on behalf of—and as agents of—the Debtors. Any reasonable bank acting with ordinary care would have known there is no legitimate reason to structure transactions in this manner. A legitimate business would simply wire the purportedly available funds or simply write and deliver checks as they were due. Moreover, if the money was intended to be immediately returned to the Debtors, there was no conceivable legitimate purpose to move the money in an endless circle, rather than the Debtors simply retaining and reinvesting it. Instead, HTLF agreed to partake in patently suspect activities, which enabled McClain to create still more float and access fictitious funds to perpetuate the scheme. At all relevant times, HTLF must have or should have known of the Ponzi scheme given the significant irregularities with the Debtors' transactions.

72.     Furthermore, HTLF should have also investigated the propriety of these transactions because it was violating its own internal policies and procedures by executing the return wires to Debtors without requiring the Debtors' checks to clear beforehand.

73.     In summary, HTLF controlled pre-signed blank checks that it received directly from the Debtors; acted as Debtors' agent by completing and then kiting the blank checks; kited those checks by depositing them into and immediately crediting investor accounts absent endorsements before Debtors' bank(s) paid the checks; and loaned the Debtors significant sums of cash, in some cases in the millions of dollars, by wiring the unpaid float back to Debtors. Without this assistance from HTLF, the Debtors' Ponzi scheme would have collapsed earlier than it did. HTLF was therefore an essential component of and conspirator in the Debtors' massive and long-running Ponzi scheme.

74.     Like Rabo, it appears HTLF viewed its own profits as more important than innocent parties' principal. The only reasonable explanation for why a sophisticated bank and its employees

would engage in inherently suspect transactions over and over again is that it was making money each time. Here, on information and belief, HTLF would loan Bo Robinson and/or 2B Farms money to invest with McClain, which loans were secured by their respective depository accounts at HTLF. HTLF would therefore profit off of the interest it collected from its customers, who happily paid it since they were still securing significant "guaranteed" profits to cover that interest, and then some, each time. Moreover, HTLF faced minimal risk exposure in participating in the scheme in this manner—if the Debtors' checks were ever unpaid, it would be HTLF's customers, from whose accounts HTLF would claw back the provisional credits and leave its customers liable for any negative balances caused thereby.

**D.     CFSB and Mechanics also participate in the kiting and Ponzi scheme.**

75.     Much like HTLF, CFSB and Mechanics Bank similarly acted to perpetuate McClain's Ponzi scheme by permitting Debtors to run ***billions of dollars in transactions***, many of which were kiting transactions, between their accounts at both institutions.

76.     Mechanics Bank's COO contemporaneously admitted to the Trustee that—for years—CFSB and HTLF "sent Mechanics Bank millions of dollars all day," and Mechanics Bank would just send that money right back to CFSB and HTLF absent investigation. Based on that freely flowing money, Mechanics Bank "knew it was in the middle of a check kiting operation" with CFSB, HTLF, and Rabo.

77.     Given Mechanics Bank's admitted knowledge of the kiting scheme, Mechanics Bank knew or should have known that Debtors were running a Ponzi scheme given the exorbitant volume of intercompany transfers, the frequency and evident pattern of those transfers, the large amounts that were being transferred back and forth for no apparent, legitimate reason; and the frequency with which the Debtors overdrew their Mechanics Bank account(s) (491 days), in many instances by more than a million dollars, despite purportedly turning significant profit with each supposed 30-90 day buy-sell cycle of new cattle, which should have resulted in excess cash flows. Mechanics Bank, which was still "powering Rabo" and working hand-in-hand with it as it did before it was spun off from

Rabo, agreed to permit, facilitate, and execute on the check kite scheme, as Rabo would continually fund additional loans to cover overdrafts in the Mechanics accounts. In addition, Mechanics was motivated by its desire to be the last bank with a chair when the music stopped, so it perpetuated the scheme despite all indications it should not do so, so that the music would never end.

78.    Worse, in a pre-bankruptcy-filing conversation with the Trustee, Mechanic's COO made troubling admissions about $1.4 million in the Debtor funds housed at Mechanics immediately before the Petition Date. When the Trustee asked how Mechanics ended up with that $1.4 million, Mechanics COO told the Trustee that Mechanics Bank knew "things were going bad" with the Debtors well before Mechanics learned about the planned receivership of Debtors. At that point, Debtors' accounts at Mechanics were overdrawn by $7 million to $8 million, meaning Mechanics stood to lose that money. Mechanics Bank did not want to be left holding the bag when the Debtors' financial merry-go-round eventually ground to an unwelcome halt. So Mechanics began withholding funds from its remittances to CFSB and HTLF as part of McClain's kiting scheme such that Mechanics housed $1.4 million of Debtors' funds when Debtors filed for bankruptcy. Mechanics did not put that $1.4 million into Debtors' accounts, but instead diverted that money to other accounts in the hopes of preserving those funds for future legal proceedings.

79.    Like Mechanics, CFSB knew or should have known that the Debtors were involved in a Ponzi scheme. Prior to Debtors' engagement with Rabo in or around 2017, CFSB was Debtors' lender and one of Debtors' depository banks.  CFSB thus had a long history with Debtors and knowledge of their business. Given the Debtors' radical growth (especially considered against CFSB's hesitance to bank the Debtors when the operations were a tiny fraction of the size they grew to be), the increasing frequency of seemingly illegitimate intercompany transfers in and out of the CFSB account combined with the decreasing number of legitimate transactions in the account, the growing value of the intercompany transfers, the evident pattern of  kiting transactions, and more than 100 days during which Debtors' account(s) at CFSB were overdrawn, often by more than $1 million, and the Debtors' facially implausible and blatantly inconsistent financial statements (which CFSB had as

part of its lending activities), CFSB knew or should have known of the kiting and Ponzi schemes. This is all the more true given the Debtors' historical transactions with CFSB, which gave CFSB a baseline against which to evaluate the highly irregular pattern of transactions that ensued beginning in or around 2018.

80.     While CFSB may claim to be a victim of McClain's kiting activity, and not a co-conspirator in it, CFSB had the same compelling reasons to turn a blind eye and perpetuate McClain's scheme as Mechanics Bank and HTLF—CFSB did not want to absorb the losses incurred as a result of McClain's scheme. Indeed, CFSB mostly achieved that result, as it was close to having a net zero balance across the Debtors' accounts by the Petition Date.

81.     Moreover, while CFSB may not have had outstanding loans with any of the Debtors as of the Petition Date, CFSB did have outstanding loans with Brian McClain personally and McClain's immediate family members. Given the length of their relationship, CFSB understood that if the Debtors' businesses were shut down, McClain would not be able to repay his personal loans. CFSB therefore had additional incentives to partake in McClain's scheme.

82.     Had CFSB, Mechanics Bank, or HTLF bothered to inquire or cursorily examine the Debtors' financial records, they would have discovered the full magnitude of what they suspected: McClain was running a Ponzi scheme. But none bothered—even though they were repeatedly alerted to the suspect nature of Debtors' transactions via their internal, automated check kiting reports. These banks also ignored or violated their policies and procedures. Their deliberate disregard of these automated warnings and other internal procedures further shows their intentional participation in McClain's scheme.

**E.     Rabo and Mechanics exerted excessive control over Debtors.**

83.     Rabo and Mechanics exerted an atypical level of control over Debtors beyond the typical banking and lending relationships between commercial parties. For example, Rabo purported to have an all encompassing security interest in large swaths of all the Debtors' property, including, by the end, their deposit accounts at Mechanics Bank via the DACA. As the Debtors were reliant on

Rabo's loans to extend their existence as outwardly viable entities, Rabo was able to leverage the Debtors to do what Rabo wanted. Mechanics, still acting hand-in-hand with Rabo as if they had never been spun off from each other, determined whether to pay many insufficient funds checks and wires in coordination with Rabo. Together, they determined the direction in which to steer the Debtors. Given that Debtors' accounts were persistently overdrawn and its line of credit with Rabo continually overextended, Rabo and Mechanics had overwhelming leverage and could and did exert significant influence and control over Debtors vis-à-vis the threat of defaulting the loans and seizing all of Debtors' property, which would immediately end Debtors' business.

84.    Rabo's domination of the Debtors was made indisputably manifest when it forced McClain out of his own companies and installed its own, handpicked chief restructuring officer in his place. .

**F.    Lawson throws Defendants under the bus during his deposition.**

85.    The unraveling of McClain's Ponzi scheme quickly spawned a host of adversary proceedings, including investor claims against Rabo.

86.    Lawson was deposed as part of those adversary proceedings. During his deposition, Lawson identified and described in detail how Defendants enabled, facilitated, and perpetuated McClain's $200 million Ponzi scheme.

