HUDSON M. JOBE
JOBE LAW PLLC
6060 NORTH CENTRAL EXPRESSWAY,
SUITE 500
DALLAS, TEXAS 75206

ALAN DABDOUB
LYNN PINKER HURST & SCHWEGMANN LLP
2100 ROSS AVENUE, SUITE 2700
DALLAS, TEXAS 75201

SPECIAL COUNSEL TO THE TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| IN RE: | Chapter 7 |
| MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC., | CASE NO. 23-20084-swe |
| *Debtors.*[1] | Jointly Administered |
| KENT RIES, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATES OF MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC., *Plaintiff,* v. COMMUNITY FINANCIAL SERVICES BANK; HTLF BANK; MECHANICS BANK; and RABO AGRIFINANCE, LLC, *Defendants.* | ADV. PROC. NO. 25-02005-swe Honorable Scott. W. Everett |

## TRUSTEE'S NOTICE OF MOOTNESS AND OBJECTION AND RESPONSE TO
## RABO'S MOTION TO DISMISS

---

[1] The Debtors in these chapter 7 cases are: McClain Feed Yard, Inc. (Case No. 23-20084-swe), McClain Farms, Inc. (Case  No. 23-20085-swe), and 7M Cattle Feeders, Inc. (Case No. 23-20086-swe).

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT & AUTHORITIES ........................................................................................ 3

    A.   The Trustee's *First Amended Complaint* moots Rabo's Motion. ........................................ 3

    B.   The Trustee sufficiently alleges facts to support Rabo's knowing participation in McClain's schemes. ........................................................................................................................... 4

    C.   The Trustee sufficiently pleaded a duty to support its negligence and fiduciary duty claims. .. 6

    D.   The affirmative defense of *in pari delicto* does not warrant dismissal of the Trustee's claims.... 7

    E.   The Trustee sufficiently pleaded a knowing participation claim. ................................... 9

    F.   The Trustee sufficiently alleged facts to support its civil conspiracy claim. ............................ 10

    G.   The Trustee sufficiently pleaded a money had and received claim. ............................................ 11

    H.   The Trustee can recover punitive damages. ................................................................... 12

    I.   The Trustee's tort claims should not be transferred. ..................................................... 12

    J.   The Trustee's tort claims are not precluded by the Debtors' purported releases. ................... 13

    K.   The Trustee's sufficiently pleaded a request for the Court to declare the extent of Rabo's lien against property in the estate. ....................................................................................... 13

    L.   The Trustee sufficiently pleaded preference and fraudulent transfer claims. ........................... 14

    M.   The Trustee sufficiently asserted a claim for disallowance of Rabo's claim. ........................... 17

    N.   The Trustee sufficiently alleged an equitable subordination claim. ........................................... 17

CONCLUSION ................................................................................................................... 18

## TABLE OF AUTHORITIES

<u>Cases</u>

*In re Enron Corp. Securities, Derivative & ERISA Litigation*, 623 F. Supp. 2d 798
   (S.D. Tex. 2009)..............................................................................................................10

*Faulkner v. Ford Motor Credit Co. (In re Reagor-Dykes Motors, LP)*, 18-50214-RLJ-11,
   2022 WL 2046144 (Bankr. N.D. Tex. Jun 03, 2022)................................................. 15, 16

*In re Vantage Benefits Administrators, Inc.*, No. 18-31351-SGJ-7, 2024 WL 3842796
   (Bankr. N.D. Tex. Aug. 14, 2024)......................................................................................7

*In re Bullion Reserve of N. Am.*, 836 F.2d 1214 (9th Cir. 1998)................................................15

*Lewis v. Davis*, 199 S.W.2d 146, 151 (Tex. 1947)......................................................................8

*Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2020 WL 4939180
   (Bankr. N.D. Tex. Aug. 24, 2020).......................................................................................8

*Schouten*, 657 B.R. 531, 539 (Bankr. N.D. Tex. 2024) ...............................................................12

*Southmark Corp. v. Grosz (In re Southmark Corp.),* 49 F.3d 1111, 1116 n.15 (5th Cir. 1995).....................15

*Ultravision Techs., LLC v. Eaton Corp. PLC*, No. 2:19-CV-00290-JRG,
   2019 WL 11250161, at *1 (E.D. Tex. Nov. 8, 2019)...........................................................4

Kent Ries, the Chapter 7 Trustee of the bankruptcy estates of McClain Feed Yard, Inc. ("**MFY**") (Case No. 23-20084-swe), McClain Farms, Inc. (Case No. 23-20085-swe), and 7M Cattle Feeders, Inc. ("**7M**") (Case No. 23-20086-swe) (the "**Trustee**"), files this notice of mootness and objection to Rabo AgriFinance LLC's ("**Rabo's**") *Motion to Dismiss Trustee's Original Adversary Complaint* (ECF No. 26) and *Brief in Support* (ECF No. 27) (collectively, the "**Motion**"), and respectfully requests the Court deny the Motion for the reasons that follow:

## INTRODUCTION

1.     At the heart of this case is a massive, multi-year Ponzi or Ponzi-like scheme perpetrated by the now-deceased Brian McClain ("**McClain**"), the Debtors' former owner. While McClain was the muscle behind the scheme, doing the grunt work of kiting checks and bilking investors to keep the scheme afloat, Rabo was the lifeblood of the scheme. Despite glaring warning signs that were apparent from the outset—and which grew only ever more alarming—Rabo deviated from its internal policies and practices to extend an initial loan to the Debtors. When the Debtors funds quickly ran out, Rabo doubled down. Again. And again. And again. Each time Rabo doubled down, providing millions more in cash flow to keep the scheme alive and the loan healthy on its books, Rabo did so knowing everywhere anyone looked, sirens were blaring that fraud was afoot.

