John H. Lovell, SBN 12609300
john@lovell-law.net
LOVELL ISERN & FARABOUGH, LLP
112 SW 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314
Phone: (806) 373-1515
Fax:    (806) 379-7176

--and—

Matthew S. Merriott, SNB 24100846
mmerriott@mhba.com
MULLIN HOARD & BROWN, L.L.P.
500 South Taylor, Suite 800
P.O. Box 31656
Amarillo, Texas 79120-1656
Telephone:  (806) 372-5050
Facsimile:  (806) 372-5086

*Attorneys for First Bank & Trust, a
division of UMB Bank n.a., successor by
merger to HTLF Bank.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| In re: | |
| | Chapter 7 |
| McClain Feed Yard, Inc., McClain Farms, Inc., and 7M Cattle Feeders, Inc., | |
| | Case No. 23-20084-swe |
| *Debtors*.[1] | Jointly Administered |
| Kent Ries, Chapter 7 Trustee for the Bankruptcy Estates of McClain Feed Yard, Inc., McClain Farms, Inc., and 7M Cattle Feeders, Inc. | |
| *Plaintiff*, | Adv. Proc. No. 25-02005-swe |
| v. | The Honorable Scott W. Everett |
| Community Financial Services Bank; HTLF Bank; Mechanics Bank; and Rabo Agrifinance, LLC, | |
| *Defendants*. | |

---

[1] The Debtors in these chapter 7 cases are: McClain Feed Yard, Inc. (Case No. 23-20084-swe), McClain Farms, Inc. (Case No. 23-20085-swe), and 7M Cattle Feeders, Inc. (Case No. 23-20086-swe).

**HTLF'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
THE TRUSTEE'S SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ ii

TABLE OF AUTHORITIES .................................................................................................. iv

I.         INTRODUCTION .................................................................................................. 1

II.        BACKGROUND FACTS........................................................................................ 1

  A.     The Trustee's Factual Allegations ............................................................... 1

  B.     The Trustee misstates the legal effect of the underlying banking transactions. .......... 2

    i.     HTLF was authorized by the Debtors and 2B Farms to complete the checks at issue.2

    ii.    Granting Provisional Settlement Credits is a normal and regular banking activity. ... 3

    iii.   Provisional Settlement Credits do not constitute a loan to check's maker. ................ 4

III.       STANDARD OF REVIEW .................................................................................... 6

IV.        ARGUMENT ......................................................................................................... 7

  **A.**    The Trustee lacks standing to assert the victims' damage claims directly
      against HTLF (Counts I, II, III, and IV). ........................................................... 7

  B.     HTLF cannot be vicariously liable for the Debtors' self-imposed injuries.
      (Counts I and III). .......................................................................................... 9

    i.     The Debtors cannot assert a tort for their own operation of the alleged Ponzi
       scheme.......................................................................................................... 9

    ii.    The Trustee does not allege that HTLF was involved in McClain's
       mismanagement of the Debtors or in causing them to operate the Ponzi
       scheme........................................................................................................ 11

  C.     The Trustee fails to allege sufficient facts to support claims that require actual
      knowledge of the Ponzi scheme (Counts I and III). ............................................. 12

    i.     The Trustee's allegation that HTLF knowingly defrauded itself in a check
       kite is not plausible. .................................................................................... 13

    ii.    Knowledge of and participation in a check kite is not knowledge of and
       participation in a Ponzi scheme. .................................................................... 15

  D.     The Trustee's claims based on agency fail to state a claim (Count II and IV). ......... 17

    i.     At most, the Trustee alleges a special agency relationship requiring HTLF
       to complete checks as instructed..................................................................... 17

    ii.    The Trustee fails to allege proximate cause. ..................................................... 19

  E.     The Trustee fails to allege fraudulent or preferential transfers to HTLF.................. 19

    i.     Control over checks is not sufficient to constitute a transfer. ............................. 19

ii.     Transfers to 2B Farms' account are not transfers to HTLF. .............................. 19

iii.    The Trustee cannot assert claims for funds that were returned to the
        Debtors........................................................................................................... 21

iv.     The Ponzi scheme presumption does not apply because the Debtors'
        scheme was mixed with legitimate business activity...................................... 22

v.      The Trustee fails to adequately allege actual or constructive fraud as to
        any particular transaction............................................................................... 24

CONCLUSION.................................................................................................................... 25

CERTIFICATE OF SERVICE ........................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**

*Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136 (Tex. 2019) ................................. 11

*Arias-Benn v. State Farm Fire & Cas. Ins. Co.*, 495 F.3d 228 (5th Cir. 2007)............................. 6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................... 6

*Barnhill v. Johnson*, 503 U.S. 393 (1992)..................................................................................... 19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).................................................................... 12, 13

*Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719 (5th Cir.) ........................................... 6

*Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir.1988)....... 20

*Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716 (Tex. 2014)................ 18

*Cunningham v. Brown*, 265 U.S. 1 (1924) ..................................................................................... 22

*F.D.I.C. v. Ernst & Young*, 967 F.2d 166 (5th Cir. 1992) ............................................................. 10

*First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214 (Tex. 2017) ............. 15

*Fojtik v. First Nat. Bank of Beeville*, 752 S.W.2d 669 (Tex. App.—Corpus Christi 1988, writ
    denied)........................................................................................................................................ 9

*Hearne v. Riversource Life Ins. Co.*, 670 S.W.3d 360 (Tex. App.—Texarkana 2023, pet. denied)
    .................................................................................................................................................. 20

*Holloway v. Skinner*, 898 S.W.2d 793 (Tex. 1995)......................................................................... 9

*In re Chris Pettit & Assocs., P.C.*, 2025 WL 1583366 (Bankr. W.D. Tex. June 4, 2025) ............. 16

*In re Cybridge Corp.*, 312 B.R. 262 (D.N.J. 2004)........................................................................ 21

*In re Montgomery*, 136 B.R. 727 (M.D. Tenn. 1992) .................................................................... 21

*In re Reagor-Dykes Motors, LP*, 2020 WL 4939180 (Bankr. N.D. Tex. Aug. 24, 2020) ............. 21

*In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2022 WL 2046144 (Bankr. N.D. Tex.
    June 3, 2022) ............................................................................................................................ 23

*In re Seven Seas Petroleum, Inc.*, 522 F.3d 575 (5th Cir. 2008) .................................................... 7

*In re Stinson Petroleum Co., Inc.*, No. 09-51663-NPO, 2011 WL 1398477 (Bankr. S.D. Miss.
    Apr. 12, 2011)........................................................................................................................... 13

*In re Today's Destiny, Inc.*, No. 05-90080, 2007 WL 2028111 (Bankr. S.D. Tex. July 6, 2007) .... 8

*In re Today's Destiny, Inc.*, 388 B.R. 737 (Bankr. S.D. Tex. 2008) ................................................ 8

*Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296 (11th Cir. 2020) .............................................. 20

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011)........................................................................... 23

*Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014)....................................................................... 8, 11

*Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560 (Tex. 2016)......................................................... 23

*Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193 (Tex. 2002)............................................. 18

*JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387 (Tex. App.—Houston [1st Dist.] 2011,
    pet. denied)............................................................................................................................... 16

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565 (1942) ........................................... 15

*Matter of Coutee*, 984 F.2d 138 (5th Cir. 1993)........................................................................... 20

*Matter of DeBerry*, 945 F.3d 943 (5th Cir. 2019) ........................................................................ 21

*Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N. A.*, 800 F. App'x 239 (5th Cir. 2020) ......... 13

