UNDERWOOD LAW FIRM, P.C.
Thomas C. Riney, SBN: 16935100
W. Heath Hendricks, SBN: 240556451
500 South Taylor, Suite 1200, LB 233
Amarillo, Texas 79101
Telephone: (806) 376-5613
Facsimile: (806) 379-0316
Email: tom.riney@uwlaw.com
Email: heath.hendricks@uwlaw.com

    *and*

Michael R. Johnson (*Pro Hac Vice*)
Matthew M. Cannon (*Pro Hac Vice*)
Austin C. Nate (*Pro Hac Vice*)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
Email:  mjohnson@rqn.com
Email:  mcannon@rqn.com
Email:  anate@rqn.com

*Attorneys for Rabo AgriFinance LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| In re:<br><br>MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.<br><br>    Debtors. | CASE NO. 23-20084-rlj7<br>Chapter No. 7<br><br>(Jointly Administered Cases) |
| KENT RIES, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATES OF MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.<br><br>    *Plaintiff,* | **ADV. PROC. NO. 25-02005**<br><br>Honorable Scott W. Everett |

| v.

COMMUNITY FINANCIAL SERVICES BANK; HTLF BANK; MECHANICS BANK; and RABO AGRIFINANCE LLC,

*Defendants.* | |

**RABO AGRIFINANCE LLC'S BRIEF IN SUPPORT OF
MOTION TO DISMISS TRUSTEE'S SECOND AMENDED ADVERSARY
COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 8, 9(b), 12(b)(1), and 12(b)(6), made applicable to this Adversary Proceeding by Rules 7008, 7009, and 7012 of the Federal Rules of Bankruptcy Procedure, and pursuant to 28 U.S.C. § 1404(a) and/or the doctrine of *forum non conveniens*, Defendant Rabo AgriFinance LLC ("**Rabo**"), through counsel, hereby submits this brief in support of its motion to dismiss *Trustee's Second Amended Adversary Complaint* (the "**Third Complaint**" or "**SAC**") filed by Kent Ries, Chapter 7 Trustee ("**Plaintiff**" or "**Trustee**").

## TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT ....................................................... 1

STANDARDS OF REVIEW AND CHOICE OF LAW ..................................... 3

ARGUMENT ................................................................................. 6

    I.     THE WRITTEN AGREEMENTS BETWEEN RABO AND
         DEBTORS DICTATE DISMISSAL OF PLAINTIFF'S STATE-LAW
         CLAIMS. ........................................................................ 6

         A.     The Court Can and Should Consider the Written Agreements. .......... 6

         B.     The Loan Agreements Contain Forum-Selection Clauses
               Dictating Dismissal or Transfer of the State-Law Claims. .................. 7

         C.     The Forbearance Agreement Bars Plaintiff's State-Law
               Claims. ................................................................... 12

    II.    THE STATE LAW CLAIMS SHOULD BE DISMISSED
         PURSUANT TO THE *IN PARI-DELICTO* DOCTRINE. ............................ 14

    III.   PLAINTIFF FAILS TO ALLEGE DAMAGES TO DEBTORS
         PROXIMATELY CAUSED BY RABO, DICTATING DISMISSAL
         OF THE STATE-LAW CLAIMS. ............................................... 19

    IV.   PLAINTIFF'S KNOWING PARTICIPATION IN BREACH OF
         FIDUCIARY DUTY CLAIM SHOULD BE DISMISSED. .......................... 20

    V.    PLAINTIFF'S CLAIM FOR BREACH OF FIDUCIARY DUTY
         FAILS FOR NUMEROUS REASONS. ........................................... 21

         A.     Rabo Owed No Fiduciary Duty to Debtors as a Matter of Law. ........ 21

         B.     Even if There Were a Duty, There Are No Facts Supporting a
               Breach. ................................................................... 24

    VI.   PLAINTIFF'S CLAIM FOR CIVIL CONSPIRACY IS WITHOUT
         MERIT AND IS NOT ASSERTED IN GOOD FAITH. ............................ 25

    VII.  PLAINTIFF'S CLAIM FOR PROFESSIONAL NEGLIGENCE
         FAILS. ........................................................................ 26

         A.     Rabo Owed No Duty as a Matter of Law. .................................. 26

         B.     The Claim is Barred by the Economic Loss Doctrine. ...................... 27

**VIII.**   **THE CLAIM FOR MONEY HAD AND RECEIVED IS WITHOUT
         MERIT.**...................................................................................................... 28

**IX.**    **PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES FAILS.** ..................... 28

**X.**     **THE COURT SHOULD DISMISS PLAINTIFF'S "CORE" CLAIMS.**........ 29

        **A.**    **Determination of Extent, Validity, and Priority of Lien.** .................... 29

        **B.**    **Plaintiff's Preference Claim Related to Rabo Loan Payments
               Fails to State a Claim Upon Which Relief May Be Granted.**.............. 31

        **C.**    **Plaintiff's Claim for Fraudulent Transfer Should Be
               Dismissed.** ............................................................................................ 33

        **D.**    **Plaintiff's Disallowance Claim Should Be Dismissed.** ........................ 36

        **E.**    **Plaintiff's Equitable Subordination Claim Must Be Dismissed.** ........ 37

**CONCLUSION** ........................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233 (5th Cir. 2009) .................................................... 5, 9

*Apache Corp. v. Dynegy Midstream Services, Ltd. Partnership*, 214 SW3d 554 (Tex. Ct. App. 2006) .................................................................................................................. 27

*Arias-Benn v. State Farm Fire & Cas. Ins. Co.*, 495 F.3d 228 (5th Cir. 2007).............................. 4

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................... 4, 37

*Askanase v. Fatjo*, 130 F.3d 657 (5th Cir. 1997) ......................................................................... 18

*Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49 (2013)................................................................................................................. 5, 8, 11, 12

*Bank of Am., N.A. v. Corporex Realty & Inv., LLC*, 875 F. Supp. 2d 689 (E.D. Ky. 2012)......... 23

*Bayou Superfund, LLC v. WAM Long/Short Fund II, LP (In re Bayou Group, LLC)*, 362 B.R. 624 (Bankr. S.D.N.Y. 2007).................................................................................... 36

*Bertrand v. White*, No. 1:09-CV-358, 2009 WL 10682257 (E.D. Tex. July 7, 2009)................. 25

*Brand Coupon Network, LLC v. Catalina Mktg. Corp.,* 748 F.3d 631 (5th Cir. 2014)................. 6

*CapRock Milling & Crushing, LLC v. Perdue Agribusiness LLC*, No. 2:24-CV-G38-Z, 2024 WL 4582903 (N.D. Tex. Oct. 25, 2024)............................................................................ 8

*Clark v. Amoco Prod. Co.*, 784 F.2d 967 (5th Cir. 1986)........................................................... 14

*Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164 (Tex. 2009).............. 27

*Elson v. Black*, 56 F.4th 1002 (5th Cir. 2023) ............................................................................. 4

*FDIC v. Ernst & Young*, 967 F.2d 166 (5th Cir. 1992) .............................................................. 18

*Finn v. Alliance Bank*, 860 N.W.2d 638 (Minn. 2015)............................................................... 35

*Gann v. Anheuser-Busch, Inc.*, 394 S.W.3d 83 (Tex. App. 2012)............................................... 26

*Gen. Car & Truck Leasing Sys., Inc. v. Lane & Waterman*, 557 N.W.2d 274 (Iowa 1996) ........ 14

*Greatbatch v. Metro. Fed. Bank*, 534 N.W.2d 115 (Iowa Ct. App. 1995) .................................. 22

*Highland Cap. Mgmt., L.P. v. UBS Secs LLC (In re Lyondell Chem. Co.)*, 491 B.R. 41 (Bankr. S.D.N.Y. 2013) ......................................................................................... 6, 9

*Holt v. FDIC (In re CTS Truss, Inc.)*, 868 F.2d 146 (5th Cir. 1989) ............................................. 38

*Houle v. Casillas*, 594 S.W.3d 524 (Tex. Ct. App. 2019) ............................................................. 22

*Hunt v. Baldwin*, 68 S.W.3d 117 (Tex. App. 2001) ...................................................................... 25

*In re Black Elk Energy Offshore Ops., LLC*, 649 B.R. 249 (S.D. Tex. 2023) ............................. 18

*In re Boyd*, No. 11-51797, 2012 WL 5199141 (W.D. Tex. Oct. 22, 2012) .................................. 15

*In re Chris Pettit & Assocs., P.C.*, 2025 WL 1583366 (Bankr. W.D. Tex. June 4, 2025) ..... 21, 27

*In re Clark Pipe & Supply Co.*, 893 F.2d 693 (5th Cir. 1990) ...................................................... 38

*In re Fabricators, Inc.*, 962 F.2d 1458 (5th Cir. 1991) ................................................................ 38

*In re Hedged-Invs. Assocs., Inc.*, 84 F.3d 1281 (10th Cir. 1996) ................................................ 16

*In re Hutcheson Med. Ctr., Inc.*, No. 14-42863-PWB, 2017 WL 4536076 (Bankr. N.D.
      Ga. Oct. 6, 2017) ............................................................................................................ 8

*In re ICPW Liquidation Corp.*, 600 B.R. 640 (Bankr. C.D. Cal. 2019) ...................................... 12

*In re LMI Legacy Holdings, Inc.*, 553 BR. 235 (Bankr. D. Del. 2016) ......................................... 8

*In re Manchester, Inc.*, 417 B.R. 377 (Bankr. N.D. Tex. 2009) .................................................... 8

*In re PA Co-Man, Inc.*, 644 B.R. 553 (Bankr. W.D. Pa. 2022) ................................................. 6, 9

*In re Pearlman*, 440 B.R. 569 (Bankr. M.D. Fla. 2010) ............................................................. 35

*In re Reagor-Dykes Motors, LP*, 2022 WL 1046144 (Bankr. N.D. Tex. June 3, 2022) ............... 34

*In re Seven Seas Petroleum, Inc. v. CIBC World Mkts. Corp.*, No. H-08-3048, 2013 WL
      3803966 (S.D. Tex. July 19, 2013) ................................................................................ 15

*In re Upper Crust, LLC*, 554 B.R. 23 (D. Mass. 2016) ............................................................... 12

*In re Wedgewood Props., LLC*, 661 B.R. 578 (Bankr. W.D. Mich. 2024) ................................... 35

*Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560 (Tex. 2016) ........................................................ 36

*Jones v. Thompson*, 338 S.W.3d 573 (Tex. Ct. App. 2010) ......................................................... 22

*Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955 (5th Cir. 2012) ..................................... 14, 15, 16

*Koesler v. Beneficial Fin. I, Inc.*, 267 F. Supp. 3d 873 (W.D. Tex. 2016) ................................... 17

*Kurth v. Van Horn*, 380 N.W.2d 693 (Iowa 1986) ...................................................................... 22

*Lane ex rel. Lane v. Halliburton*, 529 F.3d 548 (5th Cir. 2008) ..................................................... 5

*Law v. Siegel*, 571 U.S. 415 (2014) ............................................................................................... 16

*Lovelace v. Software v. Spectrum, Inc.*, 78 F.3d 1015 (5th Cir. 1996) ........................................... 6

*Martinez v. Capital One*, Case No. H-22—2767, 2022 WL 17085938 (S.D. Tex. Hous. Div. Nov. 18. 2022) ....................................................................................................... 24

*Mays v. First State Bank of Keller*, 247 S.W. 845 (Tex. Ct. App. 1923) ..................................... 18

*MC Asset Recovery LLC v. Commerzbank A.G.*, 675 F.3d 530 (5th Cir. 2012) ............................ 5

