HUDSON M. JOBE
JOBE LAW PLLC
6060 NORTH CENTRAL EXPRESSWAY,
SUITE 500
DALLAS, TEXAS 75206

ALAN DABDOUB
LYNN PINKER HURST & SCHWEGMANN LLP
2100 ROSS AVENUE, SUITE 2700
DALLAS, TEXAS 75201

SPECIAL COUNSEL TO THE TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| IN RE:<br><br>MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.,<br><br>Debtors.[1] | Chapter 7<br><br>CASE NO. 23-20084-swe<br>Jointly Administered |
| KENT RIES, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATES OF MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.,<br>Plaintiff,<br>v.<br><br>COMMUNITY FINANCIAL SERVICES BANK; HTLF BANK; MECHANICS BANK; and RABO AGRIFINANCE, LLC,<br>Defendants. | ADV. PROC. NO. 25-02005-swe<br><br>Honorable Scott W. Everett |

## TRUSTEE'S OBJECTION AND RESPONSE TO
## COMMUNITY FINANCIAL SERVICES BANK'S MOTION TO DISMISS
## TRUSTEE'S SECOND AMENDED COMPLAINT

---

[1] The Debtors in these chapter 7 cases are: McClain Feed Yard, Inc. (Case No. 23-20084-swe), McClain Farms, Inc. (Case No. 23-20085-swe), and 7M Cattle Feeders, Inc. (Case No. 23-20086-swe).

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

I.  INTRODUCTION ............................................................................................1

II.  ARGUMENT & AUTHORITIES ...................................................................3

    A.  Texas law applies to the Trustee's claims against CFSB. ........................3

        1)  There is no controlling Texas choice-of-law statute applicable to the Trustee's common law tort claims. ........................................4

        2)  Texas has the most significant relationship to the alleged torts. ........6

            a.  The Debtors were predominantly injured in Texas. .............6

            b.  The injurious conduct and location of the parties span multiple states, including Texas. ..................................7

            c.  Texas, where the injury occurred, has a more significant relationship to the Trustee's claims than Kentucky. ............8

    B.  The Trustee pleaded viable claims under Texas and Kentucky law. ..............9

        1)  Texas and Kentucky's adoption of the UCC does not preempt all tort claims. .....................................................................9

        2)  CFSB's "arguments by label" about Kentucky and Texas claims fail. ...........10

            a.  The Trustee has sufficiently alleged a knowing participation in (or aiding and abetting) breach of fiduciary duty claim. ................11

            b.  The Trustee sufficiently alleged facts to support his civil conspiracy claim. ........................................................13

            c.  The Trustee sufficiently pleaded his professional negligence claim. ........................................................17

            d.  The live complaint states a legally cognizable and factually plausible money had and received claim against CFSB. ............21

            e.  The Trustee can recover punitive damages. ..........................23

    C.  CFSB's *in pari delicto* affirmative defense does not authorize or require dismissal of the Trustee's claims under Texas or Kentucky law. ..............23

    D.  The Trustee sufficiently pleaded his fraudulent transfer claims. ..................26

a.    The Trustee has sufficiently alleged actionable repayment of debt in the form of overdrafts...................................................26

b.    The Trustee clearly alleged transfers of the Debtor's property.....................................................................................28

c.    The Trustee pleaded, and Judge Jones already found, that a Ponzi scheme was afoot in this bankruptcy case................................29

d.    None of the fraudulent transfers the Trustee seeks to recover are outside the limitations period after applying the discovery rule or equitable tolling. .........................................................31

e.    The Trustee alleges CFSB acted in bad, not good, faith. ...................32

f.    The Trustee can recover attorneys' fees from CFSB under Texas fraudulent transfer statutes. ......................................................34

E.    The Court should give the Trustee leave to amend if the Court grants CFSB's Motion or in whole or in part.............................................35

III.    CONCLUSION ...................................................................................................36

## TABLE OF AUTHORITIES

**Cases**

*3T Oil & Gas Servs., LLC v. JPMorgan Chase Bank, N.A.*, No. A-18-CV-131-LY, 2018
WL 5018483 (W.D. Tex. Oct. 16, 2018), *report and recommendation adopted*, No.
A-18-CV-131-LY, 2018 WL 6220139 (W.D. Tex. Nov. 1, 2018) ........................................... 5, 9

*Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007) ...................................................................31

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................9

*Brown v. Phillips (In re Phillips)*, 379 B.R. 765 (Bankr. N.D. Ill. 2007) ...............................33

*Bullitt County Bank v. Publishers Printing Co.*, Ky. App., 684 S.W.2d 289 (1984) ............... 17, 19

*CapLOC LLC v. Liberty Mut. Ins. Eur. Ltd.*, No. 3:20-CV-3372-B, 2021 WL 2551591
(N.D. Tex. June 22, 2021) ...........................................................................................................3

*Centennial Bank v. Holmes*, 717 F. Supp. 3d 542 (N.D. Tex. 2024) ..........................................11

*Christie v. First American Bank*, 908 S.W.2d 679 (1995) ........................................................ 17, 19

*Davis v. All Care Med., Inc.*, 986 S.W.2d 902 (Ky. 1999) ..........................................................19

*Di Piazza v. Weather Grp. Television, LLC*, Civil Action No. 5:19-CV-060-C, 2019 WL
8107920 (N.D. Tex. June 3, 2019) ..............................................................................................27

*Evans v. Armenta*, 134 F. Supp. 2d 1052 (E.D. Ky. 2015) .........................................................25

*Exch. Comm'n v. Res. Dev. Int'l, LLC*, 487 F.3d 295 (5th Cir. 2007) ........................................30

*Forcht Bank, NA v. Gribbins*, No. 2014-CA-000592-MR, 2015 WL 4039612 (Ky. Ct. App.
July 2, 2015) ......................................................................................................................17, 19, 20

*Graman v. Graman*, No. 05-14-01254-CV, 2016 WL 235055 (Tex. App.—Dallas Jan. 20,
2016, no pet. h.) ........................................................................................................................21

*Gross v. Adcomm, Inc.*, 478 S.W.3d 396 (Ky. Ct. App. 2015) ...................................................11

*Harris v. Goins*, 156 F. Supp. 3d 857 (E.D. Ky. 2015) .............................................................14

*Heghmann v. Harris*, No. 1:22-CV-627-LY, 2022 WL 22837526 (W.D. Tex. Nov. 7, 2022)................27

*Helbing v. Hunt*, 402 S.W.3d 699 (Tex. App.—Houston [1st Dist.] 2012, pet. denied)..........20

*Henderson v. Wells Fargo Bank*, ___ F. Supp. 3d ___, 2025 WL 957599 (S.D. Tex. 2025) ....................22

*Hurst v. Dixie Truss, Inc.*, No. 2020-CA-0816-MR, 2021 WL 1826881 (Ky. Ct. App.
May 7, 2021) ................................................................................................................. 20

*In re Appalachian Fuels, LLC*, No. 09-10343, 2012 WL 4059973 (Bankr. E.D. Ky.
Sept. 14, 2012) ............................................................................................................. 25

*In re Enron Corp. Securities, Derivative & ERISA Litigation*, 623 F. Supp. 2d 798 (S.D. Tex.
2009) ..................................................................................................................... 13, 14

*In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2020 WL 4939180 (Bankr. N.D.
Tex. Aug. 24, 2020) .................................................................................................. 24, 29

*In re Texas E&P Operating, Inc.*, No. 17-34386-SGJ-7, 2022 WL 2719472 (Bankr. N.D.
Tex. July 13, 2022) ....................................................................................................... 30

*In re Vantage Benefits Administrators, Inc.*, Adversary No. 20-03055-SGJ, 2024 WL 3842796
(Bankr. N.D. Tex. Aug. 14, 2024) ......................................................................... 23, 24, 25

*In re Wolf*, No. 15-31477-HCM, 2016 WL 4940198 (Bankr. W.D. Tex. Sept. 15, 2016) ..................... 32

*Insight Kentucky Partners II, L.P. v. Preferred Auto. Servs., Inc.*, 514 S.W.3d 537 (Ky. Ct. App.
2016) ........................................................................................................................ 11

*Int'l Pecans, LLC v. Ultra Trading Int'l Corp.*, 764 F. Supp. 3d 527 (W.D. Tex. 2025) ..................... 22

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185 (5th Cir. 2013) ................... 30

*Janvey v. Suarez*, 978 F. Supp. 2d 685 (N.D. Tex. 2013) .......................................................... 30

*Jelec USA, Inc. v. Safety Controls, Inc.*, 498 F. Supp. 2d 945 (S.D. Tex. 2007) ........................... 4, 6

*Jones v. Alcoa, Inc.* , 339 F.3d 359 (5th Cir. 2003) ............................................................... 30

*Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538 (Ky. Ct. App. 2013) ....................... 20

*Kinnie Ma Indiv. Ret. Acct. v. Ascendant Capital, LLC*, No. 1:19-CV-1050-LY, 2021 WL
11963051, at *5 (W.D. Tex. Aug. 25, 2021) ..................................................................... 20

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509 (Tex. 1942) ................................... 11

*Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC*, 23 F. Supp. 3d 344 (S.D.N.Y. 2014) .............. 31

*Lewis v. Davis*, 199 S.W.2d 146 (Tex. 1947) ....................................................................... 24

*McGinnis v. University of Kentucky*, No. 2022-CA-1494-MR, 2023 WL 6322212 (Ky. Ct.
App. Sept. 29, 2023) .................................................................................................... 19

*Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634 (5th Cir. 2007) ................................................ 11

*MGA Ins. Co. v. Charles R. Chesnutt, P.C.*, 358 S.W.3d 808 (Tex. App.—Dallas 2012, no pet.) ................................................................................................................................21

*Miles Farm Sply., LLC v. Helena Chem. Co.*, 595 F.3d 663 (6th Cir. 2010) ................................11

*Nat'l Plan Adm'rs Inc v. Nat'l Health Ins. Co.*, 235 S.W.3d 695 (Tex. 2007) ............................11

*Northcutt & Son Home for Funerals, Inc. v. U.S. Bank, National Association*, 747 F. Supp. 3d 1058 (E.D. Ky. 2024) ..................................................................................................... 5, 9

*Ortiz v. Cornetta*, 867 F.2d 146 (2d Cir. 1989) ..........................................................................18

*Ousley v. First Commonwealth Bank of Prestonburg, Kentucky*, 8 S.W.3d 45 (Ky. Ct. App. 1999) .......... 17, 19

*Pathways, Inc. v. Hammons*, 113 S.W.3d 85 (Ky. 2003) .............................................................20

*Peoples Nat. Bank v. Guier*, 145 S.W.2d 1042 (Ky. 1940)...........................................................22

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247 (5th Cir. 2021) ............................30

*Pirata P.S.C. v. Bank of America, N.A.*, 709 F. Supp. 3d 353 (W.D. Ky. 2024).....................5, 9, 17, 19

*PK Music Performance, Inc. v. Timberlake*, No. 16-CV-1215 (VSB), 2018 WL 4759737 (S.D.N.Y. Sept. 30, 2018) ................................................................................................ 18, 31

*Pursifull v. Interstate Oil & Gas Corp.*, 168 S.W.2d 363 (1942) ................................................25

*Reagor Auto Mall, Ltd. v. Firstcapital Bank of Tex., N.A. (In re Reagor-Dykes Motors, LP)*, Adversary No. 20-05002 (Bankr. N.D. Tex. Aug. 24, 2020) ........................................28

*Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014) .............................................................................11

*Spence v. Am. Airlines, Inc.*, 718 F. Supp. 3d 612 (N.D. Tex. 2024) ..........................................10

*Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856 (Tex. App.—El Paso 2021, no pet)................20

*Travelers Indem. Co. v. Fuller*, 892 S.W.2d 848 (Tex. 1995) .....................................................23

*United States v. Livecchi*, 711 F.3d 345 (2d Cir. 2013) ..............................................................31

