HUDSON M. JOBE
JOBE LAW PLLC
6060 NORTH CENTRAL EXPRESSWAY,
SUITE 500
DALLAS, TEXAS 75206

ALAN DABDOUB
LYNN PINKER HURST & SCHWEGMANN LLP
2100 ROSS AVENUE, SUITE 2700
DALLAS, TEXAS 75201

SPECIAL COUNSEL TO KENT RIES,
TRUSTEE OF THE MCCLAIN DEBTORS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| | § | Case No. 23-20084-swe7 |
| McClain Feed Yard, Inc., et al., | § | Jointly Administered |
| | § | |
| Debtors. | § | |
| | § | |
| In re: | § | |
| | § | |
| | § | |
| 2B Farms, a Texas General Partnership, et al., | § | Case No. 23-50096-swe12 |
| | § | Jointly Administered |
| Debtors. | § | |
| | § | |

AgTexas Farm Credit Services, AgTexas,
PCA, Thorlakson Diamond T Feeders, LP,

       Plaintiffs, and

Edward Dufurrena, et al.,

       Intervenor-Plaintiffs,

v.

Rabo AgriFinance, LLC, et al.,

       Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Adversary No. 24-02007-swe
Consolidated Adversary Proceeding

---

Kent Ries, Chapter 7 Trustee for the
Bankruptcy Estates of McClain Feed Yard, Inc.,
McClain Farms, Inc., and 7M Cattle Feeders,
Inc.,

       Plaintiff,

v.

Community Financial Services Bank; HTLF
Bank, Mechanics Bank, and Rabo AgriFinance,
LLC,

       Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Adversary No. 24-02007-swe
Consolidated Adversary Proceeding

| | | |
|---|---|---|
| HTLF Bank, as successor to First Bank & Trust, | § § § | |
|     Plaintiff, Counter-Defendant, and Cross-Claim Defendant, | § § § | |
| v. | § § § | |
| 2B Farms, a Texas General Partnership, Terry M. Robinson, and Rebecca A. Robinson, | § § § § | |
|     Defendants, Counterclaim-Plaintiffs, Third-Party Plaintiffs and Third-Party Counterclaim Defendants, | § § § § | |
| v. | § § | Adversary No. 24-02007-swe Consolidated Adversary Proceeding |
| Rabo AgriFinance, LLC and Mechanics Bank, | § § § | |
|     Third-Party Defendants and, as to Rabo AgriFinance LLC only, Third-Party Counterclaim Plaintiff and Cross-Claim Plaintiff. | § § § § | |
| HTLF Bank, as successor to First Bank & Trust, | § § § | |
|     Plaintiff and Counter-Defendant, | § § | |
| v. | § § | |
| 2B Farms, a Texas General Partnership, Terry M. Robinson, and Angela Robinson, | § § § | |
|     Defendants and Counter-Plaintiffs. | § § | |

**TRUSTEE'S OBJECTION AND RESPONSE TO
RABO AGRIFINANCE, LLC'S MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................i

TABLE OF AUTHORITIES .....................................................................................................ii

I.    INTRODUCTION ........................................................................................................1

II.   ARGUMENT.................................................................................................................2

    A.    The Trustee's State-Law Tort Claims Should Not Be Transferred................................2

    B.    The Forbearance Agreement Should Be Avoided, and the Release Therein
        Should Be of No Effect.........................................................................................5

    C.    The *In Pari Delicto* Defense Does Not Bar the Trustee's Claims. ...................................6

    D.    The Trustee Sufficiently Alleged Rabo's Tortious Conduct Inflicted
        Substantial Damages on the Debtors. .......................................................................9

    E.    The Trustee Sufficiently Pleaded His Knowing Participation Claim............................9

    F.    The Trustee Sufficiently Pleaded His Breach of Fiduciary Duty Claim. ......................12

    G.    The Trustee Sufficiently Pleaded His Civil Conspiracy Claim......................................14

    H.    The Trustee Sufficiently Pleaded His Professional Negligence Claim..........................15

    I.    The Trustee Sufficiently Alleged a Money Had and Received Claim Against
        Rabo......................................................................................................................17

    J.    The Trustee Can Recover Punitive Damages................................................................18

    K.    The Trustee Sufficiently Pleaded Its "Core" Bankruptcy Claims................................18

    1)    The Trustee's sufficiently pleaded a request for the Court to declare the
        extent of Rabo's lien against property in the estate. .........................................18

    2)    The Trustee's Avoidance Claims Are Viable and Should Not Be Dismissed. ...........18

    3)    The Trustee Sufficiently Pleaded Fraudulent Transfer Claims. ....................................22

    4)    The Trustee Sufficiently Pleaded for Disallowance of Rabo's Claim. .........................24

    5)    The Trustee Sufficiently Alleged an Equitable Subordination Claim. .........................24

III.   CONCLUSION.............................................................................................................25

### TABLE OF AUTHORITIES

**Cases**

*7X Cattle Co. LLC v. Brandstadt*, No. 6:22-CV-396-JDK-KNM, 2025 WL 852624 (E.D.
    Tex. Feb. 28, 2025), report and recommendation adopted, No. 6:22-CV-396-
    JDK-KNM, 2025 WL 848446 (E.D. Tex. Mar. 18, 2025) ................................................. 10, 11

*Apache Corp. v. Dynegy Midstream Services, Ltd. Partnership*, 214 SW3d 554 (Tex. Ct. App.
    2006) ................................................................................................................................16

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ..........................................................................11

*Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49 (2013) ...............................3

*Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836 (5th Cir. 2004) ..............................................17

*Beaumont Lamar Apartments, LLC v. Wallis Bank*, No. 4:23-CV-00341-O, 2024 WL 455343
    (N.D. Tex. Feb. 6, 2024) ..................................................................................................13

*CapLOC LLC v. Liberty Mut. Ins. Eur. Ltd.*, No. 3:20-CV-3372-B, 2021 WL 2551591
    (N.D. Tex. June 22, 2021) ............................................................................................. 6, 16

*CapRock Milling & Crushing, LLC v. Perdue Agribusiness LLC*, No. 2:24-CV-G38-Z, 2024
    WL 4582903 (N.D. Tex. Oct. 25, 2024) ...........................................................................4

*Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164 (Tex. 2009) ....................................16

*Faulkner v. AimBank (In re Reagor-Dykes Motors, LP)*, No. 20-05039, 2021 WL 1219537
    (Bankr. N.D. Tex. Mar 30, 2021) ....................................................................................23

*Faulkner v. Ford Motor Credit Co. (In re Reagor-Dykes Motors, LP)*, 18-50214-RLJ-11, 2022
    WL 2046144 (Bankr. N.D. Tex. Jun 03, 2022) ...............................................................21

*In re Am. Hous. Found.*, 543 B.R. 245 (Bankr. N.D. Tex. 2015) ...................................................19

*In re Avado Brands, Inc.*, 358 B.R. 868 (Bankr. N.D. Tex. 2006) ................................................6

*In re Chris Pettit & Associates, P.C.*, 670 B.R. 602 (Bankr. W.D. Tex. 2025) ...................................... 8, 12

*In re e2 Communications, Inc.*, 320 B.R. 849 (Bankr. N.D. Tex. 2004) ...........................................6

*In re Ramirez Rodriguez*, 209 B.R. 424 (Bankr. S.D. Tex. 1997) ................................................19

*In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2020 WL 4939180 (Bankr. N.D. Tex.
    Aug. 24, 2020) ...............................................................................................................7

*In re Schouten*, 657 B.R. 531 (Bankr. N.D. Tex. 2024) ............................................................ 3, 4

*In re Texas E&P Operating, Inc.*, No. 17-34386-SGJ-7, 2022 WL 2719472 (Bankr. N.D. Tex. July 13, 2022) ................................................................................................ 23

*In re Today's Destiny, Inc.*, 388 B.R. 737 (Bankr. S.D. Tex. 2008) ................................................. 9

*In re Vantage Benefits Administrator, Inc.*, No. 20-03055-SGJ, 2024 WL 3842796 (Bankr. N.D. Tex. Aug. 14, 2024) ......................................................................................... 6, 7, 8

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185 (5th Cir. 2013) ................... 23

*Jones v. Wells Fargo Bank, N.A.*, 2024 WL 3842796, at *21-22 ....................................................... 8