87.    Under oath, Lawson testified that, in December of 2019, internal Rabo documents (including an email from Lawson to McClain) showed that Debtor 7M was overdrawn on its Rabo loans by $4.8 million and had $1.1 million in inbound funds—a deficit of more than $3.5 million. At that time, the Debtors had housed their depository accounts at CFSB and Mechanics Bank, and Rabo knew the Debtors were feeding cattle for third parties.

88.    That was not an isolated incident. Lawson testified that the Debtors' accounts had "significant amounts" of overdrafts "on a regular basis," and Rabo was contemporaneously aware of these overdrafts.

89.     McClain brushed off those overdrafts by telling Lawson that "people owed him money." Lawson and Rabo took McClain's word at face value and assumed that others were buying cattle from the Debtors such that payment was forthcoming.

90.     Despite the Debtors' constant account overdrafts and overextension of their credit facility(ies) with Rabo, Rabo steadily increased its lending to the Debtors over the next two years, including a massive new loan of $45 million to the Debtors in 2021. That supersize loan was directly approved by Rabo's head office in the Netherlands. At all times, Rabo knew the Debtors were planning to use part of the $45 million loan to pay off existing debts—and that Debtors' debts to other parties were somehow increasing even though Debtors continued to max out and exceed their growing credit limits with Rabo.

91.     Simultaneously with Rabo's rapidly increasing loans to the Debtors, Rabo knew that the Debtors were making hundreds of intercompany transfers that served no apparent legitimate purpose, and which are a readily identified as suspect transactions by any commercial bank, including through software designed to identify and flag such transactions. Indeed, the Debtors' appeared on Mechanics' check kite report on a near daily basis. Per Lawson, Rabo knew the Debtors were "robb[ing] Peter to pay Paul" such that Rabo "ha[d] no idea who owes who and how much."

92.     In October of 2022, the Debtors' overdrafts had reached the point where Dunn told Lawson that "[m]aybe wires were received and then used to cover other checks that had been written [but] never did come in. I think Brian is in more cash trouble than we think." Stated differently, Rabo indisputably knew the Debtors had become mired in an inescapable check kiting and Ponzi scheme thanks to Rabo's funding.

93.     Lawson spoke with Dunn about his statements that: (1) the Debtors were using wired funds to "cover" phantom checks; and (2) the Debtors were "in more cash trouble than we think." During that discussion, Dunn voiced concerns that the Debtors were running a check kite. But Rabo seemingly took no internal corrective or remedial action.

94.    Notwithstanding Rabo's failure to take corrective action, Lawson testified that Rabo had an obligation to notify Mechanics about the Debtors' check kiting. Lawson further testified that, between October and December of 2022, he had multiple discussions with Jamie Rabatin ("Rabatin") and other Mechanics personnel about the Debtors' suspected check kiting and fraudulent activity.

95.    Rabatin told Lawson that Mechanics was concerned about the Debtors' "unusual activity" because "checks are coming in as they're being covered," *i.e.*, Mechanics knew it was facilitating the Debtors' ongoing check kiting activity. Rabatin also told Lawson that the Debtors' check kiting was "happening daily" such that Rabatin "didn't think anything was right" with the Debtors' Mechanics accounts. Of course, Mechanics had long been alerted to McClain's kiting activities by its internal check kite reports, which repeatedly flagged one or more of the Debtors' accounts as suspect beginning no later than June 2019. Finally, Rabatin told Lawson: "I don't know what to do" about the Debtors' check kiting. And Mechanics Bank failed to do anything to stop McClain's known fraudulent activity.

96.    By December 11, 2022, Lawson and Rabo reached a breaking point about the state of the Debtors' loans. That day, Lawson told McClain that the Debtors' operation "was getting very large" such that it was "unmanageable" without additional help. According to Lawson's sworn testimony, the Debtors' "books were in such disarray that he could not tell what money he was taking from cattle sales." Yet Rabo had seen fit to lend the Debtors $70 million based on those very same books that were "in disarray" and that caused Rabo to initially deny Debtors' credit application.[11] Lawson also told McClain that "you need to hire a CFO" and "obtain more professional bookkeeping help."

97.    In early 2023, the Debtors still did not have a CFO, and, in Lawson's own words, "the cattle count was huge." Lawson asked McClain about what prompted the seemingly "infinite growth"

---

[11] Lawson testified that Rabo originally denied the Debtors' loan in 2017 because of his "inadequate accounting records." But Rabo nevertheless approved the Debtors' loan the following year despite those accounting records having killed the loan application the prior year.

in the Debtors' operation. Lawson also told McClain that he needed to "slow the growth down." Despite that resounding alarm bell, Rabo, at Lawson's request if not insistence, inexplicably lent the Debtors an additional $4.5 million to cover existing overdrafts in Debtors' depository accounts.

98.     At the same time, internal Rabo documents showed that the Debtors were using their loans from Rabo to cover overdrafts created by payments to third parties. But Lawson and Rabo never bothered to conduct due diligence on those payments. Any dutiful bank would have taken that step and discovered that McClain was running a Ponzi scheme by paying existing investors with funds received from new investors under fraudulent Partnership Agreements that guaranteed profits on future cattle sales.

99.     In February 2023, Rabo finally insisted that Debtors provide physical yard sheets for each of its facilities so it could meaningfully audit Debtors' operations. The basic idea was that the Debtors' borrowing base certificates would have the lot and pen numbers of cattle securing his Rabo loans—and those lot and pen numbers would be physically audited in-person to confirm the accuracy and validity of the yard sheet.

100.    Rabo's insistence on auditing the Debtors' facilities against hardcopy, official yard sheets was a material change in course. Though Rabo's inspectors had long requested such yard sheets, Rabo had for years ignored that nothing more than handwritten chicken scratch had been provided in their stead, if anything at all. The only material difference in Debtors' operations between 2023 and prior years was their purported size. Rabo's decision in 2023 to actually audit Debtors' business suggests that Rabo was comfortable supporting a Ponzi scheme so long as Rabo continued to make money and the scheme did not get too large. It was only once Debtors' debt exceeded $50 million that Rabo decided its risk exposure was too great—which triggered investigating the Debtors' business operations. Indeed, in 2021, Rabo documented its risk adjusted rate of return on its capital loaned to Debtors to be a whopping 43-percent. As Michelle Stockett, Rabo's collateral inspector for the Debtors' loans testified: Lawson, Dunn and others at Rabo turned a blind eye to the red flags she

continually raised regarding the gross inadequacy of Debtors' recordkeeping because Rabo was making money on the loan (at least on paper) and wanted to keep the paper profits flowing.[12]

101.    When Rabo finally deemed its exposure to Debtors to outweigh the potential profits, Rabo actually audited the Debtors' operation on or around February 28, 2023. Rabo's audit revealed that the Debtors had 72,000 ***less*** cattle on hand than what was being represented to Rabo. Instead of the reported 80,000 cattle, the Debtors had just 8,000 on hand.

102.    Following Rabo's 2023 inspection, Stockkett circulated an internal recommendation that Rabo write off a majority of Debtors' loan balance and foreclose on the security agreement given the obvious fraud. Yet, despite the undeniable fraud at this point in time, Stockkett faced intense push back from some senior analysts and/or customer relationship team members, challenging her judgment. Ultimately, though, sanity finally prevailed. In a March 9, 2023, email chain, Frank Oliver, a top Rabo North America executive, conceded that the Debtors were involved in a check kiting fraud. The individuals copied on that email chain included Chris Olson, Rabo's second-in-command for North America. But it took Rabo over five weeks to stop the movement of funds through the Debtors' depository accounts at CFSB and Mechanics Bank following the audit.

103.    While Rabo dithered on the movement of millions of dollars through the Debtors' bank accounts, Rabo leveraged its control over Debtors to practice self-help. First, Rabo compelled Debtors and Mechanics Bank to execute the DACA, giving Rabo its purported lien on Debtors' deposit accounts on March 23, 2023, so it could sweep the accounts and keep the money. Next, Rabo compelled Debtors to execute an amended forbearance agreement to strip McClain of control over Debtors and to try to shield itself from claims stemming from McClain's Ponzi scheme—like the

---

[12] These booked profits not only incentivized Rabo as an entity to continue lending to Debtors without asking tough questions but also incentivized Rabo's employees to ignore the many red flags because the profitability of their loans was a factor in their individualized bonus determinations. Among other factors, the spread (or difference) in the interest Rabo paid to originate the funds versus the greater interest rate Debtors paid on the utilized portion of their credit facility(ies) from Rabo comprises a large portion of the paper profits. On paper at least, so long as Debtors did not default and kept paying on the loan, the larger the loan grew and the more profitable it became.

claims the Trustee now asserts. Rabo then downgraded the Debtors' loans and seized control of the cattle at their facilities without bothering to determine if the cattle actually comprised part of Rabo's collateral. Rabo did that to short-circuit the bankruptcy process to its own advantage and to the detriment of all other creditors.