2.     While Rabo was funding the Ponzi scheme with many tens-of-millions of dollars in loans, Rabo also worked with McClain, the Debtors' depository banks, Community Financial Services Bank ("**CFSB**") and Mechanics Bank ("**Mechanics**"), and later HTLF Bank ("**HTLF**") to coordinate a massive check kite scheme, thereby generating, maintaining, and covering millions of dollars in "float," or the fictitious funds created when checks are honored by the depository bank before paid by the payor bank. In still other cases, Rabo specifically instructed CFSB or Mechanics to process wires that significantly overdrew the accounts, with the promise of repaying it through future funds McClain told Rabo he would purportedly be receiving or from further extensions of credit from Rabo.

3.     Rabo now claims it is but an innocent lender, if not McClain's largest victim; not one of his co-conspirators. After all, posits Rabo, it is seemingly absurd that Rabo conspired with McClain

to loan the Debtors tens of millions of that it ultimately would not be able to recover? *See* Mot. at 11. But the Court should not fall for this swindle. Not only because Rabo's motivations are irrelevant to the Trustee's claims at this motion to dismiss stage. But also because this is not Rabo's first rodeo with a cattle-based Ponzi scheme.

4.      During the same time period Rabo was funding McClain's Ponzi scheme, Rabo also stands accused of running a similar cattle-based Ponzi scheme with another cattle-purchase and feeding operation, Phillips Cattle Company ("**PCC**"). In that case, like here, Rabo is accused of continuing to fund PCC despite financial irregularities, positioning itself to obtain maximum recovery prior to forcing PCC into a receivership, and imposing on PCC to retain Focus Management Group as a so-called independent receiver at the end of the scheme. Nor is Rabo's dalliance with PCC its only other involvement with "ghost" cattle, having been entangled in the Tyson Foods and Easterday Ranches $200 million-plus "ghost" cattle feeding fraud in 2021. And, while not necessarily involved, Rabo, with its self-described unparalleled industry expertise, was well aware of other, infamous cattle-based Ponzi schemes that had plagued the industry in recent years.

5.      Moreover, Rabo's recent corporate history reflects a corporate strategy of "grow for growth's sake" regardless of potential future consequences. In 2018, Rabobank, N.A., a corporate predecessor that became Mechanics after Rabo was spun out of it, pleaded guilty to conspiring to impede the Office of the Comptroller of the Currency (the "**OCC**") from investigating Rabobank, N.A.'s compliance, or more appropriately, Rabobank's intentional non-compliance, with anti-money laundering ("**AML**") and Bank Secrecy Act ("**BSA**") laws and regulations. Rabobank admitted that it had directed employees to ignore its internal suspicious-activity-detection software alerts, implemented a policy that evidently structured transactions under the AML reporting threshold were non-suspicious, created a "verified list" of customers who would not be considered suspicious even if their activity levels deviated from their prior track record, and failed to adequately staff the number of investigators needed to adequately review suspicious transactions, among other things. Rabo further admitted it had terminated the executive in charge of managing the AML/BSA compliance program when she raised concerns and also demoted at least one other compliance manager after she raised

concerns as well. This corruption rose to the very apex of the company, implicating its then-CEO, Chief Compliance Officer, General Counsel, and at least one senior vice president, resulting in individual prosecutions and penalties, in addition to Rabo's forfeiture of approximately $369 million in suspected cartel and other illicit funds.

The very same misconduct underlying Rabobank's guilty plea—the intentional concealment and quieting of legitimate concerns about the propriety of the business so that Rabo could keep growing its cash deposits—is the same type of conduct that Rabo exhibited in this case—the disregard of the Debtors' manifestly suspicious activities, the intentional sidelining of anyone who raised concerns about Rabo's loans to the Debtors so that Rabo could continue growing its loan portfolio and booking paper profits. By all indications, Rabo's funding of the Debtors' Ponzi scheme was but a continuation of Rabo's longstanding culture of non-compliance. Rabo knew the Debtors' financials could not be sufficiently validated—which is why Rabo initially declined the loan. Rabo knew the feedlots could sustain only 10-percent of the purported total number of cattle but figured that was for full-grown cattle, not calves. Rabo knew only a fraction of the reported cattle were observable onsite but ignored the "missing" cattle, make believing instead that the bulk of the purported cattle were always in transit when "inspections" were performed. Rabo knew the Debtors should have been cash rich from the purported guaranteed profits the Debtors claimed to make from each 90-day, buy-feed-sell cycle but continued to extend more and more credit when the Debtors were cash poor and unable to cover daily transactions. Simply put, Rabo knew or should have known it was funding a Ponzi scheme, and it continued to do so for years. Its conduct is actionable, and the Trustee has pleaded plausible claims. Rabo's Motion should therefore be dismissed.