*Mumfrey v. CVS Pharmacy, Inc.*, 719 F.3d 392 (5th Cir. 2013)..................................................... 9

*Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695 (Tex. 2007) ........................... 18

*NationsBank, N.A. v. Dilling*, 922 S.W.2d 950 (Tex. 1996) ........................................................ 10

*Newsome v. Charter Bank Colonial*, 940 S.W.2d 157 (Tex. App—Houston [14th Dist.] 1996, writ denied) ...................................................................................................................................... 20

*Paskenta Band of Nomlaki Indians v. Umpqua Bank*, 846 Fed. App'x 589 (9th Cir. 2021) ......... 16

*Perlman v. Wells Fargo Bank, N.A.*, 559 Fed. App'x 988 (11th Cir. 2014) ................................... 17

*Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001) ............................................................... 6

*Schertz-Cibolo-Universal City I.S.D. v. Wright (In re Educators Grp. Health Trust)*, 25 F.3d 1281 (5th Cir. 1994) ........................................................................................................................... 8

*Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854 (Tex. 1968)... 12

*Scholes v. Lehmann* 56 F.3d 750 (7th Cir. 1995) .......................................................................... 23

*See FG Holdings, Inc. v. London Am. Risk Specialists, Inc.*, No. 09-05-522 CV, 2007 WL 4341408 (Tex. App.—Beaumont Dec. 13, 2007, pet. denied) ................................................... 8

*Steinberg v. Buczynski*, 40 F.3d 890 (7th Cir.1994) ...................................................................... 8

*Stettner v. Smith (In re IFS Financial Corp.)*, 669 F.3d 255 (5th Cir. 2012) ............................... 23

*Taylor v. Scheef & Stone, LLP*, 2020 WL 4432848 (N.D. Tex. July 31, 2020) ........................... 11

*Thurman v. Med. Transportation Mgmt., Inc.*, 982 F.3d 953 (5th Cir. 2020) ................................ 6

*United States v. Frydenlund*, 990 F.2d 822 (5th Cir. 1993) .................................................... 13, 14

*Williams v. United States*, 458 U.S. 279 (1982) .......................................................................... 13

*Warfield v. Byron*, 436 F.3d 551 (5th Cir. 2006) .................................................................... 22, 23

*Williams v. WMX Techs., Inc.*, 112 F.3d 175 (5th Cir. 1997) ....................................................... 6

## Statutes

11 U.S.C. § 547 ............................................................................................................................. 21

11 U.S.C. § 548(1)(B)(i) ............................................................................................................... 24

Tex. Bus. & Comm. Code § 24.005 .............................................................................. 22, 23, 24, 25

Tex. Bus. & Comm. Code § 24.006 ............................................................................................... 22

Tex. Bus. & Comm. Code § 3.115(a) .............................................................................................. 3

Tex. Bus. & Comm. Code § 3.115(b) .......................................................................................... 3, 18

Tex. Bus. & Comm. Code § 4.104(a)(11) ....................................................................................... 3

Tex. Bus. & Comm. Code § 4.104(a)(5) ......................................................................................... 4

Tex. Bus. & Comm. Code § 4.201(a) .............................................................................................. 5

Tex. Bus. & Comm. Code § 4.201(a) Sec. 4.214(a) ....................................................................... 5

Tex. Bus. & Comm. Code § 4.214 .................................................................................................. 4

Tex. Bus. & Comm. Code § 4.215 .................................................................................................. 4

## Rules

Fed. R. Bankr. P. 7009 ............................................................................................................... 1, 6

Fed. R. Bankr. P. 7012 ............................................................................................................... 1, 6

Fed. R. Civ. P. 12(b)(6) ............................................................................................................ 1, 6, 25

Fed. R. Civ. P. 9(b) .................................................................................................................... 1, 6

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and Federal Rules of Bankruptcy Procedure Rules 7009 and 7012, *First Bank & Trust, a division of UMB Bank n.a., successor by merger to HTLF Bank* ("**HTLF**")[2] hereby submits this brief in support of its motion to dismiss Plaintiff's Second Amended Adversary Complaint  (the "**Complaint**") filed by Kent Reis, as Trustee of the Debtors' Bankruptcy Estates (the "**Trustee**") [Doc. 48].

## I.   INTRODUCTION

1.      In his Complaint, the Trustee includes detailed allegations regarding the alleged Ponzi scheme and check kiting schemes orchestrated by the Debtors and McClain. But HTLF is not the Debtors or McClain. Nor is HTLF one of their banks or lenders. HTLF's only banking relationship was with 2B Farms, one of the Debtors' customers. Even if the Trustee has alleged sufficient facts regarding the actions of McClain, the Debtors, their lender, and their banks, the Trustee must still allege sufficient facts to support his claims against HTLF. For the reasons set forth herein, he has failed to do so. As a result, the Complaint should be dismissed as to HTLF. In the alternative, the Trustee should be granted the opportunity to replead his causes of action if doing so would not be futile.

## II.   BACKGROUND FACTS

### A.   The Trustee's Factual Allegations

2.      The Trustee's allegations against HTLF center around its deposit account services for 2B Farms. As correctly alleged by the Trustee, HTLF's customer was 2B Farms. [Doc. 48 ¶79]. The Debtors were customers of and maintained accounts at Mechanics Bank. The Trustee's allegations regarding HTLF arise out of transactions between 2B Farms and the Debtors. [Doc. 48,

---

[2] UMB Bank, n.a., acquired HTLF Bank via merger on January 31, 2025. HTLF Bank is now operating as UMB Bank, n.a., and First Bank & Trust is now operating as a division of UMB Bank, n.a.

¶¶79-82].  In relation to these transactions, HTLF performed banking transactions on behalf of its customer, 2B Farms. Specifically, Trustee alleges that HTLF engaged in the following actions:

    a.    That, based on cattle sales statements at the direction of the Debtors, 2B Farms, and/or Terry Robinson, HTLF employees would complete McClain checks by filling in the amount of 2B Farm's share of cattle proceeds and deposit such checks in 2B Farms' account. [Doc. 48 ¶¶ 79, 206].

    b.    That HTLF gave 2B Farms a provisional credit for the checks prior to funds arriving from the Debtors' accounts at Mechanics Bank. [Doc. 48 ¶ 79].

    c.    That HTLF allowed 2B Farms to use the provisional credit to send wire transfers to the Debtors' Mechanics Bank account. [Doc. 48 ¶ 79].

3.    Outside of the 2B Farms transactions described in the preceding paragraph, the complaint does not allege that HTLF had any other interactions with McClain, the Debtors, the other Defendants, or any other victims of the scheme.

4.    Importantly, Debtors do not allege that HTLF's acceptance of deposits or issuance of wire transfers from 2B Farms' deposit account at HTLF was done without the direction and authorization of its deposit account customer, 2B Farms. Nor do the Debtors allege that the completion of McClain checks was unauthorized. As alleged, HTLF operated a deposit account as directed by its customer, 2B Farms, which was the victim of an alleged Ponzi scheme by Debtors.

**B.  The Trustee misstates the legal effect of the deposit account transactions.**

5.    After describing the facts of these transactions, the Trustee makes legal conclusions about the effect or illegitimacy of the deposit account transactions. [Doc. 48 ¶ 80]. Even taking the Trustee's allegations of the facts of these transactions as true, the Trustee's legal conclusions are inconsistent with applicable law and cannot support his causes of action against HTLF.