*McNally & Nimergood v. Neumann-Kiewit Constructors, Inc.*, 648 N.W.2d 564 (Iowa 2002) ................................................................................................................................... 14

*Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634 (5th Cir. 2007) .............................................. 20

*Off. Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145 (11th Cir. 2006) ................................................................................................................................... 15

*Perkins v. Haines (In re International Mgmt. Assocs., LLC)*, 661 F.3d 623 (11th Cir. 2011) ................................................................................................................................... 35

*Phillips v. Super Servs. Holdings, LLC*, 189 F. Supp. 3d 640 (S.D. Tex. 2016) ......................... 26

*Qmect, Inc. v Burlingame Capital Partners II, LP*, 373 B.R. 682 (N.D. Cal. 2007) .................... 30

*Quinn ex rel. CryptoMetrics, Inc. v. Scantech Identifications Beam Sys. LLC*, No. 5:13-834, 2019 WL 136823 (W.D. Tex. Jan. 8, 2019) ..................................................... 15

*Reed v. City of Arlington*, 650 F.3d 571 (5th Cir. 2011) ........................................................ 12, 15

*Robbins v. Payne*, 55 S.W.3d 740 (Tex. App. Ct. 2001) .............................................................. 28

*Robinson v. Dist. of Columbia,* 736 F. Supp. 2d 254 (D.D.C. 2010) .............................................. 7

*Rogers v. McDorman*, 521 F.3d 381 (5th Cir. 2008) ................................................................... 18

*Safeshred, Inc. v. Martinez*, 365 S.W.3d 655 (Tex. 2012) .......................................................... 29

*Sallee v. Fort Knox Nat'l Bank, N.A.*, 286 F.3d 878 (6th Cir. 2002) ........................................... 22

*Sharpe v. Turley*, 191 S.W.3d 362 (Tex. Ct. App. 2006) ............................................................ 15

*Steelvest, Inc. v. Scansteel Serv. Ctr.*, 807 S.W.2d 476 (Ky. 1991) ............................................ 22

*Steward v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271 (Del. Ch. 2015) ................................. 18

*Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856 (Tex. App.—El Paso 2021, no pet.) ................................................................................................................. 26

*Terry v. Texas Partners Bank (In re Chris Pettit & Assocs., P.C.)*, 2025 WL 1583366 (Bankr. W.D. Tex. June 4, 2025) ........................................................................... 20

*Thompson v. Kaczinki*, 744 N.W.2d 829 (Iowa 2009) .................................................. 26

*Thurman v. Med. Transportation Mgmt., Inc.*, 982 F.3d 953 (5th Cir. 2020) ................ 4

*U.S. ex rel, Willard v. Humana Health Plan of Tex., Inc.,* 336 F.3d 375 (5th Cir. 2003) ............. 6

*UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia,* 581 F.3d 210 (5th Cir. 2009) .................... 11

*United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365 (5th Cir. 2017) ........................... 4

*W.F. Potts Son & Co. v. Cochrane*, 59 F.2d 375 (5th Cir. 1932) ................................. 16

*Walch v. Adjutant Gen.'s Dep't of Tex.*, 533 F.3d 289 (5th Cir. 2008) .......................... 5

*Weltzin v. Cobank, ACB*, 633 N.W.2d 290 (Iowa 2001) ....................................... 22, 26

*Wil-Roye Investment Co. II and Renewable Investments Inc. v. Washington Mutual Bank, FA*, 142 S.W.3d 393 (Tex. Ct. App. 2004) ................................................ 22, 23, 24

*York v. Petzl Am., Inc.*, 353 S.W.3d 349 (Ky. Ct. App. 2010) .................................. 14

**Statutes**

11 U.S.C. § 105(a) ....................................................................................................... 29

11 U.S.C. § 502(b)(1) .................................................................................................. 29

11 U.S.C. § 502(d) ................................................................................................. 29, 36

11 U.S.C. § 510(c)(1) ................................................................................................... 29

11 U.S.C. § 541(a) ....................................................................................................... 16

11 U.S.C. § 541(a)(1) .............................................................................................. 16, 20

11 U.S.C. § 546(a)(1) ................................................................................................... 31

11 U.S.C. § 547 ...................................................................................................... 29, 31

11 U.S.C. § 547(b) ....................................................................................................... 29

11 U.S.C. § 548 (a) (1)(B) ....................................................................................... 29, 34

11 U.S.C. § 548(a)(1)(A) ............................................................................................. 29

11 U.S.C. § 548(d)(2)(A) ........................................................................................ 34

11 U.S.C. § 550 .................................................................................................. 29, 31

11 U.S.C. § 551 ....................................................................................................... 29

28 U.S.C. § 1404(a) ......................................................................................... ii, 4, 7

Tex. Bus. & Comm. Code § 24.004(a) ................................................................... 34

**Rules**

Fed. R. Bankr. P. 7008 ........................................................................................ ii, 3

Fed. R. Bankr. P. 7009 ........................................................................................ ii, 3

Fed. R. Bankr. P. 7012 ........................................................................................ ii, 3

Fed. R. Bankr. P. 7012(b) ........................................................................................ 3

Fed. R. Civ. P. 12(b)(1) ...................................................................................... ii, 4, 5

Fed. R. Civ. P. 12(b)(6) ................................................................................ ii, 2, 3, 4, 5

Fed. R. Civ. P. 8 .................................................................................................. ii, 3

Fed. R. Civ. P. 8(a)(2) .............................................................................................. 4

Fed. R. Civ. P. 9(b) ................................................................ ii, 2, 3, 4, 21, 25, 39

Fed. R. Civ. P. 56 ..................................................................................................... 7

## SUMMARY OF THE ARGUMENT

The factual foundation for Plaintiff's claims against Rabo is as follows: Rabo repeatedly ignored red flags when providing loan funds to Debtors, who used those funds to expand a fraudulent scheme, and that scheme would have collapsed sooner had Rabo not ignored the red flags. With respect to damages, Plaintiff alleges that "[b]y the time the scheme came to an end, those damages grew to exceed $170M, as evidenced by the volume of claims asserted by creditors against the Debtors in this bankruptcy proceeding." (SAC ¶ 167.) These allegations do not and cannot support Plaintiff's claims in this case as a matter of law.

In his third attempt to assert cognizable claims against Rabo, Plaintiff asserts six "state law" or "non-core" claims and six "bankruptcy" or "core" claims. The state law claims include: (I) Knowing Participation in Breach of Fiduciary Duties; (II) Breach of Fiduciary Duty; (III) Common-Law Civil Conspiracy; (IV) Professional Negligence; (V) Punitive Damages; and (XI) Money Had and Received. Plaintiff's bankruptcy claims include: (VI) Determination of Extent, Validity, and Priority of Lien; (VII) Avoidance of Deposit Account Control Agreement; (VIII) Preferential Payments; (IX) Fraudulent Transfer; (X) Disallowance of Claim; and (XII) Equitable Subordination. The Court should dismiss the claims.

First, Plaintiff's six state-law claims should be dismissed pursuant to the written agreements between Rabo and Debtors. Rabo's lending relationship with and loans to Debtors form the foundation for Plaintiff's state-law claims, and Plaintiff stands in the Debtors' shoes in asserting these claims. The controlling loan agreements contain express forum selection provisions providing that claims related to or arising directly or indirectly from the agreements must be litigated in Iowa. Furthermore, the claims should be dismissed pursuant to the Forbearance

Agreement repeatedly referenced by Plaintiff in his Complaint because Debtors waived and released these claims in that agreement.

Second, the Trustee has repeatedly and consistently alleged and acknowledged that the Debtors operated a fraudulent scheme. Because the Trustee is standing in the shoes of the Debtors here, these allegations and admissions dictate dismissal of Plaintiff's state-law claims under the doctrine of *in pari delicto*.

Third, the Court should dismiss all state-law claims because Plaintiff has failed to allege facts demonstrating Debtors were damaged by Rabo's actions, an essential element for each of the claims. Plaintiff's reliance on the creditors' bankruptcy claims against Debtors is not only insufficient to support Debtors' damages, but it raises serious concerns about the Trustee's capacity/right to even attempt to assert these claims.

Fourth, each of the state-law claims should be dismissed for additional reasons under 12(b)(6) and/or 9(b) given Plaintiff's failure to allege facts supporting the necessary elements for each of those claims. For example, Plaintiff's intentional tort claims generally fail for lack of allegations supporting Rabo's knowledge of the fraudulent scheme. Plaintiff also fails to allege facts that would create or support the purported duties owed by Rabo to Debtors, let alone Rabo's breaches of those duties.

Fifth, all of Plaintiff's "bankruptcy" or "core" claims are defective for additional reasons, including Plaintiff's failure to allege facts supporting the essential elements for each of those claims. One of the fatal flaws plaguing many of these claims is the Trustee's unsupported and otherwise unjustified treatment of Rabo as an "investor" as opposed to the Debtors' lender.

Despite well over a year of discovery, the benefit of defendants' prior motions to dismiss, and two prior drafts, Plaintiff has failed to allege cognizable claims against Rabo. Troublingly,

many of the new allegations in the current pleading do not appear to be relevant to any of the Trustee's claims. Instead, they are a transparent and misguided attempt to defame Rabo and otherwise extort a potential settlement. Mr. Ries's direct interactions and communications with Rabo and its counsel in this case have been polite, professional, and largely productive, even where there was strong disagreement on the issue being discussed. These interactions stand in stark contrast to the acerbic tone and bombastic allegations of the Third Complaint. Alleging that "Rabo's actions here are consistent with Rabo's long-established corrupt practices," that "Rabo's actions shout 'culpability' loud enough to shatter windows," or calling Rabo the "big, bad lender," is not befitting of a federal court filing, does not align with Rabo's interactions with Mr. Ries, and fails to reflect that Rabo itself lost over $50,000,000 as a defrauded lender due to Debtors' actions. Nor does devoting numerous pages to discussing the conduct (from over a decade ago) of a non-party (former) Rabo affiliate, or allegations made against Rabo in pleadings in unrelated cases. Rabo hopes that any future filings by the Trustee's counsel would be more aligned with the professionalism previously displayed by Mr. Ries and more commensurate with what Rabo believes are the expectations of this Court.

In any event, for the reasons outlined herein and in the motions to dismiss filed by Rabo's co-defendants, the Third Complaint fails and should be dismissed.

## **STANDARDS OF REVIEW AND CHOICE OF LAW**

### *Fed. R. Civ. P. 8, 9(b), and 12(b)(6)*

Most of the Motion seeks dismissal of Plaintiff's claims pursuant to Rules 8, 9, and/or 12(b)(6) of the Federal Rules of Civil Procedure, which rules apply to adversary proceedings pursuant to Rules 7008, 7009, and 7012 of the Federal Rules of Bankruptcy Procedure. *See* Fed. Bank. R. 7008, 7009, & 7012(b). To state a claim for relief, Rule 8 requires that a pleading contain

"a short and plain statement of the claim showing that the pleader is entitled relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) governs dismissals for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Furthermore, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief." *Id.* (citation modified). Although courts accept "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff" in analyzing a Rule 12(b)(6) motion, "a complaint may be dismissed if it clearly lacks merit—for example, where there is 'an absence of law to support a claim of the sort made.'" *Thurman v. Med. Transp. Mgmt., Inc.*, 982 F.3d 953, 955–56 (5th Cir. 2020) (citation modified). Moreover, courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Arias-Benn v. State Farm Fire & Cas. Ins. Co.*, 495 F.3d 228, 230 (5th Cir. 2007) (citation modified).