*Villarreal v. First Presidio Bank*, 283 F. Supp. 3d 548 (W.D. Tex. 2017) .....................................4

*Wolfe v. Kimmel*, 681 S.W.3d 7 (Ky. 2023)...............................................................................18

**Statutes**

11 U.S.C. § 108(a)(2)........................................................................................................ 20, 21

11 U.S.C. § 550 ..................................................................................................................36

KY. REV. STAT. § 355.4-102(2) ................................................................................................4

KY. UNIFORM VOIDABLE TRANSACTIONS ACT § 378A.090 .......................................34

TEX. BUS. & COM. CODE § 24.005 ........................................................................................36

TEX. BUS. & COM. CODE § 24.006 ........................................................................................37

TEX. BUS. & COM. CODE § 24.008 ........................................................................................37

TEX. BUS. & COM. CODE § 24.009(b) ...................................................................................37

TEX. BUS. & COM. CODE § 24.010 ........................................................................................34

TEX. BUS. & COM. CODE § 24.013 ........................................................................................37

TEX. BUS. & COM. CODE § 4.102(b) ......................................................................................4

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................................*passim*

Fed. R. Civ. P. 8 ................................................................................................9

Kent Ries, the Chapter 7 Trustee of the bankruptcy estates of McClain Feed Yard, Inc. ("**MFY**") (Case No. 23-20084-swe), McClain Farms, Inc. (Case No. 23-20085-swe), and 7M Cattle Feeders, Inc. ("**7M**") (Case No. 23-20086-swe) (the "**Trustee**"), files this objection to Community Financial Services Bank's ("**CFSB's**") *Motion to Dismiss Plaintiff's Second Amended Complaint Under Rule 7012 of the Federal Rules of Bankruptcy Procedure* (ECF No. 56) and *Brief in Support* (ECF No. 57) (collectively, the "**Motion**"), and respectfully urges the Court to deny the Motion for the reasons that follow:

## I.  INTRODUCTION

1.      At its heart, this case is a Ponzi or Ponzi-like scheme that continued for years and lasted until over $100 million had been lost. That Ponzi scheme exploded when CFSB's codefendant, Rabo AgriFinance, LLC ("**Rabo**"), discarded its initial determination that it should not extend credit to McClain and the Debtors—and subsequently continued to deviate from its policies and procedures to extend the Debtors an ever-increasing amount of credit.

2.      Codefendant Mechanics Bank ("**Mechanics**")—which spun off from Rabo a year into the relationship with Debtors—and codefendant Community Financial Services Bank, ("**CFSB**")— Brian McClain's long-term personal, family, and business bank—enabled, facilitated and permitted a four-plus year, $2 billion, intra-company check kite to run through the Debtors' depository accounts. McClain used the resulting float, together with new investor payments, as new (albeit fictitious) money to pay off old investors in his Ponzi scheme. When the overdrafts grew too large, Rabo extended more credit, including in 2021, when Rabo fully refinanced the Debtors with a $25 million line of credit to pay off major over-drafts across the Debtors' Mechanics and CFSB accounts—and McClain Farms, Inc.'s multimillion dollar, secured loan balance at CFSB.

3.      After CFSB's loan was satisfied with new financing from Rabo in 2021, the Debtors stopped using their CFSB accounts for legitimate purposes, and instead used those CFSB accounts to kite checks and create float for McClain's Ponzi scheme. Despite McClain's history and ongoing pattern of overdrawing the account, and the lack of a legitimate business purpose for maintaining the

account, CFSB maintained the account to facilitate the kite. Although CFSB's motives for facilitating McClain's check kite and Ponzi scheme are irrelevant at the motion to dismiss stage, the Trustee notes that CFSB had at least one major incentive to engage in its misconduct: maintenance of its lucrative relationship with McClain and his family members. McClain and his relatives all held CFSB depository accounts, mortgages, and personal loans. CFSB therefore had a monetary incentive to ensure that McClain's business operations continued. Otherwise, the McClains would not have enough money to satisfy CFSB's outstanding McClain family loans.

4.      Codefendant HTLF Bank ("**HTLF**") joined McClain's check kite scheme in various roles. First, HTLF loaned certain investors money to fund over $100 million in investor payments to the Debtors. Those investors also maintained depository accounts at HTLF, which secured HTLF's loans to the investors. Second, at least two HTLF employees (Shawn Ragland, the McClain investors' relationship manager, and his assistant) served as agents and fiduciaries of the Debtors. Ragland and his assistant possessed a stack of pre-signed but otherwise blank checks from the Debtors. To help facilitate McClain's Ponzi scheme, Ragland and Fernandez would complete those blank checks and deposit them into investors' accounts without indorsement at McClain's direction, immediately credit the account in full, then transfer funds back to the Debtors' accounts before the Debtors' bank(s) had honored the checks to fund the initial deposit by the Debtors. That sequence of transactions created free money for all involved parties—HTLF covered its borrowing base and profited from the interest that it charged the investors, and the investors' "guaranteed profits" from McClain far surpassed the interest that the investors paid to HTLF.

5.      CFSB now claims it is a "victim" of, and did not participate in, McClain's check kite. Wrong. CFSB did not lose money in the check kite scheme because the negative balance in Debtors' CFSB account was paid off just days outside the 90-day preference period. In reality, CFSB is not a "victim," but rather a sophisticated commercial bank that ignored blatant red flags that should have been obvious based on CFSB's intimate knowledge of the Debtors' operations—such as frequent million-dollar-plus overdrafts, banking activities consistent with a check kiting scheme, and obvious inconsistencies and falsehoods in the Debtor financial statements within CFSB's possession. Worse,

in spite of CFSB's possession of internal automated check kiting and suspicious activity reports in connection with the Debtors' accounts, CFSB flouted its own internal policies and procedures (and basic common sense) to facilitate and perpetuate McClain's check kite. That misconduct by CFSB is especially troubling because CFSB had become uncomfortable with the runaway growth of McClain Farms's cattle operations by the mid-2000s.[2] The truth is that CFSB enabled McClain's Ponzi scheme to reduce its exposure to McClain family debts.

6.      In moving to dismiss the Trustee's Second Amended Complaint, CFSB is asking the Court to ignore its culpability in McClain's Ponzi scheme. The Trustee thus urges the Court to deny CFSB's motion as factually and legally unpersuasive.

## II.     ARGUMENT & AUTHORITIES

7.      The Court should deny the Motion because the Trustee's tort claims against CFSB— for knowing participation (or aiding and abetting) McClain's breach of fiduciary duty, civil conspiracy, professional negligence, and money had and received—and the Trustee's Chapter 5 fraudulent transfer claims are plausible and viable under Texas and Kentucky law. Dismissal is unwarranted because CFSB's big-picture arguments (application of Kentucky law, preemption of claims under Kentucky law, insufficient factual allegations, in pari delicto, etc.) are unpersuasive.

### A.     Texas law applies to the Trustee's claims against CFSB.

8.      As a threshold issue, CFSB's Motion asks the Court to decide fact-intensive choice-of-law issues ill-suited for resolution at the motion to dismiss stage. *See* Adversary No. 25-02005 ECF No. 57, ¶¶ 54–61; *contrast CapLOC LLC v. Liberty Mut. Ins. Eur. Ltd.*, No. 3:20-CV-3372-B, 2021 WL 2551591, at *1 (N.D. Tex. June 22, 2021) (denying motion to dismiss because "[t]he motion presents several questions ill-suited for resolution at the motion-to-dismiss stage, particularly given that the . . . claim may hinge on a choice-of-law issue").

---

[2]  In 2009, McClain sought to refinance his business debt, then held by Regions Bank, with CFSB, and it is noted in the loan application file that McClain had moved the account out of CFSB three years prior "because [CFSB] could not get comfortable with the growth rate of his livestock businesses, the amount of money that it took to do so and the collateral position . . . ."

9.      In any case, CFSB claims this case is governed by Kentucky law, to the exclusion of Texas law. *See* Adversary No. 25-02005 ECF No. 57, ¶¶ 54–61. Wrong.

10.      Federal and Texas choice-of-law rules both incorporate the Restatement (Second) of Conflict of Laws ("**Restatement**"). Under the Restatement, when there is no applicable state statutory directive about choice of law, courts apply the Restatement's most significant relationship test. *See Jelec USA, Inc. v. Safety Controls, Inc.*, 498 F. Supp. 2d 945, 949–50 (S.D. Tex. 2007) (citing Restatement § 6). That most significant relationship test encompasses four factors: (i) the location of the injury; (ii) the location of the injurious conduct; (iii) the parties' locations; and (iv) the location where the parties' relationship is centered. *Id.* at 952. Those "contacts are to be evaluated according to their relative importance with respect to the particular issues" in the case. *Id.* The Restatement further instructs that, in tort contexts, "[t]he applicable law will usually be the local law of the state where the injury occurred." *Id.* (citing Restatement § 156). And application of the most significant relationship test to this case weighs in favor of Texas law.

### 1)      There is no controlling Texas choice-of-law statute applicable to the Trustee's common law tort claims.

11.      As to the first choice-of-law consideration—statutory direction—CFSB claims Texas Business and Commerce Code § 4.102(b), which applies to only the "liability of a bank for action or non-action with respect to an item handled by it for purposes of presentment, payment, or collection is governed by the law" of the location of the bank, specifically the branch where the action or non-action occurred. *See* Adversary No. 25-02005 ECF No. 57, ¶¶ 54–55 (citing TEX. BUS. & COM. CODE § 4.102(b) and identical KY. REV. STAT. § 355.4-102(2)).

12.      But that Uniform Commercial Code ("UCC") provision is irrelevant to common-law tort claims that continue to complement (and were not supplanted by) the UCC. *See Villarreal v. First Presidio Bank*, 283 F. Supp. 3d 548, 554 (W.D. Tex. 2017) (collecting Texas statutes, and Texas Supreme Court and Fifth Circuit precedent).

13.      The UCC—as adopted by Texas and Kentucky—cannot and does not supplant the Trustee's common-law tort claims against CFSB for: (a) knowingly participating in (or aiding and

abetting) McClain's breaches of his fiduciary duties to the Debtors; (b) engaging in a civil conspiracy with McClain, HTLF, Mechanics, and Rabo to perpetuate a years-long check kite and Ponzi scheme; (c) professional negligence for deliberately ignoring internal check kite and suspicious activity reports that alerted CFSB to McClain's misconduct; and (d) punitive damages. That is because the Trustee's tort claims challenge CFSB's conduct ***outside the funds transfer process itself***, and the UCC has ***zero*** application to torts independent of the funds transfer process. *E.g.*, *3T Oil & Gas Servs., LLC v. JPMorgan Chase Bank, N.A.*, No. A-18-CV-131-LY, 2018 WL 5018483, at *2–3 (W.D. Tex. Oct. 16, 2018), *report and recommendation adopted*, No. A-18-CV-131-LY, 2018 WL 6220139 (W.D. Tex. Nov. 1, 2018) (explaining that the Texas UCC did not preempt tort claims about conduct separate from the fund transfer process); *Pirata P.S.C. v. Bank of America, N.A.*, 709 F. Supp. 3d 353, 360 (W.D. Ky. 2024) ("[T]hese claims allege misconduct *outside* of the funds transfer process, meaning they are not preempted by the Kentucky Uniform Commercial Code." (citations omitted)); *Northcutt & Son Home for Funerals, Inc. v. U.S. Bank, National Association*, 747 F. Supp. 3d 1058, 1061–62 (E.D. Ky. 2024) (emphasizing that the UCC does not preempt common-law tort claims that exist independently of, or outside, the fund transfer process).