*Lewis v. Davis*, 199 S.W.2d 146 (1947) ............................................................................................... 7

*Neukranz v. Conestoga Settlement Services, LLC*, No. 3:19-CV-1681-L, 2022 WL 19518462 (N.D. Tex. Nov. 23, 2022), report and recommendation adopted sub nom. *Neukranz v. Conestoga Settlement, LLC*, No. 3:19-CV-1681-L, 2023 WL 2555551 (N.D. Tex. Mar. 16, 2023) ................................................................................................... 14

*Nobre on behalf of K.M.C. v. Louisiana Dep't of Pub. Safety*, 935 F.3d 437 (5th Cir. 2019) ......... 19

*Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641-N, 2014 WL 12572881 (N.D. Tex. Dec. 17, 2014) ............................................................................ 12

*Schultea v. Wood*, 47 F.3d 1427 (5th Cir. 1995) (en banc) .............................................................. 19

*Sec. & Exch. Comm'n v. Res. Dev. Int'l, LLC*, 487 F.3d 295 (5th Cir. 2007) .................................. 23

*Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856 (Tex. App.—El Paso 2021, no pet.) ......... 16

*Villarreal v. First Presidio Bank*, 283 F. Supp. 3d 548 (W.D. Tex. 2017) ...................................... 17

**Statutes**

11 U.S.C. § 547(c)(2) ....................................................................................................................... 19

Tex. Bus. & Com. Code § 9-104(a) ................................................................................................. 20

Tex. Bus. & Com. Code § 9-314(a) ................................................................................................. 20

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................. 8, 9, 17

Kent Ries, the Chapter 7 Trustee of the bankruptcy estates of McClain Feed Yard, Inc. ("**MFY**") (Case No. 23-20084-swe), McClain Farms, Inc. (Case No. 23-20085-swe), and 7M Cattle Feeders, Inc. ("**7M**") (Case No. 23-20086-swe) (the "**Trustee**"), files this objection and response to Rabo AgriFinance LLC's ("**Rabo's**") *Motion to Dismiss Trustee's Second Amended Adversary Complaint* (Adversary No. 25-02005-swe, ECF No. 73) ("**Mot.**") and *Brief in Support* (Adversary No. 25-02005-swe, ECF No. 74) ("**Br.**") (collectively, the "**Motion**"), and respectfully requests the Court deny the Motion for the reasons that follow:

## I.    **INTRODUCTION**

At the heart of this case is a massive, multi-year Ponzi or Ponzi-like scheme perpetrated by the now-deceased Brian McClain ("**McClain**"), the Debtors' former owner. While McClain was the muscle behind the scheme, doing the grunt work of kiting checks and bilking investors to keep the scheme afloat, Rabo was the lifeblood of the scheme. Despite the obvious indicators of fraud that were apparent from the outset and which grew only ever more alarming, Rabo deviated from its internal policies and practices to extend an initial loan to the Debtors. When the Debtors funds quickly ran out, Rabo doubled down. Again. And again. And again. Each time Rabo doubled down, providing millions more in cash flow to keep the scheme alive and the loan healthy on its books, Rabo did so while staring down red flags and blaring sirens screaming off the pages of the Debtors' financials.

While Rabo was funding the Ponzi scheme with many tens-of-millions of dollars in loans, Rabo also worked with McClain, the Debtors' depository banks, Community Financial Services Bank ("**CFSB**") and Mechanics Bank ("**Mechanics**"), and later HTLF Bank ("**HTLF**") to coordinate a massive check kite scheme, thereby generating, maintaining, and covering millions of dollars in "float," or the fictitious funds created when checks are honored by the depository bank before paid by the payor bank. In still other cases, Rabo specifically instructed CFSB or Mechanics to process wires that significantly overdrew the accounts, with the promise of repaying it through future funds McClain told Rabo he would purportedly be receiving or from further extensions of credit from Rabo.

After the Trustee filed his Original Complaint, Rabo moved to dismiss it, arguing, among other reasons, that it was nonsensical to suggest Rabo was an active participant in McClain's conduct, asserting "Rabo would have nothing to gain but *everything to lose* through conspiring to operate the Ponzi scheme." No. 25-02005, ECF No. 27 at 29. Now that the Trustee has amended his complaint with numerous and repeated instances in which Rabo was found to, or at least accused of, similar misconduct in circumstances where Rabo similarly would have nothing to gain *long term* and everything to lose, Rabo somehow still attempts to don a white knight's helmet, claiming it is not a bad actor—but rather the Trustee is—for including Rabo's history of misconduct in the Second Amended Complaint. Br. at 2-3. That Rabo has consistently acted improperly with regard to obvious indicators of fraud or illegality shows that Rabo's participation in McClain's schemes would be far from an aberration, even if an objective observer after the fact might question why Rabo would have seemingly acted against its long-term interests. In addition to a history of such conduct, Rabo was also incentivized to participate in the fraud because it was booking paper profits, and Rabo's relationship manager for the Debtors' accounts was incentivized to keep the loan on his books to justify his continued employment.

Rabo must be held to account for its improper behavior here. For the reasons stated below, the Court should deny Rabo's Motion and permit the Trustee to proceed on his claims seeking to hold Rabo to account.

## II.   ARGUMENT

### A.   The Trustee's State-Law Tort Claims Should Not Be Transferred.

1.     Rabo first argues that the Court should not consider the merits of the Trustee's tort claims or Rabo's substantive arguments to dismiss them. Instead, Rabo argues the Court must either dismiss or transfer the claims to a federal district court in Iowa pursuant to forum selection clauses in its master credit agreements with the Debtors and related documents. Br. at 7-12. While forum selection clauses should generally be honored, this is the precise case in which public interest factors identified by the Supreme Court compel the Trustee's claims against Rabo to remain in this Court.

2.      The Supreme Court has explained that where forum selection clauses are involved, courts may only consider "public interest factors" when determining whether to enforce the clause. *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 64 (2013); *In re Schouten*, 657 B.R. 531, 539 (Bankr. N.D. Tex. 2024). Relevant public interest factors include: "the administrative difficulties flowing from court congestion, the interest of local courts deciding local disputes, and, in a diversity case, the interest of trial before the court that is 'at home with the applicable law.'" *In re Schouten*, 657 B.R. at 539 (citation omitted) (cleaned up). In addition, in bankruptcy, courts should consider the policy of centralizing bankruptcy proceedings and the "strong presumption in favor of maintaining the venue of an adversary proceeding where the bankruptcy [case] is pending." *Id.* at 540 (citations omitted).

3.      "This proceeding falls squarely within the policy of centralizing all proceedings in the court where the case is pending. It is a chapter 7 liquidation case with an appointed trustee who is obligated to administer the estate assets as expeditiously as possible for the benefit of creditors of the bankruptcy estate." *Id.* at 540-41. Moreover, "as with most chapter 7 cases, the messy aspects of the case are foisted on the trustee," including the costs of litigation, which would necessarily increase if some of the Trustee's claims are severed into an independent matter to be prosecuted in a state with minimal to no connection with the facts of the case. The minimal funds available to the Trustee to administer the Debtors' estate here must fund not only this lawsuit, but multiple other lawsuits initiated by the Trustee against other parties as well. Maintaining and prosecuting a subset of his claims in Iowa would be an unwarranted burden on the Trustee and necessarily reduce potential funds available for distributions to creditors. These financial burdens weigh in favor of not enforcing the forum selection clause as to the Trustee's state law tort claims. *See id.* at 541.

4.      Critically, this is a chapter 7 liquidation case, and the Debtors' only assets of real potential value are the Trustee's legal claims, with his claims against Rabo the at the top of the pile. Whether the Trustee is ultimately able to prevail and obtain a recovery from Rabo largely dictates whether the Debtors' creditors will receive a semblance of a meaningful recovery on their claims. In other words, the Debtors' claims against Rabo are, presently, the Debtors' primary assets. As such,

this is precisely the extraordinary case in which the Court should decline to enforce a forum selection clause. *See CapRock Milling & Crushing, LLC v. Perdue Agribusiness LLC*, No. 2:24-CV-G38-Z, 2024 WL 4582903, at *6 n.2 (N.D. Tex. Oct. 25, 2024) (citing *In re Schouten*, 657 B.R. at 541) (explaining that even though the claims in *In re Schouten* were "non-core" claims, the public interest factor of centralizing proceedings in a bankruptcy case overcame the forum selection clause there because the legal claims were "*the* asset of the bankruptcy estate that might generate some recovery for its creditors"). These considerations warrant maintaining the Trustee's state-law claims in this Court as part of this adversary proceeding.