104.    Finally, Lawson testified under oath that Mechanics Bank and Rabo could—and should—have caught McClain's fraud before he ran up $70 million in loans from Rabo. According to Lawson, if Rabo and Mechanics Bank had done their jobs and caught McClain's fraud, his Ponzi scheme would have been far less damaging to the creditors that lost huge sums of money because of CFSB, HTLF, Mechanics Bank, and Rabo's lawless conduct.

**G.    Debtors' bankruptcy estate includes almost $200 million in claims.**

50.    The Debtors' bankruptcy estate includes almost $200 million of claims, including the claims filed by the same parties asserting USDA Claims and Rabo's claim. Accordingly, numerous creditors exist with avoidance claims which the Trustee may assert pursuant to section 544(b).

105.    To the extent pleading a specific creditor is required, any one of the many allowed investor or vendor claims would qualify as a creditor with standing for purposes of § 544(b), including but not limited to the following two tables:

| CLAIMANT/ADDRESS | POC FILED 23-20084 McClain Feed Yard, Inc. | POC FILED 23-20085 McClain Farms, Inc. | POC FILED 23-20086 7M Cattle Feeders, Inc. |
|---|---|---|---|
| Northland Capital Financial Services, LLC 333 33rd Ave. South St. Cloud, MN 56301 | Claim 1 $25,865.36 5/4/23<br><br>Claim 2 $55,511.81 5/4/23<br><br>Claim 3 $106,904.18 5/4/23 | Claim 1 $25,865.36 5/4/23<br><br>Claim 2 $55,511.81 5/4/23<br><br>Claim 3 $106,904.18 5/4/23 | Claim 1 $25,865.36 5/4/23<br><br>Claim 2 $55,511.81 5/4/23<br><br>Claim 3 $106,904.18 5/4/23 |
| BJM Sales & ServicePO Box 1073Hereford, TX 79045-1073 | Claim 6$270.035/22/23 | | |
| First Kentucky Bank, Inc. 605 Main Street Benton, KY 42025 | | Claim 14 $46,642.99 6/27/23<br><br>Claim 15 $13,269.61 6/27/23 | |
| Heartland Co-Op 2829 Weston Parkway Suite 350 West Des Moines, IA 50266 | Claim 4 $29,675.20 5/15/23 | | Claim 4 $102,938.70 5/15/23 |
| Purina Animal Nutrition, LLC 4001 Lexington Ave. North Arden Hills, MN 55126 | Claim 15 $17,174.15 5/30/23 | | |
| Caterpillar Financial Services Corporation 2120 West End Ave. Nashville, TN 37203 | Claim 20 $27,912.08 7/10/23 | | |
| Euler Hermes, N.A. Insurance Co.,as Agent for WHITAttn: Chris T. Anthony800 Red Brook Blvd., #400COwings Mills, MD 21117 | | | Claim 18 $90,131.07 8/2/23 |
| National Finance Credit Corporation of Texas 410 E. Weatherford Street Fort Worth, TX 76102 | Claim 69 $709,680.77 9/13/23 | Claim 75 $709,680.77 9/13/23 | Claim 67 $709,680.77 9/13/23 |
| Texas Comptroller of Public Accounts c/o Office of the Attorney General Bankruptcy-Collections Division MC-008 PO Box 12548 Austin, TX 78711 | Claim 92 $13,381.34 1/23/24 | | Claim 76 $5,963.08 1/23/24 |
| Republic Services #796 PO Box 9001099 Louisville, KY 40290 | | Claim 94 $1,203.61 11/16/23 | |

| CLAIMANT /ADDRESS | POC FILED 23-20084 McClain Feed Yard, Inc. | POC AMOUNT 23-20084 McClain Feed Yard, Inc. | POC FILED 23-20085 McClain Farms, Inc. | POC AMOUNT 23-20085 McClain Farms, Inc. | POC FILED 23-20086 7M Cattle Feeders, Inc. | POC AMOUNT 23-20086 7M Cattle Feeders, Inc. |
|---|---|---|---|---|---|---|
| Acey Livestock, LLC 211 Old Orchard Rd. Perryville, KY 40468 | | | #22 8/23/23 | $1,722,931.57 | | |
| Bar D Ranch Land & Cattle 4458 S US Hwy 441 Lake City, FL | #7 5/25/23 | $92,053.76 | #5 5/25/23 | $92,053.76 | #6 5/25/23 | $92,053.76 |
| Riley Livestock, Inc. PO Box 663 Mayfield, KY 42066 | #16 6/22/23 | $694,059.28 | #13 6/22/23 | $694,059.28 | #14 6/22/23 | $694,059.28 |
| Shaw & Shaw Farms Partnership LLC 11605 NW 140th St. Alachua, FL 32615 | #8 5/25/23 | $120,911.37 | #6 5/25/23 | $120,911.37 | #7 5/25/23 | $120,911.37 |

106.     Additionally, with respect to limitations, innocent vendors and investors would not have had cause to know of the Debtors' fraudulent scheme and check kiting given, among other things, the fact that the Debtors' purported cattle investment activities involved cattle located in several states, the investors were geographically located across several states, and such parties would not have had access to the Debtors' banking records and other financial information (as opposed to the Debtors' banks, which did have access to such information). As a result, there are creditors of the Debtors that could take advantage of appliable discovery rule limitations extensions for purposes of the allowable time period to later avoid transfers to the banks, and the Trustee may utilize this extension under § 544(b).

107.    The Trustee now asserts common-law tort and avoidance claims against Defendants to hold them accountable for their roles in McClain's kiting and Ponzi schemes in order to provide a meaningful return to innocent unpaid vendors and investors.

## IV.    CAUSES OF ACTION

### COUNT I: KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTIES
### (AGAINST ALL DEFENDANTS)

108.    The Trustee incorporates by reference the factual allegations stated in all other paragraphs for all purposes.

109.    "Under Texas law, 'where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such.'" *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (quoting *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942)). "To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Id.*[13]

110.    The Trustee alleges each element of a knowing participation in the breach of a fiduciary duty claim against Defendants as follows.

### A.    Brian McClain had a fiduciary relationship with Debtors.

111.    McClain was both a director and officer of Debtors, so he owed fiduciary duties of loyalty, care, and obedience to Debtors. *See Ritchie v. Rupe*, 443 S.W.3d 856, 858 (Tex. 2014) ("Directors, or those acting as directors, owe a fiduciary duty to the corporation in their directorial actions, and this duty includes the dedication of their uncorrupted business judgment for the sole benefit of the

---

[13] *See also Insight Kentucky Partners II, L.P. v. Preferred Auto. Servs., Inc.*, 514 S.W.3d 537, 546 (Ky. Ct. App. 2016) (citing *Miles Farm Supply, LLC v. Helena Chem. Co.*, 595 F.3d 663, 666 (6th Cir.2010)) ("Kentucky follows the Restatement (Second) of Torts, § 876 . . . .To prevail on a claim of aiding and abetting a breach of fiduciary duty, a plaintiff must prove the following elements: (1) the existence and breach of a fiduciary relationship; (2) the defendant gave the breaching party "substantial assistance or encouragement" in effectuating the breach; and (3) the defendant knew that the party's conduct breached that fiduciary duty.")

corporation."); *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 569-70 (N.D. Tex. 2024) (explaining that the "fiduciary status" of corporate directors and officers "gives rise to three broad duties: the duty of due care, loyalty, and obedience" (cleaned up)).

112.    Alternatively, McClain was an employee of Debtors and "owe[d] a fiduciary duty to [his] employer to act primarily for [his] employer's benefit." *Centennial*, 2024 WL 733649, at *15 (citing *Nat'l Plan Adm'rs Inc v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007)).

### B.  Defendants knew McClain was a fiduciary of Debtors.

113.    Defendants knew about McClain's fiduciary relationship with Debtors because Defendants dealt directly with McClain in his capacity as a director, officer, or employee of Debtors.

### C.  McClain breached fiduciary duties to Debtors and their stakeholders.

114.    McClain breached his fiduciary duties to Debtors and their stakeholders by using Debtors to operate a billion-dollar Ponzi scheme for many years. That Ponzi scheme was accomplished primarily through execution of fraudulent Partnership Agreements between McClain and third-party investors. McClain induced his investors to sign those contracts under the false pretense that the subject cattle (some of which were apparently fictional) were already under contract for sale at a higher weight and price—and the investor would receive two-thirds of all sale profits, with the balance going to McClain. In reality, McClain used funds from new investors and further extensions of credit by HTLF, CFSB, and Mechanics Bank (when they honored NSF checks) as well as Rabo (via extended credit facilities) to pay off old investors. This Ponzi scheme eventually spiraled out of control to such an extent that McClain committed suicide just days after relinquishing his remaining control over Debtors via the amended forbearance agreement, and the Debtors were forced to declare Chapter 7 bankruptcy, sparking this litigation.