## ARGUMENT & AUTHORITIES

### A. The Trustee's *First Amended Complaint* moots Rabo's Motion.

6.     The Court should deny Rabo's Motion because it was mooted when the Trustee filed his *First Amended Complaint* and again when the Trustee filed his *Second Amended Complaint*, in accordance with Federal Rules of Civil Procedure 12 and 15, as well as the parties' agreement and the

Court's Order (ECF No. 38). Generally, where an amended complaint does not incorporate the prior complaint, the amended complaint moots any motions to dismiss that were pending prior to the amended filing. *See, e.g.*, *Ultravision Techs., LLC v. Eaton Corp. PLC*, No. 2:19-CV-00290-JRG, 2019 WL 11250161, at *1 (E.D. Tex. Nov. 8, 2019) (collecting Fifth Circuit and other authorities).

7.      Here, the Trustee has significantly amended the complaint to address the alleged deficiencies Rabo raised in its Motion, which moots the Motion not only as a matter of law, but also on the merits.

8.      Nevertheless, should the Court find the Motion not to be mooted, the Court should still deny it because the Trustee's claims against Rabo—for knowing participation or aiding and abetting McClain's breaches of fiduciary duties, civil conspiracy, breach of fiduciary duty, professional negligence, and money had and received—as well as the Trustee's Chapter 5 bankruptcy claims are plausible and viable under controlling Texas law (and under Kentucky law as well). The Court need not, and should not at this time, address the arguments below.  However, even if the Court were to consider the merits of the Motion, it should still be denied.

### B.  The Trustee sufficiently alleges facts to support Rabo's knowing participation in McClain's schemes.

9.      Rabo asserts that the Trustee's tort claims should fail because the Trustee has failed to allege that Rabo knew of the schemes and intended to participate in them. Mot. 15-17. Rabo's contention is belied by the amended (and original) complaint.

10.     The Trustee alleges that Rabo knew, *or should have known*, of the schemes given the warning signs and red flags that indicated as much. For example, the second amended complaint alleges that Rabo initially determined the Debtors were not creditworthy because it had insufficient financial records; that the customer relationship manager who was trying to secure the loan for the Debtors was desperate to originate a new loan, having not had one for months, and worked to have the initial collateral inspector, Michelle Stockett, minimize her findings, expressed anger at the initial denial in the first place and hostility toward those who did not support it; ignored numerous red flags, including the fact that McClain had given them incorrect information about who his lenders were, his

financial records were non-existent or created years after the fact, and that McClain had never had accurate books and records, among other things. The loan should never have been issued in the first place.

11.     The Trustee further alleges that the red flags only became ever more obvious and glaring over time, including the fact that the Debtors immediately overdrew their line of credit at Rabo, within just weeks, and continued to overdraw their accounts and exceed their authorized credit limits; Rabo actively worked with McClain to run point on which overdrafts to incur and which checks not to honor; turned in financial statements that were facially suspect given that expenses seemingly could not support the size of the alleged operation; the facilities were far too small to accommodate the purported number of cattle, and that Rabo made numerous site visits throughout the years and would have inevitably seen there were no where near as many cattle as purported.

12.     Furthermore, Rabo's actions must be considered against its recent corporate actions. Rabo was well aware of cattle-based Ponzi schemes, or "ghost" cattle schemes, having been a creditor who was left unpaid when its borrower was separately revealed to have sold $200 million in non-existent cattle to Tyson Foods. Rabo should have known to be aware that the Debtors were exhibiting the very same suspect behavior and investigated. But, Rabo also has a demonstrated, criminal track record when it comes to investigating its involvement in suspicious transactions, having pleaded guilty just 7 years ago to criminal conspiracy to evade and avoid its legal obligations to monitor and investigate suspicious transactions. And, since then, Rabo has been accused in this very Court of intentionally conspiring with a different debtor-cattle business and its affiliates to defraud the debtor's priority lender and potential banking syndicate partners, including by creating false borrowing base reports inflating the number and size of cattle. And, tellingly, it now stands accused in California state court of knowingly funding another cattle Ponzi-scheme and positioning itself to obtain the greatest recovery as the secured lender before it commenced a receivership action once the scheme came to an end.

13.     The above facts and circumstances at minimum give rise to the plausible inference that Rabo knew of McClain's schemes, or at bare minimum, should have known of the schemes had it

taken even the smallest of steps to investigate. That the Court can plausibly infer Rabo's knowledge from these facts and circumstances is sufficient to establish the requisite knowledge to support the Trustee's tort claims at the motion to dismiss stage. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citation omitted) (explaining a claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

### C. The Trustee sufficiently pleaded a duty to support its negligence and fiduciary duty claims.

14.    Rabo argues that because it had a commercial lending relationship with the Debtors, it did not generally owe duties to the Debtors. But Rabo had both fiduciary duties and a duty of care to support the Trustee's tort claims.

15.    The elements of a negligence claim are: (1) duty; (2) breach; and (3) damages proximately caused by the breach. The Amended Complaint alleges Rabo owed the Debtors a duty of care pursuant to Texas statutory law and its agreements with the Debtors. 2d Am. Compl. ¶ 162.