**i.  HTLF was authorized by the Debtors and 2B Farms to complete the checks at issue.**

6.    The making of a check is governed by Article 3 of the Uniform Commercial Code, adopted in Texas in Chapter 3 of the Texas Business and Commerce Code. The pre-signed checks

at issue were "incomplete instruments," defined as "a signed writing, whether or not issued by the signer, the contents of which show at the time of signing that it is incomplete but that the signer intended it to be completed by the addition of words or numbers." Tex. Bus. & Com. Code § 3.115(a). If such an instrument is completed with authorization, it can be enforced "according to its terms as augmented by completion." *Id*. at § 3.115(b).

7.      Here, the Trustee affirmatively asserts that the checks were completed according to a "cattle statement" from the Debtors and that such actions were taken "at the direction of the Debtors, 2B Farms, and/or Terry Robinson." [Doc. 48 ¶¶ 79, 206]. Indeed, no party has alleged in any of the pending adversary proceedings that HTLF was not authorized to complete the checks. As a result, the completion and deposit of the checks into the 2B Farms account at HTLF was not an illegitimate action as alleged by the Trustee.

### ii. Granting Provisional Settlement Credits is a normal and regular banking activity.

8.      The Trustee baldly asserts that HTLF "kited those checks by depositing them into and immediately crediting investor accounts absent endorsements before Debtors' bank(s) paid the checks." [Doc. 48, ¶67]. But contrary to the Trustee's assertions, granting an immediate settlement credit on an uncleared check is a legitimate and regular banking activity, not check kiting.

9.      In the UCC, the process of paying or receiving payment on a check is "settling" the check. "'Settle' means to pay in cash, by clearing-house settlement, in a charge or credit or by remittance, or otherwise as agreed. A settlement may be either provisional or final." Tex. Bus. & Com. Code § 4.104(a)(11). The ordinary practice of banks is to make a provisional settlement on checks as they are presented, as stated in the official comments to the UCC:

> Under current bank practice, in a major portion of cases banks make provisional settlement for items when they are first received and then await subsequent determination of whether the item will be

> finally paid. This is the principal characteristic of what are referred
> to in banking parlance as "cash items." Statistically, this practice of
> settling provisionally first and then awaiting final payment is
> justified because the vast majority of such cash items are finally
> paid, with the result that in this great preponderance of cases it
> becomes unnecessary for the banks making the provisional
> settlements to make any further entries.

Tex. Bus. & Com. Code § 4.214, comment 1 (Tex. UCC) (Vernon) 2021). Such provisional

settlements normally become final settlements through the passage of time or final payment. Tex.

Bus. & Com. Code § 4.215.

10.    The mere act of granting a provisional settlement credit—the banking activity at

issue—is not check kiting. Rather, as discussed in Section IV.C.i, check kiting is the act of using

checks and provisional settlement credits to trick the victimized bank.

### iii. Provisional Settlement Credits do not constitute a loan to the check's maker.

11.    The Trustee alleges that HTLF effectively loaned money to Debtors as a "Shadow

Lender" by (1) granting immediate credit on Debtors' checks deposited into 2B Farms' account,

and (2) sending payments to Debtors out of 2B Farms' account prior to the checks clearing. [Doc.

48, ¶80]. Neither of these transactions can be characterized as a loan to Debtors.

12.    As a matter of law, granting immediate credit on an uncleared check is not a loan

to the maker of the check. In the context of a check being deposited, a bank's "Customer" is "the

person having an account with a bank or for whom a bank has agreed to collect items…." Tex.

Bus. & Com. Code § 4.104(a)(5). HTLF's customer was 2B Farms, not the Debtors.

13.    In collecting the checks, HTLF was acting as the agent of its customer, 2B Farms

and did not become a creditor of Debtors:

> Unless a contrary intent clearly appears and before the time that a
> settlement given by a collecting bank for an item is or becomes final,
> the bank, with respect to the item, is an agent or sub-agent of the

> owner of the item and any settlement given for the item is
> provisional.

Tex. Bus. & Com. Code § 4.201(a). As noted in the official comments, this provision confirms that

(unless stated otherwise) a bank is merely an agent of the owner as opposed to taking ownership

of the check itself. *Id*. at comment 1 (Tex. UCC) (Vernon) 2021). This is true "regardless of the

form of indorsement or lack of indorsement and even though credit given for the item is subject to

immediate withdrawal as of right or is in fact withdrawn…." *Id*. at § 4.201(a).

      14.     Nor was HTLF making a loan to Debtors when it completed the wire transfers from

2B Farms' account to Debtors' account at Mechanics Bank. The transaction was between Debtors

and 2B Farms, not Debtors and HTLF. When the checks were dishonored, HTLF's recourse was

to withdraw the provisional settlement credit from 2B Farms:

> If a collecting bank has made provisional settlement with its
> customer for an item and fails by reason of dishonor, suspension of
> payments by a bank, or otherwise to receive settlement for the item
> that is or becomes final, the bank may revoke the settlement given
> by it, charge back the amount of any credit given for the item to its
> customer's account, or obtain refund from its customer….

Tex. Bus. & Com. Code § 4.201(a) Sec. 4.214(a). In contrast, 2B Farms' recourse (which it has

pursued) is to assert claims against Debtors for damages in the amount of the wires. As a result,

there is no factual or legal basis for the Trustee to claim that the provisional credits or the wires

were a loan to Debtors.[3]

---

[3] The Trustee's entire "Shadow Lender" theory is essentially predicated on disregarding the existence of 2B Farms and pretending that HTLF was dealing with the Debtors instead. But the Trustee cannot unilaterally, without any support or legal process, consolidate 2B Farms and the Debtors.

III.    **STANDARD OF REVIEW**

15.     Rule 12(b)(6), as incorporated by Federal Rule of Bankruptcy Procedure 7012, governs dismissals for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012. The question before the Court in considering a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) is whether a plaintiff has pled a plausible and legally cognizable claim. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

16.     In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded facts as true and determine whether those facts, and the reasonable inferences from those facts, would entitle a plaintiff to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009). However, courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Arias-Benn v. State Farm Fire & Cas. Ins. Co.*, 495 F.3d 228, 230 (5th Cir. 2007). Even where the facts are adequately pleaded, "a complaint may be dismissed if it clearly lacks merit—for example, where there is 'an absence of law to support a claim of the sort made.'" *Thurman v. Med. Transportation Mgmt., Inc.*, 982 F.3d 953, 955–56 (5th Cir. 2020).

17.     Allegations of fraud are subject to the higher pleading standard. Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009. Fed. R Rule 9(b). "At a minimum, Rule 9(b) requires that the plaintiff specify the particulars of "time, place, and contents of the false representations." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997). "Put simply, Rule 9(b) requires the who, what, when, where, and how [of the alleged fraud] to be laid out." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir.), *modified on other grounds*, 355 F.3d 356 (5th Cir. 2003).

## IV.    ARGUMENT

### A.  The Trustee lacks standing to assert the victims' damage claims directly against HTLF (Counts I, II, III, and IV).

18.     The Trustee alleges that the Debtors' operations constituted a "massive Ponzi scheme." [Doc. 48 ¶ 1].[4] The victims of the Ponzi scheme have asserted claims against the Debtors' estate for over $100 million. [Doc. 48 pp. 46-50].[5] In Counts I, II, III and IV, the Trustee seeks to recover these claims as direct damage to the Estate. [Doc. 48 ¶¶ 124, 138, 158, and 167].[6] All of the damages are described in terms of the creditors' damages and their claims. *Id.* Such damage claims should be dismissed because those damages belong to the creditors, not the Estate.