There are certain claims, such as those based on fraud, that require factual allegations that satisfy the heightened pleading requirement under Rule 9(b) of stating with particularity the circumstances constituting the claim. Fed. R. Civ. P. 9(b). "This requires, at a minimum, that a plaintiff plead the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 371 (5th Cir. 2017) (citation modified). And if a plaintiff fails to satisfy this pleading standard, "[t]he application of Rule 9(b) is . . . fatal" to the claims, and they must be dismissed. *Elson v. Black*, 56 F.4th 1002, 1008 (5th Cir. 2023).

### *28 U.S.C. § 1404(a) & Fed. R. Civ. P. 12(b)(1)*

With respect to Rabo's arguments based on the forum-selection clause, the United States Supreme Court has explained that "the appropriate way to enforce a forum-selection clause

pointing to a state or foreign forum is through the doctrine of *forum non conveniens*" and that "Section 1404(a) is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional remedy of outright dismissal with transfer." *Atl. Marine Const. Co., Inc. v. U.S. Dist. C. for W. Dist. of Tex.*, 571 U.S. 49, 60 (2013). As to the question of whether this portion of the Motion falls under 12(b)(1) and/or 12(b)(6), it does not appear that there is a settled answer. *See id.* at 61; *see also Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 237 n.1 (5th Cir. 2009) ("This court on at least three previous occasions has declined to address the enigmatic question of whether motions to dismiss on the basis of forum selection clauses are properly brought as motions under [F.R.C.P.] 12(b)(1) [or] 12(b)(3).") (cleaned up). Under Rule 12(b)(1), "the court is permitted to look at evidence in the record beyond simply those facts alleged in the complaint and its proper attachments." *Id.* at 238 (cleaned up); *see also Lane ex rel. Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008); *Walch v. Adjutant Gen.'s Dep't of Tex.*, 533 F.3d 289, 293 (5th Cir. 2008).

### Choice of Law – Texas, Kentucky, and Iowa

The Trustee asserts state-law claims arising under Texas (or Kentucky) law. (*See generally* SAC ¶¶ 117–170.) Based on the Trustee's allegations, however, these claims also implicate the laws of Iowa. (*See* SAC ¶¶ 29, 35, 46, 49 (addressing Rabo's commercial lending relationship with Debtors and citing Rabo's Proof of Claim, which claim includes the loan agreements implicating Iowa law). However, identifying which state's law applies to each claim is only necessary if the laws actually conflict. *See, e.g., MC Asset Recovery LLC v. Commerzbank A.G.*, 675 F.3d 530, 536-37 (5th Cir. 2012). With limited exceptions (which will be addressed as appropriate below),

the potentially applicable laws for Plaintiff's state-law claims do not appear to conflict. But

regardless of what state's law applies, the Plaintiff's claims all fail as outlined herein.

## ARGUMENT

**I.   THE WRITTEN AGREEMENTS BETWEEN RABO AND DEBTORS DICTATE DISMISSAL OF PLAINTIFF'S STATE-LAW CLAIMS.**

### A.   The Court Can and Should Consider the Written Agreements.

"On a motion to dismiss, the court may properly consider the documents attached to or

incorporated by reference in the plaintiff's complaint, facts of which judicial notice may be taken,

and matters of public record." *U.S. ex rel, Willard v. Humana Health Plan of Tex., Inc.,* 336 F.3d

375, 379 (5th Cir. 2003) (citation modified); *Lovelace v. Software v. Spectrum, Inc.*, 78 F.3d 1015,

1017-18 (5th Cir. 1996) (same); *Brand Coupon Network, LLC v. Catalina Mktg. Corp.,* 748 F.3d

631, 635 (5th Cir. 2014); *see also In re PA Co-Man, Inc.*, 644 B.R. at 617-618 (holding that court

could consider debtor's prepetition release on a motion to dismiss because the contractual

relationship of the parties was "integral to the plaintiff's claim" and "plaintiff has had notice of the

documents' contents"); *Highland Cap. Mgmt., L.P. v. UBS Secs LLC (In re Lyondell Chem. Co.)*,

491 B.R. 41, 50 n.48 (Bankr. S.D.N.Y. 2013), *aff'd*, 505 B.R. 409 (S.D.N.Y. 2014) ("But if the

plaintiff . . . knows about [the extrinsic documents] and intentionally chooses to disregard [them],

a moving defendant may still rely on that extrinsic matter in moving to dismiss, and the Court need

not subject that defendant, and the Court system, to the additional expenses and burden considering

the same matter later on a motion for summary judgment.").

Rabo's lending relationship and loans to Debtors is at the core of nearly all of Plaintiff's

claims. (*See generally* SAC.) Plaintiff references and relies on Rabo's decision to enter a lending

relationship with Debtors, and the subsequent decisions to extend the line of credit and otherwise

provide funds pursuant to those agreements. (SAC ¶¶ 30, 61-73.) Plaintiff also repeatedly

references the Forbearance Agreement executed by Rabo and Debtors, relies on that agreement in support of its conspiracy claim, and even seeks to avoid it. (SAC ¶¶ 73, 112, 154, ¶ 190.) The Forbearance Agreement was produced to the Trustee and other parties in these bankruptcy proceedings on September 27, 2024, and the Loan Agreements are attached to Rabo's Proofs of Claim, which Proofs of Claim are specifically referenced and attacked by Plaintiff. (SAC ¶¶ 180, 195-97.) Accordingly, given Plaintiff's repeated references and reliance on the loan agreements, the dispositive nature of the contractual provisions at issue, and Plaintiff's knowledge of these agreements, the Court can and should consider these agreements within the context of Rule 12(b)(6).

In the alternative, the Court could consider this portion of the Motion to be made pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See, e.g., Robinson v. Dist. of Columbia,* 736 F. Supp. 2d 254, 263 (D.D.C. 2010) ("When a motion to dismiss is combined with a motion for summary judgment and outside matters are considered by the court with respect only to the latter motion, the district judge may dispose of the motion either under Rule 56 or may limit its disposition to the motion to dismiss.").

### B.    The Loan Agreements Contain Forum-Selection Clauses Dictating Dismissal or Transfer of the State-Law Claims.

The Plaintiff's state law claims against Rabo should be dismissed and/or transferred pursuant to 28 U.S.C. § 1404(a) and/or the doctrine of *forum non conveniens* because the claims are subject to forum-selection clauses in the controlling agreements between Rabo and Debtors.

The United States Supreme Court, in a unanimous decision, instructed that "[w]hen the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause" and "[o]nly under extraordinary circumstances unrelated

to the convenience of the parties should a § 1404(a) motion be denied." *Atl. Marine Const. Co., Inc. v. U.S. Dist. C. for W. Dist. of Tex.*, 571 U.S. 49, 62 (2013). The Court continued:

> When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations. A forum-selection clause, after all, may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; it may, in fact, have been a critical factor in their agreement to do business together in the first place. In all but the most unusual cases, therefore, 'the interest of justice' is served by holding parties to their bargain.

*Id.* at 64. These same standards apply to bankruptcy cases. *See In re Manchester, Inc.*, 417 B.R. 377, 385 (Bankr. N.D. Tex. 2009) ("With respect to 'non-core' matters, forum selection clauses are enforceable to the same extent that they are enforceable outside of bankruptcy."). Accordingly, a forum selection clause is "presumptively enforceable" to non-core claims brought in bankruptcy court unless the resisting party meets the "'heavy burden' of demonstrating that enforcement of the forum selection clause would be unreasonable." *CapRock Milling & Crushing, LLC v. Perdue Agribusiness LLC*, No. 2:24-CV-G38-Z, 2024 WL 4582903, at *5 (N.D. Tex. Oct. 25, 2024) (quoting *In re Manchester*, 417 B.R. at 387). The same goes for claims asserted by a trustee when the trustee is standing in the debtor's shoes; i.e., if the debtor agreed to litigate in a forum, the trustee is equally bound. *See In re Manchester*, 417 B.R. at 386–88 (enforcing forum selection clause against trustee); *In re LMI Legacy Holdings, Inc.*, 553 BR. 235, 246 (Bankr. D. Del. 2016) (same); *In re Hutcheson Med. Ctr., Inc.*, No. 14-42863-PWB, 2017 WL 4536076, at *10 (Bankr. N.D. Ga. Oct. 6, 2017) (explaining that for purposes of forum selection clause, "the Trustee stands in the shoes of [the Debtor]").

Unlike a court's "typical" analysis under a 1404(a) or *forum non conveniens* motion, courts addressing a forum-selection clause *do not* give any weight to the plaintiff's choice of forum and *do not* consider arguments about the parties' private interests. *See Atl. Marine*, 517 U.S. at 63-64.

Instead, the courts "may consider arguments about public-interest factors only." *Id.* at 64. The "[p]ublic-interest factors may include the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having a trial of a diversity case in a forum that is at home with the law." *Id.* at 62 n.6 (citation modified). Given those factors, the *Atlantic Marine* Court stated:

> Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases. Although it is conceivable in a particular case that the district court would refuse to transfer a case notwithstanding the counterweight of a forum selection clause, such cases will not be common.

*Id.* at 62 (citation modified). The party acting in violation of the forum-selection clause "must bear the burden of showing that public-interest factors *overwhelmingly* disfavor a transfer." *Id.* (emphasis added.)

Many of the key agreements between Rabo and Debtors are attached to Rabo's three Proofs of Claim, including the Proof of Claim cited by the Trustee in the Complaint. (*See* Proof of Claim, App. 1-204, cited by Plaintiff at SAC ¶ 146.) These agreements contain express forum selection provisions that the Court can and should consider with this Motion.[1] As to the specific agreements, Rabo and Debtors entered into various Master Credit Agreements ("**MCA**"), with Rabo as "Lender" and Debtors as the borrower or "Party." (App. 11-39.) The MCA provides that the "Governing Law State" is Iowa and contains, in part, the following forum-selection provision:

> **12.10    Jurisdiction and Venue** PARTY HEREBY AGREES THAT ALL ACTIONS OR PROCEEDINGS INITIATED BY PARTY AND ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT SHALL BE LITIGATED IN ANY CIRCUIT COURT OR UNITED STATES DISTRICT COURT OF THE GOVERNING LAW STATE, OR, IF LENDER INITIATES

---

[1] *See Ambraco, Inc.*, 570 F.3d at 237 (court can consider outside materials in connection with a 12(b)(1) argument); *see also In re PA Co-Man, Inc.*, 644 B.R. at 617-618; *Highland Cap. Mgmt., L.P.*, 491 B.R. at 50 n.48. The identical agreements are also contained in Proof of Claim No. 52, Case No. 23-20086, and Proof of Claim No. 56, Case No. 23-20084.

SUCH ACTION, ANY COURT IN WHICH LENDER SHALL HAVE JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY LENDER IN ANY SUCH COURTS, AND HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS AN COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREES THAT SERVICE OF SUCH SUMMONS AND COMPLAINT OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO PARTY AT THE ADDRESS TO WHICH NOTICES ARE TO BE SENT PURSUANT TO THIS AGREEMENT[.] PARTY WAIVES ANY CLAIM THAT THAT GOVERNING LAW STATE IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE . . . . THE EXCLUSIVE CHOICE OF FORUM FOR PARTY SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT BY LENDER OF ANY JUDGMENT OBTAINED IN ANY OTHER FORUM OR THE TAKING BY LENDER OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE JURISDICTION, AND PARTY HEREBY WAIVES THE RIGHT, IF ANY, TO COLLATERALLY ATTACK ANY SUCH JUDGMENT OR ACTION.

(App. 17; *see also* Joinders at App. 23 & 25.)