14.    CFSB has no argument that the Trustee's common law tort claims are about the funds transfer process, *i.e.*, presentment and payment of checks. To start, McClain's fiduciary duties to the Debtors, and CFSB's knowing participation in breach of those fiduciary duties, are independent of the funds transfer process. So, too, is CFSB's participation in a civil conspiracy with HTLF, Mechanics, and Rabo in furtherance of McClain's Ponzi scheme. CFSB joined that conspiracy to mitigate the risk of losses from McClain family defaults on their personal debts to CFSB. *E.g.*, Adversary No. 25-02005, ECF No. 48, ¶¶ 62–63. Likewise, CFSB's professionally negligent choice to deliberately ignore many years' worth of internal check kiting and suspicious activity reports (and massive red flags that were apparent from such reports) was made outside the funds transfer process. Finally, CFSB's conscious— and deliberate—institutional decision to engage in McClain's check kiting and Ponzi scheme is one basis for the Trustee's request for punitive damages. That purposeful institutional decision did not depend on the funds transfer process governed by the UCC.

15.    Because the UCC's statutory direction about choice-of-law does not apply, the Court must apply the most significant relationship test prescribed by federal and Texas law through the Restatement. *Accord* Adversary No. 25-02005, ECF No. 57, ¶¶ 57–61.

### 2)    Texas has the most significant relationship to the alleged torts.

16.    Under the most significant relationship test, the location of the injury is the weightiest factor. *See Jelec*, 498 F. Supp. 2d at 952 (citing Restatement § 156). CFSB claims "[i]t is unclear where the alleged injury occurred, if anywhere in particular." Adversary No. 25-02005, ECF No. 57, at ¶ 58. But CFSB's feigned ignorance of the injuries suffered by the Debtors is specious and rebutted by the facts alleged in the Trustee's live complaint. Moreover, CFSB's professed uncertainty about the locus of the injury in this case only highlights why the fact-intensive choice-of-law analysis cannot properly be resolved at the motion to dismiss stage.

### a.    The Debtors were predominantly injured in Texas.

17.    Texas is indisputably the locus of the injuries that CFSB inflicted on Debtors. *First*, Debtor MFY was incorporated in Texas and operated a feedyard in Deaf Smith County, Texas. *See* Adversary No. 25-02005, ECF No. 48, ¶ 8. *Second*, Debtor 7M was created for the express purpose of purchasing and operating a feedlot in Friona, Texas.[3] *See* Adversary No. 25-02005, ECF No. 48, ¶ 8. Indeed, Debtor 7M's bankruptcy petition identifies Friona, Texas, as 7M's principal place of business. *Third*, CFSB had possession of Debtor borrowing base certificates, yard sheets, and financial statements by virtue of CFSB's status as a secured creditor of McClain and the Debtors through 2021 and CFSB's long-running dealings with McClain family members, Mechanics, and Rabo in connection with persistent bank overdrafts and other McClain-adjacent matters. *See, e.g.,* Adversary No. 25-02005, ECF No. 48, ¶¶ 77, 87–91. Those borrowing base certificates, yard sheets, and financial statements establish that MFY and 7M's Texas operations accounted for an overwhelming majority of the Debtors' business. For example, the Debtors' Combined Financial Statements as of September

---

[3] *See* RABO-MCCLAIN 020227 at 020231 ("7M Cattle Feeders, Inc. (formed in 2019) was created to purchase a feed lot in Friona, TX.").

30, 2022, represented that, of the Debtors' $374 million in assets, MFY and 7M owned $211 million and $51 million, respectively. That combined $262 million in assets accounted for seventy-one percent of the Debtors' combined assets.[4] ***Fourth***, the actual cattle that were initially acquired by Debtors in Kentucky and elsewhere were ultimately transported to Debtors' locations in Texas for processing and final sale. *See* Adversary No. 25-02005, ECF No. 48, ¶ 17.[5] ***Fifth,*** the location of Debtors' operations in Texas shows that a significant number of McClain's investors were in Texas—and transacted business with Debtors in Texas. So CFSB's misconduct injured Debtors by damaging their Texas business relationships and operations. Those five facts collectively establish CFSB's misconduct inflicted injuries on Debtors in Texas.

18.    In attempting to avoid that dispositive locus-of-injury analysis, CFSB disclaims any relationship with Debtor MFY under the theory MFY did not have an account at CFSB. *See* Adversary No. 25-02005, ECF No. 57, ¶ 56 n.11. But CFSB had many ongoing communications with McClain, Mechanics, and Rabo about refinancing the Debtors' CFSB loans and overdrafts in CFSB accounts. *See* Adversary No. 25-02005, ECF No. 48, ¶ 55, 62. Because of those communications, CFSB knew that McClain viewed the three Debtors as interchangeable and frequently used massive intercompany transfers through CFSB accounts to accomplish the check kiting that was necessary to McClain's Ponzi scheme. It follows that CFSB was aware that harm to any one Debtor constituted harm to all Debtors, including MFY. Because the Debtors were collectively injured in Texas, the situs of injury factor (which carries the most weight under the most significant relationship test) requires application of Texas law to the Trustee's claims against CFSB.

**b.    The injurious conduct and location of the parties spans multiple states, including Texas.**

19.    The next two factors of the most significant relationship test (locus of the injurious conduct and the parties) are neutral because they point to many different states, including Texas. Two Debtors were based in Texas, one Debtor was based in Kentucky, and all three Debtors centered their

---

[4] RABO-MCCLAIN 007595 at 007602.
[5] *See* RABO-MCCLAIN 020227 at 020231-2.

operations in Texas. *See* Adversary No. 25-02005, ECF No. 48, ¶¶ 8, 17, 87–91. As noted by CFSB, it is incorporated and located in Kentucky. *See* Adversary No. 25-02005, ECF No. 57, ¶ 59. HTLF was incorporated in Colorado when it dealt with the Debtors in connection with McClain's check kiting and Ponzi scheme, and has since been reincorporated in Missouri as part of its acquisition by UMB Bank. *See* Adversary No. 25-02005, ECF No. 57, ¶ 59. More importantly, the HTLF branch that dealt directly with McClain and the Debtors was in Texas. *See* Adversary No. 25-02005, ECF No. 48, ¶¶ 79–83 (describing HTLF's misconduct vis-à-vis three of Debtors' Texas-based investors: 2B Farms, Bo Robinson, and Rebecca Robinson). Rabo is incorporated in Delaware, though one of the main Rabo branches involved in McClain's Ponzi scheme was in Indiana. *See* Adversary No. 25-02005, ECF No. 57, ¶ 59. Mechanics is now incorporated and located in California, where it housed Debtors' bank accounts, *see* Adversary No. 25-02005, ECF No. 48, ¶ 12, and the relevant Mechanics employees were spread across many states, including Indiana and Missouri. And McClain himself frequently moved between Kentucky and Texas for business. *See* Adversary No. 25-02005, ECF No. 48, ¶¶ 8, 15–17. The parties and injurious conduct therefore span seven states—Texas, Kentucky, Colorado, Missouri, Delaware, Indiana, and California. So the second and third factors of the most significant relationship test are neutral and do not favor any state.

### c.    Texas, where the injury occurred, has a more significant relationship to the Trustee's claims than Kentucky.

20.    To be sure, CFSB claims its relationship with the Debtors was based in Kentucky. *See* Adversary No. 25-02005, ECF No. 57, ¶ 60. That claim is questionable at best because the Debtors' operations were centered in Texas such that CFSB knowingly transacted with Texas-based entities. *See* Adversary No. 25-02005, ECF No. 48, ¶¶ 8, 17, 87–91. Regardless, the locus of injury is the central factor in the most significant relationship test—and typically dispositive. That factor overwhelmingly favors application of Texas law, and the secondary factors favor no state. The Court must heed the locus of injury factor's predisposition toward Texas law and apply Texas law to the Trustee's tort claims against CFSB. Any contrary outcome would depart from the choice-of-law analysis prescribed by federal and Texas law in tort contexts like this case.

**B.      The Trustee pleaded viable claims under Texas and Kentucky law.**

21.      Regardless of how the Court ultimately resolves the choice-of-law issue in this case, the Trustee's live complaint pleads legally viable and factually plausible common-law tort claims under Texas and Kentucky law—especially considering the low threshold for plausibility set by Federal Rule of Civil Procedure 8. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement …." (quotation marks and citations omitted)).

22.      Indeed, nowhere does CFSB claim the Trustee's common-law tort claims are not legally viable under Texas law. Rather, CFSB claims Texas law does not apply so the Trustee's Texas law claims should be dismissed. Adversary No. 25-02005, ECF No. 57, at ¶¶ 62–64. That argument about Texas law fails for the reasons set out above.

**1)      Texas and Kentucky's adoption of the UCC does not preempt all tort claims.**

23.      Unsatisfied with its spurious position that Texas law does not apply, CFSB insists the Texas and Kentucky UCC preempt the Trustee's common-law tort claims against CFSB. *See* Adversary No. 25-02005, ECF No. 57, at ¶¶ 65–69. CFSB is wrong again.

24.      As explained earlier, the Texas and Kentucky UCC statutes do not preempt common-law tort claims about conduct outside the funds transfer process, like those asserted by the Trustee. *See 3T Oil & Gas*, 2018 WL 5018483, at *2–3 (Texas UCC); *Pirata*, 709 F. Supp. 3d at 360 ("[T]hese claims allege misconduct *outside* of the funds transfer process, meaning they are not preempted by the Kentucky Uniform Commercial Code. In other words, because the claims relate to misconduct that allegedly occurred after the wire transfer (*i.e.*, in recovery efforts), preemption poses no bar to them moving forward." (citations omitted)); *accord Northcutt*, 747 F. Supp. 3d at 1061–62 (emphasizing that the UCC does not preempt common-law tort claims that exist independently of, or outside, the funds transfer process). CFSB's UCC-preemption argument thus cannot support dismissal of the Trustee's common-law tort claims.  *See 3T Oil & Gas*, 2018 WL 5018483, at *2–3.

25.     CFSB has no argument that the Trustee's common law tort claims are about the funds transfer process, *i.e.*, presentment and payment of checks. To start, McClain's fiduciary duties to the Debtors, and CFSB's knowing participation in breach of those fiduciary duties, are independent of the funds transfer process. So too is CFSB's participation in a civil conspiracy with HTLF, Mechanics, and Rabo in furtherance of McClain's Ponzi scheme. As set out above, CFSB joined that civil conspiracy to mitigate the risk of losses from McClain family defaults on their personal debts to CFSB. Likewise, CFSB's professionally negligent choice to deliberately ignore many years' worth of internal check kiting and suspicious activity reports (and the massive red flags that were apparent from such reports) was made outside the funds transfer process. Finally, CFSB's conscious—and deliberate—institutional decision to engage in McClain's check kiting and Ponzi scheme is one basis for the Trustee's request for punitive damages, and that purposeful institutional decision has no relationship with the funds transfer process governed by the UCC.

### 2)    CFSB's "arguments by label" about Kentucky and Texas claims fail.

26.     Because the Kentucky UCC does not preempt the Trustee's common-law tort claims, CFSB spends much of the rest of its motion: (a) arguing by label on the basis that Kentucky law does not recognize the Trustee's claims; and (b) claiming the Trustee live complaint omits facts capable of supporting each element of the Trustee's Texas common-law tort claims against CFSB. *See* Adversary No. 25-02005, ECF No. 57, ¶¶ 70–85, 99–126. But CFSB's contentions distort Kentucky law and the factual allegations pleaded in the Trustee's live complaint, thus reinforcing the common refrain that no factual allegation is ever specific enough to satisfy a defense lawyer that avails himself of Rule 12(b)(6). And the well-pleaded factual allegations in the Trustee's live complaint are sufficiently specific to support legally viable and factually plausible common-law tort claims against CFSB under both Texas and Kentucky law. That is especially true given that, to survive a motion to dismiss, the Trustee need only allege facts that support each element of the relevant claim—or sufficient facts upon which the satisfaction of an element may be reasonably inferred. *See, e.g., Spence v. Am. Airlines, Inc.*, 718 F. Supp. 3d 612, 619 (N.D. Tex. 2024).

### a. The Trustee has sufficiently alleged a knowing participation in (or aiding and abetting) breach of fiduciary duty claim.