5.    Here, unlike in *In re Schouten*, there are additional compelling reasons to centralize the Trustee's tort claims against Rabo by maintaining them in this Court. As the Court has previously heard, the Trustee, Rabo, and other parties in this case have argued that the Trustee's tort claims against Rabo overlap with claims asserted by the investor-creditors against Rabo, raising the possibility of inconsistent judgments or *res judicata* implications depending on which claims are adjudicated first. Indeed, the potential for inconsistent judgments or judgments implicating *res judicata* issues is the reason this adversary is now the product of four separate adversary proceedings consolidated together (with another, the recently filed Kentucky class action against Rabo, potentially to be consolidated in the near future).

6.    In addition, "[t]he public interest factors that arise in the bankruptcy context also include the 'creditors' interests since the estate is often operating on limited funds and asserting actions solely to maximize the recovery to creditors.'" *In re Schouten*, 657 B.R. at 541 (citation omitted). "The chapter 7 trustee's duties and circumstance, the associated litigation costs, and the interests of creditors of the debtor's estate all underscore the policy of maintaining all proceedings in the home court." *Id.* (citation omitted). Here, there are over 100 creditors and over $100 million in non-Rabo creditor claims. Many, if not the majority of the investor-creditors in these bankruptcy cases are located in Texas. They too assert state law claims against Rabo in this very adversary proceeding, many of which overlap with the Trustee's claims, which Rabo will have to litigate in this Court. The creditors in this

case present a large interest the Court should consider, and their interests predominantly favor maintaining the Trustee's state-law tort claims against Rabo in this Court.

7.      Furthermore, Rabo recognized the primacy of the bankruptcy proceeding here by filing claims against other parties and taking Rule 2004 discovery in the bankruptcy cases. And, as it concedes, Rabo must anyway face the Trustee's Chapter 5 bankruptcy claims, which are premised on the same core factual allegations, in this Court. Moreover, Iowa is merely a remote forum with minimal or no connection to the facts, or even the parties, in this case. Rabo is not located in Iowa—is incorporated in Delaware and headquartered in St. Louis, Missouri. Br. at 11. While Rabo asserts its legal offices are in both Missouri and Iowa, the connection between the underlying facts of this proceeding and Rabo's Iowan legal offices is not apparent, if one exists at all.[1]

8.      As the public interest factors all either favor non-enforcement of the forum selection clause or are neutral, the scales weigh in favor of not enforcing a forum selection clause that would remove this case to a remote Iowa location unconnected to the facts of the case. The Court should deny Rabo's motion to transfer.

## B.      The Forbearance Agreement Should Be Avoided, and the Release Therein Should Be of No Effect.

9.      Rabo next argues that even if the forum selection clause is not enforced, the Court should still not consider the merits of the Trustee's state-law tort claims because McClain purportedly executed a release of all claims Debtors may have had against Rabo just days before his suicide and the Debtors' filing for bankruptcy. Br. at 12-14. The Trustee, however, has asserted that the execution of this purported release was a preferential and fraudulent transfer that should be avoided and of no effect. Sec. Am. Compl. at ¶ 190.

10.     As causes of action assertable by the Debtors represent "property of the estate," and as "a release of claims 'is itself a transfer of property of the estate that is subject to be avoided under

---

[1]   Rabo's Regional General Counsel appears to be based out of St. Louis, Missouri. *See* https://www.linkedin.com/in/philip-k-b16b472/. Rabo's website does not contain information regarding a legal office in Iowa, and undersigned counsel was able to find references to two or three Rabo legal employees potentially based out of Iowa.

applicable law',” *In re Avado Brands, Inc.*, 358 B.R. 868, 885 (Bankr. N.D. Tex. 2006) (citation omitted),

the Court should not dismiss the Trustee's tort claims that otherwise might have been subject to the

release. *Id.* (citations omitted) (denying motions to dismiss and for summary judgment based on an

avoidable release); *In re e2 Communications, Inc.*, 320 B.R. 849, 853-58 (Bankr. N.D. Tex. 2004) (collecting

cases) (denying summary judgment based on a purported release because the release was a transfer of

the Debtor's property subject to avoidance, and the defendant had not met its burden of showing why

the release should not be avoided).

**C.      The *In Pari Delicto* Defense Does Not Bar the Trustee's Claims.**

11.      Rabo next argues that the doctrine of *in pari delicto*, which is an affirmative defense

which Rabo bears the burden of proving, precludes the Trustee from asserting his tort claims. Br. at

14-18. As an initial matter, while Rabo argues Iowa law applies to the Trustee's tort claims, Br. at 5,

Rabo only addresses the *in pari delicto* defense under Texas law, Br. at 14-18. It is therefore unclear if

there are differences in Texas and Iowa state law regarding the application of the *in pari delicto* defense

that would require the Court to determine which law applies before considering the defense at this

stage. *See generally In re Vantage Benefits Administrator, Inc.*, No. 20-03055-SGJ, 2024 WL 3842796, at *21

(Bankr. N.D. Tex. Aug. 14, 2024) (citations omitted) (“The Fifth Circuit has held that *in pari delicto* is

an equitable, affirmative defense, which is controlled by state common law, which accounts for the

fact that, in some states, the doctrine, . . . is applied more strictly to bar a plaintiff's claims while, in

others, . . . [it is] interpreted flexibly and to take into account the facts and circumstances of each case

to fashion an equitable result.”). If there is a difference, and the Court must conduct a choice of law

analysis, that would make it all the more ill-suited for resolution at the motion to dismiss stage, as

choice of law questions are themselves ill-suited to pre-discovery resolution. *CapLOC LLC v. Liberty

Mut. Ins. Eur. Ltd.*, No. 3:20-CV-3372-B, 2021 WL 2551591, at *1 (N.D. Tex. June 22, 2021) (denying

motion to dismiss because “[t]he motion presents several questions ill-suited for resolution at the

motion-to-dismiss stage, particularly given that the . . . claim may hinge on a choice-of-law issue”).

12.     Assuming no conflicts between the two states' laws, as Rabo does, the Court should dismiss Rabo's *in pari delicto* argument at this time and deny Rabo's Motion. Under Texas law, "even when parties are *in pari delicto*, an exception to the doctrine will sometimes be applied if public policy or the equities demand it." *In re Vantage Benefits Administrators, Inc.*, 2024 WL 3842796, at *27 (citing *Lewis v. Davis*, 199 S.W.2d 146, 151 (1947)). This is because the defense of *in pari delicto* is not for the benefit of Rabo or the Debtors or another joint wrongdoer but rather for the public's benefit. *Id.* (citing *Lewis*, 199 S.W.2d at 151). In *Lewis*, the Texas Supreme Court explained the need to, in each unique case, weigh the policy against a court assisting a wrongdoer against the policy against permitting unjust enrichment of one party (here Rabo) at the expense of another (here the Debtors and their creditors). *Lewis*, 199 S.W.2d at 151. The answer to that question "depends on the peculiar facts and equities of the case." *Id.* "In other words, a policy analysis must occur on a case-by-case basis." *In re Vantage Benefits Administrator*, 2024 WL 3842796, at *27.

13.     "There is often involved in reaching a decision as to granting or withholding relief, the question whether the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of another. The solution of the question depends upon the peculiar facts and equities of the case, and the answer usually given is that which it is thought will better serve public policy. In other words, a policy analysis must occur on a case-by-case basis." *Id.* Such an analysis is not well-suited, if it can be performed at all, at the motion to dismiss stage given that it is highly dependent on the particular facts of each case. *In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2020 WL 4939180, at *13 (Bankr. N.D. Tex. Aug. 24, 2020) (explaining that dismissal of claims because of an affirmative defense at the motion to dismiss state is only appropriate in the rare case when it is established conclusively from the face of the complaint and rejecting the availability of the *in pari delicto* defense as grounds for dismissal under Rule 12(b)); *see also In re Vantage Benefits Administrator*, 2024 WL 3842796, at *28 (finding the defense to be so "intensely factual" that it was inappropriate to resolve *even at summary judgment* because the facts were in dispute).