115.    McClain's Ponzi scheme caused Debtors to suffer over $100 million in damages, as evidenced by the fact that more than 100 creditors have asserted over $120 million in claims against Debtors with the USDA under the Dealer Trust Statute and Rabo asserts a claim of approximately $50 million. Those damages were a foreseeable consequence of McClain's decision to operate a

massive Ponzi scheme fraud in two states over multiple years, and Defendants' facilitation of that Ponzi scheme.

**D.  Defendants knowingly participated in McClain's breaches of his fiduciary duties to Debtors.**

116.    Defendants knew they were participating in McClain's breach of his fiduciary duties to Debtors. Even worse, Defendants took an active role in McClain's Ponzi scheme through cash and check kiting activity.

117.    Mechanics and Rabo used their control over Debtors' bank accounts to make on-the-spot payments to investors who presented claims for payment on Partnership Agreements with McClain. When Debtors' accounts would go into overdraft, Mechanics consulted and coordinated with Rabo to obtain repayment, often through Rabo's further extensions of credit. In other instances, where McClain admittedly "lost track" of his cash position and substantially overdrew the Debtors' Mechanic accounts even more so than typical, Rabo would lead the discussion on how to move the Debtors' cash and incoming receivables around to address any exigent issues. Rabo would relax its internal controls, policies, and procedures, and approve extensions and increases to the credit faculties despite clear warnings and red flags that Debtors were unable to afford the debt. As a result, Rabo, and Mechanics loaned Debtors any account to perpetuate McClain's Ponzi scheme. Defendants' misconduct led to huge volumes of money moving in and out of the Debtors' accounts on a monthly basis. For example, Debtors' December 2022 statements from Mechanics Bank show $102 million in debits and $102 million in credits for the month. That point is underscored by the charts of Debtors' banking activity in Paragraphs 42–46 above, which show massive and pervasive overdrafts on Debtors' bank accounts at CFSB and Mechanics Bank for the duration of McClain's long-running Ponzi scheme. Any competent bank would have investigated those overdrafts and discovered McClain's fraud.

118.    HTLF controlled pre-signed blank checks that it received directly from McClain, kited those blank checks to pay the Debtors' investors, including Bo Robinson and 2B Farms, who housed

bank accounts at HTLF, deposited those checks into investor accounts absent endorsements, immediately credited the Debtors for funds yet to arrive from Mechanics, and acted as a "shadow lender" to McClain by pre-paying him out of the investors' HTLF accounts before the underlying funds from Mechanics or CFSB cleared. HTLF was indisputably an essential component of McClain's massive and long-running Ponzi scheme. And, at all times, HTLF knew it was engaging in fraudulent activity on behalf of McClain when it performed the instant banking actions for McClain.

### COUNT II: BREACH OF FIDUCIARY DUTY
### (AGAINST RABO, MECHANICS AND HTLF)

119.    The Trustee incorporates by reference the factual allegations stated in all other paragraphs for all purposes.

120.    Under Texas tort law, the four elements for a breach of fiduciary duty claim are: "(1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

121.    The Trustee alleges each essential element of a breach of fiduciary duty claim against Rabo, Mechanics, and HTLF as follows:

### A.    Rabo, Mechanics, and HTLF owed fiduciary duties to Debtors.

122.    As set forth above, the Defendants all exercised significant control over the Debtors to the extent that each owed Debtors fiduciary duties.

123.    Rabo exercised "excessive lender control" over Debtors by virtue of the leverage it obtained by consolidating its security interest over Debtors' property by paying off and consolidating old debt into its own credit facilities with Debtors by no later than 2021. As each of Rabo's with the Debtors were cross-defaulted and cross-collateralized, Rabo could have foreclosed on its security interests, thereby ending Debtors' business. To leave no doubt as to Rabo's control over Debtors, Rabo exercised its power to control Debtors when it compelled McClain to execute the amended forbearance agreement, to grant purported releases to Rabo for all claims (other than Chapter 5 and other bankruptcy claims), and force McClain to turn management of the three companies he founded

and managed for over a decade over to Rabo's handpicked successor. Lawson even admitted in his deposition that Rabo was controlling Debtors and McClain. Rabo's excessive control over Debtors, beginning by no later than 2021, gave rise to fiduciary duties owed by Rabo to Debtors. *See Wil-Roye Inv. Co. II v. Washington Mut. Bank, FA*, 142 S.W.3d 393, 410 (Tex. App.—El Paso 2004, no pet.); *Martinez v. Capital One*, Civil Action No. H-22-2767, 2022 WL 17085938, at *4 (S.D. Tex. Nov. 18, 2022).

124.    Mechanics also exerted excessive and atypical control over Debtors by virtue of their participation and roles in Defendant's kiting scheme. At any point in time, Mechanics could have shut down Debtors' business, by refusing to send another check to create more float, by refusing to credit the Debtors' checks before they were paid by Debtors' bank(s), or by dishonoring checks due to insufficient funds. Debtors' existences as ongoing concerns were effectively subject Mechanics' whim.

125.    HTLF owed fiduciary duties to the Debtors because they acted as agents of the Debtors. Agents owe fiduciary duties to their principals. Moreover, HTLF knew it was in a special relationship based on great trust, as evidenced by the Debtors' trusting HTLF and its employees Ragland and Fernandez, to possess pre-signed, blank checks that they could have used however they wanted. This relationship of special trust between HTLF and the Debtors, *i.e.*, HTLF's ultimate control of the Debtor's accounts, gives rise to fiduciary duties. Furthermore, in agreeing to and serving in this role, Ragland and Fernandez in their roles as HTLF employees—and thus HTLF—became agents of Debtors. As an agent of the Debtors, HTLF owed Debtors fiduciary duties.

**B.  Defendants breached their fiduciary duties to Debtors.**

126.    Mechanics Bank and HTLF breached their fiduciary duties to Debtors by facilitating McClain's Ponzi scheme, including through effectuating and perpetuating McClain's check kiting activities, as detailed above. Rather than stopping the check kite and limiting its loans to Debtors, and thus Debtors' liabilities, Defendants empowered McClain to continue the Ponzi scheme unabated for years, causing significant harm to the Debtors and their investors. Defendants did this without investigating whether the Debtors' transactions were legitimate or whether the Debtors had the ability

to repay any loans and extensions of credit it received. Worse, Defendants ignored their own internal policies and procedures, deviated from regular practices, and turned a blind eye to glaring warning signs, including automated, internal warnings designed to prevent the very type of illicit transactions that Defendants ultimately facilitated.

127.    At the same time, Rabo further perpetuated McClain's Ponzi scheme by increasing its loans to the Debtors to cover overdrafts that arose from Debtors' check kite and use of new investor funds to repay old investors. Rabo continued to extend more and more credit, in many cases for the purposes of paying off old debts, even though Debtors' cumulative debts paradoxically continued to grow exponentially. Rabo's failure to act with and must have known the Debtors' operations were illegitimate because Debtors' debts continued to grow even though Debtors' financial records purported their operations should have been profitable and cash flow positive (i.e., booked expenses did not exceed booked revenue). In spite of this, Rabo prioritized its anticipated profits over the Debtors' future viability (and their innocent creditors), violating its duties of good faith and fair and honest dealing, among others, that Rabo owed Debtors.

128.    Additionally, Debtors routinely requested and obtained increases of the Rabo credit facilities to wipe away overdrafts that Rabo knew Debtors could not pay. Indeed, Rabo's *entire* relationship with Debtors is founded upon Rabo intentionally relaxing its underwriting policies uniquely for the Debtors since application of its official policies would have and compelled Rabo to reject even an initial, far smaller loan to Debtors. Had Rabo stopped ignoring its official policies at any time following its initial extension of credit to Debtors, especially in 2021 or after, Rabo would not have granted the serial loan extensions and line increases, and McClain's Ponzi scheme would have unraveled far earlier, saving Debtors and their investors hundreds of millions of dollars.

129.    At all times, Defendants knew—or should have known—about McClain's Ponzi scheme. Debtors' statements from Mechanics were replete with suspicious activity because they showed hundreds of millions of dollars passing through Debtors' bank accounts at CFSB and Mechanics on a regular basis. And Rabo's internal communications show coordination with

Mechanics to fund these transactions through CFSB and Mechanics. As illustration, Debtors' December 2022 statements from Mechanics reflect $102 million in debits and $102 million in credits for the month. And Lawson testified during his deposition that Defendants were uniquely positioned such that they "should have" detected McClain's fraud well before his Ponzi scheme spiraled out of control. Instead, Defendants put their balance sheets before the Debtors'.