16.    The Amended Complaint also plainly sets forth how Rabo breached that duty of ordinary care. Rabo disregarded glaring red flags and internal alerts that a reasonable bank would not have ignored, granting millions in additional loans and credits, including credit in excess of amounts authorized at any time, and the Debtors near immediate consumption of all available liquidity. A reasonable bank would have investigated the legitimacy of the Debtors' businesses and McClain's suspect representations and continued lack of recordkeeping, given the plethora of warning signs and red flags generated every step of the way—including the red flags that should have been apparent in the transactions themselves, which were often intercompany transfers that had no apparent legitimate purpose. *See generally* 2d Am. Compl. at ¶¶ 39-45. The extensions of credit that would not have been granted by a reasonable lender proximately caused the Debtors' damage by virtue of the fact they had no means to legitimately repay the debt it incurred, resulting in the Debtors incurring millions of dollars in debt that it could not repay. The Trustee has sufficiently pleaded a professional negligence claim.

17.    The Trustee similarly pleaded sufficient facts to give rise to Rabo's fiduciary duties to the Debtors to support the Trustee's breach of fiduciary duty claim. As Rabo notes, where a lender or bank exercises excessive control over a business, that lender owes fiduciary duties to its borrower(s). Mot. at 19. Here, the Amended Complaint alleges that Rabo effectively controlled the Debtors by consolidating nearly all of its debt, giving Rabo sole control over the future viability of the Debtors. This control manifested itself and became undeniable once Rabo forced McClain to resign from management of his own companies and to hire Rabo's handpicked restructuring officer instead. Courts have found such control to give rise to fiduciary duties, which Rabo then breached by continuing to loan money to an obvious fraudulent scheme.

18.    Rabo also claims that the Trustee failed to allege how the Debtors were injured by Rabo's alleged breach of fiduciary duty, arguing the Debtors benefitted from the loans and were not damaged by them. Mot. at 27. Yet, it is impossible to escape the fact that the more money a Ponzi scheme gobbles up, the greater the damage, in both amount of damages and victims. Here, it was not beneficial to extend more and more loans, and cover more and more overdrafts with unauthorized extensions of credit, to the Debtors when there were no or minimal operations generating profits with which to repay those loans. The Debtors incurred tens of millions of dollars in additional debt it could not possibly repay and would not have been able to incur but for Rabo's opening the floodgates. The Trustee sufficiently alleged the existence of Rabo's fiduciary duties, its breaches of them, and damage to the Debtors caused hereby.

### D. The affirmative defense of *in pari delicto* does not warrant dismissal of the Trustee's claims.

19.    Rabo next argues that the doctrine of *in pari delicto*, which is an affirmative defense which Rabo bears the burden of proving, precludes the Trustee from asserting his tort claims. Mot. at 20-21. As an initial matter, while Rabo discusses the availability of the *in pari delicto* defense under Texas and Iowa law, Rabo cites to no case law that indicates there is any difference between how the two states apply the *in pari delicto* defense to trustees in bankruptcy.  To the extent the Court must conduct a choice of law analysis, however, that would make it all the more ill-suited for resolution at

the motion to dismiss stage, as choice of law questions are themselves ill-suited to pre-discovery resolution. *See generally In re Vantage*, Adversary No. 20-03055-SGJ, 2024 WL 3842796, at *21 (Bankr. N.D. Tex. Aug. 14, 2024) (citations omitted) ("The Fifth Circuit has held that *in pari delicto* is an equitable, affirmative defense, which is controlled by state common law, which accounts for the fact that, in some states, the doctrine, . . . is applied more strictly to bar a plaintiff's claims while, in others, . . . [it is] interpreted flexibly and to take into account the facts and circumstances of each case to fashion an equitable result.").

20.     Assuming no conflicts between the two states' laws, as Rabo does, the Court should dismiss Rabo's *in pari delicto* argument at this time and deny Rabo's Motion. Under Texas law, "even when parties are *in pari delicto*, an exception to the doctrine will sometimes be applied if public policy or the equities demand it." *Id.* at 21. This is because the defense of *in pari delicto* is not for the benefit of Rabo or another joint wrongdoer but rather for the public's benefit. *Id.* (citing *Lewis v. Davis*, 199 S.W.2d 146, 151 (1947)). In *Lewis*, the Texas Supreme Court explained the need to, in each unique case, weigh the policy against a court assisting a wrongdoer against the policy against permitting unjust enrichment of one party (here Rabo) at the expense of another (here the Debtors and their creditors). *Lewis*, 199 S.W.2d at 151. The answer to that question "depends on the peculiar facts and equities of the case." *Id.* "In other words, a policy analysis must occur on a case-by-case basis." *In re Vantage*, 2024 WL 3842796, at *27.