19.     As the Fifth Circuit has made clear, the analysis of whether a claim belongs to the Estate or the creditors ultimately hinges on which party was directly injured. *See In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 589 (5th Cir. 2008). Creditors do not have standing to assert that they were indirectly injured by a direct injury to the estate. *See id.* at 584 (citing *Schertz-Cibolo-Universal City I.S.D. v. Wright (In re Educators Grp. Health Trust)*, 25 F.3d 1281, 1284 (5th Cir.

---

[4] HTLF does not concede that the Debtors' operation was a Ponzi scheme but will refer to it as such for purposes of its Motion to Dismiss.

[5] The actual amount of liability is yet to be determined and is at issue in Adversary No. 25-02003-swe.

[6] "McClain's Ponzi scheme caused Debtors to suffer over $100 million in damages, as evidenced by the fact that more than 100 creditors have asserted over $120 million in claims against Debtors with the USDA under the Dealer Trust Statute and Rabo asserts a claim of approximately $50 million." ¶ 124.

"But for Defendants' check kiting—and Rabo's unrestrained loan extensions and line of credit increases to Debtors to fund resulting overdrafts— McClain's years-long Ponzi scheme would have collapsed sooner, saving Debtors and their creditors substantial sums in misappropriated funds." ¶ 138.

"The Ponzi scheme perpetuated by McClain and Defendants caused Debtors and their creditors to lose nearly $200 million." ¶158

"At the outset, Defendants should have foreseen that their unlawful actions would cause Debtors and their other creditors to lose untold sums of money, with losses increasing with each passing day. By the time the scheme came to an end, those damages grew to exceed $170M, as evidenced by the volume of claims asserted by creditors against the Debtors in this bankruptcy proceeding." ¶ 167

1994)). Likewise, the Trustee does not have standing to assert a cause of action for a direct injury

to a creditor. *See id.* at 588 (citing *Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir.1994)).

20.     The creditors' damages arise from putting money or cattle ***INTO*** the Ponzi scheme.

While that might create a liability owed by the Estate, such a liability is a claim against the Estate

for the creditors' injury, not an injury to the Estate itself.  *See In re Today's Destiny, Inc.*, No. 05-

90080, 2007 WL 2028111, at *10 (Bankr. S.D. Tex. July 6, 2007) ("These schemes, as alleged,

caused harm to the intervening parties. The Debtor, itself, did not suffer any direct damages from

this alleged fraud—only the creditors of the estate."). Put simply, if the creditors were defrauded

into giving Debtors $100 million, then the Debtors are $100 million richer, and the creditors are

$100 million poorer. The claim for the loss of that $100 million belongs to the creditors.[7]

21.     Absent some separate basis for liability (such as contractual indemnity) the Trustee

cannot assert a direct claim against HTLF for the Debtors' own liability to third parties. *See FG

Holdings, Inc. v. London Am. Risk Specialists, Inc.*, No. 09-05-522 CV, 2007 WL 4341408, at *7

(Tex. App.—Beaumont Dec. 13, 2007, pet. denied). The Trustee does not assert such a basis.

Rather, he asserts only that HTLF and the other Defendants participated in the Ponzi scheme. Such

a claim could, at most, allow the Trustee to seek contribution from Defendants as joint tortfeasors.

*See In re Today's Destiny, Inc.,* 388 B.R. 737, 753 (Bankr. S.D. Tex. 2008). But the Trustee has not

asserted a contribution claim.

22.     To the extent the Trustee wishes to assert direct claims against the Defendants

arising out of the operation of the alleged Ponzi scheme, he must allege (and ultimately prove) the

---

[7] However, the Estate could have been injured by the Ponzi scheme to the extent it paid fictitious profits ***OUT*** of the scheme. *See Janvey v. Brown*, 767 F.3d 430, 441-43 (5th Cir. 2014) (payments of interest or profits above the return of principal was a fraudulent transfer that further injured the entity operating a Ponzi scheme). Continuing the example above, if the Debtors defrauded the creditors out of $100 million but then repaid them $150 million, the Debtors would have been injured by $50 million. While the Trustee is purportedly seeking to recover those damages in his fraudulent transfer claims, those are not the damages sought in Counts I, II, III, and IV.

damages to the Debtors. Because the Trustees' Count's I, II, III, and IV only assert direct claims for damages to the creditors, such claims should be dismissed, Alternatively, the Trustee should be required to replead if doing so would not be futile.

**B. HTLF cannot be vicariously liable for the Debtors' self-imposed injuries. (Counts I and III).**

23.    In Counts I and III, the Trustee seeks to hold HTLF vicariously liable for the Debtors' damages from the Ponzi scheme under theories of knowing participation in a breach of fiduciary duty and conspiracy. But by operating the scheme, the Debtors inflicted those damages on themselves. Ignoring this reality, the Trustee seeks to create a false distinction between McClain as an individual and the Debtors, arguing that McClain—not the Debtors—operated the Ponzi scheme. [*See, e.g.,* Doc. 48 ¶¶ 123, 153]. But this argument fails as a matter of law.

**i.    The Debtors cannot assert a tort for their own operation of the alleged Ponzi scheme.**

24.    The Trustee cannot divorce McClain's actions from those of the Debtors. "As a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts." *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995). A corporate agent's actions are imputed to the company unless he was acting solely for his own purposes. *Mumfrey v. CVS Pharmacy, Inc.*, 719 F.3d 392, 403 (5th Cir. 2013)("Even an agent's mixed motives— benefitting himself and the corporation—are insufficient."). For purposes of a conspiracy, a corporate agent's actions are deemed to be the actions of the corporation itself unless such actions were taken in a different capacity. *Fojtik v. First Nat. Bank of Beeville*, 752 S.W.2d 669, 673 (Tex. App.—Corpus Christi 1988, writ denied)("Hence, it is conceivable that Chesnut, if he had in fact conspired with the bank, did so in his capacity not as a corporate agent but as an independent equipment dealer.").

25. Here, McClain's and the Debtors' purposes in operating the alleged Ponzi scheme were aligned. McClain owned the Debtors and controlled them as a director, officer, and agent. [Doc. 48 ¶¶ 15, 120]. Like in *F.D.I.C. v. Ernst & Young*, McClain served himself by serving the Debtors and his actions are therefore attributable to the Debtors:

> "In the present case, Woods acted on the corporation's behalf because by serving Western, he served himself, Western's sole owner. As the sole owner, Woods' fraudulent activities on Western's behalf benefitted himself and injured outsiders to Western—i.e. depositors and creditors. Accordingly, under *Greenstein,* Woods acted on Western's behalf, and, therefore, his knowledge is imputable to Western."

967 F.2d 166, 171 (5th Cir. 1992). While the Trustee alleges that McClain received a benefit through the Debtors, he does not allege that McClain was acting in some other capacity or entirely on his own behalf. Indeed, the Trustee specifically alleges that "Defendants dealt directly with McClain in his capacity as a director, officer, or employee of Debtors." [Doc. 48 ¶ 122].

26. Further, the Trustee has made no effort to deny that the Debtors are liable to the victims for their damages from the Ponzi scheme—indeed, recovering funds to pay those creditors is the stated purpose of this lawsuit.  [Doc. 48 ¶ 5 ¶¶ 107, 132]. But the Trustee is not administering the Estate of Brian McClain. He is administering the Estate of the Debtors. The Debtors are only liable for such damages if McClain was acting on behalf of the Debtors in perpetrating the fraud. *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 952 (Tex. 1996). The Trustee cannot accept this liability (and attempt to use it as his measure of damages) only to turn around and argue that McClain's actions were his own independent actions for purposes of his claims against Defendants.