The Debtors, as "Grantors," and Rabo, as "Beneficiary," also executed various Deeds of Trust. (App. 41-143.) The Deeds of Trust each contain the following provision:

    **41.**    **JURISDICTION AND VENUE**  GRANTOR IRREVOCABLY AGREES THAT, AT THE OPTION OF THE BENEFICIARY, ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS DEED OF TRUST OR ANY OTHER TRANSACTION DOCUMENT WILL BE LITIGATED IN THE IOWA DISTRICT COURT FOR BLACK HAWK COUNTY, IOWA, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA. GRANTOR IRREVOCABLY CONSENSTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

(App. 53, 100-01 & 127.) This same forum-selection clause is also contained in the Master Security Agreements ("**MSA**") executed by Debtors and Rabo. (*See* App. 153. The MSA, Deeds of Trust, and MCA shall collectively be referred to herein as the "**Loan Agreements**").

The forum-selection provisions in the Loan Agreements are clearly mandatory in nature as they require claims filed by the Debtors, or by Trustee standing in their shoes, to be asserted only

in the Governing Law State of Iowa. (App. 17, 53, 100-01, 127, 153; *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia,* 581 F.3d 210, 219 (5th Cir. 2009) (a mandatory forum selection clause requires that all litigation be conducted in a specified forum).) The provisions are also extremely broad, encompassing all claims that directly or *indirectly* arise from or otherwise relate to the Loan Agreements. (App. 17, 53, 100-01, 127 & 153.) Plaintiff's state-law claims fall squarely under these provisions, with Plaintiff relying exclusively on Rabo's role and actions as the lender to Debtors as the basis for his claims. (*See generally* SAC.) Accordingly, the only question before the Court is whether Debtors can demonstrate that this case is one of those "extraordinary" and "most unusual" circumstances where the forum selection provisions should be disregarded. *See Atlantic Marine*, 517 U.S. at 62-64.

Based on the agreements and facts at issue, the Trustee cannot meet his heavy burden of demonstrating that "the public-interest factors overwhelmingly disfavor a transfer." *Id.* at 64. The three examples cited by the *Atl. Marine* Court provide Plaintiff with no help here. *See id.* at 62 n.6 (citing administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having a trial of a diversity case in a forum that is at home with the law). The forum selection clauses at issue are clear, unambiguous, and part of commercial transactions involving sophisticated parties. (App. 11-204.) Furthermore, with the negotiation and execution of each of the documents comprising the Loan Agreements, Debtors confirmed their intentions to be bound by this provision. (*See generally id.*) This case is not limited to "local"—i.e., Texas—interests. The Debtors operated in *both* Texas and Kentucky, and their investors were all over the country. Rabo is a Delaware corporation with its principal place of business in St. Louis, and with its legal offices located in both Missouri and Iowa. To

refuse to enforce those provisions here would be in direct violation of the clear standard and directions provided by the United States Supreme Court. *See Atlantic Marine*, 517 U.S. at 61-64.

Finally, looking at administrative efficiencies, it should go without saying that the United States District Court for the Northern District of Iowa may be a more administratively efficient forum to consider these non-core claims because this Court, as an Article 1 court, may be limited to making reports and recommendations on the claims, whereas the Iowa federal district court, as an Article III court, could enter final rulings on the claims. The same is true of Iowa's general jurisdiction state courts.

Accordingly, the Court should dismiss the state-law claims (for potential re-filing in Iowa state court) or transfer the state law claims to Iowa federal district court.

### C.    The Forbearance Agreement Bars Plaintiff's State-Law Claims.

The Trustee's state-law, non-core claims against Rabo fail because they were all released on April 12, 2023—a date *after* all the alleged conduct cited in purported support of Plaintiff's claims. (*See generally* SAC.) "[A] trustee receives causes of action subject to [any] defenses that could have been raised against the debtor" pre-petition. *Reed v. City of Arlington*, 650 F.3d 571, 575 (5th Cir. 2011). Accordingly, because the Debtors' release would have prevented them from bringing the claims pre-petition, the release is equally effective against the Trustee. *See In re ICPW Liquidation Corp.*, 600 B.R. 640, 659 (Bankr. C.D. Cal. 2019) ("Thus, if a cause of action is released by the debtor prepetition, it will not be a 'legal or equitable interest of the debtor in property as of the commencement of the case.'" (quoting 11 U.S.C. § 541(a)(1))); *see also In re Upper Crust, LLC*, 554 B.R. 23, 32–35 (D. Mass. 2016) (explaining that while prepetition releases bar claims brought under Section 541(a)(1), they do not affect the trustee's avoidance powers).

In this case, Debtors agreed to a release and waiver of claims in the Forbearance Agreement as follows:

> 5.      Release and Waiver of Claims.   THE LOAN PARTIES, JOINTLY AND SEVERALLY, BOTH FOR THEMSELVES AND FOR ALL PERSONS OR ENTITIES CLAIMING BY, THROUGH OR UNDER THEM, HEREBY WAIVE, RELEASE AND FULLY DISCHARGE RAF, AND RAF'S PARENTS, SUBSIDIARIES, AFFILIATES, PREDECESSORS, SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS, ATTORNEYS, EMPLOYEES AND REPRESENTATIVES (COLLECTIVELY, THE "**RELEASED PARTIES**") FROM ANY AND ALL MANNER OF CLAIMS, ACTIONS, CAUSES OF ACTION IN LAW OR IN EQUITY, SUITS, DEBTS, LIENS, CONTRACTS, LIABILITIES, CLAIMS, DEMANDS, DAMAGES, LOSSES, FEES, COSTS, EXPENSES, SET OFFS, OR CLAIMS FOR RECOUPMENT, OF ANY NATURE WHATSOEVER, KNOWN OR UNKNOWN, FIXED OR CONTINGENT THAT ANY OF THEM HAVE OR MAY HAVE OR CLAIM AGAINST THE RELEASED PARTIES, FROM THE BEGINNING OF TIME TO THE CLOSING DATE, BASED UPON ANY CONDUCT, CLAIMS, ACTIONS OR OMISSIONS OF THE RELEASED PARTIES RELATING OR PERTAINING IN ANY WAY TO THE LOANS, THE LOAN DOCUMENTS, THE RABO COLLATERAL, THE RAF INDEBTEDNESS, OR THE NEGOTIATIONS RELATING TO THIS AMENDMENT AND THE OTHER DOCUMENTS EXECUTED IN CONNECTION WITH THIS AMENDMENT OR THE FORBEARANCE AGREEMENT AND ANY OTHER INSTRUMENTS AND AGREEMENTS EXECUTED BY ANY LOAN PARTY IN CONNECTION WITH EITHER THE LOAN DOCUMENTS, THE FORBEARANCE AGREEMENT OR THIS AMENDMENT, OR ANY OTHER ACT OR OMISSION THAT HAS OCCURRED PRIOR TO THE CLOSING DATE, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS OR CAUSES OF ACTION FOR USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR CONTRACT OR AT EQUITY, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION.

(App. 211.) The Trustee stands in the Debtors' shoes in asserting his state-law claims. The Debtors therefore released all claims against Rabo "based upon any conduct, claims, actions or omissions . . . relating or pertaining in any way to the loans." (*Id.* (all-caps removed).) That release plainly applies to the claims the Trustee now attempts to assert on the Debtors' behalf. As alleged, the Trustee seeks to hold Rabo liable for its role in the underlying fraud—arising exclusively out of its role as lender to the Debtors. Accordingly, because the Trustee is bound by the Debtors' pre-

petition release and waiver, his state law claims as alleged in the complaint necessarily fail.[2] The only claims not released or waived would be claims that only the Debtors' bankruptcy estates would have, e.g., Chapter 5 claims and the equitable subordination claim, which claims would only arise under the Bankruptcy Code.

## II.   THE STATE LAW CLAIMS SHOULD BE DISMISSED PURSUANT TO THE *IN PARI-DELICTO* DOCTRINE.

The Trustee's state law claims are barred under *in pari delicto* because, per his own allegations, the Debtors were participants in the fraudulent schemes underlying this case. *See Clark v. Amoco Prod. Co.*, 784 F.2d 967, 970 (5th Cir. 1986) ("[A] claim may also be dismissed [under Rule 12(b)(6)] if a successful affirmative defense appears clearly on the face of the pleadings."). The Debtors' injuries came about because of that fraud, so *in pari delicto* would bar them from recovering. So too with the Trustee.

"The doctrine of *in pari delicto* provides that wrongdoers ought to bear the consequences of their wrongdoing without legal recourse against each other." *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 965 (5th Cir. 2012); *see also York v. Petzl Am., Inc.*, 353 S.W.3d 349, 353 n.4 (Ky. Ct. App. 2010) ("The '*in pari delicto*' doctrine is generally stated as when both parties are guilty, the court will leave them where it finds them." (cleaned up)); *Gen. Car & Truck Leasing Sys., Inc. v. Lane & Waterman*, 557 N.W.2d 274, 279 (Iowa 1996) (explaining that *in pari delicto* "den[ies] relief to one whose losses were substantially caused by his own fraud or illegal conduct"). "Courts

---

[2] But even before the Debtors released these claims through the Forbearance Agreement, the Debtors had already repeatedly waived claims in the Loan Agreements, and also agreed to express indemnification obligations that would operate to bar the claims had they not been released. (App. 6-7, 33, 47-60, 75-78, 95-107; *see also McNally & Nimergood v. Neumann-Kiewit Constructors, Inc.*, 648 N.W.2d 564, 571-72 (Iowa 2002) (providing that "a contract for indemnification is generally subject to the same rules of formation, validity and construction as other contracts" and are enforceable to relieve indemnitee from liability for its own negligence where written indemnity provides for such indemnification).

have interpreted this defense to mean that if the illegal act is inextricably intertwined with the claim and the alleged damages would not have occurred but for the illegal act, the plaintiff is not entitled to recover as a matter of law." *Sharpe v. Turley*, 191 S.W.3d 362, 366 (Tex. Ct. App. 2006).

The result is no different when the trustee attempts to assert the claim in bankruptcy. This is because "a trustee receives causes of action subject to [any] defenses that could have been raised against the debtor" pre-petition. *Reed v. City of Arlington*, 650 F.3d 571, 575 (5th Cir. 2011). So "because a bankruptcy trustee 'stands in the shoes of the debtor,' [*in pari delicto*] applies 'with equal force to a trustee-in-bankruptcy.'" *Quinn ex rel. CryptoMetrics, Inc. v. Scantech Identifications Beam Sys. LLC*, No. 5:13-834, 2019 WL 136823, at *1 (W.D. Tex. Jan. 8, 2019) (quoting *Off. Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1151 (11th Cir. 2006)); *see also In re Boyd*, No. 11-51797, 2012 WL 5199141, at *11 (W.D. Tex. Oct. 22, 2012) (concluding that trustees inherit claims subject to any *in pari delicto* defense); *In re Seven Seas Petroleum, Inc. v. CIBC World Mkts. Corp.*, No. H-08-3048, 2013 WL 3803966, at *12 (S.D. Tex. July 19, 2013) (same). A majority of circuit courts agree. *See Edwards*, 437 F.3d at 1151 ("[O]ur sister circuits that have considered the issue have unanimously concluded that *in pari delicto* applies with equal force to a trustee-in-bankruptcy as a debtor outside of bankruptcy."); *see also id.* (citing cases).