27.     "Under Texas law, 'where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as much.'" *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (quoting *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942)). "To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Id.*

28.     Kentucky law incorporates an analogous aiding and abetting breach of fiduciary duty claim where "a plaintiff must prove the following elements: (1) the existence and breach of a fiduciary relationship; (2) the defendant gave the breaching party substantial assistance or encouragement in effectuating the breach; and (3) the defendant knew that the party's conduct breached that fiduciary duty." *Insight Kentucky Partners II, L.P. v. Preferred Auto. Servs., Inc.*, 514 S.W.3d 537, 546 (Ky. Ct. App. 2016) (citing *Miles Farm Sply., LLC v. Helena Chem. Co.*, 595 F.3d 663, 666 (6th Cir. 2010)).

29.     The Trustee's live complaint alleges sufficient facts to support each element of a Texas knowing participation in breach of fiduciary duty claim, and a Kentucky aiding and abetting breach of fiduciary duty claim. Dismissal is unwarranted.

30.     **Existence of a fiduciary relationship.** McClain was a director, officer, and employee of Debtors, so he owed fiduciary duties to Debtors. *See* Adversary No. 25-02005, ECF No. 48, ¶¶ 120–21 (citing *Ritchie v. Rupe*, 443 S.W.3d 856, 858 (Tex. 2014); *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 569-70 (N.D. Tex. 2024); *Nat'l Plan Adm'rs Inc v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007)); *see also Gross v. Adcomm, Inc.*, 478 S.W.3d 396, 400 (Ky. Ct. App. 2015) ("Officers and directors owe fiduciary duties to the corporation . . . . Thus, . . . if a corporate officer or director . . . breaches a fiduciary duty, it is an injury to the corporation . . . .").

31.     **Knowledge of the fiduciary relationship.** CFSB knew about McClain's fiduciary relationship with Debtors because CFSB dealt directly with McClain in his capacity as a director,

officer, or employee of Debtors. *See* Adversary No. 25-02005, ECF No. 48, ¶ 122. That knowledge of CFSB is indisputable because CFSB was McClain's longtime banking partner and became so inextricably intertwined with McClain that it facilitated the removal of McClain's ex-wife as a director of Debtors as part of the divorce proceedings. *See* Adversary No. 25-02005, ECF No. 48, ¶ 15.

32.     **McClain's breach of the fiduciary relationship.** McClain breached his fiduciary duties to Debtors by using Debtors to operate a billion-dollar Ponzi scheme for many years. *E.g.,* Adversary No. 25-02005, ECF No. 48, ¶ 123.

33.     **Knowledge of, active participation in, and substantial assistance to, McClain's breach of fiduciary duty.** The means by which McClain accomplished his Ponzi scheme, as alleged in the Trustee's live complaint, establish CFSB's knowledge of, active participation, and substantial assistance to McClain's breach of fiduciary duty. *E.g.,* Adversary No. 25-02005, ECF No. 48, ¶ 123. Based on the size and volume of transactions in and out of McClain's CFSB accounts, and resulting internal check kiting and suspicious activity reports, CFSB had ***actual knowledge*** that McClain was breaching his fiduciary duties to Debtors by operating a massive Ponzi scheme. *E.g.,* Adversary No. 25-02005, ECF No. 48, ¶¶ 40, 46, 77, 88–91, 123, 125–27 137, 157. Worse, CFSB took an active role in that Ponzi scheme by rendering substantial assistance to McClain. Despite the massive red flags generated by CFSB's own internal check kiting and suspicious activity reports, CFSB continued to fulfill transactions in and out of the Debtors' accounts at CFSB—and took no action whatsoever to stop the never-ending stream of intercompany transfers between Debtors. *E.g.,* Adversary No. 25-02005, ECF No. 48, ¶ 126 (alleging "massive and pervasive overdrafts on Debtors' bank accounts at CFSB . . . for the duration of McClain's long-running Ponzi scheme.").

34.     Because the Trustee alleged sufficient facts for a plausible Texas knowing participation in breach of fiduciary duty claim, and Kentucky aiding and abetting breach of fiduciary duty claim, CFSB's motion must be denied outright as to that claim.

35.     CFSB's arguments about notice and due process—*see* Adversary No. 25-02005, ECF No. 57, ¶¶ 72–74—are facially implausible, as demonstrated by CFSB's citation to the footnote in the Trustee's live complaint where the Trustee explains that a Kentucky aiding and abetting breach of

fiduciary duty is the closest analogue to a Texas knowing participation in breach of fiduciary duty claim. Adversary No. 25-02005, ECF No. 57, ¶ 72. And CFSB's lengthy exposition about Kentucky aiding and abetting breach of fiduciary duty claims belies its purported "lack of notice" that such a claim could potentially be in play in the Trustee's lawsuit.

36.     Lastly, the Trustee notes that CFSB has refused to comply with the subpoena that the Trustee issued under the Court's prior Rule 2004 discovery order. Among other things, that subpoena asked CFSB to supplement its existing Rule 2004 production with its internal check kiting and suspicious activity reports. But CFSB rebuffed that request on the basis that the Trustee must obtain all discovery during the course of this adversary proceeding. At the same time, CFSB has rebuffed all discovery until resolution of Rule 12 motions in this adversary proceeding. CFSB cannot have its cake and eat it too by resisting Rule 2004 discovery and discovery in this adversary proceeding.

### b.     The Trustee sufficiently alleged facts to support his civil conspiracy claim.

37.     CFSB seeks dismissal of the Trustee's hypothetical Kentucky civil conspiracy claim because, according to CFSB, the Trustee did not plead any cognizable underlying tort, *i.e.*, knowing participation in (or aiding and abetting) breach of fiduciary duty. *See* Adversary No. 25-02005, ECF No. 48, ¶¶ 77–79. But, as explained above, the allegations in the Trustee's live complaint are not only sufficient to give rise to a factually plausible Texas knowing participation in breach of fiduciary duty claim, but also a factually plausible Kentucky aiding and abetting breach of fiduciary duty claim. The Court should thus reject CFSB's request for dismissal of the Trustee's civil conspiracy claim.

38.     Separately, in Texas, "[a] civil conspiracy is composed of two or more persons combining to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 623 F. Supp. 2d 798, 808–09 (S.D. Tex. 2009). The essential elements of a civil conspiracy claim are: "(1) two or more persons; (2) an object to be

accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Id.*[6]

39.     Crucially, the agreement or meeting of the minds necessary for civil conspiracy liability "need not be formal; rather, the understanding may be tacit; and it is not essential that each conspirator have knowledge of the details of the conspiracy; inferences of concerted action may be drawn from participation in the transactions." *Id.* (cleaned up). And "it is not necessary for each conspirator to have entered into the unlawful agreement at its inception." *Id.*

40.     And "the fact that a conspirator is not present at, or does not participate in, all the conspiratorial activities does not, by itself, exonerate him." *Id.* "A changing cast of characters does nothing to lessen the fact of one conspiracy. Once the existence of a common scheme of conspiracy is shown, slight evidence is all that is required to connect a particular defendant with the conspiracy." *Id.*

41.     The Trustee's live complaint alleges each essential element of a Texas civil conspiracy claim against CFSB as follows.

42.     **Two or more persons.** McClain, CFSB, HTLF, Mechanics, and Rabo joined together in a civil conspiracy. *See* Adversary No. 25-02005, ECF No. 48, ¶¶ 146–49.

43.     **An object to be accomplished.** The ultimate object of the civil conspiracy between McClain, CFSB, HTLF, Mechanics, and Rabo was to profit from McClain's multi-billion-dollar Ponzi scheme. *See* Adversary No. 25-02005, ECF No. 48, ¶¶ 151–52; *see also* ¶¶ 34, 38, 46, 55, 62–63, 74–77, 80, 84–91, 113, 123, 126, 137, 147–57, 166.

44.     **A meeting of the minds.** McClain, CFSB, HTLF, Mechanics Bank, and Rabo had a meeting of minds on the object of operating—and profiting from—a Ponzi scheme. That meeting of the minds is evidenced by the Trustee's allegation that "four sophisticated, commercial financial institutions—two of whom had been one and the same just a year prior—all, for years, not only

---

[6] Kentucky law recognizes a substantially similar civil conspiracy claim. *See Harris v. Goins*, 156 F. Supp. 3d 857, 866 (E.D. Ky. 2015) (articulating the elements of a Kentucky civil conspiracy claim as: "(i) the existence of a single plan; (ii) that the co-conspirators shared in a general conspiratorial objective; and (iii) an overt act in furtherance of the conspiracy that caused injury to the plaintiff"). As set out below, the allegations in the Trustee's live complaint are sufficient to state a factually plausible civil conspiracy claim under Texas and Kentucky law.

ignored countless red flags but enabled and partook in the same broad check-kiting scheme." *See* Adversary No. 25-02005, ECF No. 48, ¶ 153.

45. **One or more unlawful, overt acts.** McClain, CFSB, and CFSB's codefendants undertook at least eleven overt acts in furtherance of their meeting of the minds about the Ponzi scheme. And all eleven of those overt acts show that CFSB knowingly participated in (or aided and abetted) McClain's breach of his fiduciary duties to Debtors through the check kiting and Ponzi scheme at issue. *See* Adversary No. 25-02005, ECF No. 48, ¶ 154:

- *First,* McClain housed all of Debtors' bank accounts at CFSB and Mechanics and used Rabo as a lending facility for Debtors' operations.

- *Second,* Rabo lent Debtors $70 million to facilitate "growth" of McClain's Ponzi scheme, including, in part, to pay off Debtors' loans from CFSB and its co-defendants.

- *Third,* despite repeated and extended overdrafts in the millions of dollars, CFSB, HTLF, and Mechanics continued to honor the Debtors' insufficient funds ("NSF") checks and transactions, both as payor and payee, when their ordinary policies and procedures counseled otherwise.

- *Fourth,* Rabo, via its credit facilities, and CFSB and Mechanics, via their fulfillment of NSF checks and automatic crediting of checks despite repeated prior overdrafts, lent Debtors any fund shortfalls caused by overdrafts on Debtors' accounts at CFSB and Mechanics to perpetuate the Ponzi scheme.

- *Fifth,* CFSB and Mechanics readily accepted deposits for new Partnership Agreements when they knew such funds were the new investments required to prop up the Ponzi scheme.

- *Sixth,* HTLF controlled pre-signed blank checks drawn on Debtors' accounts at CFSB and Mechanics, which HTLF would complete and deposit without proper endorsement on Debtors' behalf (instead of demanding, as a prudent bank would, that Debtors provide completed checks or wire the funds).

- ***Seventh,*** HTLF, through Debtors' accounts at CFSB and Mechanics, created float for the Debtors by immediately crediting the corresponding customer's account for a check deposited by HTLF, then returning the funds to Debtors through outgoing wire transfers. Many examples of those circular transfers are found in CFSB and Mechanics' records for the Debtors' accounts.

- ***Eighth,*** in the days and weeks before the Petition Date, Rabo and Mechanics initiated transfers from the Debtors' deposits to CFSB to zero out Debtors' accounts at CFSB.

- ***Ninth,*** mere days before Rabo forced McClain out of business and installed its hand-picked replacement atop the Debtors, Mechanics signed Deposit Account Control Agreements that gave Rabo full control over Debtors' funds and outflows from Debtors' accounts at Mechanics.

- ***Tenth,*** Rabo extracted purported releases and waivers from the Debtors in amended forbearance agreements signed mere days before the Petition Date.

- ***Eleventh,*** McClain, at Rabo's direction, hired an external CPA firm to prepare quarterly and annual consolidated financials to give Debtors' business a veneer of legitimacy—even though the preamble to each financial statement reflected material deviations from generally accepted accounting principles and neither CFSB nor its codefendants scrutinized those financials, as would be expected of a competent depository bank.