14.     Moreover, in considering only the undisputed facts at the summary judgment stage, the bankruptcy court in *In re Vantage* found that even if the wrongdoer's acts are imputed to the debtor-

company, the defense would still not bar recovery because the Trustee "is an innocent party seeking recovery from the" defendants "that will benefit innocent creditors," and there was no evidence the Trustee's recovery would benefit the actual wrongdoer. *Id.* at *28. As such, the court there "easily conclude[d] . . . that barring the [t]rustee's tort claims . . . based on *in pari delicto* . . . would **_not_** outweigh the overall policy of not inflicting additional harm on the innocent victims of the . . . scheme." *Id.* **_The bankruptcy court in_ In re Vantage _even went as far as to recommend granting summary judgment in the trustee's favor on the in pari delicto defense even though the trustee had not moved for summary judgment on that defense._** *Id.* The conclusion should be no different here, where the Trustee's recovery will in no way benefit McClain or his personal probate estate, and where the *in pari delicto* defense would further harm innocent creditors by cutting off the Trustee's possible avenues for recovering and distributing estate assets. Accordingly, even if the Court were to reach the merits of *in pari delicto* under Texas law, it should still deny Rabo's Motion.

15.      To be sure, the court in *In re Vantage Benefits Administrator* examined the same argument Rabo makes regarding the Fifth Circuit's dicta in *Jones v. Wells Fargo Bank, N.A.*, that "the Fifth Circuit . . . has acknowledged that *in pari delicto* applies to claims brought by bankruptcy trustees." Br. at 15. ****The court rejected such an argument, pointing out that the dicta in *Jones v. Wells Fargo Bank, N.A.*, merely says that the analysis that a receiver is not subject to the *in pari delicto* defense "might be" different; not that it *is* different. 2024 WL 3842796, at *21-22. Furthermore, the court in *In re Vantage* concluded that even if *in pari delicto* does apply to trustees, under Texas law, that does not bar claims as a matter of law but requires the factually intense, case-by-case analysis to see if *in pari delicto* should be applied to bar the claims, and in situations like those presented by *In re Vantage* and the facts here, *in pari delicto* does not apply to bar the claims. *Id.* at *27-28.

16.      Accordingly, the Court should reject Rabo's argument that *in pari delicto* applies as a matter of law to bar the Trustee's claims. *See also In re Chris Pettit & Associates, P.C.*, 670 B.R. 602, 623-24 (Bankr. W.D. Tex. 2025) ("[T]he Court finds that such a policy analysis cannot be undertaken based on the 12(b)(6) motion . . . . Most other Texas bankruptcy courts generally find *in pari delicto* to not be a proper basis for a 12(b)(6) motion."); *In re Today's Destiny, Inc.*, 388 B.R. 737, 749 (Bankr. S.D. Tex.

2008) (Isgur, J.) (citations omitted) ("*The four corners of the Trustee's complaint affirmatively state that Today's Destiny was engaged in illegal conduct. However, the fact that the Trustee is in pari delicto does not justify 12(b)(6) dismissal.* Under *Lewis*, *in pari delicto* is not an automatic bar. Under *Lewis*, the Court must consider how the facts and equities of the individual case interact with the policy *in pari delicto* was designed to serve . . . . The need to consider the 'peculiar facts and equities' is particularly acute when a defendant is asserting the defense against a Trustee who seeks recovery for the benefit of creditors of a wrongdoer rather than the wrongdoer himself.").

**D.    The Trustee Sufficiently Alleged Rabo's Tortious Conduct Inflicted Substantial Damages on the Debtors.**

17.    Rabo next argues that there is a "fatal flaw" in the Trustee's claims—the Trustee's "failure to allege facts demonstrating that Rabo proximately caused Debtors' damages." Br. at 19. The folly in this argument is easily revealed by consulting other of Rabo's own pleadings. In supporting the Trustee's *Motion to Intervene*, Rabo argued that the investor-creditors' claims against Rabo actually belonged to the Trustee as their purported injuries "flow from Debtors' inability and failure to 'repay' [investors] for funds/investments provided to Debtors." No. 24-02007, ECF No. 187 at 13-14. The Debtors inability to repay tens- if not hundreds-of-millions of dollars of debts is the injury Debtors claim to have suffered because of Rabo's tortious conduct. *See, e.g.*, Sec. Am. Compl. ¶¶ 138-40.

18.    In brief, the Debtors presently owe creditors over $100 million which they cannot repay. The Debtors contend that their debts would be far smaller if Rabo had not committed its tortious acts. *Ergo*, the Debtors have alleged Rabo caused them substantial damages. Accordingly, the Court should dismiss Rabo's argument that the Trustee did not allege damages for the folly that it is.

**E.    The Trustee Sufficiently Pleaded His Knowing Participation Claim.**

19.    Rabo asserts that the Trustee's tort claims should fail because the Trustee has failed to allege that Rabo knew of the schemes and intended to participate in them. Br. at 20-21. Rabo's contention is belied by the Trustee's allegations in the Second Amended Complaint.

20.    To allege a knowing participation claim, the Trustee must plead "(1) the existence of a fiduciary relationship; (2) that the [defendant] knew of the fiduciary relationship; and (3) that the [defendant] was aware that it was participating in the breach of that fiduciary relationship." *7X Cattle Co. LLC v. Brandstadt*, No. 6:22-CV-396-JDK-KNM, 2025 WL 852624, at *13 (E.D. Tex. Feb. 28, 2025), report and recommendation adopted, No. 6:22-CV-396-JDK-KNM, 2025 WL 848446 (E.D. Tex. Mar. 18, 2025) (citations omitted). As Rabo knew McClain was acting as the principal on behalf of the Debtors, the first two elements cannot be credibly contested.

21.    As to the third element, the Trustee alleges that Rabo knew of McClain's schemes given the warning signs and red flags that such schemes were afoot. For example, the Second Amended Complaint alleges that Rabo initially determined the Debtors were not creditworthy because it had insufficient financial records; that the customer relationship manager who was trying to secure the loan for the Debtors was desperate to originate a new loan, having not had one for months; worked to have the initial collateral inspector, Michelle Stockett, minimize her findings that Debtors were unqualified; and expressed anger at the initial denial in the first place and hostility toward those who did not support it; that Rabo ignored numerous red flags, including the fact that McClain had given them incorrect information about who his lenders were, his financial records were non-existent or created years after the fact, and that McClain had never had accurate books and records, among other things. The loan should never have been issued in the first place. Sec. Am. Compl. ¶¶ 56-61.

22.    The Trustee further alleges that the red flags only became ever more obvious and glaring over time, including the fact that the Debtors immediately overdrew their line of credit at Rabo, within just weeks, and continued to overdraw their accounts and exceed their authorized credit limits; Rabo actively worked with McClain to run point on which overdrafts to incur and which checks not to honor; turned in financial statements that were facially suspect given that expenses seemingly could not support the size of the alleged operation; the facilities were far too small to accommodate the purported number of cattle, and that Rabo made numerous site visits throughout the years and would have inevitably seen there were nowhere near as many cattle as purported. *Id.* ¶¶ 46, 65, 67-70. A sophisticated lender like Rabo could not repeatedly look at the Debtors' bank statements and financial

records and miss the lack of payments to employees needed to raise 80,000 cattle, or to transport them across the country, or even feed them. Nor, critically, could Rabo have missed the *absence* of what should have been repeated profitable deposits from the purported buyers of the finished cattle. The only reasonable inference is that Rabo had to have known and did know of the fraud.

23.     Furthermore, Rabo's actions must be considered against its recent corporate knowledge and malfeasance. Rabo was well aware of cattle-based Ponzi schemes, or "ghost" cattle schemes, having been a creditor who was left unpaid when its borrower was separately revealed to have sold $200 million in non-existent cattle to Tyson Foods. Sec. Am. Compl. ¶ 53. Rabo should have known to be aware that the Debtors were exhibiting the very same suspect behavior and investigated it, not blindly funded it. But, Rabo has a demonstrated history of failing to prudently investigate suspicious transactions, having pleaded guilty just 7 years ago to criminal conspiracy to evade and avoid its legal obligations to monitor and investigate suspicious transactions. *Id.* ¶¶ 50-51. And, since then, Rabo has been accused in this very Court of intentionally conspiring with a different debtor-cattle business and its affiliates to defraud the debtor's priority lender and potential banking syndicate partners, including by creating false borrowing base reports inflating the number and size of cattle. *Id.* ¶ 52. And, tellingly, Rabo now stands accused in California state court of knowingly funding another cattle Ponzi-scheme and positioning itself to obtain the greatest recovery as the secured lender before it commenced a receivership action once the scheme came to an end. *Id.* ¶ 53.