### C. Defendants' breaches of their fiduciary duties damaged Debtors.

130.    Defendants' breaches of their fiduciary duties inflicted several hundred million dollars of losses on Debtors. But for Mechanics' and HTLF's cash and check kiting—and Rabo's unrestrained loan extensions and line of credit increases to Debtors to fund resulting overdrafts— McClain's years-long Ponzi scheme would have collapsed sooner, saving Debtors and their creditors substantial sums in misappropriated funds. To be sure, Lawson testified that Rabo could have, but did not, stop McClain's fraud in its tracks. And Lawson's colleague, Stockett, testified they did not because they did not want to derail the paper profits they were booking from their loans to Debtors.

131.    And such damages to Debtors and their creditors were a foreseeable consequence of Defendants' kiting and loans in connection with McClain's Ponzi scheme.

132.    The Trustee quantifies Debtors' damages from Defendants' breaches of their fiduciary duties as exceeding $170 million, and that figure may increase as the Trustee gathers more information about the Debtors' operations. As explained above, more than 100 claimants have asserted claims exceeding $120 million for: (1) allegedly unpaid amounts for Cattle Purchases; (2) cattle that were dropped off for Feed Yard Services and sold without returns to their owners; (3) unpaid Partnership Agreement investments; and (4) other miscellaneous transactions.

### COUNT III: COMMON-LAW CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

133.    The Trustee incorporates by reference the factual allegations stated in all other paragraphs for all purposes.

134.     In Texas, "[a] civil conspiracy is composed of two or more persons combining to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 623 F. Supp. 2d 798, 808–09 (S.D. Tex. 2009). The essential elements of a civil conspiracy claim are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Id.*

135.     Critically, the agreement or meeting of the minds necessary for civil conspiracy liability "need not be formal; rather, the understanding may be tacit; and it is not essential that each conspirator have knowledge of the details of the conspiracy; inferences of concerted action may be drawn from participation in the transactions." *Id.* (cleaned up). And "it is not necessary for each conspirator to have entered into the unlawful agreement at its inception." *Id.*

136.     '[T]he fact that a conspirator is not present at, or does not participate in, all of the conspiratorial activities does not, by itself, exonerate him." *Id.* "A changing cast of characters does nothing to lessen the fact of one conspiracy. Once the existence of a common scheme of conspiracy is shown, slight evidence is all that is required to connect a particular defendant with the conspiracy." *Id.*

137.     The Trustee alleges each essential element of a civil conspiracy claim against all Defendants as follows.

### A.     McClain and Defendants formed an illegal conspiracy to operate a check kiting scheme and Ponzi scheme.

138.     McClain and Defendants engaged in joint action in furtherance of a civil conspiracy against Debtors.

139.     CFSB, HTLF, and Mechanics violated their own policies and procedures for fraud review and analysis (and their internal controls for verification of deposits received) and ignored federal and state laws regarding money laundering and other such fraudulent schemes to grease the wheels of McClain's Ponzi scheme, to the detriment of the Debtors. By the same token, Rabo deviated

from its policies, procedures, and internal controls to bend over backwards to approve, extend, and increase its lending facilities to Debtors despite clear red flags and alarm bells sounding due to Debtors' precarious financial situation. Moreover, Mechanics executed the DACA with Rabo that gave Rabo the ability to control Debtors' access to funds, and outflows from Debtors' bank accounts at CFSB and Mechanics.

140.    To be sure, Rabo's internal communications show ongoing coordination with Mechanics to fund these transactions and cover overdrafts through Rabo's extensions of credit and floating funds between the Debtors' CFSB and Mechanics accounts. Lawson also admitted in sworn testimony that he discussed the perilous state of the Debtors' constantly overdrawn accounts and the existence of the kite scheme in 2021 with colleagues. Rabo's and Mechanics' subsequent failure to take any meaningful action to stop the check kite for more than a year reflects at least their tacit agreement to permit the check kite, and thus Debtors' manifestly illicit operations, to continue.

141.    HTLF further conspired with McClain to perpetuate the check kite, and thus the Ponzi scheme, through HTLF's use of the Debtors' pre-signed, blank checks. HTLF was an essential component of McClain's massive and long-running Ponzi scheme.

142.    The Trustee reserves the right to amend his pleadings if he identifies any additional co-conspirators during discovery.

**B.  The object of this conspiracy was to operate a Ponzi scheme.**

143.    The object of the conspiracy between McClain and Defendants was to perpetuate the check kite scheme and thereby, a billion-dollar Ponzi scheme.

144.    Through a coordinated policy of disregarding applicable bank policies, procedures, and controls, as well as ignoring state and federal laws, Defendants facilitated over a billion dollars in transactions with little to no oversight to authenticate or verify the funds despite flashing lights and sirens. In so doing, Defendants aided in McClain's concerted effort to prioritize windfalls for McClain at the expense of the Debtors. Defendants never conducted necessary due diligence on Debtors'

financial condition, capitalization, or operations. Nor did they ever scrutinize McClain's ability, as guarantor, to repay Rabo's loans or cover the Debtors' hundreds of millions of dollars in wire transfers. Worse, Rabo ignored the many warning signs revealed through the minimal reviews it did conduct, which signaled Debtors' lack of creditworthiness for a loan worth less than two-percent of the ultimate credit Rabo nevertheless extended to the Debtors. CFSB, Mechanics, and HTLF likewise ignored the many warning signs (*e.g.*, from constant overdrafts to the complete absence of basic paperwork) that demanded each of them put an end to the scheme. Instead, they permitted and partook in it.

### C. McClain and Defendants had the requisite meeting of the minds, as shown by their overt acts in furtherance of the Ponzi scheme.

145.    McClain and Defendants had the meeting of the minds on the object of operating a fraudulent Ponzi scheme. That four sophisticated, commercial financial institutions—two of whom had been one and the same just a year prior—all, for years, not only ignored countless red flags but enabled and partook in the same broad check kiting scheme speaks louder than the Trustee's factual allegations or Defendants' present denials ever could.[14] It was not a once-in-a-lifetime coincidence.

146.    To be sure, Defendants' meeting of the minds also manifested through several overt acts. **_First_**, McClain housed all of Debtors' bank accounts at CFSB and Mechanics and utilized Rabo as a lending facility for Debtors' operations. **_Second_**, Rabo lent the Debtors $70 million to facilitate "growth" of McClain's fraudulent Ponzi scheme, including, in part, to pay off Debtors' loans with other Defendants. **_Third,_** despite repeated and extended overdrafts in the millions of dollars, CFSB, Mechanics, and HTLF continued to honor the Debtors' NSF checks, both as payor and payee, when their ordinary policies and procedures (if not the law) demanded otherwise. **_Fourth_**, Rabo, via its credit facilities, and CFSB and Mechanics, both via their payment of NSF checks and continued automatic crediting of checks despite repeated prior overdrafts, lent Debtors any fund shortfalls caused by overdrafts on Debtors' bank accounts at CFSB and Mechanics to perpetuate the fraudulent Ponzi scheme. **_Fifth_**, CFSB and Mechanics accepted deposits for new Partnership Agreements when

---

[14] *See* President Abraham Lincoln's Cooper Union Speech (Feb. 17, 1860) ("[A]nd, as actions speak louder than words, so actions, under such responsibility, speak still louder.").

they knew such funds were the "new investments" required to prop up a Ponzi scheme. **_Sixth_**, HTLF controlled pre-signed blank checks drawn on one or more of the Debtors' accounts, which HTLF would complete and deposit without endorsement on Debtors' behalf (instead of demanding, as a prudent bank would, that Debtors deliver completed checks or wire the funds). **_Seventh,_** HTLF took the further step of creating "float" for the Debtors by immediately crediting the corresponding customer's account in full for the check and immediately returning some or all of the floated funds back to the Debtors, repeating the circular transactions so many times it was evident the transactions could only have illicit motivations.  **_Eighth_**, in another "coincidence," in the days and weeks before the Petition Date, Rabo and Mechanics initiated transfers of the Debtors' deposits to CFSB to zero out Debtors' accounts at CFSB. **_Ninth_**, in yet another fortune of timing, mere days before forcing McClain out of the business for Rabo's handpicked replacement, and just weeks before Debtors filed their Petitions, Mechanics executed Deposit Account Control Agreements with Rabo that gave Rabo the ability to claim a lien over and control Debtors' access to funds, and outflows from Debtors' bank accounts at Mechanics. **_Tenth_**, Rabo extracted purported waivers and releases from the Debtors in the amended forbearance agreement signed just days before the Petition Date. **_Eleventh_**, McClain, at Rabo's direction, retained an external CPA firm to prepare quarterly and annual consolidated financials to give the financials an air of legitimacy, even though the preamble to each reflected various deviations from generally accepted accounting principles and neither Rabo nor Mechanics nor CFSB cared to scrutinize them with any care or diligence.