21.     There is often involved in reaching a decision as to granting or withholding relief, the question whether the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of another. The solution of the question depends upon the peculiar facts and equities of the case, and the answer usually given is that which it is thought will better serve public policy. In other words, a policy analysis must occur on a case-by-case basis." *Id.* at *27. Such an analysis is not well-suited, if it can be performed at all, at the motion to dismiss stage given that it is highly dependent on the particular facts of each case. *In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2020 WL 4939180, at *13 (Bankr. N.D. Tex. Aug. 24, 2020) (explaining that dismissal of claims because of an affirmative defense at the motion to dismiss state is only appropriate

in the rare case when it is established conclusively from the face of the complaint and rejecting the availability of the defense as grounds for dismissal under Rule 12(b)); *see also In re Vantage*, 2024 WL 3842796, at *28 (finding the defense to be so "intensely factual" that it was inappropriate to resolve *even at summary judgment* because the facts were in dispute); *see also* Mot. at ¶¶ 88-89 (citing a long list of Texas federal district court cases finding *in pari delicto* ill-suited for resolution on a Rule 12(b) motion).

22.     Moreover, in considering only the undisputed facts at the summary judgment stage, the bankruptcy court in *In re Vantage* found that even if the wrongdoer's acts are imputed to the debtor-company, the defense would still not bar recovery because the Trustee "is an innocent party seeking recovery from the" defendants "that will benefit innocent creditors," and there was no evidence the Trustee's recovery would benefit the actual wrongdoer. *Id.* at *28. As such, the court there "easily conclude[d] . . . that barring the [t]rustee's tort claims . . . based on *in pari delicto* . . . would **not** outweigh the overall policy of not inflicting additional harm on the innocent victims of the . . . scheme." *Id.* The bankruptcy court in *In re Vantage* even went as far as to recommend granting summary judgment in the trustee's favor on the *in pari delicto* defense even though the trustee had not moved for summary judgment on that defense. *Id.* The conclusion should be no different here, where the Trustee's recovery will in no way benefit McClain or his personal probate estate, and where the *in pari delicto* defense would further harm innocent creditors by cutting off the Trustee's possible avenues for recovering and distributing estate assets. Accordingly, even if the Court were to reach the merits of *in pari delicto* under Texas law, it should still deny Rabo's Motion.

### E.  The Trustee sufficiently pleaded a knowing participation claim.

23.     Rabo also argues that the Trustee failed to plead a claim that Rabo knowingly participated in McClain's breaches of his fiduciary duties to the Debtors. Mot. at 24-25. Rabo argues that because McClain was the Debtors' manager, and thus the Debtors acted through McClaim, McClain did not owe fiduciary duties to the Debtors. Rabo offers no support for its assertion that a manager of a closely held business, which has hundreds of creditors, does not owe fiduciary duties to the business or breach those duties when the manager acts in his own interest and not that of the

businesses or their creditors. Because there is no such authority. Rather Rabo conflates the concept of *in pari delicto* with the duties a manager owes to a company, and for the reasons already explained, the *in pari delicto* defense does not warrant dismissal at this stage.

24.     Next Rabo claims McClain did not injure the Debtors because the Debtors received cash in exchange for the loan. But that assertion is belied by these very bankruptcy cases, which reflect the grossly insolvent state in which Rabo's improper lending has left the Debtors. The Debtors incurred hundreds of millions of dollars of debt they cannot repay only because Rabo continued to loan more and more money despite the obvious signs of fraud. The Trustee sufficiently alleged McClain's breaches of fiduciary duties damaged the Debtors, which is sufficient to support the Trustee's claim that Rabo knowingly participated in those breaches by advocating for and extending additional loans.

### F.   The Trustee sufficiently alleged facts to support its civil conspiracy claim.

25.     The elements of a civil conspiracy claim under Texas law are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 623 F. Supp. 2d 798, 808–09 (S.D. Tex. 2009).

26.     Here, Rabo, its codefendants, and McClain conspired together to allow McClain to kite checks, for the purpose (*i.e.*, object) of covering expenses like payments owed to old investors. Rabo did this by promising to grant excessive, unauthorized extensions of credit to cover overdrafts, instructing Mechanics and CFSB as to whether to process transactions that would overdraw the account, and otherwise ignoring and concealing the obvious signs of fraud to keep investor payments flowing to the Debtors, who could then repay its debts to Defendants. That alone is enough, considering the check kite alone enabled McClain to further indebt the Debtors to the tune of millions of dollars.

27.      Worse, Rabo knew or should have known the cash flow problems necessitating the kite, combined with the other obvious red flags known to Rabo, that the kite furthered McClain's

Ponzi scheme; knew the Debtors needed the float and additional loans to sustain operations, and knew or should have known permitting the kite to continue would sustain and perpetuate the Debtors' purported operations and thus the Ponzi scheme. Rabo, through its customer relationship manager Chip Lawson, took point on running the scheme amongst Defendants. Lawson had self interests motivating him to partake in the fraud, including the preservation of his job, and as the loan grew bigger, better compensation. Rabo as an entity wanted to expand and occupy a greater segment of the agribusinesses lending space. The conspiracy was nothing more than business as usual for Rabo.

28.     That McClain, Rabo, CFSB, HTLF, and Mechanics conspired together to further the scheme is evident from the fact that four separate, sophisticated banks and lenders for years ignored countless red flags, massive overdrafts, and exploding debts when McClain's growth and business models should've generated substantial profits and thus excess cash. Though this alone is enough to infer a meeting of the minds, the Trustee sets forth at least eleven overt acts that further evidence a meeting of the minds in the Amended Complaint, seven of which specifically identify the acts taken by Rabo. 2d Am. Compl. at ¶ 154. These allegations suffice to establish the "meeting of the minds" and "overt acts" elements.