27. As a result, at least with respect to the operation of the Ponzi scheme, the Trustee's pleadings establish that McClain's actions were the Debtors' actions as a matter of law. McClain was not using Debtors to operate his own individual Ponzi scheme. Rather, he operated the

Debtors' Ponzi scheme in his capacity as a corporate agent. All the alleged transactions were transactions by the Debtors, not by McClain. If Defendants did in fact participate in the Ponzi scheme, then they were joint participants with Debtors—not with McClain as an individual.

28.     Because the Debtors were operating the Ponzi Scheme, they cannot claim that the Ponzi scheme constituted a tort against them. The Debtors did not owe a fiduciary duty to themselves that they breached. Nor could they have conspired against themselves.[8] Nor could the Debtors have defrauded themselves. The Debtors could very well have been injured by the Ponzi scheme, but that does not mean they can assert a tort claim against themselves. And absent such a tort claim, Counts I and III must be dismissed as to the operation of the Ponzi scheme itself.

> **ii.  The Trustee does not allege that HTLF was involved in McClain's mismanagement of the Debtors or in causing them to operate the Ponzi scheme.**

29.     Even though, as noted above, the Debtors were the parties operating the Ponzi scheme, the Debtors may have potential claims against McClain or other parties who caused them to operate the scheme. *See Janvey v. Brown*, 767 F.3d 430, 437 (5th Cir. 2014) (noting that Ponzi scheme principals caused the entities to make fraudulent transfers in the course of scheme). But such claims are distinct from claims for participating in the scheme itself. *See Taylor v. Scheef & Stone, LLP*, 2020 WL 4432848, at *5, *9-10 (N.D. Tex. July 31, 2020) (receiver could not assert victim's claims against law firm for participating in fraud but could replead his claim that the firm failed to advise the entities as to the illegality of their actions).

30.     To the extent the Trustee is attempting to assert a claim that HTLF knowingly participated or conspired with McClain to cause the Debtors to operate a Ponzi scheme, the Trustee

---

[8] The Trustee's conspiracy claim fails to even allege a specific tort for which vicarious liability is sought, and therefore fails to state a conspiracy claim. *Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019) (a conspiracy is not a cause of action itself, but rather allows vicarious liability for an underlying tort committed during the conspiracy).

fails to allege any facts supporting such a claim. All of the allegations that the Trustee makes regarding HTLF are centered around the Debtors' *operation* of the alleged Ponzi scheme and HTLF's purported assistance. The Trustee does not allege that HTLF had any communications with McClain or influence over him with respect to making managerial decisions. The only parties for which such control and influence is alleged are Rabo and Mechanics. [Doc. 48, ¶¶92-93, 132]. As a result, Count I and III fail to state a claim against HTLF with respect to causing Debtors to operate a Ponzi scheme.

C. **The Trustee fails to allege sufficient facts to support claims that require actual knowledge of the Ponzi scheme (Counts I and III).**

31.     At least Counts I and III for knowing participation and for conspiracy depend on HTLF having actual knowledge that Debtors were operating a Ponzi scheme. For knowing participation, the Trustee alleges that HTLF knowingly participated in McClains breach of fiduciary duty by knowingly participating in the Ponzi scheme. [Doc. 48 ¶¶ 123, 125]. In his conspiracy claim, the Trustee alleges that "McClain and Defendants had a meeting of the minds on the object of operating a fraudulent Ponzi scheme." [Doc. 48 ¶¶ 153]. Such a meeting of the minds necessarily requires knowledge of the object to be accomplished. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968).

32.     The Trustee must therefore plead facts that make it plausible that HTLF both knew about the Ponzi scheme and that it intentionally participated in or agreed to operate the scheme. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007). Such allegations are not plausible because the Trustee's facts relate only to the alleged check kite, not the broader Ponzi scheme.

**i. The Trustee's allegation that HTLF knowingly defrauded itself in a check kite is not plausible.**

33.     The Trustee's only allegations regarding HTLF's knowledge and intent relates to HTLF's participation in the 2B Farms transactions. As discussed previously, the actual banking actions undertaken by HTLF were neutral, not inherently fraudulent. *See* § II.B. As a result, allegations that HTLF participated in such transactions are not sufficient to allege fraudulent intent on the part of HTLF. *See Twombly*, 550 U.S. at 555 (allegations of neutral parallel conduct were not sufficient to allege an underlying agreement that would make such conduct unlawful).

34.     The Trustee alleges that such transactions were used to accomplish a fraudulent check kite. However, to the extent that there was a fraudulent intent behind the transactions, HTLF was the victim, not the perpetrator, of such fraud. As discussed previously, provisional settlement credits are a regular banking activity. *See* § II.B.ii. A check-kite involves a party intentionally taking advantage of these provisional settlement credits to artificially inflate account balances. *See, e.g.*, *Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N. A.*, 800 F. App'x 239, 241 (5th Cir. 2020); *United States v. Frydenlund*, 990 F.2d 822, 824 (5th Cir. 1993); *In re Stinson Petroleum Co., Inc.*, No. 09-51663-NPO, 2011 WL 1398477, at *2 (Bankr. S.D. Miss. Apr. 12, 2011).[9]

35.     In a traditional check kite, checks are circulated between two or more banks. *Id*. Each bank grants a provisional credit based on incoming checks and uses that credit to settle

---

[9] "[A] check-kiting scheme begins when a check kiter opens an account at Bank A with a small deposit. The check kiter then writes a check on his account at Bank A for a large sum of money, such as $50,000, and uses that check to open an account at Bank B. At the time of the deposit, the account at Bank A does not have sufficient funds to cover the large check, but Bank B is unaware of this fact because of the 'float' time, that is, the delay between the time the check kiter deposited the $50,000 check and the time Bank A must pay or return it for insufficient funds or for some other reason. Bank B extends provisional credit to the check kiter, allowing the check kiter to write a $50,000 check on the account at Bank B and to present it to Bank A for payment. Likewise, Bank A extends provisional credit to the check kiter and pays the $50,000 check when Bank B presents it to Bank A for payment. By repeating the above scheme, a check kiter enjoys the use of an artificially inflated account balance, so long as he is able to keep the deposited checks 'floating' in the collection process." *Stinson.*, at *2, *citing Williams v. United States*, 458 U.S. 279, 281 n. 2 (1982)

Document    Page 19 of 31

outgoing checks. *Id*. This results in artificially inflated bank account balances during the processing period. *Id*. In most cases, the excess balance is then used to cover other expenses or otherwise withdrawn, resulting in a net negative balance among the banks. *Id*.[10]

36.    The 2B Farms transactions were not a traditional check kite because only one bank—HTLF—was granting a provisional settlement credit. [Doc. 48 ¶79(d)]. The wires that 2B Farms sent from HTLF to the Debtors' account at Mechanics Bank did not result in a provisional credit at Mechanics Bank. Therefore, these transactions only resulted in an inflated account balance in 2B Farms' account at HTLF. To the extent there was a check kite, HTLF was therefore the "kite-ee" and not the "kite-or." It is simply not plausible that HTLF knew that it was being defrauded in a check kite but continued to participate in and allow the transactions to continue.