The Fifth Circuit, too, has acknowledged that *in pari delicto* applies to claims brought by bankruptcy trustees when standing in a debtor's shoes. In *Jones v. Wells Fargo Bank, N.A.*, the defendant argued that the *in pari delicto* doctrine similarly barred claims brought by a receiver, relying on "a number of cases that have applied the *in pari delicto* doctrine against bankruptcy trustees." 666 F.3d 955, 967 (5th Cir. 2012). The defendant's "analogy" made certain sense; after

all, receivers and bankruptcy trustees both work to recoup losses to the benefit of creditors, often on behalf of a mismanaged company. *See id.* at 966–67. But despite the similarity, the Fifth Circuit ultimately rejected the defendant's argument, noting that *in pari delicto* necessarily applies against bankruptcy trustees by virtue of Section 541(a), "which limits the debtor estate to interests of the debtor 'as of the commencement of the case.'" *Id.* at 967. And because no such statutory limitation exists as to receiverships, the court declined to apply *in pari delicto* against a receiver like it would against a bankruptcy trustee. *See id.* at 966–67.

Put another way, the reason why *in pari delicto* applies against a bankruptcy trustee and not a receiver is Section 541(a) of the Bankruptcy Code. That provision "establishes the estate's rights as no stronger than they were when actually held by the debtor." *In re Hedged-Invs. Assocs., Inc.*, 84 F.3d 1281, 1285 (10th Cir. 1996). And unlike the equitable considerations that govern receiverships, *see W.F. Potts Son & Co. v. Cochrane*, 59 F.2d 375, 378 (5th Cir. 1932) (observing that receivership proceedings are "purely equitable" and should be "decided upon equitable grounds"), Section 541(a) reflects a congressional mandate that courts must abide, *see Law v. Siegel*, 571 U.S. 415, 421 (2014) (explaining that "a bankruptcy court may not contravene specific statutory provisions" and that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code" (cleaned up)). That means that regardless of whether or not it is "equitable" to apply *in pari delicto* against bankruptcy trustees, Congress has made a policy choice to require it. *See In re Hedged-Invs. Assocs.*, 84 F.3d at 1285 (explaining that although exempting trustees from the *in pari delecto* defense has "certain appeal, both from doctrinal and public policy perspectives," Section 541(a) "expressly prohibits [that] result"). The Fifth Circuit acknowledged that in *Jones*, and this court must too. *See Jones*, 666 F.3d at 967.

Accordingly, based on the Trustee's own allegations, his claims necessarily fail under the *in pari delicto* doctrine. Per his own allegations, the Debtors' "now-former owner, McClain, operated a massive Ponzi scheme through Debtors involving purported investment in cattle." (3d Compl., ECF No. 48, ¶ 3.) McClain would "solicit[] and procure[] passive investments" for the Debtors "from hundreds of parties." (*Id.* ¶ 20.) But "the Debtors did not repay investors with actual profits from Debtors' cattle operations because the unique cattle backing up every purported agreement did not exist." (*Id.* ¶ 29.) McClain also "perpetrated a massive check kite as additional means through which [he] obtained new . . . cash to cover [Debtors'] payments owed to investors, vendors or other creditors." (*Id.* ¶ 3.)

Despite the Debtors' own perpetration of the Ponzi and check-kiting schemes, the Trustee points the blame at Rabo (and the other defendants). Through a host of state law claims, the Trustee alleges that Rabo conspired with the Debtors or, at minimum, unlawfully enabled the Debtors' conduct. But because the Debtors' own involvement in the schemes is apparent from the face of the complaint, the Trustee's claims necessarily fail to state a claim to relief under *in pari delicto*. His claims against Rabo must therefore be dismissed.

Recognizing the obvious *in pari delicto* problem he has, the Trustee attempts to distinguish between McClain's and the Debtors' conduct for purposes of the fraud. (*See, e.g.*, *id.* ¶ 3 ("The Debtors' now-former owner, McClain, operated a massive Ponzi scheme *through* Debtors involving purported investments in cattle." (emphasis added)).) That distinction, however, is immaterial and should be disregarded as nothing more than clever linguistic gymnastics.

"A principal is liable for the fraudulent acts and misrepresentations of its authorized agent . . . ." *Koesler v. Beneficial Fin. I, Inc.*, 267 F. Supp. 3d 873, 887 (W.D. Tex. 2016) (cleaned up). This is so regardless of whether the principal had "knowledge of the fraud," "consent[ed] to

it," or "derive[d] a benefit from it." *Id.* (cleaned up). Accordingly, where a company's agents are engaged in fraud, the company too is deemed "*in pari delicto* in the scheme through the acts of its agents." *See Rogers v. McDorman*, 521 F.3d 381, 395 (5th Cir. 2008).

A "narrow" exception exists where the principal shows that the agent's conduct "is totally adverse to the principal." *In re Black Elk Energy Offshore Ops., LLC*, 649 B.R. 249, 261 (S.D. Tex. 2023). *Totally*, being the key word. *See Askanase v. Fatjo*, 130 F.3d 657, 668 (5th Cir. 1997) (declining to apply the adverse interest exception because appellant failed to show "that the directors acted entirely for their own interest and against the interests of the corporation"). That is, the exception applies only where the fraud was "against" the company and not to the company's benefit. *FDIC v. Ernst & Young*, 967 F.2d 166, 170–71 (5th Cir. 1992). So where the "costs of [the] fraud" are "borne out . . . by outsiders," e.g., creditors, then it cannot be said that the agent's conduct is unattributable to the company. *Id.* at 171 (cleaned up).

By those standards, the Trustee's distinction crumbles. The Trustee alleges that McClain was the Debtors' then-owner and that McClain perpetrated the fraud underlying this case using the Debtors as the vehicle for that fraud. The Trustee further alleges that McClain's fraud was not borne out by the Debtors exclusively, but by creditors too. The general proposition therefore applies, i.e., that McClain's fraudulent conduct is considered the Debtors' conduct too. And that means that, for purposes of the Trustee's Section 541(a) claims against Rabo, *in pari delicto* applies.[3]

---

[3] Even assuming that the adverse interest exception applied, "there is a qualification of [that] exception which brings [it] within the general rule" that, where "the officer or agent . . . is the sole representative," his conduct is necessarily considered that of the company. *Mays v. First State Bank of Keller*, 247 S.W. 845, 846 (Tex. Ct. App. 1923); *accord Steward v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 310–11 (Del. Ch. 2015) (explaining that the "sole actor rule overrides the adverse interest exception . . . because it is absurd to presume that the one actor involved and affected somehow could keep secrets from himself, and because the principal, as the same sole

### III.    PLAINTIFF FAILS TO ALLEGE DAMAGES TO DEBTORS PROXIMATELY CAUSED BY RABO, DICTATING DISMISSAL OF THE STATE-LAW CLAIMS.

The Plaintiff's failure to allege facts demonstrating that Rabo proximately caused Debtors' damages (or even that the Debtors were damaged) is a fatal flaw that runs through Plaintiff's Complaint. Plaintiff's allegations on damages are generally consistent with the following examples:

- The Trustee quantifies Debtors' damages from Defendants' breaches of their fiduciary duties as exceeding $170 million, and that figure may increase as the Trustee gathers more information about the Debtors' operations. As explained above, more than 100 claimants have asserted claims exceeding $120 million for: (1) allegedly unpaid amounts for Cattle Purchases; (2) cattle that were dropped off for Feed Yard Services and sold without returns to their owners; (3) unpaid Partnership Agreement investments; and (4) other miscellaneous transactions. (SAC ¶ 140.)

- When Defendants conspired to commit the Ponzi scheme, they should have foreseen the fraud would collapse, leaving Debtors and their creditors with massive financial losses. (SAC ¶ 158.)

- By the time the scheme came to an end, those damages grew to exceed $170M, as evidenced by the volume of claims asserted by creditors against the Debtors in this bankruptcy proceeding. (SAC ¶ 167.)

- When Defendants conspired to commit the Ponzi scheme, they should have foreseen the fraud would collapse, leaving Debtors and their creditors with massive financial losses. (SAC ¶ 158.)

Plaintiff also alleges in his Third Complaint that the "Debtors' bankruptcy estate includes almost $200 million of claims." (SAC ¶ 50.) In other words, the damages alleged by Plaintiff are the creditors' bankruptcy claims. The creditors' claims against Debtors, however, are not damages to Debtors—especially given the Trustee's voluminous allegations concerning the fraudulent scheme involving check kiting and the exchange of money for the purchase of fictitious cattle.

---

owner, benefits from the fraud"). McClain's conduct is therefore necessarily attributable to the Debtors.

(SAC ¶¶ 19-45.) Furthermore, Rabo lending money to its borrowers, who then improperly and in breach of the loan agreements uses some of that money pay certain investors instead of purchasing or caring for cattle, does not damage the borrowers. The injured party is Rabo, whose funds were not being used for the acquisition and operations that collateralized the Rabo loans. Plaintiff's allegations on damages also raise questions concerning the Trustee's ability to assert such claims under 11 U.S.C. § 541(a)(1). In any event, the Trustee's failure to allege facts supporting damages to Debtors, let alone that Rabo was the proximate cause for those damages (by providing loan funds), is fatal to his state-law claims.

## IV.   PLAINTIFF'S KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY CLAIM SHOULD BE DISMISSED.

"In Texas, a plaintiff pleads a knowing participation in the breach of fiduciary duty claim by demonstrating the following elements: '(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship.'" *Terry v. Texas Partners Bank (In re Chris Pettit & Assocs., P.C.)*, 2025 WL 1583366, at *5 (Bankr. W.D. Tex. June 4, 2025) (quoting *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007)). Here, even assuming that Plaintiff has adequately alleged the first two elements of the claim, he has fallen woefully short of alleging facts supporting the third element—i.e., "that [Rabo] was aware that it was participating in the breach of that fiduciary relationship."

In the recent case of *Chris Pettit & Associates*, which also involved a knowing participation claim against a bank defendant, the court focused on the requirement that the defendant must have actual knowledge that the primary tortfeasor is breaching fiduciary duties, and that the defendant actually knows that it is helping the primary tortfeasor to do so. *Chris Pettit & Associates*, 2025 WL 1583366. In the words of the court, "[k]nowing means *knowing*," and it is not enough for the

plaintiff to allege "constructive knowledge of malfeasance, imputed by 'red flags.'" *Id.* at *17; *see also id.* (dismissing trustee's knowing participation claim against Texas Partners Bank even though the Trustee alleged that the bank was aware of numerous red flags in the law firm's trust account, "instructed Pettit on ways to disguise reportable events or work arounds," "approved overdrafts 'without verifying whether Pettit would be able to deposit enough funds to cure the defects,'" "'assisted Pettit in remedying' out of compliance accounts," and even "offered Pettit a $400,000 loan to cure the defects").

Here, the Trustee's knowing participation claim against Rabo is based upon the same type of "constructive knowledge of malfeasance" and ignoring of "red flags" that is insufficient to support a claim as a matter of law. *Id.* Furthermore, these types of claims are governed by the heightened pleading standards of Rule 9(b), and even "repeat unscrupulous activity equaling an inference of knowledge fails to properly satisfy Rule 9(b)." *Id.* This claim fails, and it should be dismissed.[4]

## V. PLAINTIFF'S CLAIM FOR BREACH OF FIDUCIARY DUTY FAILS FOR NUMEROUS REASONS.

A claim for breach of fiduciary duty requires a plaintiff to demonstrate that "(1) there is a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached his fiduciary duty to the plaintiff, and (3) the breach resulted in an injury to the plaintiff or benefit to the defendant." *Zhu,* 426 S.W.3d at 339 (Tex. App. 2014). The claim fails for numerous reasons.