46.     While CFSB's motive for entering into the above conspiracy is essentially irrelevant at the motion to dismiss stage, the Trustee's live complaint illuminated CFSB's reasons for conspiring with HTLF, Mechanics, and Rabo. CFSB partook and facilitated the check kiting and Ponzi scheme to preserve its two-decade-long relationship with McClain and his family members—which allowed CFSB to retain their personal accounts and the resulting profits. Put simply, CFSB needed to ensure that the McClains (many of whom depended on the Debtors for income) had sufficient cash flow to

repay their personal debts to CFSB, which were significant in size and volume. *See* Adversary No. 25-02005, ECF No. 48, ¶ 156; *see also* ¶¶ 62–63 (listing McClain family accounts at CFSB).

47.     **Damages.** Debtors sustained $200 million in losses as the proximate result of CFSB's conspiracy with its co-defendants. *See* Adversary No. 25-02005, ECF No. 48, ¶ 158.

48.     Because the Trustee has alleged a factually plausible civil conspiracy claim against CFSB, its motion must be denied on that claim.

### c.     The Trustee sufficiently pleaded his professional negligence claim.

49.     CFSB asserts that the Trustee cannot properly plead a professional negligence claim under the false premise that CFSB was a "victim" of McClain's Ponzi scheme. *See* Adversary No. 25-02005, ECF No. 57, at ¶¶ 80–81, 109, 115. That reasoning elides the Trustee's allegations that, in the days and weeks before the Debtors' Petition Date, Rabo and Mechanics strangely initiated transfers to CFSB to zero out the negative balances in Debtors' CFSB bank accounts. *See* Adversary No. 25-02005, ECF No. 48, ¶ 154. That improbably fortuitous timing nullifies CFSB's attempt to play the victim in this case. In reality, CFSB was a knowing and willing participant in McClain's Ponzi scheme and enriched itself at Debtors' expense.

50.     Perhaps sensing the fatal flaws in its attempt to play possum, CFSB alternatively claims it owed no duty to the Debtors under Kentucky law. *See* Adversary No. 25-02005, ECF No. 57, ¶¶ 82–83. Wrong. Kentucky law establishes that CFSB owed a duty of ordinary care to the Debtors. *E.g.*, *Forcht Bank, NA v. Gribbins*, No. 2014-CA-000592-MR, 2015 WL 4039612, at *3 (Ky. Ct. App. July 2, 2015) ("The relationship between a customer and a bank is inherently contractual and, thus, it has been held that banks have a duty to act in good faith ***and to exercise ordinary care in dealing with their customers and their accounts***." (emphasis added, citing *Ousley v. First Commonwealth Bank of Prestonburg, Kentucky*, 8 S.W.3d 45, 47 (Ky. Ct. App. 1999)); *accord Pirata*, 709 F. Supp. 3d at 362 (citing *Christie v. First American Bank*, 908 S.W.2d 679 (1995); *Bullitt County Bank v. Publishers Printing Co.*, Ky. App., 684 S.W.2d 289 (1984) (explaining that, in Kentucky, banks must "exercise reasonable care in dealing with their customers and their accounts."));

51.     Moreover, the Trustee's live complaint alleges that, if the Debtors' account agreements with CFSB parallel their agreements with Mechanics and Rabo, the CFSB account agreements required CFSB to act with ordinary care when processing transactions against Debtors' accounts at CFSB. *See* Adversary No. 25-02005, ECF No. 48, ¶ 162. The existence of such a duty would be consistent with the CFSB account agreements available to the Trustee. On that point, CFSB has apparently refused to produce its account agreements with the Debtors, likely because CFSB does not want to reveal the existence of its duty of ordinary care to the Trustee.

52.     Desperate to avoid Kentucky's clear instruction that banks owe a duty of ordinary care to their customers, CFSB finally turns to Kentucky's purported one-year statute of limitations for professional negligence claims. *See* Adversary No. 25-02005, ECF No. 57, ¶¶ 84–85. But CFSB's reliance on that one-year limitations period is unavailing for several reasons requiring denial of CFSB's motion. *See PK Music Performance, Inc. v. Timberlake*, No. 16-CV-1215 (VSB), 2018 WL 4759737, at *7 (S.D.N.Y. Sept. 30, 2018) ("[W]here there is even some doubt as to whether dismissal is warranted, a court should not grant a Rule 12(b)(6) motion on statute of limitations grounds." (citing *Ortiz v. Cornetta*, 867 F.2d 146, 149 (2d Cir. 1989)).

53.     **First**, in Kentucky, the "discovery rule acts to toll the statute of limitations until the claimant knows, or reasonably should know, that injury has occurred." *Wolfe v. Kimmel*, 681 S.W.3d 7, 13 (Ky. 2023). Nowhere does CFSB explain how, or why, the Debtors or the Trustee could or should have discovered CFSB's professional negligence before the Petition Date. CFSB's contention that "the Debtors (through McClain) solicited and procured passive investments in an effort to engage in the alleged Ponzi scheme" falls well short of a cogent explanation for why the Debtors or the Trustee should have discovered CFSB's professional negligence before the Debtors filed for bankruptcy. *See* Adversary No. 25-02005, ECF No. 57, ¶ 85.

54.     **Second**, CFSB's one-year limitations period does not bar the Trustee's professional negligence claim because the federal Bankruptcy Code supersedes Kentucky law by giving the Trustee two years from the date of his appointment to investigate and file legal claims that would have been available to Debtors as of the Petition Date, *i.e.*, professional negligence against CFSB. *See* 11 U.S.C.

Case 25-02005-swe   Doc 79   Filed 08/06/25   Entered 08/06/25 19:37:49   Desc Main
Document      Page 26 of 44


§ 108(a)(2). CFSB has never argued that the Trustee failed to file his professional negligence claim against CFSB before that two-year period elapsed. Nor could CFSB make any such timeliness argument because the Trustee timely filed his Original Complaint.

55.     **_Third,_** the Kentucky Supreme Court has at least implicitly endorsed the continuing negligence doctrine, which "provides that where a tort involves a continuing or repeated injury, then the cause of action does not accrue and the limitations period does not begin to run until the date of the last injury." *McGinnis v. University of Kentucky*, No. 2022-CA-1494-MR, 2023 WL 6322212, at *4 (Ky. Ct. App. Sept. 29, 2023) (quoting *Davis v. All Care Med., Inc.*, 986 S.W.2d 902, 905 (Ky. 1999)). As alleged in the Trustee's live complaint, CFSB engaged in ongoing professional negligence against Debtors up to the Petition Date, *see* Adversary No. 25-02005, ECF No. 48, ¶¶ 89–90, 154, 162–67, so the Trustee has no statute of limitations problem here.

56.     In sum, CFSB's Kentucky law arguments against the Trustee's professional negligence claim must be rejected. At the outset, CFSB was not a victim of McClain's Ponzi scheme. CFSB was instead a net winner or non-loser because, shortly before the Petition Date, Mechanics and Rabo made transfers to CFSB to zero out the then-negative balance in the Debtors' CFSB accounts. *See* Adversary No. 25-02005, ECF No. 48, ¶ 154. Moreover, CFSB indisputably owed a duty of ordinary care to the Debtors in connection with their depository accounts. *See Forcht Bank*, 2015 WL 4039612, at *3; *Ousley*, 8 S.W.3d at 47; *Pirata*, 709 F. Supp. 3d at 362; *Christie*, 908 S.W.2d 679; *Bullitt County Bank*, 684 S.W.2d 289. Finally, CFSB's one-year statute of limitations argument is unpersuasive because (a) CFSB never explained how or why the Debtors or the Trustee could or should have discovered CFSB's negligence before the Petition Date; (b) the Trustee timely filed his Original Complaint well before the two-year deadline prescribed in 11 U.S.C. § 108(a)(2); and (c) the Kentucky Supreme Court's favorable view of the continuing negligence doctrine prevents CFSB from arguing for an accrual date other than the Petition Date on which the Debtors filed bankruptcy.

57.     Even setting aside CFSB's failed Kentucky law arguments, CFSB fares no better under Texas law as to the Trustee's professional negligence claim.

TRUSTEE'S OBJECTION TO CFSB'S MOTION TO DISMISS                                                    -19-

58.    In Texas, negligence "consists of three elements: (1) a legal duty owed by one person

to another; (2) a breach of that duty; and (3) damages proximately caused by the breach of that duty."

*Kinnie Ma Indiv. Ret. Acct. v. Ascendant Capital, LLC*, No. 1:19-CV-1050-LY, 2021 WL 11963051, at *5

(W.D. Tex. Aug. 25, 2021) (citing *Helbing v. Hunt*, 402 S.W.3d 699, 702 (Tex. App.—Houston [1st

Dist.] 2012, pet. denied)). Kentucky negligence claims encompass identical elements. *See Hurst v. Dixie

Truss, Inc.*, No. 2020-CA-0816-MR, 2021 WL 1826881, at *5 (Ky. Ct. App. May 7, 2021) ("'[T]o prevail

on a negligence claim, the pleading party must prove three elements: 1) duty; 2) breach of that duty;

and 3) consequent injury.'  The term 'consequent injury' encompasses two distinct elements—actual

injury and legal causation between the breach and the injury." (quoting *Keaton v. G.C. Williams Funeral

Home, Inc.*, 436 S.W.3d 538, 542 (Ky. Ct. App. 2013) and citing *Pathways, Inc. v. Hammons*, 113 S.W.3d

85, 88–89 (Ky. 2003)). So a factually plausible Texas negligence claim will necessarily pass muster

under Kentucky tort law.

59.    The Trustee's live complaint sufficiently alleges the elements of a factually plausible

professional negligence claim against CFSB under Texas and Kentucky law.

60.    **Duty.** CFSB owed a duty of ordinary care to Debtors at all relevant times. *See

Adversary* No. 25-02005, ECF No. 48, ¶ 162 (citing *Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d

856, 873 n.5 (Tex. App.—El Paso 2021, no pet)); *accord Forcht Bank*, 2015 WL 4039612, at *3 (noting

that Kentucky law imposes a duty of ordinary care on banks in connection with customer accounts).

61.    **Breach.** CFSB breached its duty of ordinary care by, *inter alia*, deliberately ignoring

countless check kiting and suspicious activity reports that should have tipped CFSB off about

McClain's Ponzi scheme. *See* Adversary No. 25-02005, ECF No. 48, ¶¶ 77, 91. Worse, CFSB also

breached its duty of ordinary care by actively "engaging in cash and check kiting activity where CFSB

. . . used [its] control over Debtors' accounts to make on-the-spot payments to investors demanding

payment under fraudulent Partnership Agreements." *See* Adversary No. 25-02005, ECF No. 48, ¶ 163.

And CFSB further breached its duty of ordinary care to Debtors "by allowing hundreds of millions

of dollars to be transferred between Debtors' bank accounts at CFSB and Mechanics Bank on a

monthly basis with no apparent, legitimate purpose—a basic red flag for fraudulent activity." *See*

Adversary No. 25-02005, ECF No. 48, ¶ 166. Tellingly, the Trustee alleged "massive and pervasive overdrafts on Debtors' bank accounts at CFSB . . . for the duration of McClain's long-running Ponzi scheme. Any competent bank would have investigated those overdrafts and discovered McClain's fraud." *See* Adversary No. 25-02005, ECF No. 48, ¶ 166.

62.     **Actual damages and proximate or legal causation.** As alleged by the Trustee, CFSB's professional negligence damaged Debtors by causing them to incur $200 million in debt, and CFSB should have foreseen that its unlawful actions would cause Debtors to lose massive amounts of money, with those losses increasing daily. *See* Adversary No. 25-02005, ECF No. 48, ¶ 167 (explaining the Debtors' $200-plus million in damages was the direct and foreseeable result of CFSB's refusal to stop the check kiting and float scheme).

63.     Because the Trustee has pleaded a factually plausible negligence claim under Texas and Kentucky law, CFSB's motion must be denied as to that claim.

### d.     The live complaint states a legally cognizable and factually plausible money had and received claim against CFSB.