24.     The above facts and circumstances at minimum give rise to the plausible inference that Rabo knew of McClain's schemes, or at bare minimum, should have known of the schemes had it taken even the smallest of steps to investigate. That the Court can plausibly infer Rabo's knowledge from these facts and circumstances is sufficient to establish the requisite knowledge to support the Trustee's tort claims at the motion to dismiss stage. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citation omitted) (explaining a claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). Indeed, "[c]ourts have made . . . clear that actual knowledge may be established through circumstantial evidence alone." *7X Cattle Co.*, 2025 WL 852624, at *13 (citation omitted).

25.    Rabo's citation to *In re Chris Pettit & Associates* as precedent that the above allegations are insufficient to plead a knowing participation claim is unavailing. Br. at 20. The court there held that Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for fraud applied to the knowing participation claim. *See In re Chris Pettit & Associates, P.C.*, 670 B.R. at 628 (applying the 9(b) pleading standard to the knowing participation claim). But the Trustee's claim for knowing participation in McClain's breaches of fiduciary duties is not a fraud claim subject to Rule 9(b), and the holding in *In re Chris Pettit & Assocs.* is in error. Regardless, the Trustee did not merely allege Rabo should have known of the breaches but rather alleged that Rabo did in fact know of the breaches of fiduciary duties because it can be reasonably inferred that Rabo knew of the fraudulent schemes given how blatantly obvious it was to Rabo, as suggested by their internal communications, among other things. *E.g.*, Sec. Am. Compl. ¶¶ 46, 64-61, 65, 67-70 and 125-26. Even if the Rule 9(b) standard applies, the Trustee has more than met it, as the Trustee's Second Amended Complaint sets forth the specific allegations giving rise to the inference that Rabo knew fraud was afoot and the specific actions Rabo took, like continuing to feed the fraud with new loans, that contributed to and facilitated the fraud. Accordingly, the Trustee sufficiently pleaded a knowing participation claim against Rabo, and that claim should not be dismissed at the 12(b)(6) stage. *See Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641-N, 2014 WL 12572881, at *9 (N.D. Tex. Dec. 17, 2014) ("When combined with the multitude of factual allegations Plaintiffs make concerning Loumiet's willing participation in assisting Stanford's operations, which were consistently flagged as unscrupulous, a reasonable inference arises that Loumiet, and thus Greenberg, knew of Stanford's and others' breaches of fiduciary duties to the Stanford entities.").

## F.    The Trustee Sufficiently Pleaded His Breach of Fiduciary Duty Claim.

26.    Rabo next argues that the Trustee failed to plead a breach of fiduciary duty claim against Rabo, asserting that Rabo did not owe Debtors a fiduciary duty as a matter of law, Br. at 21-24, and that even if Rabo owed fiduciary duties, it did not breach them, Br. at 24. Both of these assertions are unavailing because they are contradicted by applicable law and the Trustee's allegations.

27.    As to the existence of Rabo's fiduciary duties to Debtors, the Trustee pleaded sufficient facts to give rise to such duties to support the Trustee's breach of fiduciary duty claim. As Rabo notes, where a lender or bank exercises excessive control over a business, that lender owes fiduciary duties to its borrower(s). Br. at 23. Here, the Amended Complaint alleges that Rabo effectively controlled the Debtors by consolidating and owning nearly all of the Debtors' debt, giving Rabo sole control over the future viability of the Debtors. This control manifested itself and became undeniable once Rabo forced McClain to resign from management of his own companies and to hire Rabo's handpicked restructuring officer instead. Sec. Am. Compl. ¶ 132. Rabo counters that it only forced McClain out of three of his own companies and replaced him with its handpicked chief restructuring officer at the tail end of McClain's fraud. Br. at 23. But the timing of when Rabo exercised its control over the Debtors to force McClain out is not the relevant inquiry. The relevant inquiry is whether Rabo had such control in the first place. And the fact that it could force McClain out of his own companies demonstrates that Rabo did indeed wield such power and control over Debtors. That is enough to give rise to a duty. *Beaumont Lamar Apartments, LLC v. Wallis Bank*, No. 4:23-CV-00341-O, 2024 WL 455343, at *6 (N.D. Tex. Feb. 6, 2024) (denying defendant bank's motion for summary judgment on a breach of fiduciary duty claim, finding Plaintiff had created a triable issue as to whether the bank had demonstrated excessive control over plaintiff that would give rise to a fiduciary relationship).

28.    Likewise, Rabo's claim that it did not breach any fiduciary duties that may have existed is belied by the Trustee's allegations. The Trustee does not assert that merely loaning money to the Debtors, in isolation, constitutes a breach. Rather, the Trustee alleged that Rabo continued to cover the Debtors' overdrafts and to lend Debtors millions of more dollars, fueling the fraud and exploding Debtors' debts, despite all the indications that Rabo must have known of the fraud. As a basic matter, Rabo knew the Debtors' debt was rapidly and paradoxically increasing even though the Debtors should have been both profitable and cash flow positive if McClain's representations were true. Yet, Rabo continued to double down on its loans despite the exact opposite being true—the Debtors were not cash flow positive and were constantly accruing more debt and overdrafting their accounts. *See*

Sec. Am. Compl. ¶¶ 135-36. Facilitating the Debtors' journey into nine-figure indebtedness is a breach of Rabo's fiduciary duties. It is impossible to escape the fact that the more money a Ponzi scheme gobbles up, the greater the damage, in both amount of damages and victims. Here, it was not beneficial to extend many more loans, and cover many more overdrafts with unauthorized extensions of credit, to the Debtors when there were no or minimal operations generating profits with which to repay those loans. The Debtors incurred tens of millions of dollars in additional debt it could not possibly repay and would not have been able to incur but for Rabo's opening the floodgates. The Trustee sufficiently alleged the existence of Rabo's fiduciary duties, its breaches of them, and damage to the Debtors caused by Rabo's misconduct.

## G.    The Trustee Sufficiently Pleaded His Civil Conspiracy Claim.

29.    Rabo next asserts that the Trustee's civil conspiracy claim against Rabo fails because the Trustee's allegations did not meet the heightened pleading standards of Rule 9(b). Br. at 25. But, as before, the Trustee's civil conspiracy claim, which is not premised on an underlying tort of fraud but rather the tort of breach of fiduciary duty, is not subject to Rule 9(b). *See Neukranz v. Conestoga Settlement Services*, LLC, No. 3:19-CV-1681-L, 2022 WL 19518462, at *16 (N.D. Tex. Nov. 23, 2022), report and recommendation adopted sub nom. *Neukranz v. Conestoga Settlement, LLC*, No. 3:19-CV-1681-L, 2023 WL 2555551 (N.D. Tex. Mar. 16, 2023) (explaining 9(b) applied to the conspiracy claim because it was based on a fraud claim, and since the fraud claim failed to meet 9(b) pleading standards, the conspiracy claim also failed). Claims for breaches of fiduciary duty are not subject to Rule 9(b), and therefore, neither is the Trustee's civil conspiracy claim. And the Trustee sufficiently alleges that claim.

30.    Specifically, the Trustee alleges that Rabo, its codefendants, and McClain conspired together to allow McClain to kite checks, for the purpose (*i.e.*, object) of covering expenses like payments owed to old investors. Rabo did this by promising to grant excessive, unauthorized extensions of credit to cover overdrafts, instructing Mechanics and CFSB as to whether to process transactions that would overdraw the account, and otherwise ignoring and concealing the obvious

signs of fraud to keep investor payments flowing to the Debtors, who could then repay its debts to Defendants. Sec. Am. Compl. ¶¶ 155-57. That alone is enough, considering the check kite alone enabled McClain to further indebt the Debtors to the tune of millions of dollars.