147.     Though Defendants' motives for entering into the conspiracy are not elements of the claim, at least some of their respective incentives to do so are readily apparent. As noted above, Rabo was booking profits on the corporate level, and the key employees behind the relationship stood to gain through increased bonuses. And Mechanics, in coordination with Rabo, minimized the risks of the check kite via its relationship with Rabo, which would extend further credit to the Debtors to cover overdrafts in the Mechanics accounts.

148.     HTLF and CFSB, like Rabo, were both in pursuit of their own profits as well. HTLF was getting easy, free money by profiting off of the interest it would charge to loan the money to investors, including Bo Robinson and 2B Farms, who would in turn make money off of their purported investments and guaranteed profits. HTLF simply did not want to turn off its spigot of cash. Likewise, CFSB partook and facilitated the check kite and Ponzi scheme to preserve its two-plus decades' long relationship with McClain and his family members, thereby retaining their personal accounts (and the profits CFSB made therefrom) while simultaneously ensuring that the McClains, many of whom depended on the Debtors for income, had sufficient cash flows to repay their respective personal debts. As identified above, CFSB's list of all the McClain familial accounts it maintained, spanning over two pages, represented the incentives for CFSB to maintain this significant volume of business.

149.     Any one of the Defendants could have stopped the scheme at any time. But they did not. Instead, they put their own profits above all else. All four of these sophisticated, commercial banks with preexisting fraud detection software, decades of experience (including, in CFSB's case, with McClain and the Debtors specifically), and specialized training did not all fail to intervene and stop McClain's scheme because they were all hood-winked. Rabo's and Mechanics' employees have admitted they were often perturbed by various red flags in the Debtors' operations and documentation. And CFSB had an even greater reason to be suspicious of the Debtors' legitimacy given they were not comfortable with the Debtors' growth long before the Debtors ever began the kiting and Ponzi scheme. Rather, they did not intervene because they each had their own counter-incentives not to do so.

**D.  The conspiracy between McClain and Defendants directly and proximately inflicted $200 million in losses on Debtors.**

150.     The above overt acts directly and proximately damaged Debtors. The Ponzi scheme perpetuated by McClain and Defendants caused Debtors and their creditors to lose nearly $200 million. When Defendants conspired to commit the Ponzi scheme, they should have foreseen the fraud would collapse, leaving Debtors and their creditors with massive financial losses.

## COUNT IV: PROFESSIONAL NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

151.    The Trustee incorporates the factual allegations in all other paragraphs herein by reference for all purposes.

152.    Negligence "consists of three elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately caused by the breach of that duty." *Kinnie Ma Individual Retirement Account v. Ascendant Capital, LLC*, No. 1:19-CV-1050-LY, 2021 WL 11963051, at *5 (W.D. Tex. Aug. 25, 2021).

153.    The Trustee alleges each essential element of a negligence claim against CFSB, Mechanics Bank, and Rabo as follows.

### A.    Defendants owed a legal duty of care to Debtors.

154.    CFSB, Mechanics Bank, and Rabo owed a duty of ordinary care to Debtors at all relevant times. "The Uniform Commercial Code (the UCC) … regulates a bank's relationship with its Texas customers, and imposes a duty of ordinary care on a bank with regard to various situations, such as" bank deposits and collections, fund transfers, and negotiable instruments. *Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856, 873 n.5 (Tex. App.—El Paso 2021, no pet.) (citations omitted). Because Debtors were customers of Defendants, Texas law imposes a duty of due care on Defendants in their dealings with Debtors. HTLF, as an agent of the Debtors vis-à-vis Ragland and Ferndandez, likewise owed Debtors a duty of care.

### B.    Defendants breached their duty of care to Debtors by facilitating McClain's billion-dollar Ponzi scheme.

155.    CFSB and Mechanics Bank breached their duty of ordinary care to Debtors by engaging in cash and check kiting activity where CFSB and Mechanics Bank used their control over Debtors' accounts to make on-the-spot payments to investors demanding payment under fraudulent Partnership Agreements.

156.    Rabo breached its duty of ordinary care to Debtors by perpetuating McClain's Ponzi scheme through continuous and repeated relaxation of its internal controls, policies, and procedures

to approve extensions and increases in its lending facilities to Debtors to cover shortfalls in Debtors' CFSB and Mechanics Bank accounts because of overdrafts in connection with Partnership Agreement payments, as confirmed by Lawson.

157.    HTLF violated its duty of care by participating in the highly irregular, alarm-tripping arrangement in which it held blank, pre-signed checks of the Debtors, filled out the payee and amount, and created still more float.

158.    Defendants further breached their duties of ordinary care by allowing hundreds of millions of dollars to be transferred between the Debtors' bank accounts at CFSB and Mechanics Bank on a monthly basis with no apparent, legitimate purpose—a basic red flag for fraudulent activity. Lawson's deposition testimony confirms that any competent bank would have taken notice of—and investigated—that highly suspicious activity. That point is underscored by the charts of Debtors' banking activity in Paragraphs 39–44 above, which show massive and pervasive overdrafts on Debtors' bank accounts at CFSB and Mechanics Bank for the duration of McClain's long-running Ponzi scheme. Any competent bank would have investigated those overdrafts and discovered McClain's fraud. Of course, had Rabo simply abided by its policies and stuck with its initial determination that the Debtors were not creditworthy, any Ponzi scheme that had already begun or subsequently ensued would have been exponentially smaller.

## C. Defendants' professional negligence proximately caused significant damage to Debtors.

159.    As previously elaborated, Defendants breached their duty of ordinary care by ignoring known and obvious red flags and acting to expand the Debtors' suspect operations, instead of stopping them or, at minimum, refusing to participate in the suspect transactions. By continuing to extend credit in the form of both dollars and a fictitious float, Defendants directly and proximately damaged Debtors by enabling them to incur nearly $200 million in debt—when Rabo had initially determined years earlier that the Debtors were not qualified for a less than $2 million loan. At the outset, Defendants should have foreseen that their unlawful actions would cause Debtors and their

other creditors to lose untold sums of money, with losses increasing with each passing day. By the time the scheme came to an end, those damages grew to exceed $170M, as evidenced by the volume of claims asserted by creditors against the Debtors in this bankruptcy proceeding.

## COUNT V: PUNITIVE DAMAGES
### (AGAINST ALL DEFENDANTS)

160.    Plaintiff incorporates by reference the factual allegations in all other paragraphs for all purposes.

161.    Defendants' conduct, as described in the above paragraphs, was outrageous, malicious, fraudulent, grossly negligent, or otherwise morally culpable and reprehensible such that imposition of punitive damages would both punish Defendants for their conduct and deter others from committing similar acts in the future. Such punitive damages are available under the common law of torts in Texas. *See Safeshred, Inc. v. Martinez,* 365 S.W.3d 655, 660 (Tex. 2012) (explaining that "punitive damages are generally available for common law torts").

162.    Accordingly, the Trustee seeks punitive damages against all Defendants in an amount to be determined by the finder of fact at trial.

## COUNT VI: DETERMINATION OF EXTENT, VALIDITY, AND PRIORITY OF LIEN
### (AGAINST RABO)

163.    The Trustee incorporates the factual allegations in all other paragraphs herein by reference for all purposes.

164.    The Trustee is currently holding funds that are asserted to be the collateral of Rabo. The Trustee disputes that this property is the collateral of Rabo due to, among other things, the fact that the Debtors' property is all proceeds of commingled investor funds, and the avoidance of the DACA Agreement below. The Trustee requests the Court to declare that the estate funds are not the proceeds of Rabo's asserted security interest pursuant to 11 U.S.C. § 506.

## COUNT VII: AVOIDANCE OF DEPOSIT ACCOUNT CONTROL AGREEMENT
## (AGAINST RABO)

165.     The Trustee incorporates the factual allegations in all other paragraphs herein by reference for all purposes.

166.     Rabo asserts a blanket lien secured by virtually all of the assets of the Debtors its asserted debt of $53,516.998.13 as of the Petition Date. *See* Proof of Claim No. 57, Case No. 23-20085. It is undisputed that Rabo is under-secured on this debt.

167.     On March 23, 2023, Rabo obtained a Deposit Account Control Agreement that purported to perfect Rabo's asserted lien on certain funds of the Debtors with Mechanics Bank in connection with a prior security agreement.