29.     Finally, there was damage to the Debtors, *i.e.*, that the Debtors incurred tens of millions of dollars of debt which it could not repay. Rabo should have foreseen that enabling an illegal check kite scheme and an illegal Ponzi scheme would damage the Debtors, including because the Debtors would be unable to repay their creditors. 2d Am. Compl. ¶ 155-57. Rabo's actions did in fact cause such damages. *Id.* As such, the Trustee alleged facts sufficient to establish each element of its conspiracy claim against Rabo.

## G.  The Trustee sufficiently pleaded a money had and received claim.

30.     Rabo next argues that the Trustee's money had and received claim is barred by the economic loss doctrine and otherwise fails because it owed no duties to the Debtors. Rabo cites to no case law to support its assertions. Because there is none. Rather, Texas courts have made clear money had and received is not subject to dismissal pursuant to the economic loss rule at the motion to dismiss

stage, as the claim is intended to be a large, "catch all" claim to remediate the unjust enrichment of a party. Here, it is inequitable for Rabo, who is the sole reason the Ponzi scheme grew so large, to participate in any recovery to the detriment of other innocent creditors. The Trustee's money had and received claim is therefore plausible and should not be dismissed.

### H. The Trustee can recover punitive damages.

31.    Rabo seeks to dismiss the Trustee's punitive damages claim because it is derivative of the Trustee's tort claims, and it argued those tort claims should be dismissed. Mot. at ¶ 32. Since the tort claims should not be dismissed, the punitive damages claim should also not be dismissed.

### I. The Trustee's tort claims should not be transferred.

32.    Rabo next argues that if the tort claims are not dismissed, they should be severed from this case and transferred to Iowa district court pursuant to forum selection clauses in its master credit agreements with the Debtors. While forum selection clauses should generally be honored, this is the precise case in which public interest factors identified by the Supreme Court compel the Trustee's claims against Rabo to remain in this Court. The Supreme Court has explained that the Court should weigh the forum selectin clause against public interest factors, including "the administrative difficulties flowing from court congestion, the interest of local courts deciding local disputes, and, in a diversity case, the interest of trial before the court that is 'at home with the applicable law.'" *In re Schouten*, 657 B.R. 531, 539 (Bankr. N.D. Tex. 2024) (citation omitted) (cleaned up). In addition, in bankruptcy, courts should consider the policy of centralizing bankruptcy proceedings and the "strong presumption in favor of maintaining the venue of an adversary proceeding where the bankruptcy [case] is pending." *Id.* at 540 (citations omitted).

33.    "This proceeding falls squarely within the policy of centralizing all proceedings in the court where the case is pending. It is a chapter 7 liquidation case with an appointed trustee who is obligated to administer the estate assets as expeditiously as possible for the benefit of creditors of the bankruptcy estate." *Id.* at 540-41. There are over 100 creditors and $120 million in claims in this case who are interested in the outcome of this case.

34.     Moreover, "as with most chapter 7 cases, the messy aspects of the case are foisted on the trustee. Lawsuits are expensive; the Trustee has no readily available funds to cover the additional expenses of a trial in [Iowa]. For the Trustee, trial is far simpler in . . . Texas than in [Iowa]." These considerations warrant maintaining the suit in this Court as part of this proceeding.

35.     Furthermore, Rabo recognized the primacy of the bankruptcy here by filing claims against other parties in the bankruptcy cases and taking Rule 2004 discovery. It also, as it concedes, must anyway face the Trustee's Chapter 5 bankruptcy cases in this Court. And Rabo is not even located in Iowa—Iowa has no connection to this case whatsoever, and therefore no interest in adjudicating it.

36.     "The public interest factors that arise in the bankruptcy context also include the 'creditors' interests since the estate is often operating on limited funds and asserting actions solely to maximize the recovery to creditors.'" *Id.* (citation omitted). "The chapter 7 trustee's duties and circumstance, the associated litigation costs, and the interests of creditors of the debtor's estate all underscore the policy of maintaining all proceedings in the home court." *Id.* (citation omitted). Accordingly, the Court should deny Rabo's request to transfer venue for the Trustee's tort claims.

**J.   The Trustee's tort claims are not precluded by the Debtors' purported releases.**

37.     Rabo next claims all of the Trustee's state law tort claims fail because it was able to force McClain to sign a forbearance agreement in April 2023, right before the Petition Date, which contained broad releases by the Debtors. However, the Trustee separately has a claim to avoid the releases as a preferential and fraudulent transfer. Unless the Court determines the release as not a preferential transfer, which it cannot do at this motion to dismiss stage, the Debtors' purported releases do not warrant dismissal of the Trustee's claims.

**K.   The Trustee's sufficiently pleaded a request for the Court to declare the extent of Rabo's lien against property in the estate.**

38.     Rabo complains it is unaware of which property the Trustee seeks the Court to declare is or is not part of Rabo's collateral, and therefore, its claim for declaratory relief on this issue

should be dismissed. Rabo's own Motion, which identifies a large portion of the property, belies its own assertion. Moreover, a list of the implicated property has been incorporated into the amended complaint.