37.    The Trustee argues that there "no legitimate reason to structure transactions in this manner," and speculates that a legitimate business would simply send a wire or mail a check. [Doc. 48 ¶ 80]. But a legitimate business could also process payments the same way that the Debtors and 2B Farms did, as authorized by the Texas Business and Commerce Code and 2B Farms (HTLF's customer). Just because something is uncommon does not make it illegitimate. The Trustee also claims that "there was no conceivable legitimate reason to move the money in an endless circle, rather than the Debtors simply retaining and reinvesting it." [Doc. 48 ¶ 80]. Not so. Banks with security interests ordinarily require the proceeds of collateral to be deposited prior to more

---

[10] Theoretically, if no money were removed from the kite before it was allowed to collapse, no funds would be permanently lost. However, the Fifth Circuit has held that "[t]he bare act of check kiting defrauds the bank by temporarily placing the bank's funds at the disposal of the account holder." *United States v. Frydenlund*, 990 F.2d 822, 824 (5th Cir. 1993)

collateral being purchased. And rather than indicate that Debtors were insolvent, every check that cleared indicated to HTLF and 2B Farms that the Debtors were sound.[11]

38. The 2B Farms transactions are not problematic because of their structure, but because the Debtors were (allegedly) making checks for which they had insufficient funds to pay. But the Trustee does not allege any facts of how HTLF might know that the Debtors' accounts at Mechanics Bank were insufficient to pay the checks on which credit was given. As far as HTLF and 2B Farms knew, the checks were good. As a result, the Trustee's conclusory allegation that HTLF knew that the 2B Farms transactions were fraudulent cannot satisfy the plausibility standard in *Twombly* and cannot support Counts I or III.

### ii. Knowledge of and participation in a check kite is not knowledge of and participation in a Ponzi scheme.

39. Alternatively, even if HTLF knew that it was participating in a check kite (which it did not), that is not the same thing as knowing that there was also a broader Ponzi scheme. When a conspiracy involves multiple stages or aspects, conspirators must agree to the object of the conspiracy on which liability is based. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017)(conspiracy to commit theft was distinct from conspiracy to cover-up theft). Similarly, knowing participation in a breach of fiduciary duty does not extend to actions beyond the scope of the participation—rather, "where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 574, 160 S.W.2d 509, 514 (1942). The participation must aid in the commission of the underlying breach of duty at issue. *JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 413 (Tex. App.—Houston [1st Dist.]

---

[11] In contrast, the Trustee's suggestion that the Debtors could have retained and reinvested the proceeds would have eliminated the verification of proceeds and allowed the scheme to grow even larger.

2011, pet. denied). Therefore, the Trustee must plausibly allege HTLF's knowledge of the Ponzi scheme, not merely knowledge of the check kite, to survive a motion to dismiss.

40.    The Trustee fails to allege that HTLF had knowledge of the facts that made Debtors' operation a Ponzi scheme. As alleged by the Trustee, the Debtors' operation was a Ponzi scheme because they were misrepresenting the use of investor funds, the number of cattle on hand, and the source of alleged profits to investors and because they were using investor funds to repay other investors. [Doc. 48 ¶¶ 29-30]. The Trustee does not plausibly allege that HTLF had knowledge of the Debtors' finances or bank accounts. Nor does the Trustee allege knowledge of how many cattle the Debtors owned or claimed to own. Nor does the Trustee allege knowledge that the Debtors were using investor funds to repay other investors. Unlike in his allegations against other parties, the Trustee does not allege how HTLF might have obtained knowledge of these facts. Other than the receipt of cattle sales statements, the Trustee does not even allege that HTLF and the Debtors had any communications prior to the collapse of the scheme.

41.    The Trustee "has not offered anything but conclusory allegations to show that [HTLF] had knowledge of [McClain's] scheme. Merely alleging that [HTLF] 'should have known' based on 'red flags' that [McClain] was operating a scheme does not establish that [HTLF] knowingly permitted [McClain] to engage in suspicious transactions. Knowing means *knowing*." *In re Chris Pettit & Assocs., P.C.*, 2025 WL 1583366 (Bankr. W.D. Tex. June 4, 2025); *see also Paskenta Band of Nomlaki Indians v. Umpqua Bank*, 846 Fed. App'x 589, 590 (9th Cir. 2021) ("Paskenta failed to plausibly allege that Umpqua Bank actually knew that processing transactions requested by Pakenta's authorized signatories assisted those employees in committing a specific tort. Instead, Paskenta alleged that various irregularities required further investigation by Umpqua Bank to determine whether Paskenta employees were engaged in wrongdoing. However, actual

knowledge is required to establish an aiding and abetting claim."); *Perlman v. Wells Fargo Bank, N.A.*, 559 Fed. App'x 988, 993 (11th Cir. 2014) ("when a claim of aiding and abetting is asserted against a bank—the second element—knowledge-will only be satisfied if the plaintiff pleads facts demonstrating that the bank had 'actual knowledge' of the wrongdoings" and that plaintiff must show the alleged aider and abettor "actually knew of the underlying wrongs committed").

42.    The Trustee must plausibly allege that HTLF had actual knowledge of the Ponzi scheme.  Even if the Trustee has plausibly alleged that HTLF had knowledge of and participated in the check kite through the 2B Farms transactions (which he has not), such an allegation is insufficient to plausibly allege actual knowledge of a far larger Ponzi scheme. Without such support, Counts I and III should be dismissed as to HTLF.

**D.  The Trustee's claims based on agency fail to state a claim (Count II and IV).**

43.    Counts II and IV assert claims for negligence and breach of fiduciary duty based on HTLF's alleged status as an agent of the Debtors for filling out pre-signed checks.[12] HTLF does not agree that it was the Debtors' agent. However, to the extent HTLF was an agent, the Trustee has failed to allege a breach of any duties arising from that relationship. Nor has the Trustee alleged how HTLF's actions could have proximately caused damages to the Debtors.

**i.    At most, the Trustee alleges a special agency relationship requiring HTLF to complete checks as instructed.**

44.    Even assuming HTLF was an agent, an agency relationship does not necessarily create a general fiduciary duty in all things:

> The agreement to act on behalf of the principal causes the agent to
> be a fiduciary, that is, a person having a duty, created by his

---

[12] The Trustee previously asserted a negligence claim based on the false premise that the Debtors were customers of HTLF. The Trustee appears to have abandoned this claim. Compare Doc. 1, ¶ 136 with Doc. 48, ¶162 (omitting HTLF except for last sentence); see Doc. 48 ¶80 (identifying Debtors as non-customers as to HTLF). To the extent that the Trustee has not abandoned this claim, HTLF incorporates the arguments against such a duty in its original motion to dismiss. [Doc. 24 ¶¶ 37-40].

> undertaking, to act primarily for the benefit of another ***in matters connected with his undertaking***.

*Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002) (citing RESTATEMENT (SECOND) OF AGENCY § 13, cmt. a (1958)) (emphasis added). The scope of the duties must arise from the facts at issue:

> Accordingly, factors which must be taken into consideration when determining the scope of an agent's fiduciary duty to his or her principal include not only the nature and purpose of the relationship, but also agreements between the agent and principal.

*Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007).

45. Similarly, an agency relationship (if one exists) could also give rise to a duty of ordinary care with respect to the services to be provided. *See Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (Parties have a duty of ordinary care in providing services that they agreed to perform). Any negligence duty of care must therefore be limited to the scope of the alleged agency relationship.