### A. Rabo Owed No Fiduciary Duty to Debtors as a Matter of Law.

The laws of Iowa, Texas, and Kentucky appear to be generally consistent with respect to the issue of a lender's potential duty to its borrower. All three states have repeatedly concluded

---

[4] The absence of facts demonstrating knowledge is consistent with the reality that Rabo would not knowingly assist and participate in a fraudulent scheme involving breaches of fiduciary duty which would result in Rabo taking a $50 million loss.

that a fiduciary (or special) relationship does not exist in an ordinary lender-borrower relationship. *See Weltzin v. Cobank, ACB*, 633 N.W.2d 290, 293 (Iowa 2001) (stating that "this court has made clear that fiduciary duties are not automatically implicated in a banker-borrower relationship"); *Kurth v. Van Horn*, 380 N.W.2d 693, 696 (Iowa 1986) (same); *Sallee v. Fort Knox Nat'l Bank, N.A. (In re Sallee)*, 286 F.3d 878, 891 (6th Cir. 2002) (stating that no fiduciary duty arises in an arm-length transaction and that such a duty is the "highest order of duty imposed by law"); *Steelvest, Inc. v. Scansteel Serv. Ctr.*, 807 S.W.2d 476, 485 (Ky. 1991) (recognizing that banks do not owe fiduciary duties to their customers or debtors); *Houle v. Casillas*, 594 S.W.3d 524 (Tex. Ct. App. 2019) (stating that a fiduciary relationship does not exist in an ordinary lender-borrower relationship); *Jones v. Thompson*, 338 S.W.3d 573, 583 (Tex. Ct. App. 2010) (recognizing that "no fiduciary relationship exists between a lender and a borrower").

In *Weltzin*, the Iowa Supreme Court addressed a borrower's claims of negligence and breach of fiduciary duty against a lender based on the lender's alleged failure to analyze the records received, note discrepancies in quarterly reports, seek additional financial information that was required to evaluate the borrower's financial condition, and notify officers and directors of borrower of its true financial situation. 633 N.W.2d at 294-95. The Court cited the general rule that lenders do not generally owe duties to their borrowers, and dismissed all claims based on a lack of duty. *See id.* The court explained that imposing a duty on a lender to manage, supervise, and control its borrowers' business affairs would be unreasonable and untenable. *Id.* at 293. Iowa appellate court cases likewise "reflect a rather narrow scope" of the existence of a duty in the commercial lender/borrower relationship, *see Greatbatch v. Metro. Fed. Bank*, 534 N.W.2d 115, 117 (Iowa Ct. App. 1995), and Texas and Kentucky courts have reached similar conclusions, *see Wil-Roye Inv. Co. II v. Wash. Mut. Bank, FA*, 142 S.W.3d 393, 410 (Tex. Ct. App. 2004)

("Likewise, the relationship between a borrower and a lender is usually neither a fiduciary relationship nor a special relationship."); *Bank of Am., N.A. v. Corporex Realty & Inv., LLC*, 875 F. Supp. 2d 689, 704 (E.D. Ky. 2012) ("As a general rule, banks do not owe a fiduciary duty to their customers or debtors.").

Pursuant to these cases, Rabo did not owe a fiduciary duty to its borrowers—the Debtors— as a matter of law. In apparent recognition of this reality, Plaintiff attempts to argue that Rabo "exercised 'excessive lender control' over Debtors," which is a limited exception to the general rule of no fiduciary duty between a lender and a borrower. (SAC ¶ 132; *see Wil-Roye Inv. Co. II*, 142 S.W.3d at 411 (stating that when a "special relationship between a borrower and lender has been found, it has rested on extraneous facts and conduct, such as excessive lender control over, or influence in, the borrower's business activities")).) This attempt fails. As an initial matter, the suggestion that Rabo exercised "excessive control" over Debtors is directly contrary to Plaintiff's entire theory of the case and the legion of allegations concerning Rabo's years of purported failures to pay proper attention to Debtors' business activities, which allegations form the foundation for Plaintiff's claims. (*See generally* SAC.) Undeterred, Plaintiff does a complete "180" in paragraph 132 and points to the Chief Restructuring Officer being hired and the execution of the forbearance agreement as supporting excessive control. (SAC ¶ 132.) However, these events occurred at the collapse of the scheme and within days of Mr. McClain's death and the filing of these bankruptcy cases in April of 2023. (SAC ¶ 35.) And Plaintiff's other two examples of control are likewise unpersuasive. (SAC ¶ 132.) Specifically, Rabo being the sole lender to Debtors is immaterial, as is Plaintiff's vague and misleading statement concerning Mr. Lawson's purported testimony about

Rabo's alleged "control."[5] (SAC ¶ 132.) Plaintiff provides no fact or law to support a fiduciary duty, which is fatal to the claim.

### B.    Even if There Were a Duty, There Are No Facts Supporting a Breach.

Even if there were a duty, Plaintiff's allegations do not support Rabo's breach of that duty. Like with his other claims, Plaintiff's allegations in purported support of Rabo's breach of fiduciary duties to Debtors are simply that Rabo continued to loan Debtors money. (SAC ¶¶ 135-36.) Loaning money to your borrower or increasing the limit pursuant to the Loan Agreements is not a breach of fiduciary duty, and Plaintiff points to no fact or law to support such a conclusion. Indeed, the cases cited and relied on by Plaintiff actually support dismissal of the claim. *See Martinez v. Cap. One*, Case No. H-22—2767, 2022 WL 17085938, at * 4 (S.D. Tex. Hous. Div. Nov. 18. 2022) (recognizing that the "relationship between a bank and its customer does not usually create a fiduciary relationship"); *see also Wil-Roye Inv. Co. II,* 142 S.W.3d at 411 (same). Furthermore, while Plaintiff cites to the Forbearance Agreement to try to create a duty where none exists, Plaintiff points to no fact which occurred after the Forbearance Agreement which would result in a breach.[6]

Plaintiff's claim for breach of fiduciary duty should be dismissed.

---

[5] At no time during Mr. Lawson's deposition did he say that Rabo was "controlling" Debtors or Mr. McClain. In fact, Mr. Lawson provided the *exact opposite* testimony, stating that the concern was that Mr. McClain and his companies *could not* be controlled. Plaintiff's unsupported and misleading allegation here which directly contradict the actual record is deeply troubling and implicates Rule 11's requirements, especially considering Rabo highlighted this issue already in its motion to dismiss the Trustee's prior complaint.

[6] In conjunction with the execution of the Forbearance Agreement, Brian McClain was removed and an independent Chief Restructuring Officer was installed. Furthermore, Rabo instructed Mechanics Bank to freeze all transactions in the Debtors' accounts. Shortly thereafter, the Chief Restructuring Officer, whom Plaintiff incorrectly asserts was Rabo's agent, filed Chapter 7 petitions in order to preserve and protect the Debtors and their assets, and bring the Debtors' fraudulent activities to light.

## VI.    PLAINTIFF'S CLAIM FOR CIVIL CONSPIRACY IS WITHOUT MERIT AND IS NOT ASSERTED IN GOOD FAITH.

"A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose by unlawful means." *Hunt v. Baldwin*, 68 S.W.3d 117, 133 (Tex. Ct. App. 2001). A civil conspiracy claim has five elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages." *Id.* In pleading the foregoing elements, a plaintiff must satisfy Rule 9(b)'s heightened pleading standard. *Bertrand v. White*, No. 1:09-CV-358, 2009 WL 10682257, at *3 (E.D. Tex. July 7, 2009). Plaintiff has failed to meet this standard.

Once again, the Trustee's failure to allege Rabo's actual knowledge of the fraudulent scheme is fatal to the Trustee's claim. The Trustee continues to repeat his foundational allegations to try and bolster this claim, stating that "Rabo deviated from its policies, procedure, and internal controls to bend over backwards to approve, extend, and increase its lending facilities to Debtors despite clear red flags and alarm bells sounding due to Debtors' precarious financial situation." (SAC ¶ 147.) Because the alleged "object" of the conspiracy was to "operate a Ponzi scheme," a failure to allege facts supporting Rabo's actual knowledge of the Ponzi scheme obviously means there was no meeting of the minds and no unlawful acts in furtherance of the scheme. *See, e.g., Hunt*, 68 S.W.3d 117.

The claim fails as a matter of law, not to mention failing as being completely illogical. Why Rabo would "conspire" to loan over $50 million, not for (per the Loan Agreements) only legitimate purposes and in furtherance of the cattle business in which Rabo has a security interest, but rather for an unsupportable fraudulent scheme where Rabo's funds would be used, in part, to "repay" investors, leaving Rabo with an uncollectable loan supported by very little collateral, is incredulous. Regardless of the logic, the allegations fail to support a cognizable claim against

Rabo. Also, as outlined above, there are no facts supporting damages, which is yet another ground for dismissal.

## VII.    PLAINTIFF'S CLAIM FOR PROFESSIONAL NEGLIGENCE FAILS.

To state a claim for negligence generally, "a plaintiff must be able to prove three elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damage proximately caused by the breach." *Gann v. Anheuser-Busch, Inc.*, 394 S.W.3d 83, 88 (Tex. Ct. App. 2012). "The threshold inquiry in a negligence case is duty. . . . If there is no duty, liability for negligence cannot exist." *Id.*; *see also Thompson v. Kaczinki*, 774 N.W.2d 829, 834 (Iowa 2009) (stating that "[a]n actionable claim of negligence requires the existence of a duty to conform to a standard of conduct to protect other, a failure to conform to that standard, proximate cause, and damages." (cleaned up)). As to proximate cause, a plaintiff must demonstrate foreseeability— *i.e.*, "that a person of ordinary intelligence should have anticipated the danger created by the negligent act or omission." *Phillips v. Super Servs. Holdings, LLC*, 189 F. Supp. 3d 640, 648 (S.D. Tex. 2016). Here, the claims fails for numerous reasons.

### A.    Rabo Owed No Duty as a Matter of Law.

In this case, Plaintiff's negligence claim fails for several reasons. First, as outlined in Section V above, there was no duty as a matter of law that could support this claim. (*See* Argument V.A., *supra*; *Weltzin*, 633 N.W.2d at 293 (dismissing negligence claim against lender for lack of duty where lender allegedly failed to analyze the records received, note discrepancies in quarterly reports, seek additional financial information that was required to evaluate the borrower's financial condition, and notify officers and directors of borrower of its true financial situation).

Plaintiff's reliance on *Strobach v. WesTex Cmty. Credit Union*, and the Texas UCC as a basis for a duty on Rabo is misplaced. 621 S.W.3d 856, 873 n.5 (Tex. Ct. App. 2021). The Texas

UCC does not apply to Rabo and its lending relationship with Debtors except as it relates to Rabo's security interests in the Debtors' assets and the perfection of those interest. Furthermore, as explained in *Apache Corp. v. Dynegy Midstream Services, Ltd. Partnership*:

> The failure to act in good faith under the UCC . . . [is not] an independent cause of action because the duty of good faith and fair dealing is aimed at making effective the agreement's promises. The UCC defined duties that grow out of specific contract terms and obligations. In the absence of a specific duty or obligation in the contract to which the good-faith standard can be tied, the obligation of good faith under the UCC will not support a claim for damages.

214 SW3d 554, 563 (Tex. Ct. App. 2006), *rev'd in part on other grounds sub nom. Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164 (Tex. 2009) (citations omitted). Plaintiff points to no provision in the Loan Agreements in support of the UCC duty it relies on its Complaint.[7]

### B.      The Claim is Barred by the Economic Loss Doctrine.

The economic loss doctrine provides a second and independent basis for dismissing this claim. The economic loss doctrine bars "negligence-based causes of action" where the plaintiff alleges only a breach "of the defendant's contractual obligations." *In re Chris Pettit & Assocs., P.C.*, 2025 WL 1583366, at *12 (Bankr. W.D. Tex. June 4, 2025) (cleaned up). Here, Plaintiff alleges that Rabo breached duties to the Debtors arising only out of the Loan Agreements. (*See* SAC ¶ 164.) Accordingly, Plaintiff cannot sue for those alleged breaches on a negligence-based theory. *See id.* The claim must be dismissed.