64.     In its final attack on the Trustee's common-law tort claims, CFSB urges dismissal of the Trustee's money had and received claim against CFSB. *See* Adversary No. 25-02005, ECF No. 48, ¶¶ 198–199 (pleading Trustee's money had and received claim); *cf.* Adversary No. 25-02005, ECF No. 57, ¶¶ 121–26 (urging dismissal of instant claim). CFSB's arguments to that end must be rejected because, as pleaded, the Trustee's money had and received claim is legally cognizable and factually viable under both Texas and Kentucky law.

65.     Under Texas law, "[t]o prove a claim for money had and received, a plaintiff must show that (1) a defendant holds money (2) which in equity and good conscience belongs to the plaintiff." *Graman v. Graman*, No. 05-14-01254-CV, 2016 WL 235055, at *5 (Tex. App.—Dallas Jan. 20, 2016, no pet. h.) (citing *MGA Ins. Co. v. Charles R. Chesnutt, P.C.*, 358 S.W.3d 808, 814 (Tex. App.—Dallas 2012, no pet.)). The fundamental question "in an action for money had and received, is to which party does the money, in equity, justice, and law, belong." *Id.* Similarly, in Kentucky, "there is a right of action for money had and received, which is equitable in its nature and maintainable in all

cases where one person has received the money of another . . . under such circumstances that in equity and good conscience he ought not to retain it." *Peoples Nat. Bank v. Guier*, 145 S.W.2d 1042, 1044 (Ky. 1940) (citation omitted). CFSB therefore has no argument that money had and received is not a viable legal claim under either Texas or Kentucky law.

66.     The Trustee's live complaint contains sufficient allegations to state a factually plausible money had and received claim against CFSB. In the weeks and days leading up to the Petition Date, Rabo and Mechanics transferred funds from the Debtors' non-CFSB accounts to CFSB to zero out the then-negative balance in those CFSB accounts. *See* Adversary No. 25-02005, ECF No. 48, ¶¶ 154, 199 (alleging zero balance held by CFSB before Petition Date).

67.     Because the Trustee alleged a legally cognizable and factually plausible money had and received claim against CFSB under both Texas and Kentucky law, this Court should reject CFSB's requests for dismissal of that pending claim against CFSB.

68.     CFSB tries to sidestep that dispositive analysis by claiming its relationship with the Debtors is a creature of contract, and money had and received claims are unavailable when a contract governs the parties' relationship. *See* Adversary No. 25-02005, ECF No. 57, ¶¶ 123–26. But that argument completely misses the mark. CFSB should know that, "while parties cannot recover under both breach of contract and quasi-contract theories, Texas law clearly permits a party to plead both a claim for breach of contract and, in the alternative, equitable claims. This ensures that a plaintiff is not barred from relief if the trier of fact ultimately concludes that no valid contract existed." *Int'l Pecans, LLC v. Ultra Trading Int'l Corp.*, 764 F. Supp. 3d 527, 537 (W.D. Tex. 2025) (collecting cases); *see also Henderson v. Wells Fargo Bank*, ___ F. Supp. 3d ___, 2025 WL 957599, at *6 n.4 (S.D. Tex. 2025) ("The Federal Rules of Civil Procedure allow a party to assert separate claims under alternative theories of liability. And a plaintiff does not need the magic words 'in the alternative' to successfully plead an alternative theory."). And CFSB's speculation about contracts between itself and two of McClain's former investors is irrelevant to the Debtors' claims against CFSB—especially so at the motion to dismiss stage. Therefore, CFSB's assertion that the Trustee cannot use the money had and received

"quasi-contract theory as an alternative to a breach of contract claim" is flat wrong and must be rejected as a matter of settled pleading rules.

### e.    The Trustee can recover punitive damages.

69.    CFSB seeks dismissal of the Trustee's request for punitive damages because it derives from the Trustee's common-law tort claims. *See* Adversary No. 25-02005, ECF No. 57, ¶ 119. But all such claims are legally cognizable and factually plausible—regardless of whether Texas or Kentucky law applies—so the Trustee can pursue recovery of punitive damages from CFSB. *See, e.g.*, *Travelers Indem. Co. v. Fuller*, 892 S.W.2d 848, 853 (Tex. 1995).

## C.    CFSB's *in pari delicto* affirmative defense does not authorize or require dismissal of the Trustee's claims under Texas or Kentucky law.

70.    CFSB finally invokes the *in pari delicto* affirmative defense in seeking dismissal of the Trustee's common-law tort claims against CFSB. *See* Adversary No. 25-02005, ECF No. 57, ¶¶ 86–98. That ground for dismissal fails on the merits.

71.    At the outset, the Court must decide whether Texas or Kentucky law applies before passing on any *in pari delicto* affirmative defense. "The Fifth Circuit has held that *in pari delicto* is an equitable, affirmative defense, which is controlled by state common law, which accounts for the fact that, in some states, the doctrine, . . . is applied more strictly to bar a plaintiff's claims, while, in others, . . . [it is] interpreted flexibly and to take into account the facts and circumstances of each case to fashion an equitable result." *In re Vantage Benefits Administrators, Inc.*, Adversary No. 20-03055-SGJ, 2024 WL 3842796, at *21 (Bankr. N.D. Tex. Aug. 14, 2024). Because choice-of-law issues are poorly suited for the motion to dismiss stage, CFSB's assertion of the *in pari delicto* defense is premature, and the Court should delay any commentary pending further development of the factual record on CFSB's financial and other dealings with McClain and the Debtors.

72.    If the court ultimately addresses the choice-of-law question at this stage of the case, CFSB's *in pari delicto* defense does not require dismissal of the Trustee's common law claims, regardless of whether Texas or Kentucky law applies. The inescapable truth for CFSB is that, notwithstanding

its invocation of *in pari delicto*, the Trustee is entitled to prosecute his claims against CFSB through at least the fact discovery phase of this adversary proceeding. CFSB must now be held to account for its misconduct that deprived the Debtors' creditors of untold sums.

73.    Under Texas law, "even when parties are *in pari delicto*, an exception to the doctrine will sometimes be applied if public policy or the equities demand it." *Vantage*, 2024 WL 3842796, at *21. That is because the *in pari delicto* defense does not exist for the benefit of CFSB and other joint wrongdoers. Rather, *in pari delicto* serves the public good. *Id.* (citing *Lewis v. Davis*, 199 S.W.2d 146, 151 (Tex. 1947)). That *Lewis* decision from the Texas Supreme Court emphasized the need to, in each unique case, balance (a) judicial assistance of wrongdoers with (b) the policy against unjust enrichment of one party (here, CFSB) at the expense of others (here, Debtors and their creditors). *See* 199 S.W.2d at 151. Resolution of that balancing inquiry "depends on the peculiar facts and equities of the case." *Id.* Stated differently, "a policy analysis must occur on a case-by-case basis" when a party invokes the *in pari delicto* defense. *In re Vantage*, 2024 WL 3842796, at *27.

74.    Such analysis is poorly suited (and largely unavailable) at the motion to dismiss stage because resolution of the *in pari delicto* defense is heavily dependent on the particular facts of each case, necessitating full development of the factual record. *See In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2020 WL 4939180, at *13 (Bankr. N.D. Tex. Aug. 24, 2020) (explaining that dismissal of claims because of an affirmative defense is proper only in the rare case when the defense is established conclusively from the face of the complaint—and rejecting the availability of the defense as grounds for dismissal under Rule 12(b)); *accord In re Vantage*, 2024 WL 3842796, at *28 (finding the *in pari delicto* defense to be so "intensely factual" that it could not be resolved at the summary judgment stage given the many disputes of material fact); *see* Adversary No. 25-02005, ECF No. 57, ¶¶ 89, 92–94 (admitting CFSB "has found no published opinions by a Texas court granting a motion to dismiss under the *in pari delicto* defense" as it exists under Texas law, and expounding on a long line of Texas cases where courts denied motions to dismiss based on *in pari delicto*).

75.    Moreover, the *In re Vantage* court explained that, even when a wrongdoer's actions are imputed to a bankrupt debtor, the *in pari delicto* defense does not bar recovery because the Trustee "is

an innocent party seeking recovery from the" defendant wrongdoers that would benefit only innocent creditors, and there was no evidence that the Trustee's recovery would benefit any wrongdoer. 2024 WL 3842796, at *28. So the *In re Vantage* court "easily conclude[d] . . . that barring the Trustee's tort claims . . . based on *in pari delicto* . . . would ___**not**___ outweigh the overall policy of not inflicting additional harm on the innocent victims of the scheme" that caused the debtor to file bankruptcy. *Id.* And the *In re Vantage* court went so far as to recommend granting summary judgment ___**in the Trustee's favor**___ on the *in pari delicto* defense. *Id.* That rejection of the *in pari delicto* defense controls here because the Trustee's recovery will in no way benefit McClain, his personal probate estate, or CFSB and its fellow defendants—and because application of the *in pari delicto* defense would harm innocent creditors by impairing the Trustee's recovery of estate assets.

76.    Application of Kentucky law does not change the analysis. Kentucky courts have held that Kentucky's *in pari delicto* does not apply if: (a) the wrongful acts at issue can be attributed to specific individuals or entities; (b) the wrongdoers are removed from the plaintiff entity; and (c) a trustee seeks recovery on behalf of the plaintiff entity. *E.g., Evans v. Armenta*, 134 F. Supp. 2d 1052, 1062-65 (E.D. Ky. 2015) (citation omitted). Crucially, the *Evans* court cited a Kentucky Supreme Court case for the fundamental proposition that the *in pari delicto* defense "is a creation of the courts to purify the stream of justice and is never employed to dilute it." *Id.* at 1065 (quoting *Pursifull v. Interstate Oil & Gas Corp.*, 168 S.W.2d 363, 366 (1942)).

77.    On that "no-dilution" point, Sixth Circuit courts tasked with application of Kentucky law have interpreted the *in pari delicto* defense as arising when two conditions are met: (a) the plaintiff is equally or more culpable than the defendant for the wrongful conduct; and (b) "preclusion of the suit may not significantly interfere with the purposes of the law or harm the public interest." *In re Appalachian Fuels, LLC*, No. 09-10343, 2012 WL 4059973, at *2 (Bankr. E.D. Ky. Sept. 14, 2012) (denying a defendant's *in pari delicto*-based motion to dismiss based on a finding that the factual record required further development). Whether CFSB is equally or more culpable than McClain and the Debtors is an intensely factual inquiry that cannot be decided based on the arguments in CFSB's motion to dismiss. And, here, the public interest would be harmed if CFSB is allowed to keep its ill-

gotten gains at the expense of Debtors' creditors, especially because McClain has been removed from the Debtors and will not benefit from any recovery. Dismissal is unwarranted because the Trustee is entitled to prosecute his claim through fact discovery.

**D.    The Trustee sufficiently pleaded his fraudulent transfer claims.**

78.     CFSB finally urges dismissal of the Trustee's fraudulent transfer claim against CFSB, which seeks to recover over $33 million of overdraft payments that the Debtors made to CFSB during the pendency of McClain's Ponzi scheme. *See* Adversary No. 25-02005, ECF No. 48, ¶¶ 218–219, 221. Here, CFSB reasons: (a) no "true overdraft" occurred because all covering deposits were made before midnight on the day after check presentment (Adversary No. 25-02005, ECF No. 57, ¶¶ 129, 131–34); (b) the Debtors never held an interest in the $33 million transferred to CFSB in satisfaction of the Debtors' persistent overdrafts (Adversary No. 25-02005, ECF No. 57, ¶ 130); (c) the Trustee did not allege any badges of fraud (Adversary No. 25-02005, ECF No. 57, ¶¶ 135–39); (d) the Debtors received reasonably equivalent value for their transfers (Adversary No. 25-02005, ECF No. 57, ¶¶ 135, 140–41); (e) the fraudulent transfer claims are time-barred (Adversary No. 25-02005, ECF No. 57, ¶ 142); (f) CFSB is entitled to assert the good faith affirmative defense (Adversary No. 25-02005, ECF No. 57, ¶¶ 143–47); and (g) the Trustee cannot recover attorney's fees as part of his fraudulent transfer claim (Adversary No. 25-02005, ECF No. 57, ¶¶ 148–50). Those seven arguments are unpersuasive and must be rejected for the following reasons.