31.     Worse, Rabo knew of the cash flow problems necessitating the kite, which combined with the other obvious red flags, made clear to Rabo that the kite furthered McClain's Ponzi scheme. Rabo knew the Debtors needed the float *and* additional loans to sustain operations. And Rabo knew that permitting the kite to continue would sustain and perpetuate the Debtors' purported operations and thus the Ponzi scheme. Rabo, through its customer relationship manager Chip Lawson, took point on running the scheme amongst Defendants. Lawson had self interests motivating him to partake in the fraud, including the preservation of his job, and as the loan grew bigger, better compensation. Rabo as an entity wanted to expand and occupy a greater segment of the agribusinesses lending space.

32.     That McClain, Rabo, CFSB, HTLF, and Mechanics conspired together to further the scheme is evident from the fact that four separate, sophisticated banks and lenders for years ignored countless red flags, massive overdrafts, and exploding debts when McClain's business models should have generated substantial profits and excess cash. Though this alone is enough to infer a meeting of the minds, the Trustee sets forth at least eleven overt acts that further evidence a meeting of the minds, seven of which specifically identify the acts taken by Rabo. Sec. Am. Compl. at ¶ 154. These allegations establish the "meeting of the minds" and "overt acts" elements.

33.     Finally, there was foreseeable damage to the Debtors, *i.e.*, the Debtors incurred tens of millions of dollars of debt which they could not repay. Rabo's enabling of an illegal check kite scheme and an illegal Ponzi scheme inherently damaged the Debtors, including because the Debtors would be unable to repay their creditors. Sec. Am. Compl. ¶ 155-57. As such, the Trustee alleged facts sufficient to establish each element of his conspiracy claim against Rabo.

## H.    The Trustee Sufficiently Pleaded His Professional Negligence Claim.

34.     As with the Trustee's breach of fiduciary duty claim, Rabo argues the Trustee's negligence claim fails because the Trustee failed to establish Rabo owed a duty of care to the Debtors.

Br. at 26-27. Rabo's argument regarding the existence of a duty for the Trustee's negligence claim is as equally unavailing as its argument in the fiduciary duty context.

35.     First, as Rabo owed the Debtors fiduciary duties based on the extreme level of control Rabo wielded over Debtors, Rabo owed not just a duty of care to Debtors but also fiduciary duties. It is nonsensical to argue that though Rabo had fiduciary duties, it did not owe Debtors a duty of care.

36.     Second, CFSB, Mechanics Bank, and Rabo owed a duty of ordinary care to Debtors at all relevant times. "The Uniform Commercial Code (the UCC) … regulates a bank's relationship with its Texas customers, and imposes a duty of ordinary care on a bank with regard to various situations, such as" bank deposits and collections, fund transfers, and negotiable instruments. *Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856, 873 n.5 (Tex. App.—El Paso 2021, no pet.) (citations omitted). Because Debtors were customers of Defendants, Texas law imposes a duty of due care on Defendants in their dealings with Debtors.

37.     Third, Rabo's citation to an opinion that was reversed in part to argue that the UCC does not impose duties that can independently give rise to a negligence claim is misguided. Br. at 27 (citing *Apache Corp. v. Dynegy Midstream Services, Ltd. Partnership*, 214 SW3d 554, 563 (Tex. Ct. App. 2006), rev'd in part on other grounds sub nom. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164 (Tex. 2009). There, the Court was not discussing a duty of ordinary care. Rather, it was discussing duties of good faith and fair dealing. They are not the same. Accordingly, *Apache Corp.* does not contravene or repudiate *Strobach*, which noted the imposition of a duty of care.

38.     Fourth, while Rabo argues *Strobach* only applies to the Texas UCC and that the Texas UCC does not apply to Rabo other than to Rabo's security interests in the Debtors' assets, Br. at 26, that is putting the choice-of-law cart before the choice-of-law horse. As explained above, choice-of-law analyses are generally not ripe for resolution on a 12(b)(6) motion to dismiss. *CapLOC LLC v. Liberty Mut. Ins. Eur. Ltd.*, 2021 WL 2551591, at *1. Moreover, Rabo did not provide case law suggesting that an equivalent duty is not imposed by the UCC under Iowa law. Accordingly, if the Court is to resolve this issue at this stage, it must assume there is no difference between Texas and

Iowa law. Since Texas law imposes a duty of care on Rabo, the Trustee sufficiently pleaded a duty to support its negligence claim against Rabo.

## I.    The Trustee Sufficiently Alleged a Money Had and Received Claim Against Rabo.

39.     Next, Rabo argues that the Trustee's money had and received claim should be dismissed because (i) Rabo "had no 'profit'"; (ii) all other claims fail; (iii) Rabo had no duty to Debtors; (iv) Rabo did not breach any duties; and (v) Rabo caused no damages. Br. at 28. But these reasons are unavailing, as set forth above.

40.     First, Rabo's argument that it "had no profit" is a factual issue not ripe for resolution at the 12(b)(6) stage. The Trustee alleges Rabo continued the schemes so it could continue to profit. *E.g.*, Sec. Am. Compl. ¶ 109, n.12. The Court, at this stage, must assume the Trustee's allegations are true; it cannot resolve this factual dispute in Rabo's favor on a motion to dismiss, regardless of whether Rabo asserted in proofs of claim that it lost money. Those proofs of claim are subject to the claims administration process and have not been allowed or deemed true by the Trustee.

41.     Second, as set forth above, both Texas law and Rabo's extreme control over the Debtors imposed duties of care and fiduciary duties on Rabo, which it owed to the Debtors. And, as set forth above and in the Trustee's complaint, Rabo breached those duties, causing Debtors damage.

42.     Third, Texas courts have made clear money had and received is not subject to dismissal pursuant to the economic loss rule at the motion to dismiss stage, as the claim is intended to be a "catch all" claim to remediate the unjust enrichment of a party. *Villarreal v. First Presidio Bank*, 283 F. Supp. 3d 548, 554-55 (W.D. Tex. 2017) (citing *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004)) (listing cases holding that a claim for money had and received were not preempted by the UCC and explaining that "*a cause of action for money had and received is less restricted and fettered by technical rules and formalities than any other form of action*"). Here, it is inequitable for Rabo, who is the sole reason the Ponzi scheme grew so large, to participate in any recovery to the detriment of other innocent creditors. The Trustee's money had and received claim is therefore plausible and should not be dismissed.

**J.      The Trustee Can Recover Punitive Damages.**

43.      Rabo seeks to dismiss the Trustee's punitive damages claim because it is derivative of the Trustee's tort claims, which Rabo argues should be dismissed. Br. at 28-29. Since the tort claims should not be dismissed, the Trustee sufficiently pleaded his entitlement to punitive damages.

**K.      The Trustee Sufficiently Pleaded Its "Core" Bankruptcy Claims.**

44.      In addition to seeking the transfer or dismissal of the Trustee's tort claims, Rabo asserts the Trustee's core bankruptcy claims against Rabo should be dismissed. Br. at 29-39. But the Trustee sufficiently pleaded each of its core claims.

**1)      The Trustee's sufficiently pleaded a request for the Court to declare the extent of Rabo's lien against property in the estate.**

45.      Rabo argues that it has a perfected "all assets" lien against the Debtors' personal property and further that it took action to take ownership over the Debtors' depository accounts. Br. at 29-30. While Rabo did conspicuously extract a signed Deposit Account Control Agreement ("DACA") from McClain in the days before bankruptcy, the DACA is and should be avoided as a preferential and fraudulent transfer. Sec. Am. Compl. at Count VII.

46.      Since the DACA should be avoided and, at this stage, considered ineffective, Rabo did not have a perfected security interest in the Debtors' cash as of the Petition Date. Accordingly, it does not have a perfected lien over the property, *i.e.*, cash, underlying the Trustee's claims. The Trustee's request that the Court determine the validity of Rabo's lien should therefore not be dismissed.