168.     Pursuant to 11 U.S.C. § 547(b): [e]xcept as provided in subsections (c) and (i) of this section, the trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
    (A) on or within 90 days before the date of the filing of the petition; or
    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
    (A) the case were a case under chapter 7 of this title;
    (B) the transfer had not been made; and
    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

169.     The Deposit Account Control Agreement constitutes a transfer of an interest in the Debtors' in property for the benefit of Rabo on account of an antecedent debt owed by the Debtors before the transfer was made. At the time of the transfer, the Debtors were decidedly insolvent given the amount of the asserted Rabo debt, other claims of investors, and other debts, against the asset value of the Debtors. The transfer was made within 90 days of the petition date.

170.     All payments to Rabo during relevant time period were from Rabo sweeps or payments from the Debtors' bank accounts at banks other than Rabo for which Rabo otherwise did not have a security interest absent the Deposit Account Control Agreement. Absent the Deposit Account Control Agreement, Rabo did not otherwise have a lien on funds at other bank accounts because any such funds are not the traceable proceeds to other collateral of Rabo (like cattle). Such funds were commingled with investor funds and cannot reasonably be traced. *See, e.g.,* Texas Business and Commerce Code Sec. 9.315(b).[15] Accordingly, to the extent Rabo relies upon the Deposit Account Control Agreement to establish its lien on funds received on its under-secured loan during the preference period (which it must), the Deposit Account Control Agreement allows Rabo to receive more in this case had the Deposit Account Control Agreement not been made.

171.     This case will not be a 100% case. The Trustee is currently only holding less than $10M of assets against over $150M of asserted debt, other than litigation claims. The majority of the litigation claims consist of avoidance actions that entitle the defendant to a resulting claim under section 502(h) of the bankruptcy code.

172.     The Trustee is entitled to avoid the Deposit Account Control Agreement pursuant to 11 U.S.C. §§ 547 and 550, and to preserve the Deposit Account Control Agreement for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551.

## COUNT VIII: PREFERENTIAL PAYMENTS
## (AGAINST RABO)

173.     The Trustee incorporates the factual allegations in all other paragraphs herein by reference for all purposes.

---

[15] Texas Business and Commerce Code section 9-314(a) provides: "A security interest in investment property, deposit accounts, letter-of-credit rights, or electronic chattel paper may be perfected by control of the collateral under Section 9-104 [regarding deposit accounts], 9- 105 [regarding electronic chattel paper], 9-106 [regarding investment property], or 9-107 [regarding letters of credit]." In turn, Texas Business and Commerce Code section 9-104(a)(2) provides: "A secured party has control of a deposit account if: . . . (2) the debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor . . . ."

174.     As discussed above, Rabo is under-secured and its loan was paid with cash that was not Rabo's collateral because, among other things, the funds are the commingled proceeds of investor funds.

175.     During the preference period, Rabo improved its position (reduced its debt) by approximately $4,000,000.00.

176.     The Trustee is entitled to avoid all payments made to Rabo during the 90-day period before bankruptcy, including this improvement in position, pursuant to 11 U.S.C. §§ 547 and 550, and to preserve such payments for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551, including but not limited to the payments attached as Exhibit A hereto, for the benefit of Debtors' innocent creditors, who suffered at Rabo's behest.

## COUNT IX: FRAUDULENT TRANSFER
### (AGAINST RABO)

177.     The Trustee incorporates the factual allegations in all other paragraphs herein by reference for all purposes.

178.     **All transfers made to Rabo before bankruptcy, including but not limited to the Deposit Account Control Agreement and the schedule of payments attached as Exhibit A, constitute transfers of an interest in property of the Debtors, that were made with the actual intent of the Debtors to hinder, defraud or delay their existing and/or subsequent creditors. Those transfers were all part of an ongoing Ponzi scheme** were in violation of 11 U.S.C. §548(a)(1)(A) and (a)(1)(B); Sections 24.005 and .0006 of the Texas Fraudulent Transfer Act; and Sections 378A.040 and .050 of the Kentucky Uniform Voidable Transactions Act.

179.     The transfers are recoverable from Rabo as the party that received the transfers or benefited from the transfers, as either (1) the initial transferee of the transfers or the entity for whose benefit the transfers were made, or (2) the immediate or mediate transferee of such initial transferee, pursuant to 11 U.S.C. §§ 550 and 551 of the Bankruptcy Code. Accordingly, pursuant to 11 U.S.C. §§544, 548(a)(l)(A), 548(a)(l)(B), 550, and 551, Texas Business and Commerce Code §§ 24.005 and

24.006, and/or Kentucky Uniform Voidable Transactions Act §§ 378A.040 and .050 the Trustee is entitled to judgments:(a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof. The Trustee is further entitled to a judgment awarding his attorney's fees. TEX. BUS. & COM. CODE ANN. § 24.013.

**COUNT X: DISALLOWANCE OF CLAIM
(AGAINST RABO)**

180.    The Trustee incorporates the factual allegations in all other paragraphs herein by reference for all purposes.

181.    Bankruptcy Code section 502(d) provides: "Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title." The Trustee requests the Court to disallow all claims of Rabo against the Debtors until such time as Rabo has paid the amount of the foregoing avoidable transfers.

182.    Moreover, under section 502(b)(1) of the Bankruptcy Code, the Court shall disallow a claim to the extent, "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." In connection with a Ponzi-scheme, a claimant is only entitled to a claim for their net loss suffered by the scheme after netting all gains and losses from the scheme (and backing out prior receipt of income or other profits). In the alternative, a claimant is only entitled to a claim for the amount of their claim that represents principal amounts lost (and not interest or other profits). The Trustee requests the Court to only allow Rabo's claim to the extent of actual principal losses.

## COUNT XI: MONEY HAD AND RECEIVED
### (AGAINST RABO AND CFSB)

183.    The Trustee incorporates the factual allegations in all other paragraphs herein by reference for all purposes.

184.    Given the circumstances of this case, including Rabo's and CFSB's active and intentional facilitation of McClain's Ponzi scheme, it would be inequitable to allow Rabo to either retain or receive any profits on top of the principal it extended to the Debtors. It would be similarly inequitable to allow CFSB to retain the transfers of the Debtors' funds it received leading up to the Petition Date, which were intended to zero out the CFSB accounts and pay off CFSB to the detriment of all other unsecured creditors.

## COUNT XII: EQUITABLE SUBORDINATION
### (AGAINST RABO)

185.    The Trustee incorporates the factual allegations in all other paragraphs herein by reference for all purposes.

186.    Rabo's conduct with respect to its lending relationship with the Debtors resulted in injury to the Debtors' other creditors or the conferring of an unfair advantage on Rabo. This inequitable conduct has resulted in hardship to the Debtors' estates and the entire creditor body. It would be inequitable and unjust to allow Rabo to profit at investors' expense at the outset and throughout the life of the Ponzi scheme, which was substantially enabled by Rabo's conduct, only to reward Rabo with a priority, security interest in all of the Debtors' remaining assets at the end of the Ponzi scheme to the exclusion of all other creditors.

187.    Accordingly, pursuant to 11 U.S.C. §§ 510(c)(1) and 105(a), the Trustee requests that the Court equitably subordinate Rabo's claims against the Debtors' estates, including any that arise pursuant to 11 U.S.C. § 502(h), to the same class as allowed claims of legitimate, general unsecured creditors for distribution purposes.

## COUNT XIII: FRAUDULENT TRANSFER
## (AGAINST HTLF)

188.    The Trustee incorporates the factual allegations in all other paragraphs herein by reference for all purposes.

189.    A major investor and active participant in the Debtors' Ponzi scheme were 2B Farms and Terry "Bo" Robinson. The Debtors transferred a total of $264,945,582.72 to 2B Farms on account of its investments with the Debtors, including $104,354,798.76 during the preference period, as detailed on Exhibit B hereto. The Debtors transferred a total of $9,653,108.15 to Terry "Bo" Robinson on account of his investments with the Debtors as detailed on Exhibit C hereto. All these funds were deposited into the bank accounts of 2B or Terry Robinson at HTLF and utilized as borrowing base for their secured credit facilities extended by HTLF. Further, HTLF itself orchestrated many of the payments through pre-signed and otherwise blank Debtor checks that it filled out and deposited at its bank at the direction of the Debtors, 2B Farms, and/or Terry Robinson.

190.    Given HTLF's active participation and control over the Debtors' funds, and its discretionary decisions to immediately credit its customers' accounts for the full amount of the Debtors' checks despite the highly irregular circumstances of the Ragland/Fernandez pre-signed, blank checks scheme, HTLF exposed itself and its customers to the risk of incurring millions of dollars of unreimbursed checks if Debtors' bank(s) decided to dishonor one or more checks. Indeed, that risk was ultimately realized in the days before the Petition Date, when Mechanics Bank dishonored millions of dollars of checks that HTLF had already credited 2B Farms' and/or Terry Robinson's account(s) at HTLF, and those investors had already sent that money back to Mechanics Bank.