39.     Rabo also asserts that even if the property is identified, the claim still fails because it had a perfected lien over all of the Debtors' assets. But that is not so. It did not have a perfected lien over cash in any other institution's accounts, as the DACA it executed with Mechanics within the preference period should be avoided. Accordingly, as the identified property consists largely of cash outside of Rabo's physical control, it does not have a perfected lien over the property. This claim should therefore not be dismissed.

**L.   The Trustee sufficiently pleaded preference and fraudulent transfer claims.**

40.     Rabo also seeks dismissal of the Trustee's preference and fraudulent transfer claims because it argues it has a perfected lien over all property and could not have improved its position as to unsecured creditors since it merely received property it had a priority security interest in. But this argument fails and should be discarded.

41.     Pursuant to Texas Business and Commerce Code section 9-314(a) (as well as other states' UCC statutes), a secured lender can only obtain a perfected lien on funds in a borrower's deposit account (and certain other property) if the secured lender has "control" over the deposit account. Pursuant to Texas Business and Commerce Code section 9-104(a), a secured party can only establish "control" over the deposit account if: (1) the borrower maintains the deposit account with the secured lender; (2) the borrower, secured lender, and depository bank execute an agreement commonly referred to as a "DACA" (Deposit Account Control Agreement), or (3) the secured party becomes the owner of the deposit account.

42.     Here, the Debtors maintained their deposit accounts with Mechanics Bank and CFSB, thus the first scenario cannot be satisfied.  Rabo did not obtain a DACA with the Debtors and Mechanics Bank until March 2023 (shortly before the bankruptcy and during the preference period),

which DACA should be avoided.  Rabo never took any action to become the owner of the Debtors' deposit accounts.

43.    Thus, for all relevant times up to March 2023, Rabo did not have a perfected blanket lien on the funds in the Debtors' deposit accounts. This is significant in several respects.  First, the grant of control and a perfected lien on the Debtors' funds with Mechanics Bank under the DACA agreement was both a preference and fraudulent transfer, as discussed below. Second, for all time periods that Rabo did not have a DACA in place, whether that be prior to its execution or following its avoidance, all payments to Rabo from the Mechanics Bank Accounts (and any from CFSB) were from otherwise unencumbered funds.

44.    Rabo argues that its failure to have an enforceable lien on the Debtors' deposit accounts is immaterial because it had a blanket lien on other property of the Debtors, and therefore it automatically held a lien on the funds in the Debtors' bank accounts as the proceeds of other Rabo collateral.  This is incorrect for several reasons.  First, Rabo does not "automatically" obtain a lien on the Debtors' funds as the claimed proceeds of other property.  Under Texas Business and Commerce Code section 9.315(b), Rabo bears the burden to trace each and every dollar in the bank accounts to encumbered collateral, and any funds that are commingled and incapable of tracing are considered unencumbered cash.  Rabo cannot, and certainly has not at this stage, met this burden to trace the cash. *See, e.g., Faulkner v. Ford Motor Credit Co. (In re Reagor-Dykes Motors, LP*), 18-50214-RLJ-11, 2022 WL 2046144, at *10 (Bankr. N.D. Tex. Jun 03, 2022) (citation omitted) ("Indeed, money in commingled bank accounts under debtor's control presumptively constitutes property of the debtor's estate."). This is largely because while some of the Debtors' funds were the proceeds of, for instance, the Debtors' unencumbered cattle, Rabo has not and cannot establish that the funds obtained by the Debtors from over 100 "investors" and "partners" as part of the Debtors' fraudulent cattle investment scheme are funds that would otherwise be subject to Rabo's asserted lien.  Thus, Rabo will be unable to trace the funds in the Debtors' otherwise unencumbered deposit accounts to a source of Rabo's collateral, rendering the commingled funds unencumbered.

45.     Because Rabo did not have a lien on the Debtors' deposit accounts, Rabo is subject to fraudulent transfer and preference liability for all payments it received from those otherwise unencumbered accounts and applied to its under-secured loan.  *See Faulkner v. Ford Motor Credit Co. (In re Reagor-Dykes Motors, LP),* 18-50214-RLJ-11, Adversary 20-05005 (Bankr. N.D. Tex. Jun 03, 2022) ("[A] security interest attaches to the proceeds of commingled collateral only "to the extent that the secured party identifies the proceeds by a method of tracing.").

46.     Rabo attempts to twist the Trustee's statements regarding the source of the Debtors' funds into a suggestion that Rabo was paid with funds from a third party (*i.e.* investors).  The Trustee does not allege that the investors paid Rabo.  Rather, the source of the Debtors' funds is critical to the issue of the extent of Rabo's lien on the subject funds.  A considerable amount of funds of the Debtors that were used to pay Rabo were commingled funds raised from over 100 investors/partners rather than, for example, funds from items subject to Rabo's security interest, like inventory or equipment. Each and every payment from the Debtors to Rabo were from the Debtors' funds at either Mechanics Bank or CFSB.  Because the accounts were not subject to Rabo's asserted lien on deposit accounts (prior to the DACA and after it is avoided as a preference) and Rabo cannot trace the funds to its other collateral, Rabo is liable for all payments received from those accounts as a preference or fraudulent transfer. Contrary to Rabo's suggestion that the Trustee must prove "every nickel" came from investor funds, in fact the burden is on Rabo to trace how those funds are proceeds of its collateral, or otherwise commingled funds result in them being unencumbered and not subject to Rabo's lien.