46. The Trustee alleges that by filling out the Debtors' checks, HTLF (through its employees) was acting as an agent for Debtors. [Doc. 48 ¶ 80]. The completion of an instrument requires that the completion by authorized by the maker. Tex. Bus. & Com. Code § 3.115(b). As a result, HTLF's duty was to complete the checks as instructed and deliver them to 2B Farms, the correct payee.[13] There is no allegation that HTLF did not complete the checks as instructed and authorized. And the Trustee can offer no authority or explanation to support his contention that such a limited agency relationship also imposed a duty on HTLF to investigate, discover, and put a stop to the Debtors' schemes. As a result, Counts II and IV should be dismissed.

---

[13] As discussed previously, in depositing the checks and performing banking actions related to its customer's account, HTLF was a statutory agent of 2B Farms. See § II.B.iii.

**ii.   The Trustee fails to allege proximate cause.**

47.     Further, the Trustee fails to (and cannot) explain how HTLF's actions in the course of the alleged agency relationship resulted in damages to the Debtors. The alleged check kite could not have directly damaged the Debtors because it merely transferred more assets into the scheme—at the expense of HTLF and 2B Farms. Nor can the Trustee allege that the extension of a float indirectly caused the Debtors' potential Ponzi scheme damages. Those damages were not caused by the float. Had McClain simply returned the floated funds to HTLF and 2B Farms, there would have been no damages to anyone. Any damages arose out of the Debtors' Ponzi scheme, which was a superseding and intervening cause. As a result, Counts II and IV should be dismissed.

**E.   The Trustee fails to allege fraudulent or preferential transfers to HTLF.**

**i.   Control over checks is not sufficient to constitute a transfer.**

48.     The Trustee appears to allege that HTLF's possession, completion, and deposit of the Debtors' pre-signed checks (at the direction of the Debtors, 2B Farms, and/or Terry Robinson) is sufficient to constitute a transfer. [Doc. 48 ¶ 206]. But such actions do not constitute control over the Debtors' funds because Debtors retained control over the funds until the checks finally cleared. *Barnhill v. Johnson*, 503 U.S. 393, 401, 112 S. Ct. 1386, 1391, 118 L. Ed. 2d 39 (1992) ("until the moment of honor the debtor retains full control over disposition of the account and the account remains subject to a variety of actions by third parties."). As a matter of law, no transfer occurred until and unless the Debtors' banks honored the checks.

**ii.   Transfers to 2B Farms' account are not transfers to HTLF.**

49.     In Count XIII, asserting fraudulent transfers, the Trustee explicitly asserts that the transfers at issue were made to 2B Farms and Terry "Bo" Robinson. [Doc. 48 ¶ 206]. But the Trustee argues that because HTLF had a lien on 2B Farms and Robinsons' bank accounts, all of

the transfers should be recoverable from HTLF. [Doc. 48¶¶ 208-209]. As a matter of law, the mere transfer of funds into the accounts is insufficient to constitute HTLF having control over the funds.

50.     In determining whether a party has received a transfer, the Fifth Circuit has adopted the "dominion or control test." *Matter of Coutee*, 984 F.2d 138, 141 (5th Cir. 1993). "Under this test, a party that receives a transfer directly from the debtor will not be considered the initial transferee unless that party gains actual dominion or control over the funds." *Id. quoting Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 893 (7th Cir.1988).[14] Such control exists where a party has the right to put the money to its own uses and do whatever it wants with the money. *Id*. Texas state courts have applied the control test, as adopted by the Fifth Circuit, to TUFTA actions. *Hearne v. Riversource Life Ins. Co.*, 670 S.W.3d 360, 368 (Tex. App.—Texarkana 2023, pet. denied); *Newsome v. Charter Bank Colonial*, 940 S.W.2d 157, 165 (Tex. App—Houston [14th Dist.] 1996, writ denied).

51.     In *Bonded*, the 7th Circuit held that a bank became a transferee when it applied the account balance to reduce its loan. *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988). The Trustee generally alleges that HTLF used the funds to pay down 2B Farms' loans. [Doc. 48, ¶ 208]. But he also alleges that the funds were immediately wired back as part of

---

[14] Some Courts have found a party can be a transferee without control, but that the lack of control operates as an equitable defense. *See, e.g., Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1304 (11th Cir. 2020). However, in *Bonded*, on which the Fifth Circuit relied, the Seventh Circuit rejected this argument:

> "We are aware that some courts say that an agent (or a bank in a case like ours) is an 'initial transferee' but that courts may excuse the transferee from repaying using equitable powers. ... This is misleading. 'Transferee' is not a self-defining term; it must mean something different from 'possessor' or 'holder' or 'agent'. To treat 'transferee' as 'anyone who touches the money' and then to escape the absurd results that follow is to introduce useless steps; we slice these off with Occam's Razor and leave a more functional rule."

*Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988). Citing *Bonded*, the Fifth Circuit adopted the approach that control was part of definition of a transferee. *Matter of Coutee*, 984 F.2d at 140-41. Therefore, the "dominion or control test" is part of the element of transfer to be established by the Trustee and not an affirmative defense in this Circuit.

a check kite. [Doc. 48 ¶¶79-82]. Rather than seek recovery from HTLF to the extent that the funds paid down the debt, the Trustee seeks recovery of "all of the transfers of the Debtors to 2B Farms' and Terry Robinson's HTLF accounts." [Doc. 48 ¶ 209]. Count XIII should therefore be dismissed to the extent the Trustee seeks to recover transfers that did not pay down the debt to HTLF.

### iii. The Trustee cannot assert claims for funds that were returned to the Debtors.

52.    Essentially all of the Trustee's claims against HTLF are based on the allegation that the funds that the Debtors sent to 2B Farms were wired back to the Debtors before the checks cleared. [Doc. 48 ¶¶79-82].  Yet the Trustee seeks to recover the full amount of all transfers to 2B Farms. The Trustees' claim violates both the spirit and the letter of the law.

53.    Under 11 U.S.C. 550(d), "the trustee is entitled to only a single satisfaction" when recovering avoided transfers. The Trustee therefore cannot recover on its fraudulent transfer claims to the extent the funds were already returned. *See Matter of DeBerry*, 945 F.3d 943, 947 (5th Cir. 2019). Further, the aggregate change in position is an appropriate measure of fraudulent transfers in a check kiting case. *See In re Reagor-Dykes Motors, LP*, 2020 WL 4939180, at *7 (Bankr. N.D. Tex. Aug. 24, 2020) (quoting *In re Montgomery*, 136 B.R. 727, 729 (M.D. Tenn. 1992)).[15] And because cash is fungible, it does not matter whether the dollars returned were the exact same dollars received. *See In re Cybridge Corp.*, 312 B.R. 262, 270-71 (D.N.J. 2004) (holding that, in factoring arrangement, preferential transfer of accounts receivable was "returned" by payment of cash).

---

[15] "The complaint alleged, among other things, that on March 14, 1988, Southland Escrow had a combined negative balance of $1,971,978.75 in all its Third National accounts; that Montgomery and Southland Escrow subsequently made several hundred deposits and withdrawals, with the total deposits exceeding the total withdrawals to such an extent that on May 25, 1988, Southland Escrow had a combined positive balance of $1,179.20 in its Third National accounts; that the aggregate of all the transfers from Southland Escrow to Third National caused the bank to recover all its losses to the prejudice of Southland Escrow's other creditors; that the transfers would enable the bank to recover more than it would otherwise be able to receive as a creditor; and that the aggregate of the transfers constituted a preferential transfer within the meaning of 11 U.S.C. § 547." *Id.*

54.    Further, to the extent funds were wired back before they even cleared, there could be no transfer because 2B Farms and HTLF lacked dominion or control over the funds. Before the McClain check cleared, such funds had already been wired back. Neither HTLF nor 2B Farms could put those funds to their own purposes because they had already been earmarked for return to the Debtors. Based on the Trustee's own allegations, the checks from McClain would not have been honored without the wires first arriving from 2B Farms. As a result, any control was illusory—had HTLF or 2B Farms attempted to put the funds to their own purpose instead of wiring them back, the funds would have vanished.