---

[7] Had Plaintiff attempted to point to provisions in the Loan Agreements, Plaintiff would most certainly have expected Rabo to point to the numerous applicable waiver and indemnification provisions which further preclude Plaintiff's claim as a matter of law.

## VIII.   THE CLAIM FOR MONEY HAD AND RECEIVED IS WITHOUT MERIT.

Plaintiff also asserts a claim for Money Had and Money Received, alleging that "[g]iven the circumstances of this case, including Rabo's and CFSB's active and intentional facilitation of McClain's Ponzi scheme, it would be inequitable under either Texas or Kentucky law to allow Rabo to either retain or receive any profits on top of the principal it extended to Debtors." (SAC ¶ 199.) Rabo, however, had no "profit" in this transaction, and Plaintiff has failed to allege facts demonstrating any such profit. Indeed, Rabo's Proofs of Claims demonstrate that it took a multi-million loss on its loans. Furthermore, the claim fails based of the failure of all of the other claims asserted against Rabo in this case. As outlined herein, Rabo owed no duty as a matter of law, did not breach any duties, did not proximately cause the damages, and did not actively conspire to defraud itself and others. Accordingly, there is no "equitable" ground to add more injury and insult to Rabo's injury by disgorging any payments to Rabo under the Loan Agreements or otherwise reducing Rabo's secured claim. The Plaintiff has provided no facts or argument to support this claim.

## IX.   PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES FAILS.

Continuing with his caustic characterizations, Plaintiff purports to assert a "claim" against Rabo for punitive damages and alleges that Defendants' conduct "was outrageous, malicious, fraudulent, grossly negligent, or otherwise morally culpable and reprehensible." (SAC ¶ 169.) As an initial matter, "punitive damages" is not a recognized cause of action but is merely a remedy. *See, e.g., Robbins v. Payne*, 55 S.W.3d 740, 747 (Tex. Ct. App. 2001) (recognizing that "there is no independent cause of action for exemplary damages" and that such damages are "simply an element of damages recoverable under a cause of action") (citation modified). In any event, as outlined herein, Plaintiff has provided no fact or law to remotely support an award of punitive or

exemplary damages against Rabo under the controlling legal standards. (*See generally* SAC.) Plaintiff's reliance on *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 660 (Tex. 2012) is misplaced. The "claim" for punitive damages is without merit and there is no basis for an award of damages against Rabo, let alone punitive/exemplary damages.

## X.     THE COURT SHOULD DISMISS PLAINTIFF'S "CORE" CLAIMS.

Plaintiff brings six claims under Chapter 11 of the Bankruptcy Code: (a) Determination of Extent, Validity, and Priority of Lien; (b) Avoidance of Deposit Account Control Agreement – 11 U.S.C. § 547(b); (c) Preferential Payments – 11 U.S.C. §§ 547, 550, 551; (d) Fraudulent Transfer – 11 U.S.C. §§ 548(a)(1)(A) and (a) (1)(B) (as well as under state law Sections 24.005 and .0006 TUFTA, and Sections 378A.00 and .050 KUVTA0; (e) Disallowance of Claim 11 U.S.C. § 502(d), 11 U.S.C. § 502(b)(1); and (f) Equitable Subordination – 11 U.S.C. §§ 510(c)(1) and 105(a). The claims should all be dismissed.

### A.     Determination of Extent, Validity, and Priority of Lien.

Count VI of Plaintiff's Complaint asks the Court for a declaration that certain funds are not proceeds of Rabo's asserted security interest. (SAC ¶¶ 171-78.)  The funds the Trustee identifies are those set forth in the table under paragraph 176.

As an initial matter, this claim fails because the stated premise of the claim—that Rabo "never took any action to become the owner of the Debtors' deposit accounts"—is demonstrably false. (SAC ¶ 173.)  The Trustee knows full well that, on April 5, 2025, Rabo exercised its rights under the DACA to take ownership of the accounts. Rabo disclosed its April 5, 2023 letter in which it exercised its rights with the Trustee last fall.

This claim also fails because, irrespective of whether or not Raabo had a DACA in place and irrespective of whether or not Rabo's DACA is avoidable, Rabo has a perfected lien on *all of*

the Debtor's personal property assets, including but not limited to accounts, contract rights, payment intangibles and all other forms of personal property recognized by the Uniform Commercial Code, as well as the proceeds of such property. Even if the Trustee's incorrect statement that the Debtors' property is all proceeds of commingled investor funds is true, those "commingled investor funds" are the proceeds of the Debtors' property interests in such things as accounts, contract rights and payment intangibles, all of which Rabo has a perfected lien on. In short, unless the "commingled investor funds" are not property of the Debtors at all, Rabo has a properly perfected, first-priority lien on the funds by virtue of its all-assets security agreement and UCC-1 filings.

Furthermore, the Trustee's claim that Rabo has no lien because the funds were commingled and because Rabo cannot "trace the funds" is simply wrong. (SAC ¶ 175.) Because Rabo had a blanket lien on every property interest the Debtors had, then Rabo likewise has a lien on all proceeds of those property interests currently held by the Trustee, and it is not necessary for Rabo to "trace" which particular dollar came from which particular property interest. This is not a case where multiple secured creditors had liens on different buckets of assets, and the proceeds of those buckets of assets were deposited into a single account and commingled, making it impossible to identify which dollar is attributable to a particular item of property. And this is also not a case where a secured lender has a lien on only certain assets (like equipment, inventory or accounts), and the proceeds of those assets were deposited into bank accounts and commingled with proceeds of other assets the secured lender never had a lien on. Because Rabo had a blanket lien on *all* assets, its lien extends to all of the funds held by the Trustee, as those funds are necessarily proceeds of property that Rabo held a perfected lien on. *See Qmect, Inc. v Burlingame Capital Partners II, LP*, 373 B.R. 682, 687 (N.D. Cal. 2007) (secured creditor only has to trace post-

petition proceeds to pre-petition collateral "if the secured creditor's funds were commingled with funds from another source").

### B.     Plaintiff's Preference Claim Related to Rabo Loan Payments Fails to State a Claim Upon Which Relief May Be Granted.

Plaintiff's claim concerning alleged preferential payments contends that "[d]uring the preference period, Rabo improved its position (reduced its debt) by approximately $4,000,000.00." (SAC ¶ 189.) Thus, according to the Trustee, he "is entitled to avoid all payments made to Rabo during the 90-day period before bankruptcy, including [the] improvement in position and any valuable rights, such as releases from claims, conveyed to Rabo, pursuant to 11 U.S.C. §§ 547 and 550, and to preserve such payments . . . for the benefit of Debtors' innocent creditors, who suffered at Rabo's behest." (SAC ¶ 191.)

As currently pleaded, this claim fails to state a claim against Rabo upon which relief may be granted.

First, the Trustee's attempt to avoid the releases is time-barred. That is, the Trustee asserts that "any other rights which the Debtors transferred to Rabo, such as the purported releases in Rabo's 2013 forbearance agreement with the Debtors, are also preferential transfers that should be avoided." But the Trustee had "2 years after the entry of the order for relief"— until April 28, 2025—to assert avoidance actions. *See* 11 U.S.C. § 546(a)(1). And the Trustee's current pleading, filed in July 2025, was the first to seek to avoid the releases. The Trustee's attempt to avoid the releases is therefore time-barred.

Second, while Plaintiff includes a table in paragraph 189 and does attach Exhibit "A" showing certain alleged loan payments (and advances on the Rabo credit line, which would constitute new value), that exhibit also shows that payments were made by all three Debtors. Yet Plaintiff lumps all Debtors together as if they are one and the same. While the Debtors' estates are

being jointly administered, their separate estates have not been substantively consolidated. Thus, it is improper for the Plaintiff to file a single claim lumping all transfers together instead of asserting the elements of a preference claim as it relates to each of the three Debtors.

Third, Section 547(b) expressly requires that a trustee take "into account a party's known or reasonably knowable affirmative defenses" when asserting a preference claim.  Yet here, Plaintiff says nothing about Rabo's obvious defenses to preference claims relating to the payments made to Rabo. Namely, all of the "advances" shown in the table constitute new value, (*see* SAC, ¶ 189), and the fact that Rabo's loan had been in place since 2018 with the same "debit" and "credit" type arrangements is entirely consistent with the ordinary course as it related to the administration of the Debtors' loan (e.g., there were always advances and principal payments occurring on the loan on a daily basis, and nothing changed during the preference period).

Fourth, the Trustee fatally alleges that Rabo was "paid with cash that was not Rabo's collateral because, among other things, the Debtor's bank accounts were not subject to Rabo's lien and the funds in the accounts cannot be traced to other Rabo collateral, as opposed to the Debtors' funds obtained from investors/partners." (SAC ¶ 188.) If the Trustee is alleging that Rabo was paid with funds belonging to investors, not the Debtors, then the preference claim fails on its face because the Trustee has not alleged that the transfers were of "an interest of the debtor in property." *See* 11 U.S.C. § 547(d).

Conversely, if the Trustee is saying that Rabo was paid with the Debtors' funds originating from investor parties, he fails to explain or provide any details as to why that matters to the preference analysis. The Trustee admits that the Debtors' operations did include legitimate cattle transactions and that the Debtors received legitimate funds both from the sale of cattle and from caring for and feeding cattle belonging to third parties. Thus, the Trustee's suggestion that every

32

nickel paid to Rabo must have come from "investor funds" simply does not square with the other

allegations of the complaint. Moreover, as noted above, the Debtors granted Rabo a lien on *all of*

their presently existing or after acquired personal property assets, not just on their cattle, and on

all proceeds thereof. Thus, the Trustee's allegation that Rabo was "paid with cash that was not

Rabo's collateral" is simply not plausible. (SAC, ¶ 188.) Rabo was the only creditor with a lien on

the Debtors' assets, and that lien was all-encompassing. Thus, any monies paid by the Debtors to

Rabo necessarily were paid from Rabo's collateral, and the Trustee cannot, as a matter of law,

establish the required elements of a preference claim.

Finally, the Trustee has failed to provide any meat to his allegations that the other creditors

in this case "suffered at Rabo's behest." (SAC ¶ 191.) To the contrary, the Trustee's allegations

clearly demonstrate that Rabo was the party that uncovered the Debtors' fraud and that Rabo was

defrauded out of more money (about $50 million) than anybody else. If anything, Rabo *reduced*

the losses of investors insofar as these investors were paid from Rabo's loan proceeds. The Trustee

ignores this obvious reality in his pleading in an attempt to create some leverage against the estates'

largest creditor.

### C.   Plaintiff's Claim for Fraudulent Transfer Should Be Dismissed.

The Trustee seeks to recover all payments Rabo received on its loan during the applicable

reach-back periods under Section 548 of the Bankruptcy Code (and state fraudulent transfer

statutes) because the Debtors were engaged in a Ponzi scheme, such that all transfers made by the

Debtors are presumed to have been made with actual intent to hinder, delay or defraud.