> **a.     The Trustee has sufficiently alleged actionable repayment of debt in the form of overdrafts.**

79.     CFSB quibbles with the Trustee's allegations of overdrafts on the Debtors' accounts at CFSB under the theory that no true overdrafts occurred because all covering deposits purportedly were made at CFSB before midnight on the day of initial check presentment. *See generally* Adversary No. 25-02005, ECF No. 57, ¶¶ 129, 131–34. In short, CFSB is now attempting to litigate which of the overdrafts are and are not debt repayments based on the tracing of various funds through the Debtors' accounts. CFSB is also suggesting that, if the Trustee does not specifically describe all of the various

daily transactions and negative balances (which span hundreds of pages of bank statements in CFSB's possession), the Trustee has failed to sufficiently inform CFSB of the Trustee's claims.

80.     Paragraph 219 of the Trustee's live complaint sufficiently alleges actionable overdrafts on the Debtors' accounts at CFSB.  CFSB disputes that those overdrafts constitute avoidable debt repayment—a matter for trial, not 12(b)(6) motions.  The Court can reasonably infer that multi-day overdrafts exist among the $33 million in overdrafts alleged by the Trustee, which is sufficient to allow the Trustee to pass the motion to dismiss stage to discovery and merits determination. *See Di Piazza v. Weather Grp. Television, LLC*, Civil Action No. 5:19-CV-060-C, 2019 WL 8107920, at *1 (N.D. Tex. June 3, 2019) ("The court must accept all factual allegations in a complaint as true and draw all reasonable inferences in the plaintiff's favor. [] A claim is facially plausible when it asserts facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. This determination is context-specific and requires the court to draw upon its own experience and common sense." (citations omitted)).

81.     This is reinforced by Exhibit E to the Trustee's live complaint, which reflects many instances where the Debtors' CFSB accounts were overdrawn on consecutive days, *i.e.*, January 8–9, 2018; January 22–23, 2018; January 30–31, 2018; February 1–2, 2018; February 12–14, 2018; March 6–8, 2018; March 12–14, 2018; April 10–11, 2018; August 7–8, 2018; December 24–25, 2018; January 3–4, 2019; December 24–25, 2019; November 25–26, 2020; August 18–20, 2021; August 24–27, 2021; and June 15–17, 2022.  Those sixteen specific instances of consecutive-day overdrafts on Debtors' accounts at CFSB sufficiently allege multiple-day overdrafts that would incur interest, and are thereby actionable as fraudulent transfers.  *See In re Reagor-Dykes Motors, LP*, Adversary No. 20-05002, 2020 WL 4939180, at *4–*5 (Bankr. N.D. Tex. Aug. 24, 2020) ("The complaint alleges that the Reagor-Dykes' bank accounts at First Capital had multi-day overdrafts that were being charged interest.  This scenario, when viewed in the light most favorable to Reagor-Dykes, pleads a transfer as defined under the Bankruptcy Code.").  And it is undisputed that "deposits into a debtor's bank account that are used by the bank to cover overdrafts are transfers that may be avoided" as fraudulent transfers or preferences under federal bankruptcy law.  *Id.* at *4.

82.     To escape the gravity of the Trustee's allegations, CFSB is now trying to engage in a fact-intensive adjudication of whether the actionable overdrafts alleged by the Trustee constitute "true" overdrafts.  *See* Adversary No. 25-02005, ECF No. 57, ¶¶ 129, 131–34.  That highly factual inquiry is plainly inappropriate at the motion to dismiss stage because the existence of true overdrafts on the Debtors' accounts at CFSB will be subject to different (and likely disputed) interpretations of evidence gleaned from hundreds of pages of banking records yet to be produced by CFSB, and expert testimony about the Debtors' and CFSB's banking practices.  Further development of the factual record is necessary to determine CFSB's liability.

83.     In conclusion, dismissal is improper because the Court must accept as true the Trustee's as-pleaded allegations about overdrafts on the Debtors' CFSB accounts. *See* Adversary No. 25-02005, ECF No. 48, ¶ 219 ("Exhibit E . . . details the relevant Debtor entity, account number, date, day of week, and dollar amount of daily overdrafts of the Debtors' accounts with CFSB. Each overdraft constituted a loan to the Debtors that was subsequently repaid by future, additional deposits by the Debtors. The overdrafts to CFSB repaid by the Debtors totals $33,277,959.91."); *Heghmann v. Harris*, No. 1:22-CV-627-LY, 2022 WL 22837526, at *1 (W.D. Tex. Nov. 7, 2022) ("In deciding a 12(b)(6) motion, a court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. To survive a Rule 12(b)(6) motion to dismiss, a complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." (collecting Fifth Circuit precedent on the motion to dismiss standard)).

### b.    The Trustee clearly alleged transfers of the Debtor's property.

84.     CFSB next seeks dismissal of the Trustee's fraudulent transfer claim under the theory that the money transferred to CFSB did not belong to the Debtors. *See* Adversary No. 25-02005, ECF No. 57, ¶¶ 130 ("The Trustee also does not explain how the Debtors held an interest in investors' money" transferred to CFSB to satisfy overdrafts), 134 ("the Trustee here has failed to plead facts showing that a transfer of the Debtors' property has taken place.").

85.     Again, CFSB purposefully distorts and misstates the Trustee's factual allegations in connection with his fraudulent transfer claim against CFSB. The Trustee specifically alleged that the Debtors—not investors or other third parties—made deposits at CFSB to cover the true overdrafts on the Debtors' accounts at CFSB. *See* Adversary No. 25-02005, ECF No. 48, ¶ 219. The only reasonable inference from this allegation is that the deposited funds belonged to the Debtors, not their investors or other third parties. Importantly, the Trustee's live complaint is devoid of allegations that Debtors deposited third party funds at CFSB.

86.     Close analysis of CFSB's arguments about an interest in money reveals that CFSB is relying on a counterfactual reading of the Trustee's complaint. According to CFSB, the Trustee's fraudulent transfer claims are not viable because the negative overdraft balances in Debtors' CFSB accounts were paid off with funds that belonged to HTLF, Mechanics, Rabo, or individual McClain investors. But, by CFSB's own reasoning, HTLF, Mechanics, Rabo, and individual investors directly transferred their property to pay off the Debtors' antecedent debts (*i.e.*, overdraft balances). That is nonsensical. Investor checks were made out to the Debtors, who then deposited some of those checks in the CFSB account. Similarly, HTLF, Mechanics, and Rabo would extend credit to the Debtors, thus enabling the Debtors to transfer funds to CFSB. The origin of funds in the Debtors' possession is simply irrelevant because that money belonged to the Debtors when it was transferred to CFSB to pay off antecedent debts and overdraft balances. *See, e.g.*, *Reagor Auto Mall, Ltd. v. Firstcapital Bank of Tex., N.A. (In re Reagor-Dykes Motors, LP)*, Adversary No. 20-05002, *9 (Bankr. N.D. Tex. Aug. 24, 2020) (collecting cases holding that transfers of cash by debtors to pay negative overdraft balances were avoidable and recoverable as fraudulent transfers).

c.     **The Trustee pleaded, and Judge Jones already found, that a Ponzi scheme was afoot in this bankruptcy case.**

87.     The next part of CFSB's kitchen-sink briefing insists the Trustee's fraudulent transfer claims should be dismissed because: (a) the Trustee did not allege any badges of fraud; (b) the Debtors received reasonably equivalent value for transfers to CFSB, so a constructive fraudulent transfer theory is unavailable; and (c) the Ponzi scheme presumption should not apply because the Trustee did not

allege a Ponzi scheme and there has been no finding of a Ponzi scheme. *See* Adversary No. 25-02005, ECF No. 57, ¶ 135–41. Those related arguments also fail.

88.    Initially, the Trustee: indisputably pleaded that McClain operated a Ponzi scheme through Debtors, whereby McClain promised to sell large amounts of fictional cattle to investors in return for guaranteed profits. Those investors paid the Debtors large sums of cash by check, wire, and other methods, to purchase McClain's fictitious cattle based on his promises that the investors would be repaid within ninety days after the cattle were fattened and sold. Because McClain never actually purchased ninety-plus percent of the cattle that were purportedly sold to his investors, there were no sale proceeds from which Debtors could repay investors. McClain therefore operated a massive check kite and solicited countless new investors, who provided the cash that McClain needed to pay off his preexisting investors. *E.g.*, Adversary No. 25-02005, ECF No. 48, ¶¶ 19–45, 110.

89.    That set of facts unquestionably constitutes a Ponzi or Ponzi-like scheme entitled to a presumption of fraud because each constituent transfer was made for the purpose of concealing the Debtors' insolvency from then-unpaid investor-creditors. As a matter of law, all transfers made in furtherance of a Ponzi or Ponzi-like scheme (such as McClain's failed venture) ***cannot be*** in exchange for reasonably equivalent value. *See Faulkner v. AimBank (In re Reagor-Dykes Motors, LP)*, Adversary No. 20-05039, 2021 WL 1219537, at *9–10 (Bankr. N.D. Tex. Mar 30, 2021) (holding that a complaint did not need to allege badges of fraud, or that transfers were not for reasonably equivalent value, because the transfers were part of a Ponzi-like check kiting scheme that permitted an inference of fraudulent intent at the motion to dismiss stage—the Court denied the motion to dismiss because the plaintiff's fraudulent transfer allegation were sufficient).

90.    In concluding this part of his Objection, the Trustee notes that Judge Jones already rejected CFSB's arguments about badges of fraud, reasonably equivalent value, and the Ponzi scheme presumption in a sister adversary proceeding in which the Trustee intervened. On January 30, 2025, Judge Jones denied Mechanics' motion to stay discovery pending resolution of Mechanics' motion to dismiss the investor-plaintiff and intervenors' claims. That motion to stay discovery contended that the investor-plaintiff and intervenors' claims did not satisfy Rule 9(b)'s heightened pleading standard

for fraud. *See* Adversary No. 24-02007, ECF No. 92, at 1, 5–6. In his order denying the motion to stay, Judge Jones noted that "Ponzi and kiting schemes—this very action—allow for a presumption of fraud." *See* Adversary No. 24-02007, ECF No. 92, at 6 (citing *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013) ("This court has held that transfers from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, 'as a matter of law, insolvent from its inception.'"); *Sec. & Exch. Comm'n v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) ("In this circuit, proving that [the transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."); *In re Texas E&P Operating, Inc.*, No. 17-34386-SGJ-7, 2022 WL 2719472, at *9 (Bankr. N.D. Tex. July 13, 2022) ("A trustee can avoid the burden of proving actual fraudulent intent—or laboriously establishing different badges of fraud—in one situation identified by the Fifth Circuit: when there was a Ponzi scheme (the 'Ponzi-Scheme Presumption').")). The same legal principle and analysis controls here.

### d. None of the fraudulent transfers the Trustee seeks to recover are outside the limitations period after applying the discovery rule or equitable tolling.