**2)      The Trustee's Avoidance Claims Are Viable and Should Not Be Dismissed.**

47.      Rabo next alleges that the Trustee's avoidance claims "fail to state a claim against Rabo upon which relief can be granted." Br. at 31. In support, Rabo alleges that the Trustee's claims to avoid the release in the April 2023 forbearance agreement is time barred because the trustee only first specifically sought its avoidance in its Second Amended Complaint, which was more than two years after the Petition Date. *Id.* at 31. But the Trustee's amendments relate back to the date of the original complaint, which was filed within the two year period afforded by the Bankruptcy Code and is

therefore not time barred. *In re Am. Hous. Found.*, 543 B.R. 245, 253 (Bankr. N.D. Tex. 2015) ("An out-of-time claim raised by an amended complaint can, however, relate back to a prior, original complaint if allowed by applicable law, or if the claim arises out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading. If the late-filed claims of an amended complaint do properly relate back, dismissal is inappropriate." (cleaned up)).

48.   Rabo next posits that the Trustee's assertion of the Debtors' preference claims against Rabo in one breath instead of three somehow renders the claim improper. Br. at 31-32. This is not so. Rabo's own records are the source for the list of preferential transactions that Trustee seeks to claw back. Rabo knows full well which transfer relates to which Debtor. The Trustee need not set forth its claims in excruciating detail; the pleading standards require far less. Rabo admits the Trustee identified the alleged preferential transfers. Br. at 31 (citing to the tables and exhibits reflecting the transactions in the complaint). Rabo can easily ascertain which transfer relates to which Debtor. Any suggestion that Rabo cannot understand what transfers it is being sued for is disingenuous.

49.   Next, Rabo says the Trustee must anticipate Rabo's defenses, which it claims include the assertion that Rabo's credit "advances" constitute new value. Br. at 32. But a plaintiff is not required to "fully anticipate [defenses] in his complaint at the risk of dismissal under Rule 12." *Schultea v. Wood*, 47 F.3d 1427, 1430 (5th Cir. 1995) (en banc); *see also Nobre on behalf of K.M.C. v. Louisiana Dep't of Pub. Safety*, 935 F.3d 437, 442 & n.20 (5th Cir. 2019) ("A plaintiff is not required to anticipate or overcome affirmative defenses, such as . . . limitations, in the complaint."). Regardless, Rabo's defense that the transactions were all "ordinary course" is no defense at all. *See In re Ramirez Rodriguez*, 209 B.R. 424, 432 (Bankr. S.D. Tex. 1997) (citations omitted) ("The ordinary course of business defense set forth in 11 U.S.C. § 547(c)(2) does not apply to transfers in furtherance of a Ponzi scheme.").

50.   Rabo also reasserts its claim that it had a blanket, all-assets lien on the Debtors' personal property as a basis for dismissing the preferential transfers because, allegedly, it had a priority security interest in the cash it received. Br. at 32. But this argument fails and should be discarded.

51.   Pursuant to Texas Business and Commerce Code section 9-314(a) (as well as other states' UCC statutes), a secured lender can only obtain a perfected lien on funds in a borrower's deposit

account (and certain other property) if the secured lender has "control" over the deposit account. Pursuant to Texas Business and Commerce Code section 9-104(a) , a secured party can only establish "control" over the deposit account if: (1) the borrower maintains the deposit account with the secured lender; (2) the borrower, secured lender, and depository bank execute an agreement commonly referred to as a "DACA" (Deposit Account Control Agreement), or (3) the secured party becomes the owner of the deposit account.

52.      Here, the Debtors maintained their deposit accounts with Mechanics Bank and CFSB, thus the first scenario cannot be satisfied.  Rabo did not obtain the executed DACA until March 2023 (shortly before the bankruptcy and during the preference period), which DACA should be avoided. Rabo never took any action to become the owner of the Debtors' deposit accounts.

53.      Thus, for all relevant times up to March 2023, Rabo did not have a perfected blanket lien on the funds in the Debtors' deposit accounts. This is significant in several respects.  First, the grant of control and a perfected lien on the Debtors' funds with Mechanics Bank under the DACA agreement was both a preference and fraudulent transfer, as discussed below. Second, for all time periods that Rabo did not have a DACA in place, whether that be prior to its execution or following its avoidance, all payments to Rabo from the Mechanics Bank Accounts (and any from CFSB) were from otherwise unencumbered funds.

54.      Rabo argues that its failure to have an enforceable lien on the Debtors' deposit accounts is immaterial because it had a blanket lien on other property of the Debtors, and therefore it automatically held a lien on the funds in the Debtors' bank accounts as the proceeds of other Rabo collateral.  This is incorrect for several reasons.  First, Rabo does not "automatically" obtain a lien on the Debtors' funds as the claimed proceeds of other property.  Under Texas Business and Commerce Code section 9.315(b), Rabo bears the burden to trace each and every dollar in the bank accounts to encumbered collateral, and any funds that are commingled and incapable of tracing are considered unencumbered cash.  Rabo cannot, and certainly has not at this stage, met this burden to trace the cash. *See, e.g., Faulkner v. Ford Motor Credit Co. (In re Reagor-Dykes Motors, LP*), 18-50214-RLJ-11, 2022 WL 2046144, at *10 (Bankr. N.D. Tex. Jun 03, 2022) (citation omitted) ("Indeed, money in

commingled bank accounts under debtor's control presumptively constitutes property of the debtor's estate.”). This is largely because while some of the Debtors' funds were the proceeds of, for instance, the Debtors' unencumbered cattle, Rabo has not and cannot establish that the funds obtained by the Debtors from over 100 “investors” and “partners” as part of the Debtors' fraudulent cattle investment scheme are funds that would otherwise be subject to Rabo's asserted lien. Thus, Rabo will be unable to trace the funds in the Debtors' otherwise unencumbered deposit accounts to a source of Rabo's collateral, rendering the commingled funds unencumbered.

55. Because Rabo did not have a lien on the Debtors' deposit accounts, Rabo is subject to fraudulent transfer and preference liability for all payments it received from those otherwise unencumbered accounts and applied to its under-secured loan. *See Faulkner v. Ford Motor Credit Co. (In re Reagor-Dykes Motors, LP),* 18-50214-RLJ-11, Adversary 20-05005 (Bankr. N.D. Tex. Jun 03, 2022) (“[A] security interest attaches to the proceeds of commingled collateral only "to the extent that the secured party identifies the proceeds by a method of tracing.”).

56. Rabo attempts to twist the Trustee's statements regarding the source of the Debtors' funds into a suggestion that Rabo was paid with funds from a third party (*i.e.* investors). The Trustee does not allege that the investors paid Rabo. Rather, the source of the Debtors' funds is critical to the issue of the extent of Rabo's lien on the subject funds. A considerable amount of funds of the Debtors that were used to pay Rabo were commingled funds raised from over 100 investors/partners rather than, for example, funds from items subject to Rabo's security interest, like inventory or equipment. Each and every payment from the Debtors to Rabo were from the Debtors' funds at either Mechanics Bank or CFSB. Because the accounts were not subject to Rabo's asserted lien on deposit accounts (prior to the DACA and after it is avoided as a preference) and Rabo cannot trace the funds to its other collateral, Rabo is liable for all payments received from those accounts as a preference or fraudulent transfer. Contrary to Rabo's suggestion that the Trustee must prove “every nickel” came from investor funds, the burden is on Rabo to trace how those funds are proceeds of its collateral, or otherwise commingled funds result in them being unencumbered and not subject to Rabo's lien.

57.    As the source of great harm to the Debtors' creditors, Rabo should be held to account. As the Trustee has properly alleged numerous bankruptcy and state law claims against Rabo, Rabo's Motion should be denied.

### 3)    The Trustee Sufficiently Pleaded Fraudulent Transfer Claims.

58.    Rabo next argues the Trustee has failed to plead actual or constructive fraud in support of its fraudulent transfer claims. Br. at 33-34. Rabo asserts the Trustee is not entitled to a Ponzi scheme presumption of fraud for its actual fraudulent transfer claims. First, Rabo argues the presumption is inapplicable based on a distinction Rabo invented between McClain and the Debtors. The Trustee makes no such distinction, and such argument should be disregarded. Second, Rabo argues the presumption does not apply because Rabo was not an investor. Br. at 34. But that argument also fails.