191.    Ultimately, the Debtors' bankruptcies forced 2B Farms and Terry Robinson to seek bankruptcy protection as well. To the extent that 2B Farms and/or Terry Robinson were insolvent and unable to repay the millions of dollars in overdrafts, it is HTLF that is left with the loss. As HTLF had liens over funds in the 2B Farms and Terry Robinson depository accounts, any payments into

those accounts substantially benefitted HTLF, as HTLF had ultimate control over those funds and could and did use them to pay down 2B Farms' and Terry Robinson's credit facilities.

192.     Accordingly, all of the transfers of the Debtors to 2B Farms' and Terry Robinson's HTLF accounts should be recoverable from HTLF under 11 U.S.C. §547; 11 U.S.C. §548(a)(1)(A) and (a)(1)(B); Sections 24.005 and .0006 of the Texas Fraudulent Transfer Act; and Sections 378A.040 and .050 of the Kentucky Uniform Voidable Transactions Act.

193.     Pursuant thereto, the Trustee is entitled to judgments:(a) avoiding and preserving the transfers as to HTLF; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof, from HTLF. The Trustee is further entitled to a judgment awarding his attorney's fees. TEX. BUS. & COM. CODE ANN. § 24.013.

## COUNT XIV:  PREFERENTIAL PAYMENTS
### (AGAINST MECHANICS BANK)

194.     The Trustee incorporates the factual allegations in all other paragraphs herein by reference for all purposes.

195.     Each overdraft with CFSB and Mechanics Bank created a debt of the Debtors that was subsequently repaid by covered funds, usually from investors. The covering of the prior overdraft constituted a transfer of an interest in property of the Debtors.

196.     The overdrafts to Mechanics during the 90-day[16] preference period total $55,762,464.56 as further detailed on Exhibit D.

197.     Pursuant to 11 U.S.C. § 547(b): [e]xcept as provided in subsections (c) and (i) of this section, the trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

---

[16] The Trustee reserves the right to seek to enlarge the 90-day preference period to the 1-year insider period as to any party as appropriate.

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

198.    Each repayment to Mechanics was a transfer of an interest belonging to the Debtors for the benefit of Mechanics on account of an antecedent debt owed by the Debtors before the transfer was made. The antecedent debt was the prior overdraft. At the time of the transfers, the Debtors were decidedly insolvent given the amount of the asserted Rabo debt, other claims of investors, and other debts, against the asset value of the Debtors. The transfers were made within 90 days of the Petition Date.

199.    This case will not be a 100% case. The Trustee is currently only holding less than $10M of assets against over $150M of asserted debt, other than litigation claims. The majority of the litigation claims consist of avoidance actions that expose the defendant to a resulting claim under section 502(h) of the Bankruptcy Code.

200.    The Trustee is entitled to avoid the payments to Mechanics Bank pursuant to 11 U.S.C. §§ 547 and 550, and to preserve the value of the payments for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551.

## COUNT XV: FRAUDULENT TRANSFER
## (AGAINST CFSB AND MECHANICS BANK)

201.    The Trustee incorporates the factual allegations in all other paragraphs herein by reference for all purposes.

202.    Exhibit E hereto details the relevant Debtor entity, account number, date, day of week, and dollar amount of daily overdrafts of the Debtors' accounts with CFSB.  Each overdraft constituted

a loan to the Debtors that was subsequently repaid by future, additional deposits by the Debtors. The overdrafts to CFSB repaid by the Debtors totals $33,277,959.91.

203. Exhibit F hereto details the relevant Debtor entity, account number, date, day of week, and dollar amount of daily overdrafts of the Debtors' accounts with Mechanics. Each overdraft constituted a loan to the Debtors that was subsequently repaid by future, additional deposits by the Debtors. The overdrafts to Mechanics repaid by the Debtors totals $176,204,076.19.

204. Each of the transfers to CFSB and Mechanics to satisfy the overdrafts were done as part of the Debtors' Ponzi scheme and check kiting scheme and in direct furtherance of the scheme, which was intended to buy time for the Debtors to cover fictitious profits to investors from new investor contributions.

205. Accordingly, all of the transfers of the Debtors to CFSB and Mechanics were in violation of 11 U.S.C. §548(a)(1)(A) and (a)(1)(B); Sections 24.005 and .0006 of the Texas Fraudulent Transfer Act; and Sections 378A.040 and .050 of the Kentucky Uniform Voidable Transactions Act.

206. Pursuant to 11 U.S.C. §§544, 548(a)(l)(A), 548(a)(l)(B), 550, and 551, Texas Business and Commerce Code §§ 24.005 and 24.006, and/or Kentucky Uniform Voidable Transactions Act §§ 378A.040 and .050, the Trustee is entitled to a judgment (a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof. The Trustee is further entitled to a judgment awarding his attorney's fees. Tex. Bus. & Com. Code Ann. § 24.013.

## V. <u>RESERVATION OF RIGHTS</u>

207. During this Adversary Proceeding, the Trustee may learn through discovery (or otherwise) additional facts and circumstances regarding the relationships among the Debtors, their affiliates, defendants herein, and other third parties that were unknown to the Trustee as of the date of this Complaint.

208.    The allegations in this Complaint are formed on the Trustee's ongoing investigation to date regarding the Debtors' transactions.

209.    The Trustee reserves all rights to supplement and amend this Complaint, including, without limitation, the right to (a) further state, allege, or aver additional facts and information; (b) seek to avoid additional obligations, transfers, or conveyances; (c) seek to recover additional transfers; (d) modify, add, subtract, revise, or otherwise amend the parties; (e) allege additional defendant parties; or (f) allege additional causes of action that may become known to the Trustee at any time during this Adversary Proceeding through discovery or otherwise, and for the all such amendments to this Complaint to relate back to the same.

## VI.    **<u>PRAYER</u>**

The Trustee respectfully requests the Court to award a judgment:

a.    Entering judgment in favor of the Trustee against all Defendants;

b.    Awarding actual damages;

c.    Awarding compensatory damages, jointly and severally, in an amount to be determined at trial against Defendants as pleaded;

d.    Disgorging all profits Defendants received, directly or indirectly, as a result of breaches of fiduciary duty;

e.    Ordering and imposing a constructive trust over all property that any Defendant created or acquired with proceeds traceable to any breaches of fiduciary duty;

f.    Awarding exemplary damages;

g.    Determining the extent, validity, and priority of liens of Rabo against estate funds;

h.    Subordinating the lien of Rabo against any estate property;

i.    Subordinating the claims of Rabo to other general unsecured creditors;

j.    Voiding and preserving the DACA agreement for the benefit of the estate;

k.    Avoiding, preserving, and awarding a money judgment against Rabo for the value of its improvement in position and all payments received during the preference period;

l.      Avoiding, preserving, and awarding a money judgment against Rabo for the value all payments from the Debtors and/or on account of any loans with the Debtors;

m.     Disallowing Rabo's claims in these bankruptcy cases to the extent Rabo does not satisfy as judgment on the foregoing avoidance claims;

n.      Avoiding, preserving, and awarding a money judgment against HTLF for the value of all payments from the Debtors to Terry "Bo" Robinson and/or 2B Farms;

o.      Avoiding, preserving, and awarding a money judgment against Mechanics Bank and CFSB for the value of all overdraft payments;

p.      Disallowing the Proofs of Claim of each of the defendants herein who are liable for an avoidable transfer and not remitted payment, and subordinating any claim to the extent of other inequitable conduct;

q.      Awarding prejudgment and post-judgment interest at the maximum legal rate and to the fullest extent allowed by applicable law against each of the defendants to this action;

r.      Awarding the Trust his reasonable attorneys' fees and expenses, together with all costs and expenses of court in this suit against each of the defendants to this action; and

s.      Awarding the Trustee such further relief, general or special, at law or in equity, to which the Trustee may be rightfully entitled.

Respectfully submitted,


*/s/ Alan Dabdoub*
Alan Dabdoub
State Bar No. 24056836
adabdoub@lynnllp.com
Steven G. Gersten
State Bar No. 24087579
sgersten@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:     214-981-3800
Facsimile:     214-981-3839


*/s/ Hudson M. Jobe*
Hudson M. Jobe
Texas Bar No. 24041189
**JOBE LAW PLLC**
6060 North Central Expressway, Suite 500
Dallas, Texas 75206
(214) 807-0563
hjobe@jobelawpllc.com
**SPECIAL COUNSEL TO THE TRUSTEE**