47.     Rabo further argues the preference and fraudulent transfer claims fail because they do not identify the transfers at issue. But this information is based upon Rabo's own bank statements for the Debtors, and Rabo's suggestion that it cannot understand what transfers it is being sued for is disingenuous.

48.     Finally, the harm to creditors is obvious – had Rabo not been preferred and paid from unencumbered funds, those funds would be available in this Chapter 7 case to repay other creditors.

49.     As the source of great harm to the Debtors' creditors, Rabo should be held to account. As the Trustee has properly alleged numerous bankruptcy and state law claims against Rabo, Rabo's Motion should be denied.

### M. The Trustee sufficiently asserted a claim for disallowance of Rabo's claim.

50.     Rabo next contends that the Trustee has failed to state a claim for disallowance of Rabo's proof of claim, arguing that it is a commercial lender who provided commercial loans to Debtors, implying that this somehow grants it immunity from suit. There is no such rule.

51.     Per the plain terms of the Bankruptcy Code, if Rabo is liable for fraudulent transfers or preferential payments, its claim must be disallowed to the extent of Rabo's liability (i.e., effectively offset against it). As the Trustee has alleged plausible claims against Rabo, the Court should not dismiss the Trustee's disallowance claim based on those plausible fraudulent transfer claims. Rabo similarly ignores the body of law in Ponzi-scheme cases which limits Rabo's recovery to losses of only principal amounts, requiring disallowance of Rabo's claim to the extent it seeks more than that. The Trustee's disallowance claim is therefore plausible and should not be dismissed.

### N. The Trustee sufficiently alleged an equitable subordination claim.

52.     In its final stab, Rabo challenges the Trustee's equitable subordination claim on multiple grounds, all of which, however, fail. First, Rabo argues that it was not unfairly advantaged by its receipt of the security interests because Rabo received the cash proceeds from the loan. While Rabo acknowledges the Trustee need only allege creditors were harmed by the granting of a security interest, it ignores the fact that the Trustee alleges harm to the creditors—without Rabo's unrestrained and unvetted lending to an obvious fraud, the creditors might not have been injured at all and certainly not as much. And now, these innocent, unsecured creditors will likely be left with no recovery at all, but certainly a smaller one, if Rabo's security agreement is not subordinated, as Rabo will obtain a greater recovery vis-à-vis any collateral it collects.

53.     Second, Rabo argues that under Fifth Circuit precedent, the Trustee's equitable subordination claim must fail because it does not fit within one of the recognized categories in which

equitable subordination has been held to apply. Mot. at 47. But, as Rabo notes, those categories include "when a fiduciary of the debtor misuses his position to the disadvantage of other creditors" and "when a third-party controls the debtor to the disadvantage of other creditors." *Id.* For the reasons explained above, the Trustee has alleged a plausible breach of fiduciary duty claim against Rabo, based on Rabo's excessive control of the Debtors (reflected by, among other things, its ability to force McClain out of the very businesses he started and owned. And Rabo's breaches, as explained above, damages other, innocent creditors, who are now left emptyhanded and in a disadvantaged position if Rabo's fraudulently obtained security interests are not subordinated.

54.     Rabo should not be permitted to escape liability for the over $100 million in harms it has caused creditors by enabling and facilitating McClain's schemes. Rabo is not an innocent lender, but rather a co-conspirator. Rabo knew or should have known that McClain, who could not prepare basic accounting documentation for a single month of operations or provide a single, legitimate, verifiable yard sheet over the course of five years, was not running a legitimate $1 billion in annual revenue cattle feeding business. Rabo caused immense damages and should pay the consequences. Accordingly, Rabo's Motion should be denied.

## **CONCLUSION**

For the reasons set forth above, the Trustee respectfully requests that the Court:

- Deny Rabo's Motion as moot; or, alternatively,

- Deny Rabo's Motion on the merits in its entirety; or, alternatively, grant the Trustee leave to amend the complaint to address any sustained deficiencies; and

- Grant such other and further relief to which the Trustee is legally or equitably entitled.

Respectfully submitted,

*/s/ Alan Dabdoub*
Alan Dabdoub
State Bar No. 24056836
adabdoub@lynnllp.com
Steven G. Gersten
State Bar No. 24087579
sgersten@lynnllp.com
Farsheed Fozouni
State Bar No. 24097705
ffozouni@lynnllp.com
Campbell Sode
State Nar No. 24134507
csode@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:      214-981-3800
Facsimile:      214-981-3839

*/s/ Hudson M. Jobe*
Hudson M. Jobe
Texas Bar No. 24041189
**JOBE LAW PLLC**
6060 North Central Expressway, Suite 500
Dallas, Texas 75206
(214) 807-0563
hjobe@jobelawpllc.com
**SPECIAL COUNSEL TO THE TRUSTEE**