55.    The Trustee's claim to recover $274 million in fraudulent and preferential transfers should be dismissed. To the extent the Trustee seeks to replead a fraudulent or preferential transfer claim, he should account for funds that were contemporaneously returned to the Debtors.

### iv. The Ponzi scheme presumption does not apply because the Debtors' scheme was mixed with legitimate business activity.

56.    The Trustee identifies 283 transfers to 2B Farms or the Robinsons. Rather than seek to establish that any one of these transactions was fraudulent in particular, the Trustee seeks to apply a presumption that all transfers made by the Debtors were fraudulent.

57.    The Uniform Fraudulent Transfer Act addresses two types of fraud: (1) Actual fraud, which involves transfers made with actual intent to hinder, defraud, or delay creditors; and (2) Constructive fraud, which involves transfers made without reasonable equivalent value when the debtor is (or is at risk of becoming) insolvent. Tex. Bus. & Comm. Code §§ 24.005, 24.006.

58.    A traditional Ponzi scheme is insolvent from its inception. *See Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (citing *Cunningham v. Brown*, 265 U.S. 1, 7–8, 44 S.Ct. 424, 428, 68 L.Ed. 873 (1924)("He made no investments of any kind, so that all the money he had at

any time was solely the result of loans by his dupes.")). Such insolvency is sufficient to establish constructive fraud for transfers in which reasonably equivalent value was not provided.

59.    The Fifth Circuit has previously made broad holdings that the operation of a traditional Ponzi scheme, by itself, is sufficient to establish actual fraud. *See, e.g., Janvey v. Alguire,* 647 F.3d 585, 598 (5th Cir. 2011).  Such holdings appear to originate with *Warfield*, which cited *Scholes v. Lehmann*, a Seventh Circuit case, for this holding. *See Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (citing *Scholes v. Lehmann* 56 F.3d 750, 757 (7th Cir. 1995)). However, *Scholes* does not hold that a Ponzi scheme establishes actual fraud—it held that profits paid out of a Ponzi scheme were constructively fraudulent. *See* 56 F.3d at 757. And the insolvency intrinsic to a Ponzi scheme is only one of the "badges of fraud" that may be used to establish actual intent to defraud. *See* Tex. Bus. & Com. Code §§ 24.005(b)(9). When reviewing one of the *Janvey* cases, the Texas Supreme Court noted that while the propriety of the Ponzi Scheme Presumption was not before it, "[e]vidence of a single 'badge of fraud' does not conclusively demonstrate intent…." *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016). As a result, a general presumption of actual fraud in all transfers of any kind made during a Ponzi scheme is likely improper.

60.    Even if it were appropriate to presume fraudulent intent where a business is a traditional Ponzi scheme and insolvent from its inception, the Fifth Circuit has declined to extend this presumption to Ponzi-like schemes. *See In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2022 WL 2046144, at *4 (Bankr. N.D. Tex. June 3, 2022) (summarizing various holdings). Rather, the Fifth Circuit has engaged in the traditional "badges of fraud" analysis. *Id.* (citing, inter alia, *Stettner v. Smith (In re IFS Financial Corp.)*, 669 F.3d 255 (5th Cir. 2012)). Therefore, at least in the absence of a pure and traditional Ponzi scheme, actual fraud must be established by the relevant badges of fraud on the basis of each transaction at issue.

61.     In this case, the Trustee acknowledges that the Debtors had both legitimate and illegitimate operations. *Compl.* ¶¶ 16–19. The Complaint does not specify when the Debtors ceased their legitimate operations, if ever. *See Compl.* ¶ 19. Indeed, Debtors were still in possession of 8,000 head of cattle on February 28, 2023 and therefore still had some legitimate business activity. [Doc. 48 ¶110].  As a result, the Trustee cannot rely on the Ponzi scheme presumption to establish that every transaction entered by the Debtors was made with actual intent to hinder, delay, or defraud its creditors. Rather, he must establish the fraudulent nature of each transaction (individually or by class) using the statutory badges of fraud.

### v.  The Trustee fails to adequately allege actual or constructive fraud as to any particular transaction.

62.     Though acknowledging that at least part of the Debtors' operations legitimate, the Trustee asserts that all of the transfers from the Debtors to 2B Farms and the Robinsons were fraudulent. But the Trustee does not plead any details regarding the transactions between 2B Farms and the Debtors to establish either actual or constructive fraud for any particular transaction. Instead, the Trustee merely identifies transfers of funds.

63.     To assert a claim for constructive fraudulent transfer, the Trustee must show that transfers were made for "less than a reasonably equivalent value" or "without receiving a reasonably equivalent value in exchange." *See* 11 U.S.C. § 548(1)(B)(i); Tex. Bus. & Com. Code § 24.005(a)(2). The Trustee has failed to describe the transactions between 2B Farms and the Debtors in sufficient detail to allege that the payments to 2B Farms were not for reasonably equivalent value. Accordingly, the Complaint fails to state a claim for constructive fraudulent transfer.

64.     To establish actual intent to hinder, delay, or defraud creditors, the Trustee must allege the relevant badges of fraud:

(b)  In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:

(1)  the transfer or obligation was to an insider;

(2)  the debtor retained possession or control of the property transferred after the transfer;

(3)  the transfer or obligation was concealed;

(4)  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)  the transfer was of substantially all the debtor's assets;

(6)  the debtor absconded;

(7)  the debtor removed or concealed assets;

(8)  the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)  the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)  the transfer occurred shortly before or shortly after a substantial debt was incurred;  and

(11)  the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tex. Bus. & Com. Code § 24.005(b). Importantly, all of these badges of fraud relate to situations where a debtor is attempting to "defraud" creditors in their attempts to collect a debt by preventing the recovery of assets. The common law tort of fraud is a different type of fraud than that at issue in fraudulent transfers. The Trustee has failed to allege these badges of fraud with respect to the transfers to 2B Farms. Count XV should therefore be dismissed.

## CONCLUSION

Defendant HTLF respectfully requests that, pursuant to Federal Rule of Civil Procedure 12(b)(6) this Court dismiss the Trustee's Second Amended Adversary Complaint to the extent requested herein and grant all other relief to which HTLF might show itself justly entitled.

Dated this 31st day of July 2025.

Respectfully submitted,

**LOVELL ISERN & FARABOUGH, LLP**
John H. Lovell, SBN 12609300
112 SW 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314
Phone: (806) 373-1515
Fax:    (806) 379-7176
Email:  john@lovell-law.net

**MULLIN HOARD & BROWN, L.L.P.**
Matthew S. Merriott, SBN 24100846
500 South Taylor, Suite 800
P.O. Box 31656
Amarillo, Texas 79120-1656
Telephone:  (806) 372-5050
Facsimile:  (806) 372-5086
Email:  mmerriott@mhba.com

By:   /s/ *Matthew S. Merriott*
Matthew S. Merriott

*Attorneys for HTLF Bank, as Successor to
First Bank & Trust*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 31st day of July 2025, I electronically filed the foregoing document with the Northern District of Texas through its filing system through and that a true and correct copy was served on the parties listed through the electronic case filing system by email as registered with the electronic case filing system:

/s/ *Matthew S. Merriott*
Matthew S. Merriott