Alternatively, the Trustee asserts that even if the payments are not presumed to have been made

with actual intent to hinder, delay or defraud, the payments can be avoided as constructively

fraudulent transfers, which requires proof both that transfers were made while the debtor was

insolvent and that the debtor did not receive reasonably equivalent value in return. *See generally* 11 U.S.C. § 548(a)(1)(B)

Starting with the Trustee's constructively fraudulent transfer claims, the Trustee's claims fail because the debtor received reasonably equivalent value for the transfers. As the Trustee's allegations make clear, Rabo made a multi-million-dollar loan to the Debtors secured by all of the Debtors' presently existing and after-acquired personal property assets, and the transfers the Trustee seeks to avoid were payments made on that loan. But every time a payment was made on the loan, the Debtors partially satisfied their contractual obligations to Rabo. Under both Section 548 of the Bankruptcy Code and state fraudulent transfer laws, "value" includes (but is not limited to) the satisfaction of an existing or antecedent debt. *See* 11 U.S.C. § 548(d)(2)(A); Tex. Bus. & Comm. Code § 24.004(a). Thus, there is no constructive fraud claim as a matter of law.

Further, as it relates to the actual fraud claim, the Trustee is not entitled to rely upon the "Ponzi presumption" instead of pleading with specificity the badges of fraud here. First, the Trustee has taken the position in his complaint that McClain personally was the fraudster, and the Debtors were his victims. But if that were true, only transfers made from McClain's personal accounts would have the benefit of the Ponzi presumption. Subsequent transfers made by the victims of McClain's fraud—i.e., the Debtors—would not enjoy that same presumption. Second, if the Debtors were the ones engaging in the Ponzi scheme, the Ponzi presumption does not help the Trustee in his claims against Rabo because Rabo was not an investor. Rather, Rabo was the Debtors' secured lender. And courts have questioned "the application of the Ponzi-Scheme Presumption in a case where the transfers are payments made under a traditional debtor-creditor relationship." *Faulkner v. Ford Motor Credit Co. (In re Reagor-Dykes Motors, LP)*, No. 18-50214-RLJ-11, 2022 WL 2046144, at *7 (Bankr. N.D. Tex. June 3, 2022).

Applying the Ponzi presumption to payments made to a lender as part of a legitimate debtor-creditor relationship, bypassing pleading and proof of the actual badges of fraud "would be a radical departure from the statute." *Id.* In short, while transfers to an investor "in furtherance of" a Ponzi scheme may be presumed to have been made with actual intent to hinder delay or defraud, the transfers made to Rabo were not "in furtherance of" the Ponzi scheme because Rabo was not an investor. *See Perkins v. Haines,* 661 F.3d 623, 626 (11th Cir. 2011). Rabo was the Debtors' secured lender. *See, e.g., Finn v. Alliance Bank*, 860 N.W.2d 638, 644-53 (Minn. 2015) (Ponzi presumption could not be used to support fraudulent transfer claims against banks and financial institutions who were not investors in the scheme). If the Ponzi presumption were to apply to Rabo in this case, then it would apply to *everyone* that the Debtors made payments to, e.g., feed suppliers, cattle sellers, providers of veterinary services, and even employees. That is not the law.  Simply put, "bank loans by definition are not investments and therefore [Rabo] was not an investor." *In re Pearlman*, 440 B.R. 569, 575 (Bankr. M.D. Fla. 2010).

Lumping Rabo in with the McClain investors "ignores the many real differences between the two concepts, most notably the contractual interest rate on loans versus the unknown risk premium of equity investments." *Id.* The bulk of the Debtors' investors did not even know about Rabo's loans, and there is certainly no allegation that investors relied upon the existence of Rabo's loans as a reason to invest funds with the Debtors.  Thus, the Trustee "may not rely on the Ponzi scheme presumption solely by virtue of alleging the loan repayments were made pursuant to" the McClain Ponzi scheme.  *Id.* (holding that trustee could not use the Ponzi presumption to avoid "numerous transfers to Integra in repayment of its loans in the aggregate amount of $3,531,355.52"); *see also In re Wedgewood Props., LLC*, 661 B.R. 578, 605 (Bankr. W.D. Mich. 2024) ("The fact that the Ponzi scheme presumption applies only to transfers made 'in furtherance'

of the scheme places an important limitation on the presumption, making the inference of actual intent to defraud investors and creditors only appropriate 'where the transfers at issue somehow perpetrate the Ponzi scheme.'"); *Bayou Superfund, LLC v. WAM Long/Short Fund II, LP (In re Bayou Group, LLC)*, 362 B.R. 624, 638 (Bankr. S.D.N.Y. 2007) (explaining that, even when the debtor is a Ponzi scheme, the analysis of intent to defraud should "focus precisely on the specific transaction or transfer sought to be avoided" and suggesting that the repayment of valid antecedent debts may be distinguished from the payment of fictitious balances and profits).

Finally, the Trustee's attempt to use the Ponzi presumption as a substitute for pleading and proving an actual fraud claim under the Texas Uniform Fraudulent Transfer Act, or TUFTA, appears to be completely foreclosed by the Texas Supreme Court as a matter of law. *See Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 581 (Tex. 2016) ("We therefore conduct the same 'value' and 'reasonably equivalent value' analysis inquiry under TUFTA regardless of whether the debtor was operating a Ponzi scheme or a legitimate enterprise.").

### D.    Plaintiff's Disallowance Claim Should Be Dismissed.

Plaintiff's disallowance claim similarly ignores the commercial lender-borrower relationship at issue and attempts to lump Rabo in with the investors in Debtors' Ponzi scheme. Plaintiff's continued failure to acknowledge the relationship at issue critically undermines this claim. Further, Plaintiff's reliance on Section 502(d) for disallowing Rabo's claim is misplaced because this claim is dependent upon Plaintiff's preference and fraudulent transfer claims. As outlined herein, Plaintiff has failed to assert plausible preference and fraudulent transfer claims against Rabo, so there is simply no basis to disallow Rabo's proofs of claim.  This claim should be dismissed.

### E.    Plaintiff's Equitable Subordination Claim Must Be Dismissed.

Plaintiff has failed to allege facts supporting his claim for equitable subordination. (SAC

¶¶ 200-04.) Plaintiff alleges that "Rabo's conduct with respect to its lending relationship with the

Debtors resulted in injury to the Debtors' other creditors or the conferring of an unfair advantage

on Rabo. This inequitable conduct has resulted in hardship to the Debtors' estates and the entire

creditor body. It would be inequitable and unjust to allow Rabo to profit at investors' expense at

the outset and throughout the life of the Ponzi scheme, which was substantially enabled by Rabo's

conduct, only to reward Rabo with a priority security interest in all of the Debtors' remaining

assets at the end of the Ponzi scheme to the exclusion of all other creditors." (SAC ¶ 201.) The

claim fails.

Rabo was not conferred an "unfair advantage," given that Rabo was defrauded out of over

$50 million. The real "inequity" at issue in this case is that Rabo—the party that Plaintiff admits

uncovered the fraud and brought the Ponzi scheme to a halt—was defrauded out of far more money

than anybody else, yet is being attacked by the Trustee through unsupported and legally barred

claims. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."

*Iqbal*, 556 U.S. at 679. Furthermore, "where the well-pleaded facts do not permit the court to infer

more than the mere possibility of misconduct, the complaint has alleged—but has not 'shown'—

that the pleader is entitled to relief.'" *Id.* Here, the Trustee's equitable subordination claim is not

plausible given that Rabo's relationship with the Debtors resulted in Rabo holding a $50 million

loan that may not be collectable.

Although the Trustee alleges that Rabo's actions resulted in "hardship" to the Debtors'

estates and the creditor body, the legal standard is whether the conduct resulted in a provable injury

to creditors, or conferred an unfair advantage on the claimant. *See, e.g., In re Fabricators, Inc.*,

926 F.2d 1458, 1464-65 (5th Cir. 1991). "Hardship" is far different from actual injury or unfair

advantage. In essence, the Trustee's argument in this case is that if Rabo had done a better job of

monitoring its loan it would have discovered the Debtors' conduct and put an end to its scheme

earlier. Even if true, that is hardly a basis to subordinate Rabo's claims.

The claim also fails under controlling Fifth Circuit law. In *In re U.S. Abatement Corp.*, the

court held that equitable subordination claims are confined "to three general paradigms: (1) when

a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a

third party controls the debtor to the disadvantage of other creditors; and (3) when a third party

actually defrauds other creditors." 39 F.3d 556 , 561 (citing *Holt v. FDIC (In re CTS Truss, Inc.)*,

868 F.2d 146, 148-49 (5th Cir. 1989)). As shown herein, Rabo was not a fiduciary of the Debtors

as a matter of law. Thus, the first paradigm fails. Also, there is no allegation that Rabo actually

controlled the Debtors (at least while the Debtors were engaging in fraud), so the second paradigm

fails as well. Indeed, the only real allegation of any control relates to Rabo's DACA on the

Mechanics Bank accounts and the installation of the CRO under the Forbearance Agreement. As

the Trustee acknowledges, however, that DACA was not put into place until March 23, 2023 (that

is why he is trying to avoid it as a preference), or less than two weeks before the Mechanics Bank

accounts were frozen and just more than one month before these cases were filed. Having a lien

on a bank account perfected by a DACA hardly means that a secured creditor is "in control" of its

debtor. *Id.*, at 562 ("We know of no case (and USA cites none in its brief) in which the exercise

by one party to a contract of a contractual right . . . occasioned by the breach of the other contracting

party of that contract has been considered the type of inequitable 'control' which would justify

equitable subordination."); *see also In re Clark Pipe & Supply Co.*, 893 F.2d 693, 702 (5th Cir.

1990) ("Associates' control over Clark's finances, admittedly powerful and ultimately severe, was

based solely on the exercise of powers found in the loan agreement.  Associates' close watch over Clark's affairs does not, by itself, however, amount to such control as would justify equitable subordination. . .  Although the terms of the agreement did give Associates potent leverage over Clark, that agreement did not give Associates total control over Clark's activities.").

Moreover, the CRO was not put in place until April of 2023, just a few weeks before these cases were filed.  In fact, he is the one who signed the petitions. There is *no allegation* in the Third Complaint that the CRO continued to allow the Debtors to engage in fraudulent conduct.  In fact, he put a stop to it.

Finally, there are no allegations in the Trustee's Complaint, let alone allegations that would satisfy the heightened pleading standards of Rule 9(b), that Rabo defrauded creditors. While the Trustee baldly and without support alleges that Rabo and the other defendants engaged with McClain in a conspiracy, there are no allegations that Rabo personally defrauded anyone. The Complaint does not identify a single communication that Rabo had with any of McClain's investors, let alone explain how any such communications would be fraudulent or untrue. So the third paradigm does not apply.

## **CONCLUSION**

WHEREFORE, Rabo prays that its Motion be granted in its entirety, and that all of the Trustees' claims against Rabo be dismissed.

DATED: July 31, 2025.

UNDERWOOD LAW FIRM, P.C.
Thomas C. Riney, SBN: 16935100
W. Heath Hendricks, SBN: 240556451
500 South Taylor, Suite 1200, LB 233
Amarillo, Texas 79101
Telephone: (806) 376-5613
Facsimile: (806) 379-0316
Email: tom.riney@uwlaw.com

Email: heath.hendricks@uwlaw.com

--and--

RAY QUINNEY & NEBEKER P.C.
Michael R. Johnson *(Pro Hac Vice)*
Matthew M. Cannon *(Pro Hac Vice)*
Austin C. Nate  *(Pro Hac Vice)*
36 South State, Suite 1400
Salt Lake City, UT 84111
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
Email:  mjohnson@rqn.com
Email:  mcannon@rqn.com
Email:  anate@rqn.com


*/s/ Michael R. Johnson*
Michael R. Johnson
*Attorneys for Rabo AgriFinance LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 31, 2025, the foregoing document was filed with the Clerk of the Court using the CM/ECF system, which sent notice of electronic filing to all electronic filing users in this case.

*/s/ Michael R. Johnson*\
Michael R. Johnson

1716899