91.    CFSB asserts that some of the fraudulent transfers which the Trustee seeks to avoid and recover occurred outside the applicable two- or four-year limitations period. *See* Adversary No. 25-02005, ECF No. 57, ¶ 142. That reasoning is inapt because limitations is an affirmative defense that supports dismissal only if it is clear from the face of the complaint that a claim is time-barred ***and*** it raises no basis for tolling limitations. *Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247 (5th Cir. 2021) (citing *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003)); *see also Janvey v. Suarez*, 978 F. Supp. 2d 685, 708 (N.D. Tex. 2013) ("Texas's recognition of the discovery rule's applicability to an unjust enrichment claim is important because where a Plaintiff has invoked the discovery rule, and [where a] Plaintiff's complaint at least plausibly sets out facts where the discovery rule might apply, the Court cannot resolve that issue in the context of [a] Motion to Dismiss."). In drafting his live complaint, the Trustee was not required to specifically anticipate CFSB's affirmative defenses and plead exceptions—because CFSB bears the burden of pleading and proving any applicable limitations

defense to the Trustee's affirmative claims. *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007); *Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC*, 23 F. Supp. 3d 344, 358 (S.D.N.Y. 2014) (quoting. *United States v. Livecchi*, 711 F.3d 345, 352 (2d Cir. 2013))

92.      Importantly, Texas and Kentucky law prescribe a discovery rule for actual fraudulent transfer claims, which allows creditors to file avoidance claims within one year of the date the transfer or conveyance was or could reasonably have been discovered. *See* TEX. BUS. & COM. CODE § 24.010; KY. UNIFORM VOIDABLE TRANSACTIONS ACT § 378A.090. Consistent with its pleading of a Ponzi scheme, the Trustee's live complaint also alleges that innocent investors and vendors would not have had cause to know about the check kite and Ponzi scheme because: (a) "the Debtors' purported cattle investment activities involved cattle located in several states;" (b) "the investors were geographically located across several states;" and (c) "such parties would not have had access to the Debtors' banking records and other financial information (as opposed to the Debtors' banks, which did have access to such information." *See* Adversary No. 25-02005, ECF No. 48, ¶ 115. So, many of Debtors' creditors "could take advantage of applicable discovery rule limitations extensions for purposes of the allowable time period to later avoid transfers to the banks, and the Trustee may utilize this extension under [11 U.S.C.] § 544(b)." *See* Adversary No. 25-02005, ECF No. 48, ¶ 115 (highlighting potential application of the discovery rule to the instant case); *PK Music*, 2018 WL 4759737, at *7 (explaining that dismissal for limitations is typically improper).

93.      Given those factual allegations, it is not decisively clear from the face of the Trustee's live complaint that CFSB is entitled to dismissal of any of the specific transfers that are subject to the Trustee's fraudulent transfer claim. The Court should accordingly deny CFSB's motion to dismiss and allow the Trustee to proceed to fact discovery on his fraudulent transfer claim, which will help maximize the ultimate recovery for estate creditors.

### e.      The Trustee alleges CFSB acted in bad, not good, faith.

94.      CFSB next urges dismissal of the Trustee's fraudulent transfer claim on the premise that CFSB is entitled to assert the good faith defense. *See* Adversary No. 25-02005, ECF No. 57,

¶¶ 143–47. Somewhat incredulously, CFSB posits the live complaint alleges "normal banking activity" such that CFSB "should have known of the existence of Debtors' scheme merely due to the existence of overdrafts in the Debtors' bank accounts." *See* Adversary No. 24-02007, ECF No. 57, ¶ 147. That argument is belied by the Trustee's detailed factual allegations setting out CFSB's actual knowledge of check kiting and Ponzi activity. For example, Paragraph 77 of the live complaint alleges "CFSB . . . allowed the Debtors to thwart acceptable banking practices by improperly floating hundreds of millions of dollars of checks and blithely ignoring numerous red flags, including [(a)] the evident kiting activity, [(b)] regular, substantial overdrafts, [(c)] multiple checks or wires that were dishonored or refused by CFSB . . . due to insufficient funds, [(d)] hundreds-of-millions in intercompany transactions annually, [(e)] blatant inconsistencies in the Debtors financial statements, [(f)] glaring inconsistencies in the Debtors' stated business model, and [(g)] all of the automated, internal alerts, such as check kiting and suspicious activity reports, designed to detect and compel the investigation of the Debtors' and McClain's finances and operations." The Trustee could scarcely have made his factual allegations of CFSB's bad faith more dismissal-proof.

95.      That summation of the Trustee's factual allegations against CFSB reveals CFSB's true objective in moving to dismiss. It is well-settled that, in deciding a Rule 12(b) motion, the Court must accept the allegations in the complaint as true. But CFSB now wants the Court to depart from that requirement of federal court practice and conclude the Trustee's allegations against CFSB are false— just because CFSB said so in its motion to dismiss. The "because I said so" reasoning underlying CFSB's "normal banking activity" argument in its motion to dismiss has no place in the Federal Rules. At any rate, the existence of good faith on CFSB's part is an inherently factual issue ill suited for final resolution at the motion to dismiss stage and CFSB is not entitled to dismissal on good faith grounds. *See In re Wolf*, No. 15-31477-HCM, 2016 WL 4940198, at *36 (Bankr. W.D. Tex. Sept. 15, 2016) ("Whether a transferee . . . acted in good faith is a question of fact.").

### f. The Trustee can recover attorneys' fees from CFSB under Texas fraudulent transfer statutes.

96.     Finally, invoking "black letter law," CFSB says the Trustee cannot recover attorneys' fees for his fraudulent transfer claim because, CFSB wrongly asserts, recovery for avoided transfers is governed exclusively by 11 U.S.C. § 550. *See* Adversary No. 25-02005, ECF No. 57, ¶¶ 148–50. In support of that incorrect assertion, CFSB cites *Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 780 (Bankr. N.D. Ill. 2007). But that case directly contradicts and negates CFSB's representations about so-called "black letter law" on recoverability of attorney's fees.

97.     *Brown* made clear that both the Bankruptcy Code ***and*** state law can provide the basis for recovering attorneys' fees on fraudulent transfer claims: "The Court also avoided the mortgage payoff under [state] law. Thus, the Court must also look to [state] law to determine whether a basis exists for such an award." *Id.* at 789. The relevant state's law, which was neither Texas nor Kentucky law, however, did not provide for attorney's fees. *Id.*

98.     Here, the Trustee pleaded his fraudulent transfer claim against CFSB pursuant to Texas Business and Commerce Code §§ 24.005, 24.006, 24.008, and 24.009(b) , among other statutes. The Trustee further pleaded his claim to recover attorneys' fees from CFSB under Texas Business and Commerce Code § 24.013. *See* Adversary No. 25-02005, ECF No. 48, ¶ 222–23. The first two Texas Business and Commerce Code sections define when a fraudulent transfer has occurred. The next two sections provide for avoidance and recovery as available remedies. Most importantly, Section 24.013 expressly provides that "in ***any*** proceeding under this chapter, the court may award costs and reasonable attorney's fees as equitable and just." Tex. Bus. & Com. Code § 24.013. So the Trustee may validly recover his reasonable and necessary attorney's fees for any successful fraudulent transfer claim that the Trustee prosecutes against CFSB under Texas fraudulent transfer law.

99.     Because CFSB's characterization of "black letter law" is plainly incorrect, the Court should deny the part of CFSB's motion to dismiss that pertains to the Trustee's recovery of attorney's fees for fraudulent transfer claims prosecuted against CFSB under Texas law. Such recovery is clearly available to the Trustee as a matter of black letter law.

**E.     The Court should give the Trustee leave to amend if the Court grants CFSB's Motion in whole or in part.**

100.     CFSB ends its motion to dismiss by arguing that the Court should deny the Trustee leave to amend his live complaint to correct any substantive pleading deficiencies that the Court believes merit complete or partial dismissal of one or more of the Trustee's claims against CFSB. *See* Adversary No. 25-02005, ECF No. 57, ¶ 151.

101.     But CFSB acknowledges that denial of leave to amend at such an early stage of the case is "rare" and warranted only in cases of undue delay, bad faith or dilatory motive, undue prejudice, or futility. Though it is not entirely clear what "rare circumstance" CFSB believes to exist in this case, CFSB is apparently complaining about undue delay—as shown by its protest about the Trustee filing his Original Complaint "nearly two years" after the Petition Date. But the fact the Trustee filed his first complaint within the two-year window prescribed by the Bankruptcy Code is no evidence whatsoever of undue delay, much less bad faith or dilatory motive. In truth, CFSB is asking the Court to punish the Trustee for taking the time to properly investigate the bankruptcy estate before filing claims against CFSB and its fellow defendants—and for filing such pleadings in a timely fashion.

102.     CFSB also appears to suggest undue prejudice to CFSB because CFSB would be forced to incur additional legal expenses to respond to a third amended complaint by filing another (futile) motion to dismiss. That alone cannot possibly constitute undue prejudice—if it did, then denial of leave to amend would be the regular case, not a rare one.

103.     CFSB has accordingly failed to assert a single legitimate reason to deny the Trustee leave to amend if required by the Court. In fact, it would be unjust and inequitable to deny the Trustee leave to amend because CFSB has thus far categorically refused to produce "extensive" Rule 2004 discovery. At best, CFSB made a partial production, which appears to be comprised largely of scanned hard copy documents from a loan cabinet or file, and a handful of emails. That threadbare production is inconsistent with the Court's order authorizing the Trustee's Rule 2004 subpoena of CFSB.[7]

---

[7]  A copy of the Court's order granting Rule 2004 discovery from CFSB, the Trustee's Rule 2004 subpoena, CFSB's objections thereto, a brief summary of CFSB's production, and subsequent email correspondence are attached hereto as Exhibits A-E, respectively.

104.     In sum, CFSB did not fully comply with the Trustee's document requests, and has for months obstructed discovery, hindering the Trustee's efficient administration of the bankruptcy estate. CFSB's excuse for that misconduct is: although the Court ordered CFSB to comply with and fully respond to the Trustee's Rule 2004 subpoena (which was reviewed and pre-approved as part of the Court's Rule 2004 order), CFSB need not complete its production now that the Trustee has initiated this adversary proceeding. Yet CFSB is simultaneously refusing to conduct discovery in this adversary proceeding until the Court resolves all Rule 12 motions.

105.     While adversary proceeding parties are typically only subject to discovery afforded by the Federal Rules of Civil Procedure, that is not necessarily the case when a party was one of the Debtors' primary banks for many years and housed a depository account for a Debtor at all relevant times through the Petition Date. Such a party is logically still subject to Rule 2004 discovery. *See, e.g.,* *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 711-12 (Bankr. S.D.N.Y. 1991) ("The cases are . . . in general agreement that pending litigation *by or against* the trustee is not sufficient cause to deny the [Rule 2004] examination."). To hold otherwise would contravene the Bankruptcy Code's overarching objective and purpose, which is to efficiently administer the Debtors' estate. At minimum, CFSB's discovery malfeasance requires the Court to give the Trustee leave to amend should the Court find CFSB's Motion is not moot and is in any part meritorious.

106.     The Court should therefore reject CFSB's unfounded suggestion that, should CFSB prevail on any part of its motion to dismiss, the Trustee is not entitled to leave to amend his live complaint to remedy whatever pleading deficiencies may exist.

### III.     <u>CONCLUSION</u>

For the foregoing reasons, the Trustee requests that the Court:

- Deny CFSB's Motion on the merits in its entirety; or, alternatively, grant the Trustee leave to amend the complaint to address any substantive pleading deficiencies identified by the Court; and

- Grant all other relief to which the Trustee is legally or equitably entitled.

Respectfully submitted,

*/s/ Alan Dabdoub*
Alan Dabdoub
State Bar No. 24056836
adabdoub@lynnllp.com
P. Campbell Sode
State Bar No. 24134507
csode@lynnllp.com
Farsheed Fozouni
State Bar No. 24097705
ffozouni@lynnllp.com
Steven G. Gersten
State Bar No. 24087579
sgersten@lynnllp.com
**Lynn Pinker Hurst & Schwegmann LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:      214-981-3800
Facsimile:      214-981-3839

*/s/ Hudson M. Jobe*
Hudson M. Jobe
Texas Bar No. 24041189
**JOBE LAW PLLC**
6060 North Central Expressway, Suite 500
Dallas, Texas 75206
(214) 807-0563
hjobe@jobelawpllc.com

**SPECIAL COUNSEL TO THE TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that, on August 6, 2025, a true and correct copy of the foregoing was served via the

Court's ECF system on all parties that have appeared and requested notice via the Court's ECF system.

*/s/ Alan Dabdoub*
Alan Dabdoub