59.    The Trustee indisputably pleaded that McClain operated a Ponzi scheme through Debtors, whereby McClain promised to sell large amounts of fictional cattle to investors in return for guaranteed profits. Those investors paid the Debtors large sums of cash by check, wire, and other methods, to purchase the Debtors' fictitious cattle based on his promises that the investors would be repaid within ninety days after the cattle were fattened and sold. Because McClain never actually purchased ninety-plus percent of the cattle that were purportedly sold to his investors, there were no sale proceeds from which Debtors could repay investors. McClain therefore operated a massive check kite and solicited countless new investors, who provided the cash that McClain needed to pay off his preexisting investors. *E.g.*, Sec. Am. Compl. ¶¶ 19–45, 110.

60.    That set of facts unquestionably constitutes a Ponzi or Ponzi-like scheme entitled to a presumption of fraud because each constituent transfer was made for the purpose of concealing the Debtors' insolvency from then-unpaid investor-creditors. As a matter of law, all transfers made in furtherance of a Ponzi or Ponzi-like scheme (such as McClain's failed venture) cannot be in exchange for reasonably equivalent value. See *Faulkner v. AimBank (In re Reagor-Dykes Motors, LP)*, No. 20-05039, 2021 WL 1219537, at *9–10 (Bankr. N.D. Tex. Mar 30, 2021) (holding that a complaint did not need to allege badges of fraud, or that transfers were not for reasonably equivalent value, because the

transfers were part of a Ponzi-like check kiting scheme that permitted an inference of fraudulent intent at the motion to dismiss stage and therefore denying a motion to dismiss).

61.    Rabo's citation to *In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2022 WL 2046144, at *8 (Bankr. N.D. Tex. June 3, 2022), for the proposition that courts have questioned whether the Ponzi-scheme presumption applies to lenders is inapposite. There, the court found the debtors were not operating a classic Ponzi scheme and there was no presumption to be had. Nevertheless, the Court found the complaint was "replete with the circumstantial indicators of fraud," including insolvency, an illegal course of conduct, and fraudulent acts, which alone could support the fraudulent transfer claims. *Id.* at *8-9 (denying summary judgment). The same is true of the Trustee's Second Amended Complaint here.

62.    In concluding this part of his Objection, the Trustee notes that Judge Jones already rejected Mechanics' arguments about badges of fraud, reasonably equivalent value, and the Ponzi scheme presumption in a sister adversary proceeding in which the Trustee intervened. On January 30, 2025, Judge Jones denied Mechanics' motion to stay discovery pending resolution of Mechanics' motion to dismiss the investor-plaintiff and intervenors' claims. That motion to stay discovery contended that the investor-plaintiff and intervenors' claims did not satisfy Rule 9(b)'s heightened pleading standard for fraud. *See* No. 24-02007, ECF No. 92, at 1, 5–6. In his order denying the motion to stay, Judge Jones noted that "Ponzi and kiting schemes—this very action—allow for a presumption of fraud." *Id.* at 6 (*citing Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013) ("This court has held that transfers from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, 'as a matter of law, insolvent from its inception.'"); *Sec. & Exch. Comm'n v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) ("In this circuit, proving that [the transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."); *In re Texas E&P Operating, Inc.*, No. 17-34386-SGJ-7, 2022 WL 2719472, at *9 (Bankr. N.D. Tex. July 13, 2022) ("A trustee can avoid the burden of proving actual fraudulent intent—or laboriously establishing different badges of fraud—in one situation identified by the Fifth Circuit: when there was a Ponzi scheme (the 'Ponzi-Scheme Presumption').")). The same legal principle and analysis controls here. Accordingly, the Trustee sufficiently pleaded claims for fraudulent transfers.

**4)      The Trustee Sufficiently Pleaded for Disallowance of Rabo's Claim.**

63.      Rabo next contends that the Trustee has failed to state a claim for disallowance of Rabo's proof of claim, arguing that it is a commercial lender who provided commercial loans to Debtors, implying that this somehow grants it immunity from suit. Br. at 36. There is no such rule.

64.      Per the plain terms of the Bankruptcy Code, if Rabo is liable for fraudulent transfers or preferential payments, its claim must be disallowed to the extent of Rabo's liability (i.e., effectively offset against it). As the Trustee has alleged plausible claims against Rabo, as set forth above, the Court should not dismiss the Trustee's disallowance claim based on those plausible fraudulent transfer claims. Rabo similarly ignores the body of law in Ponzi-scheme cases which limits Rabo's recovery to losses of only principal amounts, requiring disallowance of Rabo's claim to the extent it seeks more than that. The Trustee's disallowance claim is therefore plausible and should not be dismissed.

**5)      The Trustee Sufficiently Alleged an Equitable Subordination Claim.**

65.      In its final stab, Rabo challenges the Trustee's equitable subordination claim on multiple grounds, all of which, however, fail. First, Rabo argues that it was not unfairly advantaged by its receipt of the security interests because Rabo "was defrauded out of over $50 million." Br. at 37. Whether and how much Rabo profited from the loans, however, is a fact issue not susceptible to resolution at this motion to dismiss stage. Moreover, whether Rabo did lose some money does not mean it was not unfairly advantaged—without the purported security interest, upon which Rabo seeks to retain ill-gotten funds, Rabo would have incurred even greater alleged losses. Either way, Rabo has been unfairly advantaged.

66.      Second, Rabo claims the Trustee has failed to plead a provable injury to creditors occurred because of Rabo's security interest even though Rabo also quotes the Trustee's allegation that it "resulted in injury to the Debtors' other creditors." Br. at 37. In addition to ignoring its own quotation from the complaint, Rabo also ignores that the Trustee alleges harm to the creditors throughout the complaint—without Rabo's unrestrained lending to further the illicit activities, the creditors might not have been injured at all and certainly not as much. If Rabo's security agreement is

not subordinated, these unsecured creditors will be left with a smaller recovery, if any at all.

67.    Third, Rabo argues that under Fifth Circuit precedent, the Trustee's equitable subordination claim must fail because it does not fit within one of the recognized categories in which equitable subordination has been held to apply. Br. at 38. But, as Rabo notes, those categories include "when a fiduciary of the debtor misuses his position to the disadvantage of other creditors" and "when a third-party controls the debtor to the disadvantage of other creditors." *Id.* For the reasons explained above, the Trustee has alleged a plausible breach of fiduciary duty claim against Rabo, based on Rabo's excessive control of the Debtors (reflected by, among other things, its ability to force McClain out of the very businesses he started and owned. And Rabo's breaches, as explained above, damages other, innocent creditors, who are now left emptyhanded and in a disadvantaged position if Rabo's fraudulently obtained security interests are not subordinated.

68.    Rabo should not be permitted to escape liability for the over $100 million in harms it has caused creditors by enabling and facilitating McClain's schemes. Rabo is not an innocent lender, but rather a co-conspirator. Rabo knew or should have known that McClain, who could not prepare basic accounting documentation for a single month of operations or provide a single, legitimate, verifiable yard sheet over the course of five years, was not running a legitimate $1 billion in annual revenue cattle feeding business. Rabo caused immense damages and should pay the consequences. The Trustee has sufficiently pleaded plausible claims against Rabo. Rabo's Motion should be denied.

### III.    <u>CONCLUSION</u>

For the reasons set forth above, the Trustee respectfully requests that the Court:

- Deny Rabo's Motion on the merits in its entirety; or, alternatively, grant the Trustee leave to amend the complaint to address any sustained deficiencies; and

- Grant such other and further relief to which the Trustee is legally or equitably entitled.

Respectfully submitted,

*/s/ Alan Dabdoub*
Alan Dabdoub
State Bar No. 24056836
adabdoub@lynnllp.com
Steven G. Gersten
State Bar No. 24087579
sgersten@lynnllp.com
Farsheed Fozouni
State Bar No. 24097705
ffozouni@lynnllp.com
Campbell Sode
State Nar No. 24134507
csode@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:    214-981-3800
Facsimile:    214-981-3839

*/s/ Hudson M. Jobe*
Hudson M. Jobe
Texas Bar No. 24041189
**JOBE LAW PLLC**
6060 North Central Expressway, Suite 500
Dallas, Texas 75206
(214) 807-0563
hjobe@jobelawpllc.com

**SPECIAL COUNSEL TO THE TRUSTEE**

### CERTIFICATE OF SERVICE

I hereby certify that, on September 4, 2025, a true and correct copy of the foregoing was served via the Court's ECF system on all parties that have appeared and requested notice via the Court's ECF system.

*/s/ Alan Dabdoub*
Alan Dabdoub